UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| MAGNOLIA ISLAND PLANTATION L.L.C. and BARBARA MARIE CAREY LOLLAR | § § § | CIVIL ACTION NO: 5:18-cv-01526 |
| Plaintiffs | § § | |
| VS | § § | CHIEF JUDGE S. MAURICE HICKS, JR. |
| LUCKY FAMILY, L.L.C., W.A. LUCKY, III, and BOSSIER PARISH SHERIFF JULIAN C. WHITTINGTON | § § § § | |
| | § | MAGISTRATE JUDGE KAREN HAYES |
| Defendants | § | Jury Trial Demanded |

**BARBARA LOLLAR'S MEMORANDUM IN SUPPORT OF MOTION
TO COMPEL PRODUCTION OF COMMUNICATIONS BETWEEN
W.A. LUCKY, III AND LUCKY FAMILY, L.L.C.**

RESPECTFULLY SUBMITTED:

**DAVIDSON SUMMERS, APLC**
Randall S. Davidson, LSBA No. 4715, TA
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA No. 34947
Harold R. Bicknell, III, LSBA 36801
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342; Fax: (318) 226-0168

COUNSEL FOR BARBARA LOLLAR

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... iii

I.      Overview ............................................................................................................1

II.     Discovery Requests at Issue and Efforts at Resolution ....................................7

        A.      Discovery to W.A. Lucky, III and Response ..........................................7

        B.      Efforts toward Resolution ......................................................................9

III.    Law ..................................................................................................................10

        A.      Discovery in General ...........................................................................10

        B.      Work Product Doctrine ........................................................................11

        C.      Common Interest Doctrine ...................................................................13

        D.      Crime-Fraud Exception to Assertions of Work-Product Doctrine
                Or Attorney-Client Privilege ...............................................................15

IV.     Communications at Issue in Privilege Log and Argument .............................15

        A.      10/23/18 Emails ....................................................................................16

        B.      10/24/18 Emails ....................................................................................17

        C.      Multiple Entries Regarding the LLC's Note Collection .......................18

V.      CONCLUSION ................................................................................................22

CERTIFICATE OF SERVICE ....................................................................................23

# TABLE OF AUTHORITIES

PAGES

## STATUTES:

Federal Rule of Civil Procedure 26(b)............................................................10, 11, 12, 14, 19, 20

La. R.S. 13:4365 ...............................................................................................................................3

Louisiana Code of Evidence art 506 ................................................................................................7

## CASES:

*In re Auclair,* 961 F.2d 65, 70 (5th Cir. 1992)................................................................................13

*In re Burlington N., Inc.,* 822 F.2d 518, 524 (5th Cir. 1987), ........................................................15

*Caruso v. Coleman Co.,* No. 93-cv-9733, 1995 W 384602, at *1 (E.D. Pa. June 22, 1995)........11

*D'Ippolito v. Cities Serv. Co.,* 39 F.R.D. 610 (S.D.N.Y. 1965) .............................................11, 20

*Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir. 1970) ...............................................................14

*In re Grand Jury Subpoena,* 419 F.3d 329, 335 (5th Cir. 2005) ...................................................15

*In re Grand Jury Subpoenas,* 561 F.3d 408, 411 (5th Cir. 2009)..................................................15

*Gulf Islands Leasing, Inc. v. Bombarder Capital, Inc.,*
215 F.R.D. 466, 471 (S.D.N.Y. 2003) ............................................................................................14

*In re Hardwood P-G, Inc.,* 403 B.R. 445, 462-64 (Bankr. W.D. Tex. 2009)................................20

*Hickman v. Taylor,* 329 U.S. 495, 507-508, 67 S.Ct. 385, 91 L. Ed. 451 (1947).........................10

*Hodges, Grant & Kaufmann v. U.S. Government, Dept. of the Treasury, I.R.S.,*
768 F.2d 719, 721 (5th Cir. 1985) ...........................................................................................11, 20

*In re International Systems & Controls Corporation Securities Litigation,*
693 F.2d 1235, 1242 (5th Cir. 1982) ..............................................................................................15

*In re LTV Securities Litigation,* 89 F.R.D. 595, 604 (1981)...............................................7, 13, 14

*Lugosch v. Congel,* 219 F.R.D. 220 (N.D. N.Y. 2003).......................................................13, 19, 20

*Mack Energy Co. v. Red Stick Energy, L.L.C.,* No. CV 16-1696,
2019 WL 4752110, at *6 (W.D. La. Sept. 27, 2019 ......................................................................14

*McCook Metals, LLC v. Alcoa, Inc.,* 192 F.R.D. 242, 260 (N.D. Ill. 2000) ...................................12

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.l2d 1482, 1485 (5th Cir. 1990) ......22

*Mims*, 230 F.R.D. at 484 ............................................................................................................12

*Navigant Consulting, Inc. v. Wilkinson,* 220 F.R.D. 467, 473 (N.D. Tx. 2004).....................11, 12

*North River Ins. Co. v. Columbia Gas Co.,* 1995 WL 5792, at *3 (S.D.N.Y. Jan. 5, 1995) .........15

*Robinson v. Texas Auto Dealers Ass's,* 214 F.R.D. 432, 443-44 (E.D. Tex. 2003)
*vacated in part sub nom. In re Texas Auto. Dealers Assn.,* No. 03-40860, 2003
WL 21911333 (5th Cir. July 25, 2003).............................................................................12, 13, 19

*In re Santa Fe Int'l Corp.,* 272 F.3d 705, 710-13 (5th Cir. 2001) ...............................11, 12, 14, 20

*SR Intern. Business Ins. Co. Ltd. V. World Trade Center Properties, LLC,*
2002 WL 1334821 (S.D.N.Y.)................................................................................. 12, 20, Fn. 21

*Stanley Works v. Haeger Potteries, Inc.,* (1964, DC Ill) 35 FRD 551...........................................12

*State of Me. V. U.D. Dep't of the Interior,* 298 F.3d 60, 69 (1st Cir. 2002)...................................12

*United States v. Am. Tel. & Tel. Co.,* 642 F.2d 1285 (1298 (D.C. Cir. 1980) ........................13, 20

*United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir. 1982) .................................................12

*Upjohn Co. v. United States,* 449 U.S. 393, 400,
101 S. Ct. 677, 688, 66 L. Ed. 2d 584 (1981) ............................................................................11

**BARBARA LOLLAR'S MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL PRODUCTION OF COMMUNICATIONS BETWEEN
W.A. LUCKY, III AND LUCKY FAMILY, L.L.C.**

**I.**  **Overview:**

Barbara Lollar owned a 1.7-million-dollar promissory note (the "Note")[1], which was seized on behalf of W. A. Lucky, III. After seizure, the Note was sold at a Bossier Parish Sheriff's Sale for only 6% of its value.  But the underlying judgment on which the Note was sold was reversed just two months after the sale took place.  The sole bidder for the Note at sale was Lucky Family, L.L.C., the family company of W.A. Lucky, III and which is purported to be managed by his wife, Vickie Lucky.  Although the LLC claims to have obtained the Note for only $105k, it immediately sought to default the Note's payor, Magnolia Island Plantation, L.L.C. ("Magnolia") and enforce the Note for its full value.

Mrs. Lollar's Amended Complaint (Rec. Doc. 51) claims that the sale of her Note was invalid.  Mrs. Lollar further alleges that the Sheriff failed his duty to appoint an independent third appraiser and that the third appraisal on which the sale price was based was not true and just.[2] Mrs. Lollar also alleges that Mr. Lucky used a separate lawsuit (now dismissed) and lis pendens to artificially cloud title to the Note's collateral and to attack the validity of the Note before coordinating with his family company to purchase it at a reduced price.[3]  Below is a brief synopsis of events and facts:

---

[1]     See Rec. Doc. 51, Exhibit "A" (51-1) Mrs. Lollar's *First Amended and Restated Complaint* for a copy of the Note.

[2]     *Id*. at paragraphs 30-49, 51-54.

[3]     *Id*. at paragraphs 11-18, 35-49, 55-59.

1

-   In November of 2017, Mrs. Lollar sold property to her husband by way of a Credit Sale Deed, and in which part of the consideration received by Mrs. Lollar was the Note at issue.  The property sold served as collateral for the Note.[4]

-   In January of 2018 W.A. Lucky, III, received a monetary judgment in a suit against Mrs. Lollar (termed "Lucky I" in the pleadings).[5]  The Lucky I judgment was purely monetary and did not include rights to any specific property of Mrs. Lollar.

-   Mr. Lucky filed two lis pendens in the public record describing the property which served as the collateral for the Note.[6]  One lis pendens was filed in December of 2017 prior to any judgment in the Lucky I suit, and the 2nd was filed in February of 2018.

-   In addition, Mr. Lucky also filed a lawsuit against Mrs. Lollar and her husband in February of 2018 (termed "Lucky II" in the pleadings) in which he claimed that the transactions by which the Note was created were null and of no effect as simulations, and sought for the collateral property to be placed back in Mrs. Lollar's name and that the collateral property be subject to Mr. Lucky's judgment.[7]

-   Just after taking the above actions against the validity of the Note and its collateral, Mr. Lucky pursued seizure of the Note from Mrs. Lollar based on his monetary judgment in Lucky I.  Rather than garnish the Note payments, Mr. Lucky sought to

---

[4]     See Rec. Doc. 51 Exhibit "B" (51-2) for a copy of the Credit Sale Deed.

[5]     See Rec. Doc. 51 Exhibit "D" (51-4) for a copy of the Lucky I Judgment.

[6]     See Rec. Doc. 51 Exhibits "E" (51-7) and "F" (51-8) for a copy of each lis pendens referenced.

[7]     A copy of Lucky II is attached hereto as Exhibit "1".  See also Rec. Doc. 70 for W.A. Lucky, III's *Answer to First Amended and Restated Complaint* at paragraph 15 for Mr. Lucky's admission to filing Lucky II.

expedite a sale of the Note only after he had filed both of the lis pendens and Lucky II, so as to cast doubt as to the Note and its collateral.[8]

- The Note was to be sold with the benefit of appraisal.  After both Mrs. Lollar and Mr. Lucky submitted appraisals which were beyond the averaging limits set forth by La. R.S. 13:4365, the Sheriff was required to appoint a third appraiser under the statute to make a true and just appraisal which would be final.[9]

- However, the Sheriff did not contact a third appraiser and instead consigned that power to the Mr. Lucky's counsel, Curtis Shelton.[10]  Mrs. Lollar and her counsel were never contacted for input or participation regarding the third appraiser.

- Mr. Shelton chose Patrick Lacour to be the putative third appraiser. Mr. Lacour was then working as an expert for Mr. Shelton in another matter.[11]  Mr. Shelton sent Lacour a 6-page letter with commentary and advice on what should be considered in the appraisal, as well as a specific set of documents for Lacour to review.[12]

- Mr. Shelton's letter to Lacour disparaged Mrs. Lollar and her husband (as well as counsel for Mrs. Lollar), while emphasizing Mr. Lucky's lis pendens and lawsuit affecting the collateral property and the Note's validity.   Mr. Shelton attached

---

[8]      Mrs. Lollar's counsel argued before the Lucky I court at a July 5, 2018 hearing that if Mr. Lucky was permitted to choose the Note to satisfy the Lucky I judgment, then garnishment of the Note would be the proper procedure.  Mr. Lucky's counsel argued in favor of seizure and sale of the Note.

[9]      See Rec. Doc. 51, Exhibit "I" (51-11) where Mr. Lucky's appraiser, Chad Garland, presented a value of $173,000 and Exhibit "J" (51-12) where Mrs. Lollar's appraiser, John Dean, presented a value of $1,478,048.68.

[10]     See Exhibit "2" attached hereto for a September 17, 2018 email from Sheriff's employee Kim Flournoy to Mr. Lucky's counsel, Curtis Shelton, requesting a third appraiser.  Emails produced by the Sheriff's office indicate that Mrs. Flournoy continued to communicate directly with Mr. Shelton to handle procuring a third appraisal.  The documents produced in this matter indicate that only Mr. Shelton, rather than the Sheriff, was in contact with Lacour prior to Lacour creating an appraisal.

[11]     See Exhibit "3" attached hereto for an excerpt from the transcript of Mr. Lacour's deposition at p. 59, lns 1-25 where Mr. Lacour admits to concurrently working with Mr. Shelton on another matter at the time of his appraisal in this matter.

[12]     See Rec. Doc 51 at Exhibit "K" (51-13) for a copy of the October 10, 2018 letter.

3

selective filings from the trial court judgment in favor of Mr. Lucky and Mr. Lucky's new lawsuit, while leaving out any pleadings by Mrs. Lollar and the fact the underlying judgment was pending appeal with briefs being filed at that time.[13]

- Patrick Lacour submitted a third appraisal of the Note for 10% of its face value. The discounts which Lacour applied to the Note's value were primarily based upon Lucky II, the lis pendens and Lacour's communications with Mr. Shelton.  Lacour sought no independent information regarding the Note, the value of the collateral or the Note's payor to make his appraisal instead accepting at face value Lucky's counsel's statements regarding the effect of the suit Mr. Lucky had filed.[14]

- The Sheriff's office has testified in depositions that it had never sold a promissory note before.  A representative of the Sheriff's office stated in communications with Mr. Shelton prior to the sale that the situation was a "learning experience".[15] Mr. Lacour was not in contact with the Sheriff prior to providing his appraisal. Instead, Mr. Shelton served as his contact.

- Mrs. Lollar filed a Petition for Preliminary Injunctive Relief with the court in Lucky I on October 22, 2018 regarding the grossly low appraisal but the motion was not addressed by the court until the day after the Sheriff's Sale when the judge simply noted on the order that it was "moot".[16]

---

[13]     *Id.*

[14]     See Exhibit "4" attached hereto for excerpts from the transcript of Mr. Lacour's deposition at p.24 at lns. 2-23, p. 63 at lns. 2-8, p. 77 at lns. 2-11, p.123 at lns. 9-20.  Mr. Lacour's testimony indicates that he reached no further than the documents sent to him by Mr. Shelton in making his appraisal, including Lacour's admission that he never even saw the Note itself before submitting the appraisal.

[15]     See Exhibit "5" attached hereto for October 23, 2018 email from Sheriff's employee Kim Flournoy to Mr. Lucky's counsel, Curtis Shelton.

[16]     See Exhibit "6" attached hereto for Rule to Show Cause scratched through by Judge Parker Self as "moot" on October 25, 2019.

- Despite the debtor seeking injunctive relief, the Sheriff's office conducted the sale of the Note on October 24, 2018.  Lucky Family, LLC was the sole bidder for the Note. The LLC's bid was $105k, 6% of the Note's face value.  It was only the second purchase for the LLC from a Sheriff's Sale in its 21-year existence and its first promissory note purchase.[17]

- Thereafter, on April 24, 2019, Mr. Lucky dismissed Lucky II and cancelled both lis pendens he filed against the collateral property.  Of course, these actions removed the clouds upon the Note which allowed that company to purchase the Note for 6% of its face value.

- Lucky Family, LLC has actively pursued payment on the face value of the Note and also claimed default by the payor in an effort to seek acceleration of the Note payments.[18]

The facts disclosed during discovery have supported Mrs. Lollar's claims of Mr. Lucky's improper actions and improper use of judicial procedure to Mrs. Lollar's detriment.  The facts from discovery also support that Lucky Family, LLC was not just a happenstance bidder at a Sheriff's sale.  Instead, Lucky Family, LLC was there to obtain the Note at a reduced price so that Mr. Lucky could pursue an artificial deficiency in his monetary judgment, while the LLC pursued the full $1.7M value of the Note.  In essence, Mr. Lucky's plan sought to double his recovery while increasing his leverage against Mrs. Lollar.  Mr. Lucky's counsel has admitted as much in a letter sent to Mrs. Lollar just after the Sheriff's sale which outlined the bounty of their actions.

---

[17]     Deposition testimony of Vickie Lucky, November 14, 2019, transcript of such testimony is still being prepared by the court reporting agency.

[18]     See Exhibit "7" attached hereto for February 1, 2019 letter from David Touchstone to Magnolia claiming default under the Note and acceleration of payments.  Magnolia previously informed Mr. Touchstone in writing that the installment he claimed was not paid had been paid prior to Lucky Family, LLC's purported purchase of the Note.  Magnolia has also provided copies of the checks where such payments had been made.

5

While purchasing the Note at Sheriff's sale may have been a first for Lucky Family, LLC, Mr. Lucky was no stranger to handling the purchase of promissory notes at a discount.  Mr. Lucky testified at his November 20, 2019 deposition that he would once purchase "problem notes" from the government for a small percentage of their face value and then seek to collect on the notes to turn a profit.  However, in our matter, it was Mr. Lucky who manufactured an alleged "problem" with Mrs. Lollar's Note so that his family LLC could obtain the Note for an absurdly cheap price.

Mrs. Lollar requested discovery from W.A. Lucky, III seeking identification and production of communications with Lucky Family, LLC, or communication between their counsel. The scope of the requests was limited as to communications pertaining to "Lucky I, Lucky II, the Note, the Sheriff Sale, and/or the [collateral] Property."  The scope was also limited as to time of occurrence.  These relevant communications are central to Mrs. Lollar's allegations that Lucky Family, L.L.C. is not a good faith purchaser of the Note and were instead in coordination with Mr. Lucky to bid and purchase on the Note so that he may attempt to obtain leverage against Mrs. Lollar, as well as the payor, Magnolia.

W.A. Lucky, III  objected to Mrs. Lollar's discovery requests, claiming that all such communications were privileged. He also produced a privilege log summarily identifying the communications he had with counsel for Lucky Family, LLC.  Lucky argued that the communications between counsel were privileged under both the work product doctrine and the common interest doctrine.  Review of the privilege log indicates that certain communications listed between counsel would not be protected by such privileges.   In the alternative, if such communications are found to be privileged under either theory, such privilege is overcome by the fact that the communications were for the purpose of perpetuating Mr. Lucky and Lucky Family LLC's coordinated effort to deprive Mrs. Lollar of the full value of her Note.  The purpose of this

6

Motion to Compel is to request that this Court order W.A. Lucky, III to produce copies of certain communications identified herein which are not protected by the privileges which Mr. Lucky claims.

## II.     <u>Discovery Requests at Issue and Efforts at Resolution:</u>

### A.  **Discovery to W.A. Lucky, III and Response:**

<u>Interrogatory No. 1</u>:

Identify and describe all communications between you, including your representatives or legal counsel, or any one of them, and Lucky Family, including its manager, other members, representatives, or legal counsel, or any one of them, which occurred after November 3, 2017 and which relate, refer, or pertain to Lucky I, Lucky II, the Note, the Sheriff Sale, and/or the Property, including the identification of when, and with whom such communications occurred, as well as identifying any documents reflecting such communications.

<u>W.A. Lucky, III's Answer to Interrogatory No. 1:</u>[19]

W.A. Lucky, III objects to this interrogatory as follows:

….

B. Communications between Mr. W. A. Lucky, III's attorneys and Lucky Family, L.L.C. which are privileged as work product privilege or communications in defense of this case and preparation for trial under the joint defense or common interest rule. *See, e.g., In re LTV Securities Litigation,* 89 F.F.D. 595, 604 (1981) ("We agree with Defendants that disclosure of privileged information by an attorney to actual or potential co-defendants, or to their counsel, in the course of a joint defense does not constitute a waiver of the attorney-client privilege.") "For the purposes of the joint defense privilege, the term co-defendant is broadly construed." *Id.* "The joint defense privilege encompasses shared communications '…to the extent that they concern common issues and are intended to facilitate representation in possible subsequent proceedings.'" *Id.*

The joint defense privilege or common interest privilege is a part of the attorney-client privilege under Louisiana Code of Evidence article 506, which reads:

B…A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or

---

[19]   The response by Mr. Lucky contained section objecting to spousal communications which are not at issue in this motion and therefore due to the length of his response we are reciting the relevant portion of the response which were asserted for the communications at issue.

otherwise, made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like of the mental, emotional, or physical condition of the client in connection with such a communication, when the communication is:

(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.

(2) Between the lawyer and a representative of the lawyer.

(3) By the client or his lawyer, a representative of either, to a lawyer, or representative of a lawyer, *who represents another party concerning a matter of common interest.*

(4) Between representatives of the client or between the client and a representative of the client.

(5) Among lawyers and their representatives representing the same client.

(6) Between representatives of the client's lawyer.

Communications that are no subject to the foregoing privileges are contained in the documents that are produced herewith and which are designated in answer to this interrogatory.

Request for Production No. 1:

Produce all documents identified in your response to Interrogatory No. 1.

W.A. Lucky, III's Answer to Request for Production No. 1:

Documents that contain communications that are not subject to the privileges asserted in the answer to interrogatory number 1 are produced herewith.

In conjunction with Mr. Lucky's response, a privilege log was provided which identified email communications between W.A. Lucky, III and his counsel and Lucky Family, L.L.C. and its counsel for the dates of October 23, 2018 until the date of response. A copy of this privilege log is

8

included as Exhibit 9 hereto. Counsel for W. A. Lucky, III has stated in later correspondence that there was no other responsive communication to identify between prior to October 23, 2018 within the scope of the request.

**B.  Efforts toward Resolution:**

**October 18, 2019**:  Counsel for Mrs. Lollar provided a letter to Mr. Lucky's counsel outlining deficiencies in their September 16, 2019 responses, along with their October 9, 2019 document production.  Interrogatory No. 1 was presented to Mr. Lucky's counsel as deficient because the privileges asserted as to communications with Lucky Family, L.L.C. were inapplicable. (See Exhibit 8 for a copy of the October 18, 2019 correspondence).

**October 23, 2019**:  Counsel for Mr. Lucky provided a letter response to the October 18th correspondence in which he defended the privilege assertions as to Interrogatory No. 1 and maintained the same.  No supplemental response or production was provided.  (See Exhibit 9 for a copy of the October 23, 2019 correspondence and final privilege log).

**November 6, 2019**:  Counsel for Mrs. Lollar responded to Mr. Lucky's October 23th letter.  The November 6th correspondence provided further argument in support of her position that the privileges asserted by Mr. Lucky in regards to communications with Lucky Family, LLC were inapplicable due to the lack of common interest protection.  (See Exhibit 10 for a copy of the November 6, 2019 correspondence).

**November 11, 2019**:  Counsel for Mr. Lucky provided a letter response to the November 6th correspondence in which he continued to defend the privilege assertions as to Interrogatory No. 1

and maintained the same.  No supplemental response or production was provided.  (See Exhibit 11 for a copy of the November 11, 2019 correspondence).

**November 19, 2019:**  A call was held between counsel for Mrs. Lollar and Mr. Lucky in an attempt to resolve the discovery dispute as to the communications between Mr. Lucky and Lucky Family, L.L.C.  Counsel.  No resolution was reached between the parties.

In short, a dispute still exists concerning whether W.A. Lucky, III should be required to produce the communications at issue which are responsive to Interrogatory No. 1 and RFP No. 1. The dispute centers on whether the communications at issue may be withheld under the work-product doctrine and the common interest doctrine.  The Court should consider the combined effect of all the claimed privileges: they would block all sources of evidence regarding the scheme pursued by W. A. Lucky and his family LLC to acquire the Note at an absurdly low price while, at the same time asserting that Plaintiffs have failed to produce evidence of the scheme or the control exercised by Lucky over his family LLC.

### III.   Law:

### A.  Discovery in General:

Federal Rule of Civil Procedure 26(b) allows a party to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The information sought need not be admissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The United States Supreme Court has recognized that the discovery rules "are to be accorded a broad and liberal treatment." *Hickman v. Taylor,* 329 U.S. 495, 507–508, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The party resisting discovery

must show specifically how each request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir.1990). And the "party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability." *In re Santa Fe Int'l Corp.,* 272 F.3d 705, 710 (5th Cir.2001).

**B.  Work Product Doctrine:**

Rule 26 accords special protection to work product revealing the attorney's mental processes. FRCP 26(b)(3) and (5) *Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S. Ct. 677, 688, 66 L. Ed. 2d 584 (1981).  The Rule permits disclosure of documents and tangible things constituting attorney work product upon a showing of substantial need and inability to obtain the equivalent without undue hardship. *Id*. The work product doctrine provides for the qualified protection of documents and tangible things prepared by or for a party or that party's representative "in anticipation of litigation or for trial." FRCP 26(b)(3).  The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial. *See Hodges, Grant & Kaufmann v. U.S. Government, Dept. of the Treasury, I.R.S.,* 768 F.2d 719, 721 (5th Cir.1985). A general allegation of work product protection is insufficient to meet this burden. *See Navigant Consulting, Inc. v. Wilkinson,* 220 F.R.D. 467, 473 (N.D. Tex. 2004).  Instead, 'a clear showing must be made which sets forth the items or categories objected to and the reasons for that objection.' " *Id.* (quoting *Caruso v. Coleman Co.,* No. 93–cv–9733, 1995 WL 384602, at *1 (E.D. Pa. June 22, 1995)).  Each document to which privilege is claimed must be separately considered. *D'Ippolito v. Cities Serv. Co., 39 F.R.D. 610, 610 (S.D.N.Y. 1965)*

The advisory committee notes to Rule 26(b)(3) state that "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other

11

nonlitigation purposes are not under the qualified immunity provided by this subdivision." *United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir.1982); *see also* Fed. R. Civ. P. 26(b)(3), Adv. Comm. Notes. The work product doctrine must be strictly construed. *See Mims,* 230 F.R.D. at 484; *see also McCook Metals LLC v. Alcoa, Inc.,* 192 F.R.D. 242, 260 (N.D.Ill.2000) (work product doctrine "significantly restricts the scope of discovery and must be narrowly construed in order to aid in the search for the truth"). Privilege does not protect documents and other communications simply because they result from an attorney-client relationship *Navigant* at 473. "[T]he mere relation of documents to litigation does not automatically endow those documents with privileged status." *State of Me. v. U.S. Dep't of the Interior*, 298 F.3d 60, 69 (1st Cir.2002). Instead, the party invoking the privilege must affirmatively demonstrate that the documents were prepared in anticipation of litigation by the party or his representative. *Id*.; FRCP 26(b)(3). That is, the document must be prepared by an attorney (or other representative) in his representative capacity. *Id*. If it is prepared by a party's counsel but not in his representative capacity, it is not privileged. *Id*. Where representatives for different parties exchange their "work product", those documents are only protected if the parties share a mutual interest. *Stanley Works v Haeger Potteries, Inc*. (1964, DC Ill) 35 FRD 551. Further, the privilege is waived if the product is transmitted to a party with an adverse interest. *Robinson v. Texas Auto. Dealers Ass'n,* 214 F.R.D. 432, 443–44 (E.D. Tex. 2003), *vacated in part sub nom. In re Texas Auto. Dealers Assn*., No. 03-40860, 2003 WL 21911333 (5th Cir. July 25, 2003).

The common legal interest exception (discussed *infra*. at III. C.) can also cover work product*. In Re Santa Fe Int'l Corp*., 272 F.3d 705, 710 (5th Cir. 2001). However, that exception is waived if a party transmits work product to a party with whom it does not share an identical, or at least mutual, interest. *SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties LLC*

12

2002 WL 1334821 (S.D.N.Y.); *Lugosch v. Congel*, 219 F.R.D. 220 (N.D. N.Y. 2003) (requiring the parties to have "identical litigation perspectives" to prevent a waiver of the work product privilege). For instance, the exception applies between parties "one of whose interests in prospective litigation may turn on the success of the other party in a separate litigation." *United States v. Am. Tel. & Tel. Co.,* 642 F.2d 1285, 1298 (D.C. Cir. 1980).[20]

### c. **Common Interest Doctrine:**

The "joint defense" privilege, sometimes called the "common interest" or "community of interest" rule is not an independent privilege, but merely an exception to the general rule that no privilege attaches to communications that are made in the presence of or disclosed to a third party. See *In re Auclair*, 961 F.2d 65, 70 (5th Cir. 1992) (holding that the joint defense privilege preserved the attorney-client privilege against waiver in the context of a group with common interests seeking common representation); *In re LTV Securities Litigation*, 89 F.R.D. 595, 604 (N.D. Texas 1981) (The joint defense privilege merely "extends the attorney-client privilege to communications made in the course of joint defense activities."). If a communication satisfies all the elements of the attorney-client privilege except confidentiality, the joint-defense privilege will preserve the attorney-client privilege, so long as the only breach of confidentiality is sharing the communication "with a third person who has a common legal interest with respect to the subject matter of the communication. *Robinson v. Texas Auto. Dealers Ass'n*, 214 F.R.D. 432, 443–44 (E.D. Tex. 2003), *vacated in part sub nom. In re Texas Auto. Dealers Assn.,* No. 03-40860, 2003 WL 21911333 (5th Cir. July 25, 2003)

---

[20]     Therefore, the exception does not apply when a party would be adversely affected by the success of the other party in separate litigation.

The two types of communications protected under the common interest privilege are: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between potential co-defendants and their counsel. With respect to the latter category, the term "potential" has not been clearly defined. *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710–13 (5th Cir. 2001).  A party claiming a privilege "shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Federal Rule of Civil Procedure 26(b)(5); *In re Santa Fe, supra*. A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability. *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710–13 (5th Cir. 2001).  Because the privilege is "an obstacle to truthseeking," it must "be construed narrowly to effectuate necessary consultation between legal advisers and clients." *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710–13 (5th Cir. 2001), citing *In re LTV Sec. Litig.*, 89 F.R.D. 595, 606 (N.D.Tex.1981) and *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970).[21]

Communications in which the parties are negotiating issues on which they are adverse would be unlikely to be protected by the common-interest privilege.  *Mack Energy Co. v. Red Stick Energy, L.L.C.,* No. CV 16-1696, 2019 WL 4752110, at *6 (W.D. La. Sept. 27, 2019) Communications that are not in furtherance of legal advice or which are between the clients and not the attorneys are not privileged.  *Id.* "The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." *Gulf Islands Leasing, Inc. v.*

---

[21]      Other circuits have expressed in strong terms that the common interest doctrine application should be limited.  See *SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties LLC* 2002 WL 1334821 (S.D.N.Y.), 3-4, "The common interest privilege is a limited exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party. It is not a separate source of privilege, and the Second Circuit has warned that courts should be cautious about extending the attorney-client privilege under the common interest rule."

14

*Bombardier Capital, Inc.,* 215 F.R.D. 466, 471 (S.D.N.Y. 2003), citing *North River Ins. Co. v. Columbia Cas. Co*., 1995 WL 5792, at *3 (S.D.N.Y. Jan.5, 1995).

### D.  Crime-Fraud Exception to Assertions of Work-Product Doctrine or Attorney-Client Privilege:

 The work-product privilege can be overcome where communication or work product is intended to further continuing or future criminal or fraudulent activity. See both *In re Grand Jury Subpoena,* 419 F.3d 329, 335 (5th Cir.2005), and *In re Grand Jury Subpoenas,* 561 F.3d 408, 411 (5th Cir.2009).  The crime-fraud exception recognizes that because the "client has no legitimate interest in seeking legal advice in planning future criminal activities," society has no interest in facilitating such communications. *In re Burlington N., Inc.,* 822 F.2d 518, 524 (5th Cir. 1987), citing *In re International Systems & Controls Corporation Securities Litigation,* 693 F.2d 1235, 1242 (5th Cir.1982).

The party seeking discovery of privileged or protected information bears the burden of establishing a prima facie case that the attorney-client relationship was intended to further criminal or fraudulent activity. *See Grand Jury,* 419 F.3d at 335. To make the necessary prima facie showing for the application of the crime-fraud exception, Plaintiff "must produce evidence such as will suffice until contradicted and overcome by other evidence ... a case which has proceeded upon sufficient proof to that stage where it will support [a] finding if evidence to the contrary is disregarded." *Id.* at 336.

### IV.  <u>Communications at Issue in Privilege Log and Argument:</u>

The communications outlined below are contained on the privilege log presented by Mr. Lucky in conjunction with his discovery responses.  These specific communications do not appear to be protected by the work product doctrine or the common interest doctrine, as Mr. Lucky claims. In general, the communications are either for commercial purposes or are communications by

15

Lucky's counsel which appear prepared for a third party (Lucky Family, LLC) and which relate to issues in which Mr. Lucky has a contrary interest.  Alternatively, if such communications are found to be privileged under either theory, that privilege is overcome by the fact that the communications can only be in furtherance of the coordinated efforts by Mr. Lucky and Lucky Family LLC's to deprive Mrs. Lollar of the full value of her Note.

The communications at issue go right to the heart of Mrs. Lollar's allegations of coordination between Mr. Lucky and his family LLC.  Mr. Lucky has asserted that if he spoke to Mrs. Lucky (the purported Manager of the LLC) about the topics in the discovery request at issue, it would be protected by spousal privilege.  Otherwise, Mr. Lucky claims all communications with the LLC were through their respective counsel.  Therefore, Mrs. Lollar has no alternative method to obtain these same types of communications, which Mr. Lucky claims to be the only responsive written communications on his behalf with the LLC on the relevant topics.

**A.  10/23/18 Emails:**

The privilege log for W.A. Lucky, III lists 4 separate communications between Curtis Shelton, as counsel for Mr. Lucky, to David Touchstone, presumably as counsel for Lucky Family, LLC.  The subject matter of the communication is listed as "E-mail of documents concerning the lawsuits, Note and foreclosure so that David Touchstone may evaluate same and provide legal advice to Lucky Family, L.L.C. (Collectively the "10/23/18 Emails").

The 10/23/18 Emails are all from Mr. Shelton and each occurred prior to the filing of the current lawsuit. More importantly, the 10/23/18 Emails occurred prior to the Sheriff's sale where Lucky Family, LLC purports to have purchased the Note.  At the time of these communications, there was no common interest, because Lucky Family, LLC held no interest in the Note.  The limited subject matter listed in the privilege log for 10/23/18 can only be read as Mr. Lucky's

16

counsel providing information on the Note to Lucky Family, LLC prior to it bidding on the Note. As from Lucky's counsel, the communications would be for a commercial purpose and therefore not one which is afforded protection under either the common interest doctrine or the work-product privilege.  The communications are also of great importance toward further establishing the facts regarding Mr. Lucky coordinating with Lucky Family, LLC to bid on the Note.  These are direct communication which both parties allege to be the first responsive communications regarding the Note, and which occurred prior to the Sheriff's Sale.  Review of the privilege log synopsis of later communications (discussed below) show that Mr. Lucky and his counsel continued to be contacted solely to be kept in the loop as to Lucky Family, LLC's pursuit of Note payments from the payor and its attempt to claim default under the Note.  These are legal issues in which Mr. Lucky would have no interest in, as he claims he has no interest in Lucky Family, LLC or the Note.  The only viable purpose would be that Lucky Family, LLC was in fact interposed by Mr. Lucky to purchase the Note at his direction and control.

**B. 10/24/18 Emails:**

The privilege log for W.A. Lucky, III lists four separate communications.  The first two entries will be discussed in this section, while the latter two entries will be discussed below at IV. C.  The first two entries are by David Touchstone (Lucky Family, LLC) to Mr. Lucky directly, with his counsel Curtis Shelton copied.  The subject matter of the communications is listed as:

"E-mail with David Touchstone recommendations to Lucky Family, L.L.C."

And

"Copy of 10/24/18 letter to Ronald Lollar from David M. Touchstone"

17

The first entry states that it contains recommendations to Lucky Family, LLC, yet it is only sent to Mr. Lucky and his counsel.  The second entry provides Mr. Lucky and his counsel with a copy of a 10/24/18 letter to Ronald Lollar from Lucky Family, LLC.  We have attached the October 24th letter as Exhibit 12 to this Memorandum.  The content of the letter is to notify Mr. Lollar that the LLC has purported to have purchased the Note.  However, the email communication itself is not to Touchstone's client but to Mr. Lucky, his counsel, and Mr. Lucky's secretary, Jackie Tucker.

Unless he is controlling the LLC and using it to buy the Note as Mrs. Lollar contends, Mr. Lucky's interests at this time are directly contrary to that of the LLC.  This email communication regards the LLC's enforcement and collection of the Note.  The relief sought by Mr. Lucky in Lucky II would nullify the transactions creating the Note, invalidating the Note and its collateral. Therefore, while Mr. Lucky is trying to kill the Note, the LLC seeks to collect and enforce it.   Mr. Lucky continued to pursue Lucky II until he filed to dismiss his claims in April of 2019.  Mr. Lucky does not get to be on both sides of the fence depending on which argument suits him.  Mrs. Lollar has already alleged that Mr. Lucky utilized Lucky II in a scheme to artificially devalue the Note.  Now, Mr. Lucky chooses to ignore those claims in order to shield communications with a 3rd party under a theory of common interest. He cannot have it both ways.

### C.  Multiple Entries Regarding the LLC's Note Collection:

The latter 2 entries on 10/24/18 are between Mr. Lucky's counsel and counsel for the Lucky Family, L.L.C. both stated as regarding "Legal advice communication about letter to Ronald Lollar".  Here we see the first instance of many (outlined below) where Mr. Lucky's counsel is communicating to the LLC's counsel on the issue of pursuit and collection of the Note.  This is an issue in which (a) Mr. Lucky would have no vested interest since he claims not to be in the LLC

and claims not to have an interest in the Note; or (b) to the extent he has any interest it would be opposed to the LLC due to the relief he seeks in Lucky II.

Similar subject matter regarding the LLC's collection of the Note is contained in the following privilege log entries between Mr. Shelton (Lucky) and Mr. Touchstone (Lucky Family, LLC):

| 11/2/18: | "Email from David Touchstone containing drafts of default letters." |
|----------|------|
| 11/2/18: | "Email regarding default letter" |
| 11/2/18: | "Response by Touchstone to Shelton re: default letter." |
| 1/17/19: | "Email containing drafts of round two default letters and draft of proposed answer to claim and counterclaim; questions regarding CM/ECF" |
| 1/17/19 | "Response to email containing drafts of letters and draft pleading" |
| 2/7/19: | "Forwarding letter from J. Davis Powell dated 2/7/19"[22] |
| 2/7/19 | "Response re: letter from J. Davis Powell dated 2/7/19" |

The emails from counsel for Lucky to counsel for Lucky Family, LLC regarding the issues affecting the latter party are not the "work product" of either party.  As to Lucky Family LLC, this is because these emails are not documents prepared by a representative for that party. As to Lucky, this is because the documents were not prepared by counsel in his representative capacity for Lucky; they were prepared solely for the benefit of Lucky Family, LLC, rather than on behalf of Lucky. FRCP 26(b)(3). Not only that, these parties had conflicting interests *vis a vis* the Lucky II matter and this litigation. As such, they were prepared by a representative with an interest adverse to the other, making the work product privilege inapplicable   See *Lugosch v. Conge* and *Robinson v. Texas Auto*, *supra*.

---

[22]     A copy of the February 7, 2019 letter is attached at Exhibit 13.

19

Further, and to the extent any could qualify as work product in the first place, the privilege was waived because they were transmitted between parties with adverse interests. *United States v. Am. Tel. & Tel. Co, supra.* Lucky and Lucky Family, LLC had conflicting interests with regard to the collection and enforcement of the Note.  The parties certainly did not have identical litigation perspective on the issues discussed in the communications.   *Lugosch v. Conge, supra; SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties LLC, supra.* Even if this Court does not require that the parties share an identical interest, the fact that their interests diverge so starkly on this subject should render any work product privilege waived; any legal issue within the communications regarding the LLC's collection of the Note was surely not common or mutual between the parties.  *In Re Santa Fe Int'l Corp.*, 272 F.3d 705, supra.

The burden is on Mr. Lucky to demonstrate that the work product privilege applies. FRCP 26(b)(5); *Hodges, supra*, at 721.  Blanket assertions of the privilege are insufficient and the party invoking it must show that all four necessary elements of the privilege are met for all materials. FRCP 26(b)(3) and (5); *In re Hardwood P-G, Inc.,* 403 B.R. 445, 462–64 (Bankr. W.D. Tex. 2009). With such a relatively limited number of documents, this privilege should be demonstrated with particularity and on a document-by-document basis. *D'Ippolito v. Cities Serv. Co., 39 F.R.D. 610, 610 (S.D.N.Y. 1965)*.  Mr. Lucky cannot meet such a burden here.

Reading through the privilege log one: what is the purpose of all of the extraneous communication regarding the LLC's collection of the Note?  Initially, it is apparent that Lucky Family, LLC's counsel is keeping Mr. Lucky and his counsel informed of all efforts regarding Note collection and the payor's responses.  Next, it is apparent that Mr. Lucky's counsel is not a passive recipient but instead actively advises the LLC on an issue as to which Mr. Lucky should be adverse, based on the relief he was seeking in Lucky II.   Lucky cannot have it both ways.  If

20

he is going to attempt to stand by Lucky II as being filed in good faith and without pretext, then the Court can assume that Lucky sought the relief he requested to invalidate the Note transactions. If that is Lucky's position, he cannot shield third party communications with Lucky Family, LLC under a broad guise that anything his counsel communicates is work-product and anything communicated to Lucky Family, LLC is of a common interest.

Mr. Lucky could possibly meet his burden under the work-product and common interest doctrine if he simply confessed that the LLC is acting at his direction in their purchase of the Note. However, such coordination would fall under the crime/fraud exception to the privilege assertions. The facts already indicate the close relationship one would presume between Mr. Lucky and his family's LLC.  Although the LLC now asserts that Mr. Lucky has not been a member since 2000, they have provided no evidence that his role as Manager was revoked.  Discovery has shown that Mr. Lucky acts on the LLC's behalf, borrows money from the LLC, and even receives assets from the LLC.  The ongoing relationship is close and fluid and has been beneficial to Mr. Lucky even if he has not been treated as a member for tax purposes.

Mr. Lucky was able to create the problems for the Note and its collateral, and he could secrete and woodshed the third appraiser, but the one thing Mr. Lucky couldn't do was risk bidding on the Note himself as the judgment creditor.  He needed some type of insurance in case he lost the appeal on Lucky I (which he did) and the only way to achieve that was to insert another party to purchase the Note which could allow for the strained argument of a good-faith, third-party purchaser.  But Mr. Lucky couldn't look too far from home for such a party or he would risk losing control of the Note.  Lucky Family, LLC had only made one purchase at a Sheriff's sale in its 21-year history, and never a promissory note.  Lucky Family, LLC did not stumble into the Bossier Parish courthouse on the morning of October 24, 2018: they were purposely there to serve as Mr.

21

Lucky's proxy.  This is made even more evident by the communications by Mr. Lucky's counsel to Lucky Family LLC's counsel the day before the Note sale, which they now seek to withhold in discovery.  It is also evident from the extensive communications, updates, and reporting thereafter in which Mr. Lucky and his counsel were consulted on issues of the collection of the Note.

V.      **Conclusion:**

The communications which Mr. Lucky attempts to shield from discovery do not qualify for the privileges he asserts. The communications were with a third-party as to topics which were either commercial in nature, or not of a common interest.  The communications are central to the claims presented by Mrs. Lollar that Mr. Lucky coordinated with Lucky Family, L.L.C. to purchase the Note at an absurdly low value.  The communications at issue cannot be obtained in a separate manner, as the communication between Mr. Lucky and Lucky Family, L.L.C.'s counsel was the method they chose in which to achieve their ends.  Mrs. Lollar requests that this Court order the production of the subject communications.

Respectfully submitted by,

____/s/ Andrew D. Martin_____
Randall S. Davidson, LSBA No. 4715, TA
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA 34947
Harold R. Bicknell III, LSBA 36801
DAVIDSON SUMMERS, APLC
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342 | (318) 226-0168
E:      rsdav@davidsonsummers.com
        dpowell@davidsonsummers.com
        dmartin@davidsonsummers.com
        hbicknell@davidsonsummers.com
        ***Counsel for Barbara Lollar***

22

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF filing system, and notice of the same will be sent by operation of the court's electronic noticing system to all counsel.

Shreveport, Louisiana, on this 25th day of November, 2019.

/s/ Andrew D. Martin
OF COUNSEL

23