UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| MAGNOLIA ISLAND PLANTATION | § | CIVIL ACTION NO: 5:18-cv-01526 |
| L.L.C. and BARBARA MARIE CAREY | § | |
| LOLLAR | § | |
|     Plaintiffs | § | |
| | § | |
| VS | § | CHIEF JUDGE S. MAURICE HICKS, JR. |
| | § | |
| LUCKY FAMILY, L.L.C., W.A. LUCKY, | § | |
| III, and BOSSIER PARISH SHERIFF | § | |
| JULIAN C. WHITTINGTON | § | |
| | § | MAGISTRATE JUDGE KAREN HAYES |
|     Defendants | § | Jury Trial Demanded |

**MEMORANDUM IN SUPPORT OF BARBARA LOLLAR'S
MOTION FOR PARTIAL SUMMARY JUUDGMENT**

RESPECTFULLY SUBMITTED:

**DAVIDSON SUMMERS, APLC**
Randall S. Davidson, LSBA No. 4715, T.A.
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA No. 34947
Harold R. Bicknell III, LSBA 36801
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342; Fax: (318) 226-0168
Email: rsdav@davidsonsummers.com
      dpowell@davisonsommers.com
      dmartin@davidsonsummers.com
      hbicknell@davidsonsummers.com
***Counsel for Barbara Marie Carey Lollar***

## TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

I.     INTRODUCTION AND STATEMENT OF THE CASE ............................................... 1

II.    LAW AND ARGUMENT ........................................................................................ 5

       A.     The Sheriff's Failure Under La. R.S. 13:4365 ............................................ 5

       B.     Mrs. Lollar's Right to Restitution of the Note ........................................ 12

III.   CONCLUSION ...................................................................................................... 22

CERTIFICATE OF SERVICE ........................................................................................ 22

# TABLE OF AUTHORITIES

**PAGES**

**STATUTES:**

La. Civil Code art. 2299 .................................................................................... 13, 16, Fn. 24

La. Civil Code art 2338 ...................................................................................................18, 20

La. Civil Code art 2344 ...........................................................................................................18

La. Civ. Code Ann. Art. 2304 ................................................................................................13

La. Code Civ. Proc. art. 2332 .................................................................................................5

La. R.S. 13:4106 ..................................................................................................................5, 6

La. R.S. 13:4363-4366 ..............................................................................................................5

La. R.S. 13:4363 ........................................................................................................................5

La. R.S. 13:4365 ...................................................................................1, 2, 5, 6, 7, 8, 12, 22

**RESTATEMENTS:**

Restatement (First) of Restitution §74 (1937) ............................................................ Fn. 28, Fn. 29

Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011) ......................... 14, Fn. 28

**CASES:**

*Am. Bank & Tr. Co. v. Price,* 23,018 (La. App. 2 Cir. 4/3/96), 688 So. 2d 536,
*on reh'g* (June 7, 1996), *writ denied*, 96-1769 (La. 10/11/96), 680 So.2d 645 ...................... Fn. 15

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.,* 249 U.S. 134 (1919) .......................................14

*Assocs. Commercial Corp. v. Vick's Sand Pit & Dredging Co.,* 522 So.2d 663
(La. App. 4 Cir.), *writ denied*, 525 So.2d 1056 (La. 1988) ............................................................5

*Bank of U.S. v. Bank of Washington,* 31 U.S. 8, 17, 8 L. ed. 299 (1832) .....................................14

*Baumann v. Fields,* 332 So.23d 885 (La. App. 2 Cir. 1976) ...........................................................5

*Citizens Bank of Ville Platte v. Am. Druggists Ins. Co.,*
471 So. 2d 1119 (La. App 3d Cir. 1985) .............................................................................. Fn. 17

*Erickson v. Booth*, 127 Cal. App. 2d 644, 274 P.2d 460 (1954)............................................ Fn. 30

*Fush v. Egan,* 48 La. Ann. 60, 19 So. 108 (1985) ......................................... 16, Fn. 27

*German v. Nicholls,* 18 La. 361 (1841) .................................................................. Fn. 32

*Gootee Construction, Inc. v. Amwest Surety Insurance Co.,* 030144 (La. 10/10/03),
856 So.2d 1203 ..........................................................................................13, 14, 15, 16

*Graham v. Eagan,* 15 La. Ann. 97 (1860) ...................................14, 15, 16, 21, Fns. 26, 27, 28, 29

*Guar. Bank of Mamou v. Cmty. Rice Mill, Inc.*, 502 So.2d 1067 .........................................5, 6, 11

*Int'l Harvester Credit Corp. v. Majors,* 467 So.2d 1251 (La. App. 2 Cir. 1985).........................12

*Lisi Realty, Inc. v. Plaisance,* 306 So.2d 920 (La. App. 1st Cir. 1974),
*writ denied*, 310 So.2d 640 (1975)..........................................................................13

*M. Marx Sons v. Cooper,* 63 So.2d 883 (La. App. 1 Cir. 1953) .........................................6

*Mathis v. DCR Mortg. III Sub, I, LLC,* 952 F. Supp. 2d 828 (W.D. Tex. 2013) ..........................17

*Morris v. Morris,* 96-788 (La. App. 3 Cir. 12/26/96), 685 So. 2d 673, *writ denied,*
97-0237 (La. 3//14/97), 690 So.2d 40 ...............................................................18

*Oak Cliff Bank & Tr. Co. v. Kittle,* 309 So.2d 742 (La. App. 4 Cir. 1975) .......................6, 11, 12

*Orgeron v. Security Industrial Funeral Homes, Inc.,* 9602127
(La. App. 4 Cir. 2/26/97), 690 So.2d 243 .............................................................13

*Pasley v. McConnell*, 38 La. Ann. 470 (1886)......................................... 15, 16, Fn. 27

*PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 743 F. Supp 2d 1136 (C.D. Cal. 2010),
*affid in part,* 884 F.3d 812 (9th Cir. 2018) ................................................ 17, Fn. 29

*Saacks v. Saacks*, 97-570 (La. App. 5 Cir. 1/27/98), 708 So. 2d 1077,
*writ denied*, 98-0502 (La. 4/3/98), 717 So. 2d 232...............................................18, 20

*Villarrubia v. Villarrubia,* 18-430 (La. App. 5 Cir. 12/27/18), 263 So.3d 949 ............... 18, Fn. 31

## MEMORANDUM IN SUPPORT OF BARBARA LOLLAR'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.      INTRODUCTION AND STATEMENT OF THE CASE:**

Barbara Marie Carey Lollar ("Mrs. Lollar") moves for partial summary judgment as to the

following two claims from her Amended and Restated Complaint [Rec. Doc. 51]:

1.  The Bossier Parish Sheriff failed his duty under La. R.S. 13:4365 to appoint a
    third appraiser.

2.  Mrs. Lollar is entitled to restitution of her promissory note due to the complete
    reversal of the judgment upon which it was seized and sold.

Mrs. Lollar is the prevailing party after a devolutive appeal in a lawsuit which had been

filed against her by W.A. Lucky, III ("Mr. Lucky").  This original State court lawsuit is referenced

in this matter as "Lucky I".  There was a 12-month period between the issuance of the monetary

judgment in Lucky I and the complete reversal of that judgment by the Louisiana Second Circuit

Court of Appeal in January of 2019.  During this year, Mr. Lucky seized only one particular asset

of Mrs. Lollar's: a promissory note in the amount of $1,730,000.00 payable to Mrs. Lollar (the

"Note", Rec Doc. 51-1). The Note was purportedly sold at Sheriff's sale to Mr. Lucky's family

L.L.C. for just $105,000.  Mrs. Lollar filed this suit to address the improprieties which resulted in

her property being seized and sold for such a grossly deficient value, as well as to seek restitution

of the Note itself due to the reversal of the judgment upon which it was sold.

Lucky II, Lis Pendens and Seizure:

Prior to seeking seizure of the Note, Mr. Lucky first filed 2 lis pendens in the public records,

describing the property which served as the collateral for the Note.[1]  Mr. Lucky also filed a lawsuit

---

[1]        See Rec. Doc. 51 Exhibits "E" (51-7) and "F" (51-8) for a copy of each lis pendens referenced.

against Mrs. Lollar and her husband in February of 2018 ("Lucky II", see Rec. Doc. 71-2 for copy of Lucky II petition).  In Lucky II, Mr. Lucky claimed that the transactions by which the Note was created were null and of no effect as simulations.  Mr. Lucky sought for the immovable property which served as the Note's collateral to be placed back in Mrs. Lollar's name to be subject to the Lucky I judgment.[2]  After each lis pendens and Lucky II were in place, Mr. Lucky sought seizure of only the Note.  No other property owned by Mrs. Lollar was ever seized or identified for seizure by Mr. Lucky.  Rather than seek garnishment of the Note's payments, Mr. Lucky sought to hurriedly sell the Note at Sheriff's sale.

Appraisal and Sheriff's Sale:

The Note was to be sold with the benefit of appraisal.  After both Mrs. Lollar and Mr. Lucky submitted appraisals which were beyond the averaging limits set forth by La. R.S. 13:4365, the Sheriff was required by statute to appoint a third appraiser to make a true and just appraisal which would be final.  The Sheriff did not perform his duty.  Instead, the Sheriff allowed Mr. Lucky's counsel, Curtis Shelton, to obtain an additional appraisal.  This alleged third appraisal came from Patrick Lacour, at the request of Mr. Shelton.  Mr. Lacour was then working as an expert for Mr. Shelton in another matter.[3]  Mr. Shelton sent Lacour a 6-page letter with commentary and advice on what should be considered in the appraisal, as well as a specific set of documents for Lacour to review (the "Shelton Letter").[4]  Attorney Shelton's Letter to Lacour disparaged Mrs. Lollar and her husband (as well as undersigned counsel) while emphasizing Mr. Lucky's lis pendens and Lucky II lawsuit affecting the collateral property and the Note's validity.

---

[2]        A copy of the Lucky II petition filed by Mr. Lucky can be found at Rec. Doc.  71-2.

[3]        See Rec. Doc. 71-4 for an excerpt from Mr. Lacour's deposition at p. 59, lns 1-25 where Mr. Lacour admits to concurrently working with Mr. Shelton on another matter at the time of his appraisal in this matter.

[4]        See Rec. Doc 51-13, for a copy of the October 10, 2018 Shelton Letter.

The Shelton Letter attached selective filings from the Lucky I opinion as well as Mr. Lucky's new lawsuit (Lucky II), while leaving out any pleadings by Mrs. Lollar and the fact the underlying judgment was pending appeal with briefs being filed at that time.

Mr. Lucky's counsel served as the only contact with Mr. Lacour until Lacour formed an appraisal. In turn, the Sheriff's office was only in contact with Lucky's counsel. Mrs. Lollar and her counsel were never contacted or notified regarding Mr. Lacour's work until Lacour provided an appraisal to the Sheriff's office. Mrs. Lollar had no opportunity for input as to this additional appraisal. Mr. Lacour submitted an appraisal of the Note for 9% of its face value. The discounts which Lacour applied to the Note's value were based on Lucky II, the lis pendens, and Lacour's communications with Mr. Shelton. He sought no independent information regarding the Note, the value of the Note's collateral, or the Note's payor to make his appraisal; in fact, Mr. Lacour never even saw a copy of the Note.[5]

Mrs. Lollar's $1.7 million dollar Note was presented for sale by the Sheriff on October 24, 2018 with an opening bid of only $104,672.81. There was only one bidder: Vickie Lucky, in attendance at the sale with her husband, Mr. Lucky, provided the sole bid of $105,000 on the Note on behalf of Lucky Family, L.L.C.[6]

Post-Sale:

Lucky Family, L.L.C. began immediate efforts to collect installment payments on the Note after the Sheriff's sale, and then claimed default by the payor (Magnolia Island Plantation, L.L.C.

---

[5]    See Rec. Doc. 71-5 for excerpts from the transcript of Mr. Lacour's deposition at p.24 at lns. 2-23, p. 63 at lns. 2-8, p. 77 at lns. 2-11, p.123 at lns. 9-20. Mr. Lacour's testimony indicates that he reached no further than Mr. Shelton's Letter and its attachments in making his appraisal.

[6]    Mrs. Lucky was also joined by attorney David Touchstone who assisted her with bidding.

or "Magnolia") to accelerate the Note for its full value of $1,730,000.[7]  Mr. Lucky dismissed Lucky II and cancelled both of the lis pendens he filed against the collateral property.  This paved the way for his family L.L.C. to pursue the Note without the encumbrances he had set in place to reduce the appraisal value.

Today, Mrs. Lollar stands as the prevailing party in the initial Lucky I suit filed by Mr. Lucky against her.  The opinion by the Second Circuit was candid: Lucky I never should have happened, as the State court committed prejudicial legal error by repeatedly failing to simply apply Louisiana's writing requirement to dismiss Mr. Lucky's claims.[8]  So what does Mrs. Lollar get for prevailing?  In addition to the attorney fees and time spent defending herself throughout the *9 years* Mr. Lucky prosecuted Lucky I, Mrs. Lollar now has been deprived of her $1,730,000 property, the value of which Mr. Lucky's family LLC is now seeking to collect in full.  Mr. Lucky may allege that he was within his rights to seek sale of her property during the pendency of a devolutive appeal in Lucky I.  Unfortunately, the facts point to severe failures by the Sheriff in the appraisal and sale process, as well as continued abuses of process by Mr. Lucky and Lucky Family, L.L.C. to obtain the Note for pennies on the dollar.  The Sheriff's sale cannot be upheld under these facts.  But even if Lucky had only exercised a right to seize and sell during appeal, there exists a counterbalance to ensure that if the judgment is ultimately reversed an unjust enrichment does not occur at the expense of the successful appellant.  Louisiana law supports Mrs. Lollar's claim that she is entitled to restoration of her property under the circumstances of Lucky I's reversal.

---

[7]     See Rec. Doc 71-8, for a copy of a letter on behalf of Lucky Family, L.L.C. addressed to Magnolia, claiming the LLC has accelerated the Note.

[8]     Mr. Lucky's allegation in Lucky I was that he was owed an obligation regarding the transfer of immovable property based on an alleged oral agreement with Mrs. Lollar.  There was no agreement, written or otherwise and Mrs. Lollar strongly refuted his claims.

## II.    LAW AND ARGUMENT:

### A.   The Sheriff's Failure Under La. R.S. 13:4365

The Bossier Parish Sheriff failed in its duty to appoint a third appraiser, as required by La. R.S. 13:4365.  This failure by the Sheriff to conduct the October 24, 2018 Sheriff's sale of Mrs. Lollar's Note in accordance with the statutory requirements caused the Note to be sold without appraisal under the statute and renders the sale itself a nullity.

Law.

Property sold at a judicial sale under a writ of fieri facias must be appraised according to law prior to the sale. La. Code Civ. Proc. art. 2332; *Baumann v. Fields*, 332 So. 2d 885, 887 (La. App. 2 Cir. 1976). The procedure for such an appraisal is contained in La. R.S. 13:4363-13:4366. Id., at 888 (La. App. 2 Cir. 1976); *Assocs. Commercial Corp. v. Vick's Sand Pit & Dredging Co*., 522 So. 2d 663, 664–65 (La. App. 5 Cir.), writ denied, 525 So. 2d 1056 (La. 1988). Those statutes direct both the creditor and the debtor to select an appraiser to value the property prior to the sheriff's sale. La. R.S. § 13:4363. If the appraisers cannot agree on a valuation but the two values are within $250,000.00 of each other and the lower valuation is at least ninety percent of the higher valuation, the sheriff is required to average the values and use the average value as the opening bid in the sale. La. R.S. 13:4365(B). However, if the two valuations are not within these averaging limits, the sheriff is required to appoint a third appraiser. *Id*. The third appraiser's decision is final. *Id*.

Though the appraisal requirement for sales pursuant to a fifa writ is in the Civil Code, the procedure for such appraisals is contained in the Deficiency Judgment Act (the "DJA") portion of the Revised Statutes: La. R.S. 13:4106, *et seq*. The substance of the DJA is primarily intended to cover deficiencies following a judicial sale stemming from an executory proceeding. *Guar. Bank*

*of Mamou v. Cmty. Rice Mill, Inc*., 502 So. 2d 1067, 1071. In that context, if there are substantial irregularities in the appraisal process, the sale is treated as having been made without appraisal, and the creditor thus cannot pursue a deficiency. La. R.S. 13:4106; *M. Marx Sons v. Cooper*, 63 So. 2d 883, 884–85 (La. App. 1 Cir. 1953). Louisiana courts have ruled that a debtor cannot point to such irregularities to enjoin a creditor seeking a deficiency judgment after a fifa sale. *Guar. Bank of Mamou, supra*, at 1071-1072; *Oak Cliff Bank & Tr. Co. v. Kittle*, 309 So. 2d 742, 742–43 (La. App. 4 Cir. 1975). However, Louisiana's Fourth Circuit noted in *Oak Cliff* that a debtor might raise a faulty appraisal process in other contexts, "such as a suit to annul the sale." *Id*. The Fourth Circuit thus recognized that the limitation enunciated in *Oak Cliff* and *Guar. Bank of Mamou* only applies to deficiency judgments; those rulings do not diminish a debtor's ability to challenge the appraisal process for any other purpose. *Oak Cliff Bank & Tr. Co. v. Kittle*, *supra*.

Facts:

The following facts are those to which there should be no genuine issue to be tried.  Mrs. Lollar's Note was to be sold by the Sheriff with the benefit of appraisal.  Both the judgment creditor (Mr. Lucky) and the debtor on appeal (Mrs. Lollar) provided respective appraisals to the Sheriff's office in regards to the potential sale of the Note.[9]  Based on the disparity in value between the two appraisals, the Sheriff was required, under La. R.S. 13:4365 to appoint a third appraiser whose decision would be final. The Sheriff's office contacted the judgment creditor's counsel, Curtis Shelton, in regards to a third appraisal even before it was known if one would be necessary.[10]  The Sheriff's office did not contact the debtor or the debtor's counsel for any input regarding a third

---

[9]     See Rec. Doc. 51, Exhibit "I" (51-11) where Mr. Lucky's appraiser, Chad Garland, presented a value of $173,000 and Exhibit "J" (51-12) where Mrs. Lollar's appraiser, John Dean, presented a value of $1,478,048.68.

[10]    See Rec. Doc. 71-3 for email from Sheriff's office to Curtis Shelton regarding the third appraiser.

appraiser, nor did the Sheriff's office independently search for an appraiser. The judgment creditor's counsel, Mr. Shelton, asked Patrick Lacour to provide an additional appraisal of the Note.[11]  Mr. Lacour happened to already be contracted with Mr. Shelton at the time in relation to a separate client.[12]  There is no evidence of communications between the Sheriff and Lacour prior to Lacour forming his appraisal.  All communications and directives to Mr. Lacour prior to the completion of his appraisal came from Mr. Shelton rather than the Sheriff, including the Shelton Letter to Lacour and its attachments.  Likewise, all communications by the Sheriff's office regarding this additional appraisal were with Mr. Shelton prior to the completion of the appraisal.  Mr. Lacour's appraisal was submitted on October 22, 2018 for $157,009.22 - only 9% of the Note's face value.[13]  In performing this appraisal, Mr. Lacour relied on the Shelton Letter, as well as Mr. Shelton's attachments thereto without performing independent research beyond those documents.[14]

Application:

The Sheriff never appointed a third appraiser in this case. Instead, Mr. Lucky's attorney selected an additional appraiser after Mr. Lucky had already submitted the Garland appraisal. The Sheriff's decision to allow Mr. Lucky to select two appraisers is appalling. It gave Lucky a second, definitive bite at the apple. The Sheriff clearly violated his duty under La. R.S. 13:4365(B) by failing to appoint a third appraiser. Because the Sheriff never designated a third appraiser, no

---

[11]    See Shelton Letter at Rec. Doc. See. Rec. Doc. 51-13.

[12]    See Rec. Doc. 71-4 for excerpt from deposition wherein Mr. Lacour testifies that he was already working with Mr. Shelton in another matter at the time.

[13]    See Rec. Doc. 51-14 for a copy of Lacour's appraisal submitted October 22, 2018.

[14]    See Rec. Doc. 71-5 for excerpts from the transcript of Mr. Lacour's deposition at p.24 at lns. 2-23 (No independent research on the quality of the borrower); p. 63 at lns. 2-8 (No independent research into other court filings); p. 77 at lns. 2-11 (Lacour did not review a copy of the Note); p.123 at lns. 9-20 (Lacour's review of public records was confined to the attachments to the Shelton Letter.)

statutorily-authorized third appraisal was ever made. The sale process was not performed in accordance with the law and should be annulled.[15]

The available evidence reflects that Mr. Lacour could not be working for the Sheriff in conducting his appraisal.  Mr. Shelton was the only party who communicated with Mr. Lacour regarding appraising the Note prior to the completion of that appraisal. Mr. Shelton is the only party who selected the information to provide to Mr. Lacour. The Sheriff played no role in identifying, selecting, contacting, or communicating with Mr. Lacour regarding his appraisal. Though a sheriff's employee asked Mr. Shelton for a *recommendation* for a third appraiser in the event of a value discrepancy, this was merely a request for a suggestion for a hypothetical scenario that had not yet occurred.[16] There is no sense in which this speculative entreaty constitutes an appointment by the Sheriff. Similarly, the mere fact that Mr. Lacour eventually signed the Oath of Appraiser in front of a Sheriff's office representative does not mean the Sheriff appointed him. The relevant statute requires affirmative action by the Sheriff or his office: "the sheriff *shall appoint* a third appraiser." La. R.S. 13:4365(B).[17] However, the Sheriff's role in this regard was entirely passive. At best, the Sheriff's only action was acquiescing to Mr. Lucky inserting an additional appraisal, which was treated as controlling as to the Note's sales price. The Sheriff provided payment to Mr. Lacour, but only after the appraisal was completed based on the Shelton

---

[15]    While Louisiana's Second Circuit has held, in the deficiency judgment context, that a third appraiser need not be a totally disinterested party, he still needs to be a party appointed by a sheriff and it still must be a true and just appraisal.  Am. Bank & Tr. Co. v. Price, 28,018 (La. App. 2 Cir. 4/3/96), 688 So. 2d 536, 540, on reh'g (June 7, 1996), writ denied, 96-1769 (La. 10/11/96), 680 So. 2d 645

[16]    See Rec. Doc. 71-3 for a September 17, 2018 email from Sheriff's employee Kim Flournoy to Mr. Lucky's counsel, Curtis Shelton, regarding a third appraisal.  This occurred more than a month before it was even known whether a third appraiser would be necessary.

[17]    Emphasis added. See also, Citizens Bank of Ville Platte v. Am. Druggists Ins. Co., 471 So. 2d 1119, 1121-1122 (La. App. 3d Cir. 1985): "Therefore the sheriff's official duties include appointing a qualified and competent appraiser for a judicial sale…".

Letter and its attachments. In every practical sense, Mr. Lacour was an appraiser chosen by Mr. Lucky, for Mr. Lucky.

The legal ground for an annulment in this motion is the Sheriff's refusal to do his statutory duty, rather than the flaws in the appraisal or the information considered by Lacour. However, there were problems with both of these aspects of the Lacour "appraisal". Mr. Lacour never saw a copy of the Note, never performed independent research beyond the Shelton Letter, and completely failed to factor in the actual value of the collateral for the Note, while also excluding the substantial mineral value of the property securing the Note.[18] These flaws would provide sufficient grounds for the Lacour appraisal to be thrown out on their own, but for the purpose of this motion they emphasize why the Sheriff, rather than the judgment creditor, is tasked with appointing a definitive third appraisal.

Though the Shelton Letter states that Mr. Lacour "will not be acting for either the plaintiff or the defendant", it then went on to provide an extended one-sided "background" section on the dispute. The contents of that letter highly partisan and contain numerous incorrect factual and legal claims, as well as heavily-biased phrasing[19]:

- We caught onto Ms. Lollar's scam…

- It is obvious that she knew that Judge Self was going to rule against her in Lucky-Carr I.

- She was not truthful in her testimony.

- …Ms. Lollar, aided and abetted by her lawyers who had unsuccessfully defended Lucky-Carr I…

- The appraisal indicates that the [Property] has a value of $4,000 per acre. The property that Ms. Lollar transferred was 280 acres, which would, therefore, have a value of

---

[18]     See Rec. Doc. 71-5 for excerpts from Mr. Lacour's deposition at p.24 at lns. 2-23, p. 63 at lns. 2-8, p. 77 at lns. 2-11, p.123 at lns. 9-20 and footnote No. 14, *supra*. See also Exhibit A, attached hereto, for pgs. 34-35 and p. 53 of Mr. Lacour's deposition wherein he admits he chose to disregard the mineral value of the collateral property (pgs. 34-35), and that he performed no research beyond the Shelton Letter (p. 53).

[19]     Reference Rec. Doc 51-13 for a copy of the Shelton Letter.

$1,120,000.00. Nevertheless, what is relevant here is that the value of the [Note] must be determined based on the fact that a person who buys it will do so subject to the claims made against the property in Lucky-Carr II, which are protected by a lis pendens.

The Shelton letter is the primary written communication to Lacour regarding his appraisal, and one which Lacour himself admits influenced his appraisal.[20] The Sheriff did not write it or participate in its drafting.  In fact, the Shelton Letter was kept from the Sheriff according to deposition testimony by Sheriff employee Jean Horne, who had never seen it.[21]  Mrs. Lollar did not get any opportunity to counter Mr. Shelton's commentary or to provide her own "background" section. The fact characterizations are insulting ("scam"; "scheme"; "aided and abetted") and designed by Lucky's counsel to prejudice Mr. Lacour against Ms. Lollar and Magnolia.  Mrs. Lollar was under no prohibition from selling property as the relief sought by Mr. Lucky in Lucky I was monetary.  For the most part, Mr. Shelton's legal *arguments* are worded as uncontested conclusions of law; for example, the proposition that the claims in Lucky-Carr II are "protected by a lis pendens." The Lucky II defendants disputed that this lis pendens was properly filed in their Answer to that suit's petition.  Because it was improperly filed, it did not "protect" any of the claims in Lucky-Carr II.  But Mr. Lacour was presented only Lucky's position on the dispute with the Shelton Letter stating Mr. Lacour had the ability to "evaluate the merits of the lawsuit".[22] Mr. Shelton was given a free shot to woodshed Mr. Lacour with his own instructions, guidelines, and arguments, all of which compromised the neutrality of the process.

Furthermore, Mr. Lacour only reached his absurdly-low valuation of the Note by giving undue weight to the problems Mr. Lucky manufactured through Lucky II and the lis pendens

---

[20]     See Rec. Doc. 71-5 at p. 123 of the Lacour deposition.

[21]     See Exhibit B attached hereto containing pgs. 24-26, and pgs. 53-54 of Jean Horne's deposition. At p. 26, Mrs. Horne testified in regards to the Shelton Letter that "This is not normal in our procedure." At p. 53-54 Mrs. Horne testified that she had not seen the Shelton Letter and it was not in the Sheriff's file.

[22]     Reference Rec. Doc 51-13 for the Shelton, Letter; See also Exhibit A at Page 53.

against the Note's collateral. Mr. Lucky manipulated the process on both ends to reach his desired outcome.  Mr. Lucky knew that he could chill the sale of the Note with Lucky II and the lis pendens, which would allow his family LLC the opportunity to buy it on the cheap.  Mr. Lucky could then control the Note while pursuing the remaining amounts of his judgment.  This double recovery is evidenced in Lucky's own letter to Lollar just days after the Sheriff's sale wherein his counsel claims that "the amounts owed by Ms. Lollar and Mr. Lollar total nearly $4.3 million."[23]  Doubling his soon-to-be reversed $1.7 million dollar judgment was Mr. Lucky's goal.  The potential for even the appearance of bias is precisely why the Sheriff is tasked with selecting the third appraiser in the first place. Allowing this "sale" to stand would gut the purpose of the statutory process.

In his opposition to this Motion, Mr. Lucky may argue that the Sheriff's actions did not constitute a breach of his duty – that the Sheriff still did appoint an appraiser, and merely did so *through* Mr. Shelton. This Court should not be persuaded by that argument. There is no evidence that the Sheriff instructed any outside party to do the Sheriff's job. More importantly, there is no statutory provision that would even allow the Sheriff to deputize a creditor's counsel to perform the Sheriff's duties in this regard. The relevant statute is unambiguous in directing the Sheriff to make the appointment.

Alternatively, Mr. Lucky may argue that the Lacour appraisal should not be "invalidated" even if the Sheriff did breach his statutory duty. That argument would require a misunderstanding of Ms. Lollar's argument here and of the *Guar. Bank of Mamou* and *Oak Cliff Bank* rulings. Those decisions held that a debtor in an ordinary process action cannot use any irregularities in the appraisal process as a defense against a creditor seeking to recover a deficiency judgment. That defense does work in the executory proceeding context, where improperly-performed appraisals

---

[23]    See Exhibit C, attached hereto, for October 29, 2018 letter from Mr. Shelton to Mrs. Lollar.

11

are ignored and the sales are treated as having been made without appraisal, such that no deficiency can be pursued. *Int'l Harvester Credit Corp. v. Majors*, 467 So. 2d 1251, 1253–54 (La. App. 2 Cir. 1985). This distinction between ordinary and executory process is irrelevant to our facts, as Mrs. Lollar is not attempting to invoke a defense to efforts to collect a deficiency.  Instead, Plaintiffs have demonstrated that the sale itself is null because of the Sheriff's failure to perform his duty; there is no deficiency judgment at issue. As the *Oak Cliff Bank* court recognized, the fact that a debtor in an ordinary process action cannot invoke irregularities in the appraisal process as a defense to a deficiency judgment does not mean that debtor is unable to point to those irregularities in a suit to annul the sale.

Finally, this Court should consider the loss of institutional trust that will result if the Note sale is allowed to stand in spite of the Sheriff's refusal to perform his duty. No debtor could, or should, expect a fair appraisal if their litigation opponent is allowed to select the third appraiser in the event of a significant discrepancy between the first two appraisals. The statutory procedure exists so that a referee arbiter can make a final, objective valuation in cases of conflict.   A ruling that the Sheriff's breach in this case has no consequences will erode public confidence in the neutrality and objectivity of our legal processes. The procedure of La. R.S 13:4365(B) provides an important check on litigants with competing interests.  The statutory procedure exists to protect all participants, whether creditor or debtor. It is incumbent on the judicial system to maintain those protections.

### B.  Mrs. Lollar's Right to Restitution of the Note

Due to the complete reversal of the underlying judgment on which Mrs. Lollar's property was seized and sold, she is entitled to have her property restored to her Louisiana law.

Law: Restitution of Property Seized and Sold Upon Judgment Reversal.

When a judgment is reversed, the former judgment debtor is entitled to restitution. The modern basis for this restitution owed is found in the unjust enrichment principles set forth in Civil Code article 2299. *Gootee Construction, Inc. v. Amwest Surety Insurance Co*., 030144 (La. 10/10/03), 856 So.2d 1203. Article 2299 provides that: "A person who has received a payment *or a thing* not owed to him is bound to restore it to the person from whom he received it."[24]  The subsequent Article 2304 states that: "When the thing not owed is an immovable or a corporeal movable, the person who received it is bound to restore the thing itself, if it exists…" La. Civ. Code Ann. art. 2304.  The Louisiana Supreme Court applied these precepts in *Gootee Const., Inc. v. Amwest Sur. Ins. Co.,* There, the Court addressed a claim by a judgment debtor for the return of a cash payment after an appellate reversal of the underlying judgment. The former debtor made that payment to the former judgment creditor during the pendency of a devolutive appeal. The Supreme Court held that the cash payment had to be refunded to the former judgment debtor.  In so ruling, the court walked through its basis for awarding the return of the funds:

> [T]he starting point of our analysis begins with the codal articles. Louisiana Civil Code, article 2299, provides:
>
>> A person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it.
>
> This court has not previously interpreted Article 2299 in light of the question of whether funds paid in satisfaction of a judgment which is subsequently reversed must be refunded.[2] However, we agree with the decisions in *Orgeron v. Security Industrial Funeral Homes, Inc.,* 96-2127 (La.App. 4 Cir. 2/26/97), 690 So.2d 243, and *Lisi Realty, Inc. v. Plaisance,* 306 So.2d 920 (La.App. 1st Cir.1974), *writ denied,* 310 So.2d 640 (1975), which applied the principle recited in Article 2299, although neither case cited codal authority.

---

[24]   La. Civ. Code. art. 2299, (Emphasis ours).

13

The concept of restitution to a judgment debtor upon reversal is a well-established concept in law, both in Louisiana and nationwide:

- On the reversal of the judgment, the law raises an obligation in the party to the record, who has received the benefit of the erroneous judgment, to make restitution to the other party for what he has lost. *Bank of U.S. v. Bank of Washington*, 31 U.S. 8, 17, 8 L. Ed. 299 (1832);

- A party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby. This right, so well founded in equity, has been recognized in the practice of the courts of common law from an early period.  *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co*., 249 U.S. 134, 145 (1919);

- A transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution as necessary to avoid unjust enrichment. Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011).

Even before *Gootee*, the Louisiana jurisprudence on restitution in Louisiana consistently aligned with this longstanding national stance, providing for recovery by the judgment debtor in instances where property or payment was seized prior to the underlying judgment being reversed.  The mode of how Louisiana courts accomplish this recovery has been dependent on the facts of each case.

In the 1860 case of *Graham v. Eagan*, 15 La. Ann. 97(1860), the Louisiana Supreme Court was presented with a judgment debtor having his property seized and sold during the pendency of a devolutive appeal.  The purchaser of the debtor's property at judicial sale was the judgment creditor which had caused his property to be sold.  The *Graham* court made a distinction between situations where a third party purchases the debtor's property and where the judgment creditor purchases it, differentiating the modes of restitution available to those parties.  The court reasoned that an "innocent purchaser" should not be prejudiced "by the subsequent change of affairs by the reversal of the judgment".  However, it also recognized that the same was not true of the judgment creditor; a judgment creditor purchaser "can do more: he can restore the property itself and place

14

the [former judgment debtor] in the same condition he would have occupied if he had not been harassed with an unfounded demand." Similar to the later *Gootee* ruling, the *Graham* court supported its ruling through unjust enrichment principles which, in the case of *Graham*, were based in Roman and civilian authorities. It also pointedly overruled its own prior decision in *Baillo v. Wilson,*[25] which appeared to limit the scope of restitution to the judgment debtor in a reversal scenario. The *Graham* court affirmed the lower court order requiring the seizing creditor to restore to the purported judgment debtor the actual property the creditor had seized in execution of the reversed judgment.

The *Graham* court recognized the judgment debtor is, at times, prevented from taking a suspensive appeal, whether due to economic hardship or otherwise, and that this places the judgment debtor (who becomes an appellant) in a passive position to the judgment on appeal which can be subject to oppression or injustice.[26] *Graham* does not take issue with the choice by the judgment creditor to execute on a judgment during pendency of an appeal, or even a creditor who wishes to obtain his debtor's property at sale. However, it does establish that the property owner who was subject to the creditor's seizure and sale will still have rights which must be adequately protected in the case of the judgment's reversal.

In *Pasley v. McConnell*, 38 La. Ann. 470 (1886), the Louisiana Supreme Court found itself with a similar situation to *Graham*, in that the executing creditor purchased the debtor's property at judicial sale. However, the underlying judgment was only partially reversed in *Pasley*. *Id*. at 474. For this reason, *Pasley* found that a just ground for the judicial sale itself remained, and therefore the mode of restitution would be for the purchasing creditor to restore to the debtor any

---

[25]     5 Mart.(n.s.) 214 (1826)

[26]     *Graham v. Eagan*, 15 La. Ann. 97, 98–100

15

amounts in excess of the surviving judgment. *Id*. Although *Pasley* distinguishes *Graham* based on its specific judgment being only partially reversed, it did not overrule it. Shortly after *Pasley*, the Supreme Court reaffirmed the general principle of Graham in the matter of *Fush v. Egan*. There, property was seized and sold at a sheriff's sale prior to the reversal of the original judgment on appeal. The Court stated:

> When the judgment in favor of a plaintiff is reversed on the devolutive appeal, he owes restitution to defendant of all obtained on execution of the judgment. The party cast on the devolutive appeal is placed *where he stood before he brought his suit, and the successful appellant is restored to the property wrested from him under the void judgment*.

*Fush v. Egan*, 48 La. Ann. 60, 62–66, 19 So. 108, 109–11 (1895)  (Emphasis added)[27]

This early jurisprudence on the modes of restitution in the scenario of a reversed judgment was never specifically codified in current law.  However, the *Gootee* court's recent reliance on art. 2299 unjust enrichment provides direction in our current matter.  *Graham, Gootee,* and Civil Code article 2299 provide that restitution of the property itself is available to the aggrieved party whose property was sold by a judgment creditor during the pendency of the appeal. This approach is also congruent with other jurisdictions and general principles of restitution at law.[28]  For example, the

---

[27] Later Louisiana Supreme Court cases did not consistently follow the *Graham* and *Fush* rationale. For instance, in *Holland v. Bryan* 148 La. 999, 88 So. 246 (1921), the court denied the former debtor *in specie* restitution and stated that his only option was to recover from the proceeds of the sale. Curiously, *Holland* supported its decision with citation to *Baillio v. Wilson* case, *supra*, which the court had expressly rejected as contrary to Louisiana law in *Graham, supra*. The *Holland* court addressed its failure to rely on *Graham* by incorrectly claiming that *Graham* had been overruled by *Pasley v. McConnel, supra*.  However, as discussed above, *Pasley* distinguished *Graham* on the facts (due to *Pasley's* partial reversal), in order for its ruling to be in conformity with *Graham's* precedent.

[28]    See Restatement (First) of Restitution § 74 (1937) stating that a judgment creditor purchasing the debtor's property on execution sale and retaining it must restore it in specie, citing cases from multiple jurisdictions, including *Graham v. Eagan, supra*.  See also comment f. 2. Of Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011)  stating that "…parties and privies to the underlying proceeding who purchase at an execution sale-including the judgment creditor, the

federal Western District of Texas dealt with a judgment reversal after a judicial sale of property in *Mathis v. DCR Mortg. III Sub, I, LLC*, 952 F. Supp. 2d 828 (W.D. Tex. 2013). The court ruled that when property has been taken in this context, then the prevailing party on reversal can recover it, unless the rights of third parties entitled to protection have intervened. The *Mathis* court stated that: "It is pretty well settled that, where the plaintiff has purchased at the sale, upon reversal the defendant may recover from him the property itself or its value if it has been alienated". (citation omitted) *Id*. at 834; See also *PSM Holding Corp. v. Nat'l Farm Fin. Corp.,* 743 F. Supp. 2d 1136 (C.D. Cal. 2010), *aff'd in part,* 884 F.3d 812 (9th Cir. 2018).[29]

The authorities addressing restitution of property rather than its sales value also include caveats to protect any innocent, third party purchasers at a judicial sale when the underlying judgment is reversed. However, the protection of true third parties does not run afoul of property restitution when the seizing creditor inserts himself into the process to acquire his debtor's property during the pendency of an appeal. A judgment creditor whose debtor files for a devolutive appeal is under no requirement to stay execution of the judgment. However, should the judgment creditor choose to execute during the pendency of the devolutive appeal, it is at his risk in regards to restitution which may be owed on reversal.[30] The judgment creditor owes the restitution obligation to a former judgment debtor in cases of judgment reversal. Therefore, if the judgment creditor, or

---

creditor's attorney, the creditor's successor, or the real party in interest-acquire property of the judgment debtor subject to the risk that the underlying judgment may be subsequently reversed or set aside."

[29] *PSM*, relying on §74 of the First Restatement on Restitution, as well as citing to *Graham v. Eagan*, *supra*, ruled that a party prevailing on appeal was entitled to specific restitution of property rather than simply the value of what was sold. *PSM* at 1142.

[30] For instance, see *Erickson v. Boothe,* 127 Cal.App.2d 644, 274 P.2d 460 (1954):

> Although plaintiff was guilty of no wrongdoing when she retook the property, she knew that judgment was not final; she knew that if the appeal were successful, she would be subject to an accounting and full restitution.

17

a representative thereof, purchases the seized property, then under Louisiana law the restoration of the former debtor's property is necessary to make the former debtor whole after prevailing on a reversal of the judgment.

<u>Law: Monetary Judgments In Louisiana's Community Property Regime.</u>

A legal cause of action that arises during the existence of a community property regime is community property. La. Civ. Code art. 2338; *Saacks v. Saacks*, 97-570 (La. App. 5 Cir. 1/27/98), 708 So. 2d 1077, 1081, writ denied, 98-0502 (La. 4/3/98), 717 So. 2d 232; *Villarrubia v. Villarrubia*, 18-430 (La. App. 5 Cir. 12/27/18), 263 So. 3d 949, 952.[31] Similarly, a monetary judgment awarded to one spouse during the marriage is community property. La. Civ. Code art. 2338; *Morris v. Morris*, 96-788 (La. App. 3 Cir. 12/26/96), 685 So. 2d 673, 675, writ denied, 97-0237 (La. 3/14/97), 690 So. 2d 40. The exception to this general rule is contained in Civil Code article 2344, which makes settlement amounts or damage awards arising from personal injuries sustained during the existence of the community separate property. As is clear from the text of that article, this limited exception does not apply to any other species of damages award or settlement. The Louisiana Fifth Circuit recognized as much in *Saacks v. Saacks,* holding that a settlement for breach of contract that occurred during the marriage was community property. *Id*., at 1281. As a result, the former Mrs. Saacks was entitled to fifty percent of the settlement. *Id*.[32]

<u>Facts:</u>

Mr. Lucky had Mrs. Lollar's $1,730,000 Note seized and sold based on the Lucky I

---

[31]     The *Villarrubia* court said: To the extent that a right to receive proceeds derives from a spouse's labor and industry during the existence of the community, that right is a community asset. 263 So. 3d 949, 952.

[32]     Furthermore, property obtained by one spouse at a sheriff's sale is community property, even if the sale is executed pursuant to a judgment that is separate property. *German v. Nicholls*, 18 La. 361, 365–66 (1841).

judgment, which was then on devolutive appeal.[33]  The Note was sold on October 24, 2018 to Lucky Family, L.L.C. for only $105,000.[34]  Less than three months later, the Lucky I judgment was reversed in its entirety.[35]  Prior to the sale of the Note, Mr. Lucky, individually and through his counsel, provided his family's LLC with information regarding the Note sale.[36]  Mr. Lucky's wife, Vickie Talley Lucky ("Mrs. Lucky"), was a member and one of the Managers of the Lucky Family, L.L.C.[37]  Mrs. Lucky attended the October 24, 2018 Sheriff's Sale with Mr. Lucky, where Lucky Family, L.L.C. was the only bidder for the Note.  There is no factual dispute that, at the time of the company's purported purchase of the Note, all of the following was true: Mr. Lucky was listed as a member of Lucky Family, L.L.C. in the Secretary of State records;  Mr. Lucky's role as Manager of Lucky Family, L.L.C. had not been changed or otherwise revoked;[38] Mr. Lucky, and his counsel, were in communication with Mrs. Lucky, Lucky Family, L.L.C., and its counsel in regards to efforts to collect on the Note.[39]  After the Note sale, Mr. Lucky dismissed his claims in Lucky II and cancelled both lis pendens he previously filed which had encumbered the Note's collateral during the seizure, appraisal, and sale of the Note.[40]  Mr. Lucky and Mrs. Lucky are

---

[33]     See Rec. Doc. 70, at paragraph 19, in which Mr. Lucky's Answer to Mrs. Lollar's Amended and Restated Complaint admits to seeking seizure of the Note.

[34]     See Rec. Doc. 51-15 for Sheriff's Proces Verbal for the October 24, 2018 Sheriff's Sale.

[35]     See Rec. Doc. 51-5 for reversal by the Louisiana Second Circuit Court of Appeal.

[36]     Such communications are the subject of a *Motion to Compel* filed by Mrs. Lollar at Rec. Doc. 71. Although the contents of the communication are at issue in the motion, the subject matter has been disclosed in filings therein.

[37]     See Rec. Doc. 11-2 for copy of La. Secretary State listing for Lucky Family, L.L.C., printed on February 1, 2019

[38]     Although Mr. Lucky and Lucky Family, L.L.C. have presented documents in an effort to evidence Mr. Lucky transferred his membership interest (see Rec. Doc. 37-2 and 37-3), there is no evidence that Mr. Lucky has relinquished his role as Manager in accordance with the requirements for such.

[39]     See Footnote No. 37, *supra*.

[40]     See Exhibit D, attached hereto, for *Request for Cancellation* of both lis pendens and Mr. Lucky's dismissal of Lucky II.

19

husband and wife, and subject to Louisiana's community property regime.

    Application:

    Lucky Family, L.L.C. was the sole bidder for the Note at the October 24, 2018 Sheriff's Sale. The Lucky I judgment which had served as the basis of the seizure and sale was reversed in its entirety only a few months after the sale.  The name of the alleged purchaser is no coincidence, as it is Mr. Lucky's family L.L.C., and is owned in part by his wife, Vickie Lucky.  Mr. Lucky has asserted that he has no ownership in Lucky Family, L.L.C. and that this should be dispositive of the L.L.C.'s role as a third-party.  This is, at best, a paper-thin front that cannot defeat Mrs. Lollar's right to be restored her property and or allow for the unjust enrichment of the defeated party.  Mr. Lucky's claim is contrary to the membership listed for Lucky Family, L.L.C. by the Secretary of State at the time of the Note sale. It is also inconsistent with the fact that Mr. Lucky never relinquished his role as Manager and continues to exert that authority on behalf of the L.L.C. Further, Mr. Lucky was using Lucky Family L.L.C. as his own bank for land purchases during this same time period, with some of the property he purchased being later transferred into a separate L.L.C., in which Vickie Lucky and Mr. Lucky were equal owners.[41]  Mr. Lucky's demonstration that (on paper) he has no ownership in Lucky Family, L.L.C. is contrary to the undisputable control and management he exerts in its regard.

    In addition, to the extent Mr. Lucky had anything from his erstwhile Lucky I judgment, it was community property. La. Civ. Code art. 2338; *Saacks v. Saacks*, *supra.*  Therefore, Mrs. Lucky

---

[41]    See Exhibit E, attached hereto which includes Mr. Lucky's company, Coyote Land Co., L.L.C.'s Mortgage with Lucky Family, L.L.C., borrowing almost $1 million dollars to purchase the tracts covered by the Mortgage, and then Coyote Land's Transfer into Lucky Real Estate Holding, L.L.C. in which Mr. Lucky and his wife were equal owners.

was not a true third-party purchaser in acting through the family's LLC to purchase the Note; she was just as much a judgment creditor as her husband.

As recognized in *Graham v. Eagan*, the creditor who purchases his debtor's property at judicial sale can "do more" than a third-party purchaser by restoring to the prevailing appellant their actual property. Mr. Lucky, Vickie Lucky and Lucky Family, L.L.C. are not entitled to the protection provided to true third parties after a judicial sale of property and subsequent reversal of the underlying judgment.  To rule otherwise would permit the circumvention of Louisiana's restitution law. Further, it would allow the unjust enrichment of the party with no judgment at the expense of the successful appellant. Currently Mr. Lucky's family L.L.C. purports to own the Note as a third-party purchaser and is seeking a ***1600% return*** by collecting the full principal amount of the Note and accrued interest.  This is the same Note Mr. Lucky claimed was a nullity in Lucky II.  Of course, Mr. Lucky has now moved away from these claims, as they would hinder his family's attempt at a windfall.  Louisiana's restitution law exists to prevent injustices such as this. A ruling to apply Louisiana's restitution law and restore the Note itself to Mrs. Lollar will ultimately lead to resolution of Mrs. Lollar's claims in this matter.  Further, should the Note be restored, it is not Mrs. Lollar's intention to prevent Lucky Family, L.L.C. from receiving any portion of the $105,000 paid for the Note which it may be due under the law.  Based on the reversal of Lucky I, and the fact that Note was not purchased by a true third party, the restoration of the Note to Mrs. Lollar is simply a function of our law to equitably tie up the loose ends which have been created when a zealous litigant decides to seize and sell another's property during the pendency of an appeal.

21

### III.    CONCLUSION:

For the foregoing reasons, the undisputed material facts entitle Mrs. Lollar to judgment

as a matter of law as follows:

1. That the Bossier Parish Sheriff failed its duty under La. R.S. 13:4365 to appoint a third appraiser and that October 24, 2018 Sheriff's sale of the Note is therefore annulled.

2. That Mrs. Lollar is entitled to restitution of her Note from Lucky Family, L.L.C.

Respectfully submitted by,

_____/s/ J. Davis Powell_____
Randall S. Davidson, LSBA No. 4715, TA
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA 34947
Harold R. Bicknell III, LSBA 36801
DAVIDSON SUMMERS, APLC
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342 | (318) 226-0168
E:      rsdav@davidsonsummers.com
          dpowell@davidsonsummers.com
          dmartin@davidsonsummers.com
          hbicknell@davidsonsummers.com
***Counsel for Barbara Marie Carey Lollar***

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing was filed electronically with

the Clerk of Court using the CM/ECF filing system, and notice of the same will be sent to all

counsel of record by operation of the court's electronic noticing system.

Shreveport, Louisiana, on this 23rd day of December, 2019.

_____*s/ J. Davis Powell*_____
                        OF COUNSEL