Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 1

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**SHREVEPORT DIVISION**

| | |
|---|---|
| **MAGNOLIA ISLAND PLANTATION, L.L.C., BARBARA MARIE CAREY LOLLAR** | **DISTRICT JUDGE ELIZABETH FOOTE** |
| **Plaintiffs** | |
| **VERSUS** | **CIVIL ACTION NO. 5:18-cv-01526** |
| **LUCKY FAMILY, L.L.C., W.A. LUCKY, III, AND BOSSIER SHERIFF JULIAN C. WHITTINGTON, IN HIS OFFICIAL CAPACITY** | **MAGISTRATE JUDGE KAREN HAYES JURY TRIAL DEMAND** |
| **Defendants** | |

**DEPOSITION OF PATRICK HENRY LACOUR**

**TAKEN FOR AND ON BEHALF OF THE PLAINTIFFS**

**AT THE JONES LAW FIRM**

**ALEXANDRIA, LOUISIANA**

**ON TUESDAY, OCTOBER 22, 2019**

**BEGINNING AT 10:31 A.M.**

**REPORTED BY:**
**DIANNE STEWART, CERTIFIED COURT REPORTER & NOTARY PUBLIC**



EXHIBIT
75
Blumberg No. 5192

(800) 841-6863    PILANT COURT REPORTING    www.pilant.com

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 2

1                        **APPEARANCES**

2

3    **ATTORNEY FOR PLAINTIFFS:**

4

        **DAVIDSON SUMMERS, APLC**
5       **By: Mr. James David Powell, Attorney at Law**
        **330 Marshall Street, Suite 1114**
6       **Shreveport, Louisiana 71101**
        **Phone: 318-424-4342**
7       **E-Mail: dpowell@davidsonsummers.com**

8

9    **ATTORNEY FOR DEFENDANTS:**

10

        **AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC**
11      **By: Mr. Curtis R. Shelton, Attorney at Law**
        **333 Texas Street, 1400 Regions Tower**
12      **Shreveport, Louisiana 71101**
        **Phone: 318-227-3500**
13      **E-Mail: curtisshelton@arklatexlaw.com**

14

        **LANGLEY, PARKS & MAXWELL**
15      **By: Ms. Julianna Petchak Parks, Attorney at Law**
        **401 Market Street, Suite 1100**
16      **Shreveport, Louisiana 71101**
        **Phone: 318-383-6422**
17      **E-Mail: jparks@lphmlaw.com**

18

        **THE TOUCHSTONE LAW FIRM**
19      **By: Mr. David M. Touchstone, Attorney at Law**
        **2708 Village Lane**
20      **Bossier City, Louisiana 71112**
        **Phone: 318-752-8080**
21      **E-Mail: dmtouchstone@firstcommercetitle.com**

22

23   **ALSO PRESENT:Mr. Ronald Lollar**
                     **Ms. Barbara Lollar**

24

25



(800) 841-6863                                    www.pilant.com

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 5

1                          **STIPULATIONS**

2         The deposition of Patrick Henry Lacour, it is stipulated

3    by and between counsel for plaintiffs and counsel for

4    defendants, is taken at the Jones Law Firm, in Alexandria,

5    Louisiana, on Tuesday, October 22, 2019, before Dianne Stewart,

6    Certified Court Reporter.

7         This deposition is taken by counsel for plaintiffs for the

8    uses as provided for in the Federal Code of Civil Procedure,

9    according to notice as provided by law.

10        The parties hereto waive all formalities in connection

11   with the taking of this deposition, except the swearing of the

12   witness, the reduction of the questions and answers to print,

13   and the reading and signing of the deposition transcript by the

14   witness.  All objections are reserved except as to the form of

15   the question and the responsiveness of the answer.

16

17

18

19

20

21

22

23

24

25

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 6

1              Patrick Henry Lacour

2              4806 Wendover Boulevard

3              Alexandria, Louisiana 71303

4        PATRICK HENRY LACOUR, after being duly sworn

5    to tell the truth, the whole truth, and nothing

6    but the truth, was examined and testified as

7    follows:

8                      EXAMINATION

9    BY MR. POWELL:

10   Q    Mr. Lacour, my name is Davis Powell with the

11        firm of Davidson and Summers in Shreveport.

12        We represent Barbara Lollar and Magnolia

13        Island Plantation, LLC in this matter.  You

14        did receive a subpoena to appear here today,

15        and I have marked that as Exhibit 1.  I just

16        want you to review it and confirm that you did

17        receive this.

18   A    I did receive this.

19   Q    Okay.  Give me your full name.

20   A    Patrick Henry Lacour.

21   Q    And is this address on the subpoena correct?

22   A    Where is the address on the subpoena?

23   Q    At the top.

24   A    Okay.  Yes.

25   Q    And could you read that off for me?



Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 15

1    Carr I and Lucky-Carr II.  And so again, those
2    were the background that formed the fact
3    pattern for my work.

4  Q  On your base yield -- and I'm getting into the
5    schedule, the first schedule you see there.
6    Do you see that?

7  A  Yes.

8  Q  On your base yield you use a U.S. prime rate.
9    Could you explain your reasoning to use the
10   U.S. prime rate?

11 A  That's typically in commercial loans, and I
12   think bankers would tell you the same thing.
13   You start with a prime rate, whatever the
14   quoted prime rate is for that time, and I
15   looked it up.  Also, in my experience as a
16   contract CFO and in my work, it's typically a
17   base rate -- prime, plus something.  And in
18   this case, in working with the bankers that I
19   know, it was prime, plus two and a quarter.

20 Q  Well, that is my next question.  How did you
21   arrive at the value of two and a quarter?

22 A  Again, personal references with -- with
23   bankers that I know.

24 Q  And who are those?

25 A  Randy Ponthier (phonetic) at Southern Heritage

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 16

```
 1        is one.  I don't know that I contacted him
 2        about this specifically.  But in the course of
 3        my work, that's typically what the going rate
 4        was at the time.
 5   Q    How do you know that?
 6   A    Again, from just working.
 7   Q    I just need you to explain a little further
 8        about what your basis is for the 2.25.  Okay?
 9        So you mentioned a banker's name, but you
10        didn't contact him regarding this particular
11        item, so could you just -- and I understand
12        you have some basis, --
13   A    Yeah.
14   Q    -- but could you elaborate on that?
15   A    Well, for instance, the -- one of my clients
16        at the time was working on a refinance, and we
17        were working with several banks, Regions Bank
18        being one of them.  I have a contact there,
19        Kevin Smith.  And I'm certain that in the
20        context of that refinance for that client, he
21        was telling me that typically it's prime, plus
22        two and a quarter at that time.  So that was
23        my basis for it.
24   Q    So you believed that Kevin Smith told you that
25        it would be two and a quarter percent for the
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 21

```
 1        have suggested more liquidity.  But if you had

 2        a third party transaction -- say, if Exxon

 3        Mobile had decided to buy this note, that

 4        could have demonstrated some liquidity.

 5    Q   Discuss how you arrived at 10 percent as the

 6        adjustment for lack of liquidity.

 7    A   Based on my judgment, these factors that you

 8        see on the adjustments are basically -- if I

 9        look at the base yield and I determine what

10        these factors are in relation to the base

11        yield, that's me adding more risks to the

12        product, more risk to the promissory note.

13        And so again, using the base yield as a

14        starting point, I feel like the lack of

15        liquidity was one and a third times higher

16        because of that, because of the factors that

17        we just spoke about.

18    Q   But you, in your own judgment, came up with

19        one and one third times higher.  Correct?

20    A   Correct.

21    Q   Lack of Marketability.  Describe lack of

22        marketability.

23    A   I think to a third party, looking at it based

24        on the fact pattern that we saw, it was an

25        original transaction between husband and wife,
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 22

1      and so -- and there was also no personal

2      guarantee given that I could see, so I think a

3      third party coming into this would say this

4      may not be a -- this may not be a transaction

5      that I can rely on, as a third party.

6   Q  What's the difference between that and lack of

7      liquidity?

8   A  Well, lack of liquidity suggests that you

9      can't make the note.  Right?  So in the

10     current instance, the first payment was due

11     after one year, so it wasn't as though they

12     were making payments every month, and we had

13     no history of any payments.  So the two are

14     similar in the sense that if there's a lack of

15     liquidity, that's a sign that there's probably

16     a lack of marketability.  If you can see that

17     a company or an instrument is paying, then

18     people are more interested to buy it.

19  Q  Well, your definition of lack of liquidity was

20     that the note could not be readily conveyed,

21     and it seems very similar to lack of

22     marketability.  And now you're saying lack of

23     liquidity is something different, or I'm

24     hearing that.  Could you clarify?  Because

25     they seem similar.

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 23

1  A    They are very similar, and I would clarify to
2       the comments that I just made that a lack of
3       liquidity is the inability to make payment on
4       something.  And so marketability is similar to
5       that, in that when you are -- when you have a
6       lack of liquidity, you have a lack of
7       marketability.
8  Q    Which one has to do with lack of market for
9       the note?
10 A    Lack of market for the note, lack of
11      marketability.
12 Q    So lack of liquidity doesn't have to do with
13      whether the note can be bought or sold
14      readily?
15 A    In the sense that -- to the extent that if the
16      note is not liquid, okay, or if the holder of
17      the note is not liquid and not making
18      payments, that will affect marketability.
19 Q    And how did you arrive at five percent for
20      that adjustment?
21 A    Again, using the base yield as a starting
22      point, I think that risk factor was five
23      percent, as compared to seven and a half
24      percent of what the base yield would be.
25 Q    It's your response that you came up with that

PILANT
COURT REPORTING

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 24

1      percentage on your own.  Correct?

2   A  Correct.  That's my judgment.

3   Q  Describe for me Quality of Borrower.

4   A  Okay.  So Magnolia Island Plantation was

5      formed on October 31st of 2017.  There was no

6      credit history, no payment history that I

7      could see.  And again, being formed two days

8      earlier, I couldn't really substantiate the

9      quality of the borrower.  Also, it was formed

10     by Mr. Lollar, so --

11  Q  What did you do to attempt to substantiate the

12     quality of the borrower?

13  A  Again, I didn't have anything that showed any

14     credit history or payment history, or -- I

15     didn't have any financials on Magnolia Island

16     Plantation.  And it was formed two days

17     earlier, so -- and it was formed by Mr.

18     Lollar, but that's the information that I had.

19  Q  Did you request any financials?

20  A  No, I -- no.

21  Q  Did you do any independent research on the

22     quality of the borrower?

23  A  No.

24  Q  When your note says, "Magnolia Island

25     Plantation was formed on October 31st, 2017,"

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 27

1              valuation as of October 19th, 2018.  Correct?

2      A      Correct.

3      Q      So was there any research done into the credit

4              history from the time of formation up until

5              the time of your report?

6      A      I didn't have any documents from Magnolia

7              Island Plantation.

8      Q      Okay.  Number four is Quality of Collateral.

9              Excuse me.  I need to take a step back, and

10             let me just get your answer on the 10 percent

11             on Quality of Borrower.  Was that a factor

12             that was your own judgment?

13     A      My professional judgment, yes.

14     Q      Okay.  Number four, Quality of Collateral.

15             Could you describe that for me?

16     A      Well, again, the fact pattern here is that

17             this note was created during the litigation.

18             That's Lucky-Carr I, and then that was

19             followed by Lucky-Carr II.  I would say

20             there's a cloudy title in the sense that there

21             was a Notice of Lis Pendens filed on February

22             20th of 2018.  I even cited the instrument

23             number, and so --

24     Q      If you could -- we're going to get to the

25             notes.  I just want you to explain the factor

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 32

```
 1          the status of Lucky-Carr I was, vis-a--vis
 2          appeals.
 3   Q      Are you aware that the judgment in Lucky-Carr
 4          I was reversed in its entirety shortly after
 5          the Sheriff's sale?
 6   A      I was not aware of that.
 7   Q      Seven percent on Quality of Collateral.
 8          That's a pretty specific number.  How did you
 9          arrive at the number?
10   A      Again, just in relation to the base yield,
11          what additional risk factor would that add,
12          and that's my professional judgment.
13   Q      Okay.  So the lis pendens is -- in your
14          judgment was a claim against the collateral,
15          and it's a -- only seven percent, as compared
16          to the ones above it that are 10 percent.
17          Correct?
18   A      Correct.
19   Q      Okay.  Number five is Coverage of Collateral
20          to Note.  Before we get into the specifics of
21          this case, just give me a brief explanation of
22          how that -- of what that factor is.
23   A      Well, very simply, if you had a free and clear
24          title to an asset.  In this case, land.  And
25          that land was worth -- again, in this case the
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 33

```
 1          note was roughly 1.8 million dollars, or 1.7
 2          million dollars.  If you had collateral --
 3          again, that was free and clear title, that
 4          would suggest that regardless of anything that
 5          would happen with liquidity, with the
 6          borrower's liquidity, that you would always
 7          have this land that you could -- or this asset
 8          or collateral that you could be made whole.
 9     Q    And how did you base your calculations on
10          coverage of collateral to the note?
11     A    So there is an appraisal by Glenn A. Russ
12          Wilson, Junior, and I did see that appraisal.
13          In that appraisal he -- and that was an
14          appraisal of 300 -- and I'm going off memory
15          here, 353 and some-odd acres, I believe.  So I
16          could be -- I could be off somewhat, but he
17          did the original appraisal for a larger amount
18          of land.  Apparently Ms. Lollar sold off
19          roughly 80 acres of land, so what Ms. Lollar
20          transferred to Mr. Lollar was 280 acres, and
21          to be specific, 280.135 acres.  And so using
22          the value that Mr. Wilson found of $4,000 per
23          acre in his appraisal, I can then use that to
24          multiply by the acreage that was transferred,
25          and that's how I came up with roughly 1.12
```



Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 34

1      million dollars of collateral.

2   Q   You mentioned earlier that you did not run

3       title on this tract of land.  How did you come

4       to the understanding that there was a sale of

5       some of the collateral property?

6   A   Well, I think in the Cash Deed with Special

7       Mortgage -- again, if I'm using that title

8       correctly; I may be off a little bit.  It

9       actually has listed in there, if you have a

10      copy, that it was less and except 80 acres.  I

11      mean, and it may be 80 point-something.  Okay?

12      But I believe the actual Cash Deed between Ms.

13      Lollar and Mr. Lollar reference that.

14  Q   Do you recall what year the appraisal by Mr.

15      Wilson was?

16  A   I do not.

17  Q   Do you recall if the appraisal was surface

18      only, or did it include any other portion of

19      land?

20  A   I believe he was only -- land only surface.

21  Q   I don't see any other note on Coverage of

22      Collateral to the Note, as far as what was

23      relied upon.  Is that the only value you gave

24      to the collateral?

25  A   Yes, because I think there were -- there was a

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 55

1       your previous deposition. [Sic].  It was

2       related to Mr. Shelton.  Is that right?

3   Q   I'm sorry.  I'm not understanding what you're

4       asking now.

5   A   Well, I think you're saying you wished that

6       you had this email with this Bossier Sheriff.

7   Q   No.  I was just asking you simply what did the

8       Sheriff provide you, if anything.

9   A   That's it.  They wanted me --

10  Q   And you said the Oath of Appraisement, and I

11      said, "When did that occur?"  And you said, "I

12      don't know."

13  A   Oh, I mean, it's that week.  I mean, the date

14      I can't remember.  It would have been the week

15      of -- you know, I think that was a Thursday or

16      a Friday, October 19th.

17  Q   How did they provide it to you?

18  A   Via email.

19  Q   Do you remember who emailed it to you?

20  A   I have her name at the office.  I can't

21      remember her name.

22  Q   All right.  This is Exhibit 3.  This is an

23      email with attachments that is dated October

24      10th, 2018.  This is an email from Mr. Curtis

25      Shelton to Patrick Lacour.  Are you familiar

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 56

```
 1          with this email?
 2    A     I am.
 3    Q     And if you look near the bottom, there are
 4          attachments listed near the bottom of that
 5          page.  They're bulleted right there.  Do you
 6          see that second one that says Oath of
 7          Appraiser?
 8    A     Correct.
 9    Q     Was it Mr. Shelton that provided you the Oath?
10    A     No, I feel pretty -- I mean, he did here, but
11          I feel pretty confident that I received that
12          from the Sheriff's department, because I know
13          I had to contact them, and I believe they sent
14          that to me.
15    Q     Okay.  Will you take a brief moment to look at
16          this email and the attachments, and just to
17          confirm that this appears to be a complete
18          version?
19    A     (Pause).  It does.
20    Q     And this is the first email of a number of
21          emails that we'll show you, just to confirm.
22          Is that correct?
23    A     Correct.
24    Q     To your knowledge, this was the first in a
25          series of emails?
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 71

```
 1              accurate.  It depends -- I mean, and I'm not
 2              -- I don't do land appraisals, so I'm not
 3              telling you.  But maybe there -- there may be
 4              no comps in between September 12th of 2016 and
 5              when I did my report, such that it wouldn't
 6              have mattered.  I can't --
 7    Q    We're dealing with maybes there.  I'm just
 8              asking --
 9    A    Yeah, that's right.  You're asking me a
10              question, and I'm telling you it's a
11              hypothetical question that I -- I can't say
12              that it would be more or less accurate.  It
13              might be the same answer.
14    Q    But it would take into account the time period
15              between this appraisal that you relied upon,
16              and anything that occurred in that time span
17              before you created your valuation?
18    A    It would be ideal if -- I'll stick to my
19              answer, because my answer does not involve any
20              hypotheticals, and I can -- I can make that
21              statement with certainty.  It would be ideal
22              if all the appraisals were the same date, then
23              I wouldn't have to answer questions like why
24              is this two years old.  I can't tell you if
25              this would change at all.  I guess Mr. Carr
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 72

```
 1        would be the person to ask.  Again, it's
 2        entirely possible that there were no
 3        comparables, and that this is the same answer
 4        that he would produce.  I can't say it would
 5        definitely be different.
 6   Q    Did you review this report?
 7   A    I did.
 8   Q    Did you have any issue with this report?
 9   A    No.  I don't do land appraisals.
10   Q    Okay.  Did you have any questions for Mr.
11        Shelton regarding this report?
12   A    No.
13   Q    Did you discuss this report with Mr. Shelton
14        after you received it?
15   A    I don't remember any details.  I know that,
16        again, the biggest difference for me is that
17        this report was for 353 -- again, I'm going
18        off of memory.  I can -- well, let me not go
19        off of memory.  Let me go into the report and
20        say how many acres it was.  (Pause).  353.145
21        acres.  Okay.  So it was for that, and I know
22        the biggest difference here is that that's not
23        the amount that was transferred from Ms.
24        Lollar to Mr. Lollar.
25   Q    Okay.  This is going to be Exhibit 8.  It's
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 77

1  A   I don't see it.

2  Q   Now that you've had a chance to refresh

3      yourself with the documents, do you believe

4      that the promissory note was provided to you?

5  A   Perhaps it was not.

6  Q   Did you review the promissory note before you

7      made your report?

8  A   Given that I don't see it in front of me, I --

9      no, I don't believe I saw the promissory note.

10     I did see the Cash Sale Deed With Vendor's

11     Lien And Special Mortgage.

12 Q   After Mr. Shelton contacted you to ask if you

13     would be available for this, he sent you these

14     emails at some point in time after that.  Is

15     that correct?

16 A   Correct.

17 Q   At that point in time did you contact the

18     Sheriff's office?

19 A   At some point I had to contact them to get --

20     they had to provide -- and again, you know,

21     exact titles of things.  But the Oath of

22     Appraisement, or whatever that document was,

23     you know, I had to tell them this is what the

24     basis of my work is.  They had to prepare that

25     for me, and then I had to drive up and sign

(800) 841-6863          PILANT          www.pilant.com
                    COURT REPORTING

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 78

1        it.

2    Q   So you believe you talked to the Sheriff's

3        office close to the time that you drove up to

4        sign your report?

5    A   Yes.  I mean, again, I really can't remember

6        if October 19th was a Thursday or a Friday.  I

7        feel like it was a Friday, and I talked with

8        them that week.  Okay?  So whether it was

9        Monday, Tuesday, Wednesday, I did talk with

10       someone and -- talk and exchange emails with

11       someone such that they would have my report

12       which you have previously provided as Exhibit

13       2, and that I would then -- they showed me

14       what I'd be signing, but then I would drive up

15       and sign that.

16   Q   But this was after you had preformed the work.

17       Correct?

18   A   Correct.

19   Q   Did the Sheriff's office provide you any

20       further documentation regarding this task?

21   A   No.

22   Q   You talked to Mr. Shelton before you finalized

23       your report.  Correct?

24   A   That's correct.

25   Q   What did y'all discuss?

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 101

```
 1   A     Because of the --
 2   Q     -- the person with whom you were dealing?
 3   A     Not -- her name is very unique.  That's why I
 4         know it.
 5   Q     Okay.
 6              MR. SHELTON:
 7          Let me see some of the other exhibits
 8          here.  Don't we have one with the Oath of
 9          the appraiser attached to it?
10              MR. POWELL:
11          I think it's Exhibit 3, Email 2.  Try that
12          one.
13              MR. SHELTON:
14          Oh, here we go.  Okay.  Thank you, Mr.
15          Powell.
16   BY MR. SHELTON:
17   Q     Exhibit 3 to your deposition has attached to
18         it an Oath of an appraiser.  Right?
19   A     Yes.
20   Q     And it has a description of the note that you
21         were undertaking an oath to appraise.  Is that
22         right?
23   A     Yes.
24   Q     And it states that it was an original
25         promissory note dated November 2, 2017.  Do
```

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 102

1        you see that?

2    A   Yes.

3    Q   And it states the principal amount of the note

4        is $1,730,000?

5    A   Yes.

6    Q   And it states the interest rate.  Correct?

7    A   Yes.

8    Q   And it states the way it was payable, in four

9        annual consecutive installments of $100,046.

10       Do you see that?

11   A   Yes.

12   Q   And that it states that it was, you know,

13       payable in a final balloon payment that would

14       be due and payable on November 1, 2022.

15   A   Yes.

16   Q   Would that be all the essential terms of a

17       promissory note that you would need to have,

18       you know, from the face of it, to appraise it?

19   A   That's fair.  I guess you -- I could say that

20       if there were covenants that went with it, or

21       other restrictions.  Now, we saw that -- I say

22       "we".  I saw that in the Credit Sale.  I saw

23       information to that nature.  But unless you

24       say that there was more detail than that,

25       that's a fair description of a promissory

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 103

1           note.
2    Q      So if there were covenants and restrictions,
3           then covenants -- you know, restrictions would
4           further devalue the note.  Is that right?
5    A      That's correct.
6    Q      So what you have there would enable you to
7           give it its best potential value, under the
8           circumstances?
9    A      Yes.  And I mean, I can say you have loan
10          agreements and you have promissory notes, and
11          promissory notes are typically very spare
12          documents, similar to what you just wrote that
13          appeared in the publication from the Sheriff's
14          office.  So again, that definition fits the
15          definition of a promissory note.  Now, it
16          could be more than that, but a loan agreement
17          would typically be substantially more than
18          that.
19   Q      On Exhibit 3 it has attached the October 10th,
20          2018 letter that I wrote to you.  And in that
21          letter I tried to convey, and did you
22          understand that you would not be working for
23          Mr. Lucky, but that you would be working for
24          the Sheriff?
25   A      That's correct.

PILANT
COURT REPORTING

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 104

1  Q   And was that your understanding, was that the
2      Sheriff was going to be your client in this
3      matter?
4  A   Yes.  At all times that was my understanding.
5  Q   Okay.  And that you would not be doing this
6      work for Mr. Lucky; you would be paid by the
7      Sheriff?
8  A   That's correct.
9  Q   Even though Mr. Lucky might pay the Court
10     costs to the Sheriff, you know, you were still
11     to render your opinion for the Sheriff?
12 A   That's correct.
13 Q   And were you ever asked to do anything to try
14     -- you know, to try to artificially lower the
15     value of your appraisal?
16 A   No.
17 Q   Were you given a suggested number for your
18     appraisal?
19 A   No.
20 Q   Did you act completely independently --
21 A   Yes.
22 Q   -- in doing your appraisal?
23 A   Yes.
24 Q   And you worked for the Sheriff.  Correct?
25 A   Yes.

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 127

1          on the original promissory note is probably

2          not accurate.

3     Q    Okay.  Thank you.  No further questions.

4               MR. POWELL:

5          I've got one followup.

6     EXAMINATION BY MR. POWELL:

7     Q    Have you read any pleadings in this matter?

8               MS. PARKS:

9          I have some questions.

10              MR. POWELL:

11         Oh, go ahead.  I'm sorry.

12    EXAMINATION BY MS. PARKS:

13    Q    Hi.  My name is Julianna Parks.  I represent

14         the Bossier Sheriff's Office, and I just have

15         a couple of questions for you.

16    A    Okay.

17    Q    Was it your understanding when you performed

18         this appraisal that you were doing it on

19         behalf of the Bossier's Sheriff's Office?

20    A    Yes.

21    Q    Did anybody ever tell you anything different

22         than that?

23    A    No.

24    Q    Did anyone at the Sheriff's Office ever tell

25         you that they wanted your appraisal to end up

Magnolia Island Plantation, et al. v. Lucky Family, LLC, et al.
PATRICK HENRY LACOUR

Page 128

1      a certain way?
2   A    No.
3   Q    So was it your independent opinion regarding
4        the value of this note?
5   A    Yes.
6   Q    That's all I have.
7   EXAMINATION BY MR. POWELL:
8   Q    And my final question is, have you read any
9        pleadings in this matter?
10  A    Aside from what we've seen here, no.
11  Q    In this current matter.  This is a matter in
12       federal court.  It does not relate to the
13       docket numbers we've discussed so far.
14  A    Right.  I'm not even familiar -- no, I have
15       not.
16  Q    Okay.  Thank you.
17            MR. POWELL:
18         That's all I have.
19            MR. SHELTON:
20         Read and sign?  I guess you'll want to
21         read?
22            THE WITNESS:
23         I'd like to read it, yes.
24            (DEPOSITION CONCLUDED 1:03 P.M.)
25



**Curtis R. Shelton <curtisshelton@arklatexlaw.com>**                    10/10/2018 6:47 PM

# Appraisal of Promissory Note

To Patrick Lacour, CIA, CVA <patrick@whitehalladvisors.net>

Patrick,

Here is a letter explaining this task. I am sending the enclosures by this and additional e-mails. I am also mailing you a hard copy.

Curtis R. Shelton
Ayres, Shelton, Williams, Benson & Paine, LLC
14th Floor Regions Tower
333 Texas Street (71101)
P. O. Box 1764
Shreveport, LA  71166-1764
318-227-3500 work
318-227-3306 direct
318-470-9010 mobile
318-227-3806 facsimile
www.arklatexlaw.com

**IRS Circular 230 Disclosure:**  To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that any U.S. federal tax advice contained in this communication, including any appendices, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under U.S. federal tax law, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**CONFIDENTIALITY STATEMENT**

This electronic message transmission contains information from the law firm of Ayres, Shelton, Williams, Benson & Paine, LLC and is confidential or privileged. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (318-227-3306).

- 10-10-18 - Shelton to Lacour.pdf (800 KB)
- Oath of Appraiser - Patrick Lacour.pdf (132 KB)
- Appraisement Sheet - Patrick Lacour.pdf (132 KB)
- Opinion in Lucky v. Carr I.pdf (575 KB)



Lacour 015

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC
333 TEXAS STREET, 1400 REGIONS TOWER
SHREVEPORT, LOUISIANA 71101
TELEPHONE: 318-227-3500
FACSIMILE: 318-227-3980

Curtis R. Shelton

Direct: 318-227-3306
curtisshelton@arklatexlaw.com

Mailing address:

Post Office Box 1764
Shreveport, LA 71166

October 10, 2018

*VIA E-MAIL*

Mr. Patrick Lacour
Whitehall Advisors, LLC
3820A Bayou Rapides Rd.
Alexandria, LA 71303

Re:   Appraisal of Promissory Note

W. A. Lucky, III versus Barbara Marie Carey Carr, number 127,573 in the 26th Judicial
District Court, Bossier Parish, Louisiana, Section F

Dear Patrick:

I intend to provide the Bossier Parish Sheriff your name and contact number as a person
who can appraise a promissory note for the sheriff for the sheriff's sale in the above referenced
lawsuit. The sheriff's sale is scheduled for Wednesday, October 24, 2018, at 10:00 a.m. Each of
the plaintiff and defendant will submit an appraisal. If the appraisers do not agree and their
appraisals cannot be averaged under Louisiana Revised Statutes 13:4365 as set forth hereinafter,
the Sheriff will need to appoint a third appraiser to appraise the note. In those cases where the
two appraisers do not agree and the values are not within the averaging limits, the Sheriff
appoints a third appraiser, and the decision of the third appraiser shall be final.

If the sheriff elects to appoint you as a third appraiser, you will not be acting for either
the plaintiff or the defendant to appraise the promissory note. If you are appointed, you will be
the Sheriff's appraiser. In fact, it will not matter whether the payment of your fees or expenses
are paid by the plaintiff or the defendant. In fact, when a judgment is enforced by a seizure of
property and its sale, the Sheriff will require the plaintiff to advance funds to cover the costs
incurred by the Sheriff in conducting the process. The law then provides the manner in which the
plaintiff may recover those costs from the sale of the property by the Sheriff. Regardless of any
requirement that the plaintiff, in this case W. A. Lucky, III, advance funds to cover the costs
incurred by the Sheriff, you will still be the Sheriff's appraiser.

The process is set forth in Louisiana Revised Statutes 13:4363 and 13:4365.

**Lacour 016**

Ayres, Shelton, Williams, Benson & Paine, LLC

Mr. Patrick Lacour
October 10, 2018
Page 2

Louisiana Revised Statutes 13:4363 reads:

A. Not less than seven days, exclusive of holidays, before the sale of seized property, the sheriff shall serve written notice on the debtor and on the seizing creditor, in the manner provided for the service of a citation, directing each to name an appraiser to value the property and to notify the sheriff of his appointment prior to the time stated in the notice, which shall be at least four days, exclusive of holidays, prior to the time of the sale. The appraisal of the debtor and seizing creditor shall be made and delivered to the sheriff at least two days, exclusive of holidays, prior to the time of the sale.

B. If there are two or more debtors or seizing creditors and these parties cannot agree as to which should act as or appoint an appraiser, and in any case where an appraisal is required prior to the judicial sale and which is not otherwise provided for in this Section, on the ex parte application of the sheriff or of any interested party, the court shall designate the party to act as or appoint the appraiser, and the notice required by Sub-section A of this Section shall be served on the party so designated.

The Sheriff has already served the written notice on the debtor and on the seizing creditor, directing each to name an appraiser. I have already notified the Bossier Parish Sheriff of the plaintiff's appointment of Mr. Chad M. Garland to do the appraisal of the promissory note for the plaintiff. Mr. Garland's credentials include, among others, an ABV accreditation and CVA designation.

I am informed that the defendant has notified the Sheriff of the appointment of Mr. John Dean of Business Valuation Consultants of Shreveport to appraise for the defendant. I am also aware that Mr. Dean has an ABV accreditation and CVA designation.

While I am hopeful that the two appraisers will agree on the value of the promissory note, I recognize the possibility that they will not. Because the defendant's appraisal is could be required to be submitted as late as October 19, 2018, that could result in a third appraisal being needed by the following Monday or Tuesday, October 22, 2018, or October 23, 2018. Because of this possible time crunch, I thought I would provide you with relevant information in advance so that, if you are appointed, you will be able to meet the short time delay that you would have to appraise for the Sheriff.

Louisiana Revised Statutes 13:4365 reads:

A. The appraisers shall take an oath to make a true and just appraisal of the property.

**Lacour 017**

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC

Mr. Patrick Lacour
October 10, 2018
Page 3

      B.  If the appraisers cannot agree, and (1) the difference in value between the two appraisals does not exceed two hundred and fifty thousand dollars, and (2) the value assigned by the lower of the two appraisers is at least ninety percent of the value assigned by the higher of the two appraisers, then the sheriff shall average the two figures and use the average as the appraised value for purposes of determining the opening bid.  In those cases where the two appraisers do not agree and the values are not within the averaging limits, then the sheriff shall appoint a third appraiser, who shall also be sworn, and whose decision shall be final.

      C.  The property seized must be appraised with such minuteness that it can be sold together or separately.

      D.  The appraisers shall reduce their appraisal to writing, sign it, and deliver it to the sheriff.

      E.  The appraisal of any appraiser appointed by the sheriff shall be made and delivered to the sheriff at a time prior to the sale.

      The parts of the statute which will apply to you are paragraphs A and D. I will need you to do two things. The first is to take an oath to make a true and just appraisal of the property, in this case, the promissory note. The second is to appraisers shall reduce their appraisal to writing, sign it, and deliver it to the sheriff. The requirement that the appraisal be reduced to writing is not a requirement for any extensive appraisal report. It is a requirement that the appraisal amount be reduced to writing.

      I am sending two documents with this letter to illustrate the process. The first is titled "Oath of Appraiser." If you are appointed, you will need you to execute that before a Notary and get the original to the sheriff by the appraisal deadline.

      The second document is the appraisement sheet that you will sign and provide to the sheriff's office. As you can see, what are required are a signature and a figure for the appraised value. That is all of the detail the sheriff will require.

**Background**

      Here is some background that I think you will find to be helpful to this potential task.

      As we discussed, our client, Mr. W.A. Lucky, III ("Mr. Lucky") has a judgment in the above referenced lawsuit against Barbara Marie Carey Lollar a/k/a f/k/a Barbara Marie Carey Carr ("Ms. Lollar"). The judgment is in the amount of One Million, Seven Hundred Ninety-Nine Thousand, Four Hundred Fifty And 52/100 Dollars ($1,799,450.52), plus judicial interest on the aforesaid amount from the date of judicial demand until paid in full and all costs associated with the proceeding. In this letter, I will call the above referenced lawsuit "Lucky-Carr I."

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC

Mr. Patrick Lacour
October 10, 2018
Page 4

The property that is to be offered at a sheriff's sale in Lucky-Carr I on October 24, 2018, is a **promissory note**, which is described as follows:

That certain original promissory note dated November 2, 2017 made by Ronald William Lollar payable to Barbara Marie Carey Carr Lollar or her order in the principal amount of One Million Seven Hundred Thirty Thousand and No/100ths Dollars ($1,730,000.00) plus interest thereon at the rate of four percent (4.0%) per annum until paid, payable in four (4) consecutive annual installments of $100,046.00, the first such installment being due and payable on November 1, 2018, and a final balloon payment equal to all remaining principal and interest then due hereunder, due and payable on November 1, 2022.

The aforementioned promissory note is ostensibly secured under a "Credit Sale Deed with Vendor's Lien and Special Mortgage." A copy of this Credit Sale Deed with Vendor's Lien and Special Mortgage is being sent with this letter.

The circumstances under which the promissory note and the Credit Sale Deed with Vendor's Lien and Special Mortgage were executed by Mr. Ronald William Lollar are described in the petition filed in a second lawsuit which is pending as "W. A. Lucky, III versus Barbara Marie Carey Lollar, Ronald William Lollar, Tributary Properties, L.L.C., and Magnolia Island Plantation, L.L.C.," case number 155,382-A in the 26th Judicial District Court for Bossier Parish, Louisiana. This lawsuit is the second lawsuit by our client, Mr. Lucky, against Ms. Lollar. I will refer to it as "Lucky-Carr II." I am including a copy of the petition filed in Lucky-Carr II.

Lucky-Carr II was filed because of the attempt by Ms. Lollar to place the immovable property (real estate) described in the Credit Sale Deed with Vendor's Lien and Special Mortgage out of her name. Ms. Lollar transferred the property into Mr. Ronald William Lollar's name so that the judgment obtained by Mr. Lucky could not be collected by having the Sheriff seize and sell the real property. (Mr. Lollar is Ms. Lollar's husband, but we understand that they are separate in property.)

We caught onto Ms. Lollar's scam, and we filed Lucky-Carr II. We also filed a notice of *lis pendens* against the immovable property (real estate) so that third parties would clearly be on notice of Ms. Lollar and her husband's misdeeds. We believe that the notice of *lis pendens* makes the claims in the second lawsuit effective against the immovable property (real estate). A copy of the notice of *lis pendens* is being sent with this letter.

An overview of the claims made in Lucky-Carr II is that, while Judge A. Parker Self, was receiving briefs and considering his ruling in Lucky-Carr I, Ms. Lollar executed the note and the Credit Sale Deed with Vendor's Lien and Special Mortgage. (Ms. Lollar took action to put other property out of her name, but here we are concerned with this promissory note scheme.)

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC

Mr. Patrick Lacour
October 10, 2018
Page 5

Ms. Lollar had held the property that she transferred to her husband in her name since 2003. Ms. Lollar held the property in her name all the way through the trial in Lucky-Carr I. It is obvious that she knew that Judge Self was going to rule against her in Lucky-Carr I. She was not truthful in her testimony. Ms. Lollar knew that a judgment was coming. I am including a copy of Judge Self's Opinion in Lucky-Carr I under which the judgment was rendered.

As you can see from the petition in Lucky-Carr II, Ms. Lollar, aided and abetted by her lawyers who had unsuccessfully defended Lucky-Carr I, prepared and executed the Credit Sale Deed with Vendor's Lien and Special Mortgage. It was executed/notarized in her lawyers' office.

The claims made in Lucky-Carr II include that:

(a)   Ms. Lollar's acts (and the acts of the other defendants) were in furtherance of Ms. Lollar's breach of her duties as mandatary and fiduciary and by which Ms. Lollar, acting in concert with the other defendants, sought to thwart or frustrate Mr. Lucky's rights to obtain and enforce collection of the judgment in Lucky-Carr I.

(b)   Ms. Lollar's, her husband Ronald's, and the other defendants' actions were obviously intentional or willful, were the result of a conspiracy among them, and were designed to damage Mr. Lucky.

(c)   The Credit Sale Deed with Vendor's Lien and Special Mortgage is null, void, and of no effect whatsoever as a simulation.

(d)   The supposed transfer was illicit and made by a debtor (Ms. Lollar) to conceal property from her creditor (Mr. Lucky).

(e)   Ms. Lollar had never before transferred the property to her husband Ronald in all the years that the property had been in her name or during all the years in which Lucky-Carr I was pending. Ms. Lollar only did so on the eve of the Court's taking Lucky-Carr I under advisement to render a decision therein. It is obvious that Lollar knew and anticipated that her wrongful conduct would soon result in a judgment against her in Lucky-Carr I.

(f)   Further, from Ms. Lollar's complete lack of credibility at the trial on the merits in Lucky-Carr I, it must be concluded that no actual transfer of the property from Lollar was actually intended by the Credit Sale Deed with Vendor's Lien and Special Mortgage. Instead, the entire transaction is a sham obviously designed with the assistance of Ms. Lollar's attorneys.

(g)   In the alternative, if and to the extent that the Credit Sale Deed with Vendor's Lien and Special Mortgage is not null, void, and of no effect whatsoever as a simulation, then it is subject to revocation for the reason that the ostensible

AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC

Mr. Patrick Lacour
October 10, 2018
Page 6

transfer represented thereby caused or increased Ms. Lollar's insolvency rendering same subject to revocation under Louisiana Civil Code articles Louisiana Civil Code article 2037, *et seq.*

(h)    In the further alternative, the Credit Sale Deed with Vendor's Lien and Special Mortgage is an act of fraud and must be rescinded.

I believe that you can evaluate the merits of the lawsuit filed as Lucky-Carr II when you look over the petition. The defendants have already tried to have the petition in Lucky-Carr II dismissed, and the Court has already ruled against them. I am sending a copy of that ruling, which was made by Judge Michael Craig. We are going to press forward with Lucky-Carr II to a trial and judgment. Mr. Lucky is resolute and unwavering, and he will pursue Lucky-Carr II to a conclusion.

Although the property to be appraised and to be offered at the Sheriff's sale in Lucky-Carr I on October 24, 2018, is the promissory note, I am also sending an appraisal of the real property that Ms. Lollar transferred by the Credit Sale Deed with Vendor's Lien and Special Mortgage. The appraisal indicates that the property has a value of $4,000 per acre. The property that Ms. Lollar transferred was 280 acres, which would, therefore, have a value of $1,120,000.00. Nevertheless, what is relevant here is that the value of the promissory note must be determined based on the fact that a person who buys it will do so subject to the claims made against the property in Lucky-Carr II, which are protected by a *lis pendens*.

Finally, I am sending a copy of the opinion of Coutret and Associates about the value of the mineral interest in the land. You will notice from Judge Self's ruling that he thought that it would be speculative to include an amount in his award for the value of the minerals to which Mr. McGowen testified. Like the land, it is not really the minerals that are to be appraised in this case, it is the promissory note. But, I wanted to include Coutret and Associates' opinion with this letter so that your information would be complete.

If you have any questions, please do not hesitate to call.

Yours very truly,

Curtis R. Shelton

CRS:hs

Encls.

Lacour 021

# OATH OF APPRAISER

| Suit No: | (08) 127573 | BENTON, LA |
|---|---|---|
| | W. A. Lucky, III | 26th Judicial District |
| | vs | Parish of Bossier |
| | Barbara Marie Carey Carr | State of Louisiana |

STATE OF LOUISIANA
PARISH OF CADDO

BEFORE ME, the undersigned authority, personally came and appeared PATRICK LACOUR, who, after being duly sworn, deposed and stated:

1.     I, Patrick Lacour, have been appointed by Julian C. Whittington, Sheriff of Bossier Parish, to value the following described property to be sold in the above captioned lawsuit, being the promissory note which is described as follows:

That certain original promissory note dated November 2, 2017 made by Ronald William Lollar payable to Barbara Marie Carey Carr Lollar or her order in the principal amount of One Million Seven Hundred Thirty Thousand and No/100ths Dollars ($1,730,000.00) plus interest thereon at the rate of four percent (4.0%) per annum until paid, payable in four (4) consecutive annual installments of $100,046.00, the first such installment being due and payable on November 1, 2018, and a final balloon payment equal to all remaining principal and interest then due hereunder, due and payable on November 1, 2022; and

2.     Further, I do hereby solemnly swear that I will make a true and just appraisal of the above described property, and that, in making said appraisement, I will act fairly and impartially and make a true value of what the above described property is worth in cash, to the best of my knowledge, information, and belief.

_____
PATRICK LACOUR

SWORN TO AND SUBSCRIBED before me, Notary Public, this _____ day of _____, 2018.

_____
NOTARY PUBLIC, _____ PARISH
Name:_____
Notary I.D./Bar Roll No.: _____
My commission expires: Life

Lacour 022

# APPRAISEMENT SHEET

| | |
|---|---|
| Suit No:  (08) 127573 | BENTON, LA |
| W. A. Lucky, III | 26th Judicial District |
| vs | Parish of Bossier |
| Barbara Marie Carey Carr | State of Louisiana |

We, the undersigned, having been appointed to appraise the property advertised for sale by the Sheriff in the above entitled and numbered cause, do solemnly swear that in making said appraisement, we have acted fairly and impartially and have made a true value of what the said property is worth in cash, to the best of our knowledge, information, and belief.

1.  Plaintiff (sheriff) Appraiser
Sworn to and subscribed before me this
_____ day of _____, 2018.

_____
Deputy Sheriff

2.  Defendant (sheriff) Appraiser
Sworn to and subscribed before me this
_____ day of _____, 2018.

_____
Deputy Sheriff

3.  Third (sheriff) Appraiser
Sworn to and subscribed before me this
_____ day of _____, 2018.

_____
Notary Public
Name: _____
Notary I.D./Bar Roll No.: _____
My commission expires: Life

That certain original promissory note dated November 2, 2017 made by Ronald William Lollar payable to Barbara Marie Carey Carr Lollar or her order in the principal amount of One Million Seven Hundred Thirty Thousand and No/100ths Dollars ($1,730,000.00) plus interest thereon at the rate of four percent (4.0%) per annum until paid, payable in four (4) consecutive annual installments of $100,046.00, the first such installment being due and payable on November 1, 2018, and a final balloon payment equal to all remaining principal and interest then due hereunder, due and payable on November 1, 2022

_____
APPRAISEMENT

_____
2/3 of Appraisement

1.  Plaintiff (sheriff) Appraiser

_____
Appraisement

2.  Defendant (sheriff) Appraiser

_____
Appraisement

3.  Third (sheriff) Appraiser

_____
Appraisement

ATTORNEY:   CURTIS R. SHELTON
333 Texas street, Suite 1400
Shreveport, LA 71101
(318) 227-3500

**Lacour 023**



DEC 19 2017

DEPUTY CLERK
26TH JUDICIAL DISTRICT COURT
BOSSIER PARISH, LOUISIANA

W.A. LUCKY, III                              NUMBER: 127,573

VERSUS                                       26TH JUDICIAL DISTRICT COURT

BARBARA MARIE CAREY CARR                     BOSSIER PARISH, LOUISIANA

## OPINION

This case was tried before the Court on August 28 & 29, 2017. Following the trial and an extensive post trial briefing schedule, this matter was deemed submitted to the Court for decision on November 6, 2017. The instant litigation arises out of the acquisition of a 365 acre tract of land located adjacent to the land referred at trial as the Lucky Farm. Mr. W. A. Lucky, III, (hereinafter referred to as "Mr. Lucky"), was present and represented by his attorneys of record Lee Ayres, Curtis Shelton, and Stacey Melerine. Defendant, Barbara Marie Carey Carr, now Lollar, (hereinafter referred to as "Mrs. Lollar"), was present and represented by her attorneys, Julia Blewer and Davis Powell. After consideration of the law and evidence as applied to the facts of this proceeding, the Court issues the following Opinion:

The parties to this litigation had a long standing relationship, having met one another around 1992, with Mrs. Lollar working for Mr. Lucky for a period between 1992 and 2003. It was apparent from the evidence that Ms. Lollar shared more than a business relationship with the Luckys. Testimony served to establish that in addition to working on real estate titles, deeds, and mortgages, Ms. Lollar would meet with various individuals regarding certain land deals in which Mr. Lucky had an interest. At one time, Ms. Lollar had an office in the Lucky Building. It is also interesting to note that Ms. Lollar would tend to various personal tasks for the Luckys. For example, she had the code to their gate and keys to their home. While the Luckys were away Ms. Lollar would pick up the mail despite the Luckys having children in this area. From direct testimony, the Court learned that Ms. Lollar spent certain holidays with the Luckys and went out of her way to do "nice things" for the Luckys. For example, personalized stationery invites were created by Ms. Lollar for the Luckys granddaughter. Also Ms. Lollar gifted the Luckys a decorative screen with the image of Jesus for their home.

The testimony of Mr. Lucky was compelling as he related the nature of their relationship. Mr. Lucky read from correspondence he had written to Ms. Lollar and that had been received

Lacour 024

from her.  Both Mr. and Mrs. Lucky related how much they had depended upon Ms. Lollar during the time Mr. Lucky was diagnosed with and received treatment for cancer.  Additionally, upon acquiring a home in Florida and spending approximately 50% of their time away from Bossier Parish, Mr. Lucky describe how he depended upon Ms. Lollar to an even greater extent. There was also testimony as to a joint venture in real estate wherein Ms. Lollar profited substantially by virtue of Mr. Lucky's involvement.  The Court even heard testimony regarding the process by which Mr. Lucky assisted Ms. Lollar with obtaining her home.  While this Court has previously described Mr. Lucky's testimony as compelling, the Court would also characterize his testimony as sincere.

Ms. Lollar's testimony was less than credible.  Ms. Lollar spent an extensive amount of time trying to minimize the nature of the relationship she enjoyed with the Luckys.  Ms. Lollar indicated that the "nice things" that she did for the Luckys was simply something she would do for anyone.  The Court notes that despite her former husband Mr. Carr (who demonstrated absolutely no animosity toward his ex-wife), and other business acquaintances that testified at trial, none were questioned about nor volunteered about the "nice things" that Ms. Lollar had done for them or others.

Ms. Lollar was hesitant in answering questions and appeared to be trying to craft answers to advance her position in the best legal sense.

Much time was spent on whether or not a letter to Mr. Chip Naus, attorney at law, who represented the Lucky Trust, was confidential. The correspondence was prepared in response to a demand letter Mr. Naus had written to her.  The Court ruled regarding its admissibility.  Ms. Lollar indicated while the whole letter appears to be what she wrote, she can not confirm if changes were made.  Following the testimony of her ex-husband, Mr. Carr, the Court is convinced the letter is Ms. Lollar's work product.  This letter acknowledged she would get the contract [regarding the 365-acre tract] in her name then transfer it to any entity Mr. Lucky wanted to have title to the property.

However, the most unbelievable testimony by Ms. Lollar was about the 365-acre tract which she acquired and which is the subject of this litigation.  Ms. Lollar testified she was unaware that this piece of property was adjacent to Mr. Lucky's property.  During the course of

2

Lacour 025

the trial based upon testimony from the parties, surveyor, parish engineer, and review of the aerial photographs, any person as well versed in the real estate business as Ms. Lollar indicated she was, could not have been ignorant of the proximity of the 365-acre tract to Mr. Lucky's farm. The testimony of Mr. and Mrs. Lucky, and their son served to indicate that Mr. Lucky had always desired to acquire that property.  Due to some inappropriate and unkind remarks about his neighbor who owned the 365-acre tract, Mr. Lucky understood that the neighbor would never sell that land to him.  Mr. Lucky testified that Ms. Lollar had discovered the property was once again for sale and that she was, as testified to by Mr. Lucky, "going to make him the happiest man in the world."  Mr. Lucky testified that Ms. Lollar volunteered to purchase the 365 acres and to transfer those acres to him.  For her efforts, Ms. Lollar would receive a $25,000.00 commission.   The Court notes that in anticipation of acquiring the 365-ace tract, Mr. Lucky installed gates in his fence that abutted the 365-acre tract and acquired a bull dozer to extend roadways to said fence.  Mr. Lucky stated that he intended to utilize the area for pasture land so that it would support the number of head of cattle that a farm needed to work in order to make the enterprise profitable.

Ms. Lollar maintained that she and Mr. Lucky had agreed to purchase the 365-acre tract and to subdivide it as a joint venture.  Ms. Lollar testified since the neighbor did not like Mr. Lucky she had agreed with the neighbor to purchase the land herself.  Mr. Lucky offered her the money to purchase the property for their "joint venture"; however, Ms. Lollar maintained that she wanted to purchase it in her own name so as to be truthful to the seller.

The Court listened with interest to those individuals with knowledge of what would be necessary to "develop" the 365-acre tract for utilization as a subdivision.  It appears that not only was this tract in the flight path of Barksdale Air Force Base, it was also in a flood plain as oppose to a flood zone.  Thus, extensive fill dirt would have to be trucked in to make even a portion of this land suitable for residential development.  Testimony indicated that there was no portion of the 365-acre tract that had the right composition of soil to serve as fill dirt.  This would certainly increase the amount of monies needed to be expended if, in fact, this tract of land could ever be placed in a positon for development.

3

Lacour 026

The 365-acre tract was transferred to Ms. Lollar and, according to Mr. Lucky, Ms. Lollar informed him that she was keeping the land for herself and not transferring it to him. The subsequent request for specific performance, demands by attorneys that transfer be made, and this litigation ensued.

The Court would note that there were certain disinterested witnesses who testified regarding this proposed transaction.

First, Mrs. Linda Davidson testified that she had on occasion purchased land for Mr. Lucky in her name and then transferred that land to him. Her testimony was that she understood that if sellers knew that Mr. Lucky was involved, the price would spike.

Secondly, Mr. Craig Dickerson testified that he had worked for Mr. Lucky and that his office was in the Lucky Building. Mr. Dickerson testified that he was aware that Ms. Lollar was to purchase the 365-acre tract and transfer it to Mr. Lucky. While the Court might discount some of Mr. Dickerson's testimony based upon the fact that he had a working relationship with Mr. Lucky, the most convincing part of Mr. Dickerson's testimony was that in overhearing conversations regarding acquisitions of the 365-acre tract, he heard Mr. Lucky state that he was okay with acquiring the 365-acre tract even if the seller required the mineral rights to be reserved to the seller. Mr. Dickerson stated that this was an extreme departure from the normal business practice of Mr. Lucky who routinely required the mineral rights to be transferred with the property before he would purchase any tract of land.

Finally, the Court received testimony from Mr. Carter Rogers, the owner of a local title company. Mr. Rogers indicated that he had been in the title business for thirty five years and that he had met Ms. Lollar around the year 2000. Over the years he had handled various closings for her numbering perhaps a dozen. Mr. Rogers testified that Ms. Lollar would buy properties in her name and then some of those she would sell to Mr. Lucky. This understanding by Mr. Rogers was based upon information told to him by Ms. Lollar. Mr. Rogers and his office prepared what was labeled as Exhibit 61. That exhibit is Credit Sale Deed. Mr. Rogers stated that he and Ms. Lollar had a conversation regarding the 365-acre tract. As it related to whether or not that tract could be developed, Mr. Rogers indicated he did not remember the exact conversation but he believed that land was going to be used as timber land, or for agriculture, or

4

for recreational purposes.   As it relates to the 365-acre tract at the time of the closing, Mr. Rogers testified that Ms. Lollar told him she was buying the 365-acres for Mr. Lucky.

When asked during her examination as to her impression of Mr. Rogers, Ms. Lollar stated she held him in high esteem.   Of importance to this Court was Mr. Rogers testimony regarding Mr. Lucky.  Mr. Rogers stated that he had never met Mr. Lucky, never talked to him on the phone and would not know him if he passed him on the street.  In addition, Mr. Rogers indicated that he did not care to be doing business with or for Mr. Lucky based upon Mr. Lucky's reputation.  Thus, Mr. Rogers was simply restating what his client, Ms. Lollar, had informed him; that is she was purchasing the 365-acre tract for Mr. Lucky.  She purchased the property by virtue of the deed identified as Exhibit 61.  When Ms. Lollar's attorneys questioned Mr. Rogers as to the prohibition against Ms. Lollar transferring the note and the obligation, Mr. Rogers testified that a third person could not assume the obligation but the tract of land could be sold to that third person by Ms. Lollar.

After the Court has weighed the evidence the Court is satisfied by preponderance of the evidence that Mr. Lucky has established a mandatary (agent) and fiduciary duty between himself and Ms. Lollar.  The actions of Ms. Lollar in failing to transfer the 365-acre tract to Mr. Lucky was a breach of that duty.  See Louisiana Civil Code Articles 3001, 3004 and 3005.

Based upon the breach of the duty owed by Ms. Lollar to Mr. Lucky and in accordance with the Civil Code, the Court determines that Mr. Lucky is entitled to damages.

The Court is aware of the testimony of Mr. Lucky that he intended to utilize this land for pasture purposes for his cows and to acquire an area on the property known as "the blue hole" which has been described as a area with a pond and cypress trees that would rival anything you would see in South Louisiana.  The Court notes that since the original purchase by Ms. Lollar of the 365-acre tract, the only area that she has sold to another individual is, in fact, the area known as the blue hole and that no development of the remaining property has begun.

When the Court considers what would be an appropriate award of damages based upon the breach of the duty Ms. Lollar owed to Mr. Lucky, the Court fixes damages in the following amounts:

Actual mineral royalties/surface rights acquired since the date of purchase:

5

| | | |
|---|---|---|
| Funds received as lease bonus of $200.00 per acre, along with a 22.5% royalty interest, for leasing the property. | | $56,070.00 |
| Funds received for a 10% mineral interest in the property sold on November 22, 2010 | | $250,000.00 |
| Funds received from Audubon Oil and Gas Corporation for royalties or lease bonus on the remaining 280.135 acres. | | $570,770.00 |
| Funds received from Encana Oil & Gas, Inc. for mineral production form the property. | | $848,571.37 |
| Funds received from Anadarko E&P Onshore, LLC for a lease bonus on the property. | | $163,663.60 |
| Funds received from GEP Haynesville for mineral production from the property. | | $62,875.55 |
| | TOTAL: | $1,951,950.52 |
| Proceeds from the sale of 85 acres of the 365 acre tract by Ms. Lollar. | | $212,500.00 |
| Lease bonus paid on the 85 acres sold to Hummer and Son Honey Farm, LLC. | | $85,000.00 |
| | TOTAL: | $2,249,450.52 |
| Less purchase price of $425,000.00 and Ms. Lollar's Commission of $25,000.00 | TOTAL: | -$450,000.00 $1,799,450.52 |

Despite the testimony of Mr. Robert McGowen who was qualified as an expert in the field of reservoir engineering, the Court feels it would be speculative to award or to place a value on what reserves might be present beneath the land which have not yet been produced.

The above referenced damages are owed by Ms. Lollar to Mr. Lucky with legal interest from date of judicial demand until paid and all court cost associated with this proceeding.

The Court finds, regarding the reconventional demand of Ms. Lollar, that there is not sufficient evidence to substantiate that claim and the reconventional demand is hereby dismissed.

The Court will sign a judgment in accordance with this Opinion to be prepared by the attorneys for Mr. Lucky and circulated for signature.

The Clerk of Court is requested to provide notice of this Opinion to all parties of record.

OPINION RENDERED on this ___19___ day of _Decemb___ 2017, in Benton, Bossier Parish, Louisiana.

[judge's signature only on next page]

6

**Lacour 029**



PARKER SELF
DISTRICT JUDGE

<u>PLEASE SERVE:</u>
Mr. Lee H. Ayres
Mr. Curtis R. Shelton
Ms. Stacey S. Melerine
333 Texas Street, Suite 1400
Shreveport, LA 71166
Attorneys for Plaintiff

Ms. Julia Blewer
Mr. Davis Powell
330 Marshall Street, Suite 1114
Shreveport, LA 71101
Attorneys for Defendant

127573

Lacour 030