UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| MAGNOLIA ISLAND PLANTATION | § | CIVIL ACTION NO: 5:18-cv-01526 |
| L.L.C. and BARBARA MARIE CAREY | § | |
| LOLLAR | § | |
|      Plaintiffs | § | |
| | § | |
| VS | § | CHIEF JUDGE S. MAURICE HICKS, JR. |
| | § | |
| LUCKY FAMILY, L.L.C., W.A. LUCKY, | § | |
| III, and BOSSIER PARISH SHERIFF | § | |
| JULIAN C. WHITTINGTON | § | |
| | § | MAGISTRATE JUDGE KAREN HAYES |
|      Defendants | § | Jury Trial Demanded |

**MEMORANDUM FILED BY BARBARA MARIE LOLLAR AND MAGNOLIA ISLAND
PLANTATION IN OPPOSITION OF LUCKY FAMILY, L.L.C.'S
RULE 56 MOTION FOR DISMISSAL OF PLAINTIFFS' CLAIMS**

RESPECTFULLY SUBMITTED by:

/s/ J. Davis Powell
**DAVIDSON SUMMERS, APLC**
Randall S. Davidson, LSBA No. 4715, T.A.
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA No. 34947
Harold R. Bicknell III, LSBA 36801
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342; Fax: (318) 226-0168
Email: rsdav@davidsonsummers.com
      dpowell@davisonsommers.com
      dmartin@davidsonsummers.com
      hbicknell@davidsonsummers.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iii

I.     MR. LUCKY'S FOCUS ON FALSE, AND IMMATERIAL, CLAIMS ...................... 1

II.    GENUINE ISSUES OF FACT FOR TRIAL ................................................... 2

III.   LAW & ARGUMENT ............................................................................. 4

      A.    Mrs. Lollar's Due Process of Claim ................................................ 4

      B.    Magnolia's Due Process Claim ..................................................... 9

      C.    The Appraisal and Sale of Mrs. Lollar's Note Was Unlawful ............. 10

      D.    Mr. Lucky and Lucky Family, L.L.C. Are Liable for Abuse of Process ........... 12

      E.    Mrs. Lollar Has Not Ratified the Sheriff's Sale ................................. 14

      F.    The Luckys Owe an Obligation to Restore the Note .......................... 16

            1.    The Voided Judgment in Lucky I was Community Property ............... 16

            2.    Lucky Family Owes Duty of Restoration, Along
                 with Mr. and Mrs. Lucky ...................................................... 17

                 a.    Forced Sale of Note to LLC is a Windfall
                    To Vickie Lucky, Judgment Creditor ........................................ 17

                 b.    Alternatively, Lucky Family LLC is Not a Holder
                    In Due Course, and Took the Note Subject to
                    Mrs. Lollar's Claim for Restitution ........................................... 19

                 c.    Alternatively, Veil-Piercing is Warranted to
                      Prevent Circumvention of Restitution Obligation ....................... 21

                 d.    Restitution of the Note is Appropriate Under
                    Louisiana Law ................................................................. 23

CERTIFICATE OF SERVICE ....................................................................... 26

# TABLE OF AUTHORITIES

**PAGES**

**STATUTES:**

Fourteenth Amendment ................................................................................................5

La. R.S. 10:3-104 ........................................................................................................24

La. R.S. 10:3-201 ........................................................................................................24

La. R.S. 10:3-202(b) ..........................................................................................19, 20, 25

La. R.S. 10:3-203(b) ....................................................................................................19

La. R.S. 10:3-302(a)(2)(v) ...........................................................................................25

La. R.S. 10:3-302(c)(i) ...........................................................................................19, 25

La. R.S. 10:3-306 ..............................................................................................19, 20, 25

La. R.S. 13:4365 ...........................................................................................3, 5, 6, 8, 10

La. Civ. Code art. 473 ..................................................................................................24

La. Civ. Code art. 1853 ..........................................................................................Fn. 48

La. Civ. Code art. 2334 ................................................................................................16

La. Civ. Code art. 2336 ................................................................................................17

La. Civ. Code art. 2338 ................................................................................................16

La. Civ. Code art. 2340 ................................................................................................16

La. Civ. Code art. 2360 ................................................................................................17

La. Civ. Code art. 2361 ................................................................................................17

La. Stat. Ann. §10:302(c) .............................................................................................19

UCC Chapter 3........................................................................................................24, 25

UCC §3-202:6 ..............................................................................................................20

11 Am. Jur. 2d Bills and Notes §226 ...........................................................................20

La. Acts No. 92 ............................................................................................................24

24 La. Civ. L. Treatise, Sales §1:4...............................................................................24

**CASES:**

*Alexis v. [Metro,] Life [Ins.] Co.*, 604 So.2d 581 (La. 1992) .................................. Fn. 49

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ......................................................... Fn. 26

*Bailey v. Metro Fed. Sav. & Loan Ass'n of Lake Charles*,
642 F. Supp. 616 (W.D. La. 1986).................................................................. Fn. 43

*Brown v. Liberty Loan Corp. of Duval*, 539 F.2d 1355 (5th Cir. 1976) ................. 7, 8, Fns. 21, 25

*Carter v. D P & L Timber*, 2006-714 (La. App. 3 Cir. 11/8/06), 944 So.2d 732,
*writ denied sub nom. Carter v. DP & L Timber*, 2007-0302 (La. 3/30/07), 953
So. 2d 72 .................................................................................................. Fn. 48

*Classic Syndicate, Inc. v. Robert E. Bethard*, 139 F.3d 899 (5th Cir. 1998) .......... Fn. 62

*Coastal Agric. Supply6, Inc. v. JP Morgan Chase Bank, N.A.*,
759 F.3d 498 (5th Cir. 2014) ......................................................................... 19

*Coleman v. Burgundy Oaks, LLC*, 71 So.3d 352 (La. App. 2nd Cir. 2011) ............... 22

*Coleman Oldsmobile, Inc. v. Cobb*, 366 So.2d 994 (La. App. 1st Cir. 1978) .......... Fn. 51

*Courtesy Fin.*, 424 So.2d ............................................................................. 20

*Duboe v. City of New Orleans*, 909 F.2d 129 (5th Cir. 1990) .............................. Fn. 40

*Ebrahimpour v. Bozorg*, 95-1269 (La. App. 4 Cir. 1/19/96), 668 So.2d 434 ........... 19

*Glazer v. Comm'n on Ethics for Pub. Employees*, 431 So.2d 752 (La. 1983)............ 22

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ....................................................... Fn. 28

*Gootee Construction, Inc. v. Amwest Surety Ins. Co.*,
856 So. 2d 1203 (La. 2003) .......................................................... 23, 24, 25, Fns. 51, 62

*Gulf Oil Corp. v. State Mineral Bd.*, 317 So.2d 576 (La. 1974)............................. 24

*Henry Waters Truck & Tractor Co., Inc. v. Relan*, 277 So.2d 463
(La. App. 1st Cir. 1973).............................................................................. Fn. 51

*Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379 (5th Cir. 2000)...................... 21

*Jones v. Gillen*, 564 So.2d 1274 (La. App. 5 Cir. 1990)...................................... Fn. 48

*Keller v. Haas*, 202 La. 486, 12 So.2d 238 *1943)...................................... 21, 22, 23

*Lahaye v. Canon*, 330 So.2d 264 (La. App. 3 Cir. 1975) ............................... 14, 15

*Lambert v. People of State of Ca.*, 355 U.S. 225, 78 S.Ct. 240 ........................... Fn. 24

*Lisi Realty, Inc.*, 306 So.2d ................................................................................. Fn. 62

*Marshall v. Jerrico*, 446 U.S. 238 (1980) .......................................................... Fn. 27

*Matthews vs. Eldridge*, 424 U.S. 319 (<u>1976</u>) ........................................... 8, Fn. 18

*McCahey v. L.P. Inv'rs*, 774 F.2d 543 (2d Cir. 1985) ........................................ Fn. 23

*Mosbey v. Jefferson Par. Sheriff's Office* 18-69 (La. App. 5 Cir. 6/27/18),
250 So.3d 1110 ..................................................................................................... Fn. 49

*Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950) .................................. Fn. 22

*ORX Res., Inc. v. MBW Expl. L.L.C.*, 2009-0662 (La. App. 4 Cir. 2/10/10),
32 So.3d 921, *writ denied* 2010-0530 (La. 5/7/10), 34 So. 3d 862................................21

*Pearlstine v. Mattes*, 223 La. 1032, 67 So.2d 582 .......................................................43

*Plauche-Locke Securities, Inc. v. Johnson*, 187 So.2d 178 (La. App. 3d Cir. 1966) ...................12

*Rollins v. Allstate Ins. Co.*, 2002-330 (La. App. 3 Cir. 10/2/02), 828 So. 2d 677 ........................16

*Schweiker v. McClure*, 456 U.S. 188 (1982) ................................................................. Fn. 27

*Strickland v. Alexander* 153, F.Supp. 1397 (N.D. Ga.)
*amended* 154 F. Supp. 3d 1347 (N.D. Ga. 2015) and *amended*
162 F.Supp 3d. 1302 (N.D. Ga. 2015) ................................................................. Fn. 25

*Succession of Franklin*, 968 So.2d 811, 43,496 (La. App. Cir. 10/17/07)....................24

*Succession of Love*, 2016-245 (La. App. 3 Cir. 9/28/16), 201 So. 3d 1027 ................................24

*Swain v. Kirkpatrick Lumber Co.*, 143 La. 30, 78 So. 140 (La. 1918) ...........................Fns. 43, 44

*Tealwood Props., LLC v. Succ'n of Graves*, 64 So.3d 397 (La. App. 2nd Cir. 2011).............22, 23

*Triffin v. Automatic Data Processing, Inc.*, 394 N.J. Super. 237,
926 A.2d 362 (App. Div. 2007) ........................................................................................20

*Wetherbee v. Lodwick Lumber Co.*, 194 La. 352, 193 So. 671 (1940).........................................23

*Williams v. Brocato*, 194 So.67 (La. App. 2 Cir. 1940)........................................................14, 15

I.      MR. LUCKY'S FOCUS ON FALSE, AND IMMATERIAL, CLAIMS.

Mr. Lucky begins his supporting memorandum with a section labeled "Facts" within which he cites transactions by Mrs. Lollar which led to the origin of the Note.[1]   However, the memorandum moves away from the facts to indulge in fantasy masked as fact.   Mr. Lucky spends 3 pages characterizing the transactions which created the Note as a "scheme" meant to "prevent Mr. Lucky from successfully collecting on the [Lucky I] judgment."[2]  There was no scheme, but more importantly, this endeavor is a red herring the Court should avoid.

Mrs. Lollar was never prohibited from transferring her property during the pendency of Lucky I, just as Mr. Lucky was likewise under no prohibition.[3]  Mr. Lucky was subject to a reconventional demand in Lucky I for forging Mrs. Lollar's name.   Either party was subject to a judgment but not as to any specific property.   Further, Mrs. Lollar sold the property for consideration which includes the promissory note (the "Note"), the sale of which is the subject of this current lawsuit.[4]  Mr. Lucky repeatedly suggests that Mrs. Lollar tried to move property to avoid a judgment, but how can this be when she received value (the secured Note) for the property she transferred?  This is the same Note Mr. Lucky seized, and which Mr. Lucky's family LLC now wishes to enforce for its full value of over $1.7M.  It would be the ultimate contradiction to argue that the Note did not constitute value while attempting to enforce it for its full value.   Mr. Lucky's claims of a "scheme" regarding the Note transactions is of no relevance in our matter. Mr. Lucky

---

[1] **Rec. Doc. 84-22** p. 1-3.
[2] **Rec. Doc. 84-22** at p. 2.  Mr. Lucky assumes it was known who would prevail in Lucky I.  It was certainly not at that time of the transactions and Mrs. Lollar felt strongly the court would rule in her favor.
[3] See **Exhibit 6** attached hereto for Affidavit by Randall S. Davidson.
[4] The property sold serves as collateral to secure the payment of the Note to Mrs. Lollar.  At the time of the Sheriff's sale, the value of the collateral had increased beyond the value of the Note, however the actual value of the collateral was not factored into the purported third appraiser.

1

already filed previous litigation ("Lucky II") complaining the Note transactions were simulations. He has since dismissed his claims in Lucky II. The validity of the Note is not before this Court.

If nobody is claiming the Note is ineffective, one may wonder why Mr. Lucky has spent so many pages in order to falsely characterize the Note transactions. The answer is that Mr. Lucky attempts to disparage the Lollars using his false allegations from Lucky II but stops short of claiming the Note transactions were simulations.  This tact is a false distraction and does not address issues before this Court, or any court.  There is no evidentiary value to Mr. Lucky's commentary on the transactions as it does not make any fact of consequence more or less probable.

Mr. Lucky is aggrieved by the failure of his 9 year-long prosecution of Mrs. Lollar in Lucky I.  Mr. Lucky now argues that any loss Mrs. Lollar alleges regarding the Note, she deserves; that any abuse of process, statutory failure and due process violation which followed Lucky I should be ignored.  Mr. Lucky argues that Mrs. Lollar deserved to have her property sold for 6%, only to then be subject to his promise to chase the remainder of the $1.7 million dollar Lucky I judgment. As he said at his deposition: "I'm going to chase a deficiency against that woman sitting right there. The rest of her life, if I get it." [5]

The improper sale of the Note is the issue in this matter unless, and until, Mr. Lucky claims the Note is null as part of a simulation (a la, the dismissed Lucky II), in which case, the Sheriff sold nothing to Lucky Family, L.L.C.

## II.    GENUINE ISSUES OF FACT FOR TRIAL[6]

During a 12-month period between the issuance of the monetary judgment in Lucky I and the complete reversal of that judgment by the Louisiana Second Circuit Court of Appeal, Mr.

---

[5] See **Exhibit 7** attached hereto for excerpt from deposition of W. A. Lucky, III at 58:5-7.
[6] Plaintiffs incorporate their Response to W.A. Lucky, III's Statement of Undisputed Facts ("Response Statement") which accompanies this memorandum as if copied here in its entirety.

2

Lucky seized only one piece of property, Mrs. Lollar's Note.[7]  Prior to seeking seizure of the Note, Mr. Lucky first filed 2 *lis pendens* in the public records, encumbering the property which served as the collateral for the Note.[8]   Mr. Lucky also filed a lawsuit claiming that the transactions by which the Note was created were null and of no effect as simulations.[9] Not only did each of these filings call the Note into question, each clouded title to the collateral property owned by Magnolia and directly caused the suspension of Magnolia's oil and gas income.[10] Once Mr. Lucky had the lis pendens and Lucky II in place, he sought seizure and sale of Mrs. Lollar's Note.

The Note was to be sold with the benefit of appraisal.  After both Mrs. Lollar and Mr. Lucky submitted appraisals which were beyond the averaging limits set forth by La. R.S. 13:4365, the Sheriff was required by statute to appoint a third appraiser to make a final, true and just appraisal.  The Sheriff did not perform his duty.  Instead, the Sheriff allowed Mr. Lucky's counsel, Curtis Shelton, to obtain an additional appraisal.  This alleged third appraisal came from Patrick Lacour, at the request of Mr. Lucky' s attorney, Curtis Shelton with whom Mr. Lacour was working for in another matter.[11]  Mr. Shelton sent Lacour a 6-page letter with commentary and advice on what should be considered in the appraisal, as well as a specific set of documents for Lacour to review (the "Shelton Letter").[12]  The Shelton Letter disparaged Mrs. Lollar and her husband while emphasizing Mr. Lucky's lis pendens and Lucky II lawsuit as encumbering the collateral property and the Note's validity.  Finally, the Shelton Letter attached selective filings from the Lucky I

---

[7] See **Rec. Doc. 51-1** for a copy of the Note.

[8] See **Rec. Doc. 51** Exhibits "E" (51-7) and "F" (51-8) for a copy of each lis pendens referenced.

[9] A copy of the Lucky II petition filed by Mr. Lucky can be found at Rec. Doc.  71-2.

[10] See **Exhibit 8**, attached hereto for a copy of emails from GEP Haynesville, L.L.C. suspending Magnolia's royalty due to Mr. Lucky's filings.  Magnolia's oil and gas income was a source of income to pay the Note.

[11] See **Rec. Doc. 71-4** for an excerpt from Mr. Lacour's deposition at p. 59, lns 1-25 where Mr. Lacour admits to concurrently working with Mr. Shelton on another matter at the time of his appraisal in this matter.

[12] See **Rec. Doc 51-13**, for a copy of the October 10, 2018 Shelton Letter.

opinion as well as Mr. Lucky's new lawsuit (Lucky II), while leaving out any pleadings by Mrs. Lollar and the fact the underlying judgment was pending appeal.

Mrs. Lollar and her counsel were never contacted or notified regarding a third appraisal or Mr. Lacour's work until Lacour provided an appraisal to the Sheriff's office.  Mr. Lacour submitted an appraisal of the Note for 9% of its face value by applying discounts based on Mr. Lucky's filings in Lucky II and the lis pendens.  He sought no independent information regarding the Note, the value of the Note's collateral, or the Note's payor to make his appraisal; in fact, Mr. Lacour never even saw a copy of the Note.[13]  Mrs. Lollar's property was presented for sale by the Sheriff on October 24, 2018 with an opening bid of only $104,672.81.  There was only one bidder:  Vickie Lucky, in attendance with her husband,, provided the sole bid of $105,000 purportedly on behalf of Lucky Family, L.L.C.[14]  Lucky Family, L.L.C. began immediate efforts to collect installment payments on the Note after the Sheriff's sale, and then claimed default by the payor (Magnolia Island Plantation, L.L.C. or "Magnolia") to accelerate the Note for its full value of $1,730,000.[15] Mr. Lucky later dismissed Lucky II and the lis pendens which claimed the Note was invalid.

## III.    LAW & ARGUMENT

### A.    <u>Mrs. Lollar's Due Process Claim:</u>

Mr. Lucky argues that Mrs. Lollar has no due process claim. Mrs. Lollar's due process claim is legally supported, but for the purpose of Mr. Lucky's motion, the material facts at issue to determine whether Mrs. Lollar's due process rights were violated are in apparent dispute as shown in the Response Statement by Plaintiffs. For this reason, Rule 56 does not afford Mr. Lucky

---

[13] See **Rec. Doc. 71-5** for excerpts from the transcript of Mr. Lacour's deposition at p.24 at lns. 2-23, p. 63 at lns. 2-8, p. 77 at lns. 2-11, p.123 at lns. 9-20.  Mr. Lacour's testimony indicates that he reached no further than Mr. Shelton's Letter and its attachments in making his appraisal.

[14] Mrs. Lucky was also joined by attorney David Touchstone who assisted her with bidding.

[15] See **Rec. Doc 71-8**, for a copy of a letter on behalf of Lucky Family, L.L.C. addressed to Magnolia, claiming the LLC has accelerated the Note.

the relief which he seeks in his motion.

Mr. Lucky's memorandum focuses its due process discussion on the sufficiency of notice to Mrs. Lollar prior to the third appraisal.[16] Mr. Lucky argues that notice was satisfied by the July 5, 2018 hearing and the later notices of seizure and to appoint an appraiser.[17]   But Mr. Lucky's argument misses, or avoids, the real issue.  Mrs. Lollar's claim for lack of due process is not based on lack of notice of the seizure of her Note.  Mrs. Lollar's due process claim is based on the fact that she was deprived of her property, or the full value thereof, due to the extreme failures by the Sheriff to follow state statutory law which led to the sale of her property for 6% of its value.  Mrs. Lollar claims she has been deprived of her property without due process based on the fact that she was not provided notice or an opportunity to be heard in regards to the final appraisal.  Once the initial appraisals of Mr. Lucky ($173,000) and Mrs. Lollar ($1,478,048) differed by more than the averaging limits, the Sheriff was required to appoint a third appraiser under La. R.S. 13:4365.  The Sheriff's office ignored its statutorily required duty to appoint a third appraiser.  Instead, the Sheriff and his office knowingly allowed the judgment creditor to select an additional appraiser to set the price for the Note sale.  Although there was a more than $1.3M difference between Mrs. Lollar's appraisal and that of the purported third appraisal, the Sheriff did not pause, and went ahead to sell Mrs. Lollar's property at 6% of its face value.

The due process clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property without due process of law."  The Supreme Court recognizes rights to both procedural and substantive due process.  To satisfy the requirements of due process, the state must provide the injured party with notice and a meaningful opportunity to be heard prior to the deprivation of their property.  In civil contexts a balancing test is used that evaluates the

---

[16] See **Rec. Doc. 84-22** at 5-7.
[17] All of which were directed to Mrs. Lollar, not Magnolia.

government's chosen procedure with respect to the private interest affected, the risk of erroneous deprivation of that interest under the chosen procedure and the government interest at stake.[18] In our matter, the private interests at stake are that of the judgment creditor in satisfaction of a monetary judgment (should the creditor choose to execute while on appeal) and that of the debtor in ensuring any property seized is sold at its sufficient value to avoid subjecting the debtor to unjust deficiencies in satisfaction of the judgment. Allowing a judgment creditor to manage the third appraisal causes serious risk for erroneous deprivation of property rights,  a demonstrated by Mr. Lucky's manipulation of the process.

The Sheriff's role exists not just for the judgment creditor but as a representative of all citizens.  Therefore, the Sheriff also has an interest in protecting the judgment debtor from unlawful or improper appraisals or sales of their property, especially when, as here, the debtor would be subject to deficiency amounts based on the sale value. This is why the Sheriff is has a duty under La. R.S. 13:4365; otherwise, judgment creditors could run roughshod over a debtor's rights in any manner which suits the creditor's interest.  The Sheriff's statutory duty regarding third appraisals is already mandated by State law, but it is otherwise of little burden when compared with the risk of harm should the Sheriff farm out its role to just the creditor.

Although the State has the authority to seize and sell a citizen's property, such authority comes with the responsibility to do so in accordance with state statutes and in accord with Constitutional principles of fairness.  In this matter, the Sheriff and his office failed to do what state law requires.  The Sheriff's office has described the process of selling Mrs. Lollar's Note as "a learning experience"[19], and have described some of the actions by Mr. Lucky and his counsel

---

[18] *Matthews vs. Eldridge*, 424 U.S. 319 (1976)

[19] See **Rec. Doc. 71-6** for an October 23, 2018 email from Kim Flournoy to Curtis Shelton as Ms. Flournoy describes that process with Mrs. Lollar's Note as a "learning experience."

as "not normal."[20]    Instead of following the law, the Sheriff reached out to the judgment creditor and his counsel and allowed them to handle the selection and communications with the additional appraiser. The Sheriff did not contact the judgment debtor or her counsel to afford them the same opportunity, nor was the judgment debtor informed that the judgment creditor's counsel was handling the additional appraisal until it was too late. The Sheriff's actions were fundamentally unfair and unconstitutional as overtly favoring the creditor and allowed manipulation of a process which the Sheriff was entrusted to protect.  In fact, it is only through discovery in this matter that we are finding out the full extent of the Sheriff's failures as well as the extent of the abuses by Mr. Lucky and his counsel to rig the sale to his advantage.  The Sheriff's failures led to the deprivation of Mrs. Lollar's property for an absurdly low value.  Mrs. Lollar had a $1.7M promissory note secured by excessive collateral at the time it was sold for just $105k.  The additional $1.6M is the value of which she was unjustifiably deprived.

Mr. Lucky argues that even if Mrs. Lollar had not received notice before the seizure of the Note, "it would not matter."  He cites *Brown v. Liberty Loan Corp.*[21] to aruge that notice is not constitutionally required "post-judgment."  The reliance on *Brown* is misplaced for two reasons. The first is that Mr. Lucky is interpreting "post-judgment" as anything that follows the now reversed Lucky I judgment.  This is incorrect, as we cannot simply cumulate all of the events leading up to the sale of Mrs. Lollar's property back into Lucky I.  To do so would mean that anything that happens to Mrs. Lollar or her property after the judgment in Lucky I is not protected. This is obviously not true.  A citizen's due process rights are required in "any proceeding"[22] which would include the events which constituted the appraisal and sale of her property. Federal courts

---

[20] See **Rec. Doc. 80-3** for excerpt from Deposition of Jean Horne at P. 26:5-10.
[21] *Brown v. Liberty Loan Corp. of Duval*, 539 F.2d 1355 (5th Cir. 1976)
[22] *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950) at 314.

have recognized that initial proceedings do not resolve all future issues between creditor and debtor.[23]  That is not always the case, especially in situations where the sales price of the debtor's property is affected by a separate process in and of itself (the appraisal and La. R.S. 13:4365). Such post-judgment processes are determinative of whether a deprivation will occur, and as such they must adhere to the principles of due process.[24]  Second, *Brown* does not hold that there are no post-judgment notice protections. Instead, the court used a balancing method similar to that in *Matthews*, *supra* to determine whether a debtor's interest was protected. [25]

While Mrs. Lollar's property was initially allowed to be seized, it must be sold under the same principles of fair due process to prevent a deprivation.  In this matter, Mrs. Lollar has argued that she is entitled to restitution of her Note due to the reversal of the underlying judgment by which it was seized and sold.  However, if restitution is not ordered, she has been subject to the deprivation of that property's full value by the Sheriff's failures.   The opportunity to be heard must be granted at a meaningful time and in a meaningful manner.[26] The neutrality requirement helps to guarantee that life, liberty or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law… At the same timen it preserves both the appearance and reality of fairness.[27]  An impartial decisionmaker is an essential right in civil proceedings.[28] It is disingenuous for Mr. Lucky to say he is "flummoxed" by the due process claim. His discussion of due process and "actual notice" is inapplicable to the appraisal events to which Mrs. Lollar was

---

[23] See *McCahey v. L.P. Inv'rs,* 774 F.2d 543, 548 (2d Cir. 1985) finding an initial judgment does not resolve all issues of debtor and creditor and does not assume judgment collection is just a "ministerial act."

[24] See *Lambert v. People of State of Ca.*, 355 U.S. 225, 228, 78 S. Ct. 240, 243. "Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed."

[25]  *Brown* at 1365.     See also fn 3 in     *Strickland v. Alexander*, 153 F. Supp. 3d 1397, 1407(N.D.Ga.), *amended*, 154 F. Supp. 3d 1347 (N.D. Ga. 2015), and *amended,* 162 F. Supp. 3d 1302 (N.D. Ga. 2015) recognizing that *Brown* is "not rooted in *Endicott*" and did not apply the *Endicott* holding.

[26]  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

[27]  *Marshall v. Jerrico,* 446 U.S. 238, 242 (1980); *Schweiker v. McClure* 456 U.S. 188, 195 (1982).

[28]  *Goldberg v. Kelly,* 397 U.S. 254, 271 (1970).

left in the dark.  The due process violations occurred when the Sheriff breached his duty with regard to a third appraiser.

**B.**      **Magnolia's Due Process Claim:**

Magnolia assumed the Note's original payor's obligation as such regard Mrs. Lollar. Magnolia has a right to make payments under the Note for the purpose of avoiding the Note's default provisions.  Magnolia made such payments to Mrs. Lollar representing the 2018 installment prior to the October 24, 2018 Sheriff's sale of the Note.   Magnolia now faces claims by Lucky Family that the payments Magnolia made were of no effect and therefore Magnolia is in default despite such payments.  At the same time, Lucky Family argues that Magnolia not does not have an interest in the Note which would affords it a Constitutional right to notice of the Note's seizure and sale.  This is the catch-22 in which Lucky Family wishes to place Magnolia: Magnolia is not afforded notice of the Note's seizure and sale, but also should not get credit for the payments it made prior to receiving notice of the Note's sale.Magnolia's status regarding the Note was reasonably ascertainable, as its assumption of the obligation was a matter of public record in the Exchange Deed (Rec. doc. 51-3) where it received its interest in the property being conveyed. Magnolia cannot be denied a right to notice of the Sheriff's sale under these circumstances while being found in default for making payments to Mrs. Lollar prior to the Sheriff's sale.  Mr. Lucky argues that the fact that the same law firm represents Magnolia and Mrs. Lollar would mean that notice to one serves as notice to all.  This is incorrect, as the fact that the undersigned firm represented Mrs. Lollar regarding the seizure and sale of the Note does not automatically impute such notice upon a separate client.

9

C.       **The Appraisal and Sale of Mrs. Lollar's Note Was Unlawful:**

It is undisputed that both Mr. Lucky and Mrs. Lollar were afforded the opportunity to submit initial appraisals of the Note.  Mr. Lucky's appraiser, Chad Garland, submitted a $173,000 appraisal and Mrs. Lollar's only appraiser, John Dean, submitted a $1,478,048.68 appraisal.  That is a $1.3 Million dollar difference in appraisal on property which has a face value of $1.7 million. It is disputed that Mr. Garland's appraisal qualifies as true and just, as he chose to take the collateral "out of play" completely based on the clouds on title which Garland admits were created by Mr. Lucky.[29]  Mr. Garland acknowledged that if the collateral had been considered then an appraisal would have reflected almost the full value of the Note.[30]  It is only through discovery that Mrs. Lollar was able to get behind Garland's number to determine that he gutted the Note's value either by error or at Mr. Lucky's behest.  In either instance, the Garland appraisal was invalid.

However, at the time the Garland and Dean appraisals were submitted, and based solely on the values submitted, the Sheriff was required to appoint a third appraiser under La. R.S. 13:4365. Whether the Sheriff undertook this duty at all is disputed.  Rather than appoint a third appraiser, The Sheriff's office contacted Mr. Lucky's counsel allowing him to select an additional appraiser and be the sole contact with that appraiser.  Mr. Shelton chose Patrick Lacour who was already working with Mr. Shelton in another matter.[31]  It was Mr. Shelton who provided Mr. Lacour with the information Lacour used to perform his appraisal.  The information provided consisted of the lis pendens Mr. Lucky filed against the Note's collateral, as well as selective filings from Lucky I and Lucky II, such as the Lucky II petition alleging the Note transactions were simulations and the

---

[29] See **Exhibit 1** attached hereto for excerpt from deposition of Chad Garland at p. 40: 19-25 and p. 41: 1-9.  Garland hedges that he took the collateral out based on Lucky I, but this is his misunderstanding as the Lucky I judgment was monetary and only against Mrs. Lollar, not the collateral's owner, Magnolia.
[30] See **Exhibit 1**, the Garland deposition at p. 34:7-25 through 35:1-3.
[31] See **Rec. Doc. 71-4** for excerpt from deposition transcript of Patrick Lacour at p. 59:1-10.

10

Lucky I opinion.  Absent from the information were any of Mrs. Lollar's pleadings or defenses in Lucky I or Lucky II, as well as any mention that the Lucky I judgment was pending appeal.  It was only after Lacour had completed his appraisal, with the assistance of Mr. Shelton, that he was in contact with the Sheriff's office about submitting his appraisal. None of these facts support an appointment by the Sheriff.  Mrs. Lollar was not provided notice or the opportunity to be heard in regards to the appraisal which the Sheriff ultimately used to govern the Note sale.  On the other hand, Mr. Lucky and his counsel were not only provided notice and a chance to be heard regarding the governing appraisal, but were given an all-access pass to choose the appraiser and be his sole contact.  For this reason, there was no third appraisal and therefore the Sheriff's sale was a nullity.

Separate from the issue of whether the Sheriff appointed a third appraiser or not, the Lacour appraisal itself suffers from fatal errors and was based on the biased information provided by the judgment creditor's counsel.[32]  It is also disputed whether the appraisal itself is true and just as required by law.  The Lacour appraisal relied on the information provided by Mr. Lucky's counsel which included only partial legal filings[33] attached to a letter outlining what Lacour should consider.[34]  Mr. Lacour never saw the promissory note[35], never independently reviewed public records and obtained no information on the credit worthiness of the Note's payorMr. Shelton even suggested to Mr. LaCour that he was capable of using his own judgment as to the merits of Mr. Lucky's second lawsuit ("Lucky II"), which alleges the Note transactions were null in valuing the Note.[36] Lacour erroneously made legal judgments regarding what were mere allegations by Mr. Lucky and which were later dismissed.

---

[32] See attached 56.2 Response Statement by Plaintiffs at paragraphs 8-19.
[33] See **Rec. Doc. 71-5**, excerpt of deposition transcript of Patrick Lacour at p. 63:2-19.
[34] See **Rec. Doc. 80-2**, excerpt of deposition transcript of Patrick Lacour at p. 53:15-19.
[35] See **Rec. Doc. 71-5**, excerpt of deposition transcript of Patrick Lacour at p. 77:6-11.
[36] **Rec. Doc. 51-13** at p. 6.

11

Mr. Lucky's memorandum argues that appraisers are not required to be disinterested.  In support Mr. Lucky cites to *Plauche-Locke Securities, Inc. v. Johnson*[37], in which a sheriff chose an appraiser for a debtor who did not appoint one for himself.  In *Plauche-Locke*, unlike in this case, the *Sheriff did take an action to select an appraiser.  The Plauche-Locke* court did not find evidence of bad faith and that there was otherwise substantial compliance with the statutory requirements.  Further, the appraiser's value for the property (a vehicle) was based on the NADA "blue book" which included commonly accepted benchmark for vehicle values. While *Plauche-Locke* states that there is no statutory requirement that appraisers be "disinterested persons", this does not relieve the Sheriff from performing its duty to handle the appointment of the third appraisal, and does not relieve the appraiser from the requirement that the appraisal be true and just.  *Plauche-Locke* is not a hall pass for judgment creditors to manipulate the process.

### D.      Mr. Lucky and Lucky Family, L.L.C. Are Liable for Abuse of Process:

The abuse of process claim in this matter is not based just on the two lis pendens filed by Mr. Lucky, as he asserts.[38]  It includes the entirety of Mr. Lucky and Lucky Family's actions whereby the Note transactions were alleged in judicial proceedings as null (Lucky II), the collateral being encumbered by the lis pendens (ostensibly supported by Lucky II), all while Mr. Lucky purported to satisfy the Lucky I judgment through seizure and sale of the Note.  Filing Lucky II and the lis pendens in the public record alone served to chill the Sheriff's sale of the Note which would be contrary to a judgment creditor's motivations but for his ulterior purpose.  As set forth in the preceding section, Mr. Lucky and his counsel then utilized Lucky II and then lis pendens to improperly influence the appraisers to discount the Note's value so that Mr. Lucky's family LLC could purchase the note for a wildly discounted value before turning around and attempting to

---

[37] 187 So. 2d 178 (La. App. 3d Cir. 1966).
[38] **Rec. Doc. 84-22**, p. 19

enforce the Note for its full value.  Mr. Lucky has since dismissed Lucky II and cancelled the lis pendens, each of which were without merit to begin with.

Mr. Lucky has admitted that his actions caused problems for the Note.[39]  The facts are supportive of (1) an ulterior purpose and (2) a willfull act in the use of the process not in the regular prosecution of the proceeding.[40]  But even before reaching the merits of the claim, it is apparent that the facts regarding Mr. Lucky's intent and whether an abuse of process occurred are in dispute. Mr. Lucky argues that his intent could not be malicious by filing the lis pendens as they were "obviously" filed to protect his rights.  However, this ignores his other actions and the fact that his contrary actions in seizing the Note for sale contradicts any claim of neutral intent.  Further, the fact that Mr. Lucky eventually dismissed Lucky II and cancelled the lis pendens does not alleviate the matter, as he suggests.[41]  Mr. Lucky's proceedings had an effect upon Mrs. Lollar, Magnolia, and the sale on their filing.  For one, Magnolia's oil and gas royalty income was suspended until the lis pendens was removed and it lost a lease offer for the same reason.[42]  Mr. Lucky was not only trying to cloud the Note's collateral before it was seized and sold, but he sought to choke Magnolia's ability to pay the Note to increase a chance for default.  Although Magnolia was able to avoid default by making the required payments, Mr. Lucky's actions still caused harm under abuse of process.  Having Lucky II and the lis pendens of public record also served to chill the sale so that Lucky Family would be able to obtain the Note for the lowest price possible.  Actions which are reasonably capable to chill a sale or prevent competition at a sale will be sufficient to annul the

---

[39] See **Exhibit 7** attached hereto for excerpt from deposition of W.A. Lucky, III at p. 114:4-9, when asked about his prior experience buying "problem notes" and then collecting on them, Mr. Lucky was asked if Mrs. Lollar's Note was a "problem note" to which he agreed, acknowledging Lucky II was the problem.
[40] See **Rec. Doc. 84-22** at p. 19 for Mr. Lucky's acknowledgment of the elements of abuse of process by citation to *Duboe v. City of New Orleans*, 909 F.2d 129 (5th Cir. 1990)
[41] **Rec. Doc. 84-22**, p. 19
[42] See **Exhibit 8** attached hereto for March 12 and 14, 2018 emails from GEP Haynesville, L.L.C. to Ronald Lollar on behalf of Magnolia.

sale.[43]  In fact, under Louisiana Supreme Court precedent, the sale is to be set aside irrespective of intentional misconduct if competition is stifled.[44]  The effect of Mr. Lucky and Lucky Family's actions are evident in that there was only one bid for the Note and that was by  Lucky Family, LLC.

The damage to Magnolia is evidenced by Magnolia's suspension of royalties and its loss of a lease offer due to the lis pendens.  For Mrs. Lollar, the damage was the loss of value of her Note when it was sold for 6% of its value.  Of course, the restitution relief sought by Lollar to have the Note returned has the potential to address the loss of property value, absent interest and related damages, but should the Sheriff sale be upheld and should Lucky Family be allowed to retain the Note, the facts support Mrs. Lollar's claim for damages from abuse of process.

### E.      Mrs. Lollar Has Not Ratified the Sheriff's Sale

Mr. Lucky claims that Mrs. Lollar ratified the sheriff's sale and therefore is barred from seeking a nullity of it.[45] This is incorrect. The alleged ratification is a November 13, 2019 letter from counsel for Mrs. Lollar to counsel for Mr. Lucky, requesting payment of the proceeds of the sale (the "Martin Letter").[46] The Martin Letter does not constitute a judicial confession under Louisiana law. The Lucky Motion cites *Lahaye v. Canon*, 320 So.2d 264, 267 (La. App. 3 Cir. 1975) and *Williams v. Brocato*, 194 So. 67 (La. App. 2 Cir. 1940) as support for the proposition that "one cannot claim, judicially, the proceeds of a sale and afterwards attack that sale for nullity."[47] But even that quote belies Mr. Lucky's argument: it speaks only of parties who have

---

[43] *Bailey v. Metro Fed. Sav. & Loan Ass'n of Lake Charles*, 642 F. Supp. 616, 620 (W.D. La. 1986), citing *Pearlstine v. Mattes,* 223 La. 1032, 67 So.2d 582, 586 n. 3, *citing Swain v. Kirkpatrick Lumber Co*., 143 La. 30, 78 So. 140 (La.1918).
[44] *Swain v. Kirkpatrick Lumber Co.,* 143 La. 30, 39, 78 So. 140, 143 (1918)
[45] **Rec. Doc. 84-22**, p.5.
[46] **Rec. Doc. 84-18**, at Exhibit 51.
[47] **Rec. Doc. 84-22**, p. 5

14

*judicially* claimed the proceeds of a sale. In *Williams v. Brocato*, the plaintiff demanded sales proceeds in open court, affirmatively representing to the court his entitlement to the funds at issue. *Id*. In *Lahaye v. Canon*, the judicial admission was a party's signing of a partition agreement, under an order of the court to do so. The court determined that the signing of the partition agreement under court order constituted a judicial homologation of the partition. The Martin Letter is not a claim that was made judicially, in the sense required by the jurisprudence; it was not a claim made to the Court itself (as in *Williams v. Brocato*) or an act ordered by, or approved by, the Court in the course of a judicial proceeding (as in *Lahaye v. Canon*).  Instead, it is simply a letter between attorneys concerning amounts which Mrs. Lollar believed were owed to her beyond the claims in this suit, with no court involvement.

Further, the Martin Letter does not make a claim to the validity of any claims. In order for a party's statement to constitute a judicial confession, it must be an express acknowledgment of an adverse fact.[48]  Additionally, "the adverse party must have believed the fact was no longer at issue or must have relied on it, to his detriment."[49] The Martin Letter does not contain any express acknowledgment of an adverse fact. Instead, it states that "[Mrs. Lollar] reserves all rights."[50] Further, it plainly discusses the possibility that the Court could rule either to annul the sheriff's sale or to maintain it, and that Mr. Lucky would not be entitled to the disputed funds in either case. This is not a confession as to the validity of the sheriff's sale; it does not state that Mrs. Lollar agrees that the sheriff's sale was lawful. Just as Mr. Lucky was entitled to attempt collection on

---

[48] La. Civ. Code art. 1853; *Carter v. D P & L Timber*, 2006-714 (La. App. 3 Cir. 11/8/06), 944 So. 2d 732, 735, *writ denied sub nom. Carter v. DP & L Timber*, 2007-0302 (La. 3/30/07), 953 So. 2d 72; *Jones v. Gillen,* 564 So.2d 1274 (La. App. 5 Cir.1990).
[49] *Mosbey v. Jefferson Par. Sheriff's Office*, 18-69 (La. App. 5 Cir. 6/27/18), 250 So. 3d 1110, 1118; *Alexis v. [Metro.] Life [Ins.] Co.,* 604 So.2d 581 (La.1992).
[50] **Rec. Doc. 84-18**, at Exhibit 51.

15

his *Lucky I* judgment while the issue was pending on devolutive appeal, Mrs. Lollar was entitled to seek payment of funds owed to her under the then-existing order of the district court pending resolution of this case. Further, Lucky's Motion for Summary Judgment does not even claim that Mr. Lucky believed the fact was no longer at issue, nor that Mr. Lucky relied on it.

### F.   The Luckys Owe an Obligation to Restore the Note

#### 1.   *The Voided Judgment in Lucky I Was Community Property*

Upon reversal of their judgment on devolutive appeal, Mr. Lucky and his wife, Vickie Lucky, owe restitution to Mrs. Lollar for any money or property they garner in execution.[51]  That voided judgment from *Lucky I* was community property, which is presumed by law.  La. C.C. art. 2334, 2338, 2340.  Although Vickie Lucky was not a plaintiff in *Lucky I*, she was subject to the community of acquets and gains with Mr. Lucky.  La. C.C. art. 2334.  The community between them included any property or rights "acquired during the existence of the legal regime through the effort, skill or industry of either spouse" as well as "all other property not classified by law as separate property."  La. C.C. art. 2338.  The *Lucky I* allegations revolved around Buddy's claim -- now conclusively rejected -- that he had an oral agreement with Mrs. Lollar to purchase immovable property using the undisclosed agency of Mrs. Lollar.  Mr. Lucky, individually, brought suit on thus claim without joining Vickie, but Vickie nevertheless was a judgment creditor on the resulting judgment to the same extent as Buddy.  La. C.C.P. art. 686; *Rollins v. Allstate Ins. Co.*, 2002-330 (La. App. 3 Cir. 10/2/02), 828 So. 2d 677, 679 (wife not named as plaintiff subject to res judicata effect of judgment brought by husband on community rights). This meant that Vickie had an undivided interest in Lucky's purported rights under the voided judgment.  La. C.C.

---

[51] *Gootee Construction, Inc. v. Amwest Surety Ins. Co.,* 856 So. 2d 1203, 1206 (La. 2003); *Henry Waters Truck & Tractor Co., Inc. v. Relan*, 277 So 2d 463, 467 (La. App. 1st Cir. 1973).  "[A] defendant who has suffered seizure under an invalid judgment has a right to recover that which was wrongfully seized." *Coleman Oldsmobile, Inc. v. Cobb*, 366 So. 2d 994, 996 (La. App. 1st Cir. 1978).

art. 2336.    Likewise, when the community judgment was reversed on devolutive appeal, the obligation to restore the money or property received is a community obligation, shared by both of them.  La. C.C. art. 2360, 2361.

### 2.    *Lucky Family Owes Duty of Restoration, Along with Mr. and Mrs. Lucky.*

The central conceit of Mr. Lucky's filings is that his family is  able to ***avoid*** the restitution obligation by causing the Note to be purchased at a sheriff's sale by a limited liability company purported to be owned almost entirely by Vickie Lucky.[52]  This assertion is flawed, and does not warrant summary judgment, for several reasons.

### a.    *Forced Sale of Note to LLC is a Windfall to Vickie Lucky, Judgment Creditor.*

First, it is not necessary to pierce the veil of Lucky Family to find that both Luckys were unjustly enriched by Lucky Family's acquisition of the note through sheriff's sale under the now-voided judgment.  Through their manipulation of the seizure process, they were able to cause Vickie's company to buy the $1.7 million dollar note for the sum of $105,000.     The note purportedly entitles the LLC to either (1) collect the full payments owed under the Note in the amount of $1.7 million dollars cash or (2) foreclose on mortgaged property securing the note. Even since the time of Lucky's appraisal of the collateral there has been significant mineral development which has made the collateral worth far more than the Note amount.  This is in fact what Lucky Family is attempting to do in this very litigation. The $1.7 million dollar windfall to the Lucky Family LLC, is also a windfall to its purported majority owner Vickie Lucky, co-judgment creditor of Buddy Lucky under the voided Lucky I judgment.  Through her purported role as one of the Managers of the Company, and as the 96% member of the Company, Vickie has the right to control and access the funds at any time. Section 4.3 of the LLC operating agreement

---

[52] See **Rec. Doc. 83-2** for Lucky Family's *Statement of Material Facts* at paragraph 33.

specifically provides that "Distributions shall be made at such time and in such amounts as the Manager (or if there is no Manager, a majority of the Members), so determines.  The windfall to Lucky Family LLC increased the value of Vickie's membership interest by a commensurate amount. The small sum paid at the Sheriff's sale went to pay fees and expenses of the sheriff and clerk of court, which were incurred for the benefit of the Luckys in their litigious crusade against Mrs. Lollar.  The remaining funds went directly to Mr. Lucky, and as fruits of the purported community judgment they became part of his community with Vickie Lucky, subject to the restitution obligation.  Besides being in community with Vickie, Mr. Lucky shares in this windfall through his clear and documented ability to control and influence the management and operations of Lucky Family, and through his ability to use the family LLC as a funding source for his various projects.  Mr. Lucky had control and influence, as demonstrated by the following: Mr. Lucky's status as Manager of Lucky Family, L.L.C. has never been changed; [53]Mr. Lucky continues to represent Lucky Family, L.L.C;[54]Mr. Lucky has used Lucky Family, L.L.C. to fund his projects.[55] In a true third-party purchase by an entity not owned by the Luckys or their family, under an appraisal not tainted by the Lucky's machinations, the outcome would be different.   Both Luckys benefitted substantially and inequitably from the forced sale of Mrs. Lollar's note at less than 6% of its value.

---

[53] See **Rec. Doc. 84-19** at Exhibit 59 for Unanimous Consent of Members electing Mr. Lucky as Manager; See also Rec. Doc. 84-19, Exhibit 61 for Lucky Family's Operating Agreement and First Amended Operating Agreement, at no point has the L.L.C. taken steps to remove or change Mr. Lucky's status as Manager in accordance with the terms of the Operating Agreement or otherwise.

[54] See **Exhibit 4**, attached hereto for a Sheriff's sale purchase of land wherein Mr. Lucky represented Lucky Family, L.L.C. ; See also **Rec. Doc. 84-21** at Exhibit 70 for *Certificate* confirming Mr. Lucky's authority on behalf of the L.L.C.; See also **Exhibit 5** attached hereto for documents signed by Mr. Lucky with Vickie Lucky to open a commercial account for Lucky Family, L.L.C. with the Bank of Jackson Hole in Wyoming.

[55] See **Rec. Doc. 80-6** for transactions by which Coyote Land Co., owned by Mr. Lucky, received a one-million-dollar loan (not personally guaranteed) from Lucky Family in order to purchase property which it later transferred into an LLC jointly owned by Mr. and Mrs. Lucky before re-payment of the loan.

**b.** **_Alternatively, Lucky Family LLC is Not a Holder In Due Course,_**
**_and Took the Note Subject to Mrs. Lollar's Claim for Restitution._**

Second, Lucky Family LLC is not protected against the claims of Carr for restitution
because it is not an innocent purchaser.  Under the Uniform Commercial Code, the transferee of a
promissory note or other negotiable instrument takes subject to any adverse claims to the
instrument including a claim to rescind a negotiation and to recover the instrument or its proceeds.
La. 10:3-306.  The only exception is if the transferee is a holder in due course (HIDC).  La. R.S.
10:3-306.   See also La. R.S. 10:3-202(b) (negotiation of instrument may be rescinded to extent
permitted by other law, unless against subsequent HIDC).

 A party claiming HIDC status has the burden of establishing it.  *Ebrahimpour v. Bozorg*,
95-1269 (La. App. 4 Cir. 1/19/96), 668 So. 2d 434, 436; See also Coastal Agric. Supply, Inc. v. JP
Morgan Chase Bank, N.A., 759 F.3d 498, 507 (5th Cir. 2014). At the most fundamental level,
Lucky Family cannot attain HIDC status as to Mrs. Lollar's restitution claim because it acquired
the Note through judicial sale, and the restitution claim belongs to Mrs. Lollar.   The UCC
provisions on HIDC specifically provide that a person cannot become an HIDC through acquisition
of a promissory note at a sale under writ of execution.  La. Stat. Ann. § 10:3-302(c).   Section 3-
302(c) only allows for the possibility of a purchaser acquiring the right of the transferor as HIDC
under the so-called "shelter rule" of Article 3, La. R.S. 10:3-203(b).  However, the shelter rule
cannot function in this case for several reasons.

First, Mrs. Lollar obviously cannot be an HIDC with respect to her own claim for
restitution.  Pursuant to La. R.S. 10:3-302(a)(2)(v), an HIDC must be "without notice of any claim
to the instrument described in R.S. 10:3-306."   Mrs. Lollar obviously has notice of her own
restitution claims, and therefore Lucky Family cannot acquire HIDC rights from Mrs. Lollar
against her own claims under the shelter rule.  Also, Mrs. Lollar's status as original payee means

she cannot acquire HIDC status absent acquisition of the note through an intermediary, further undermining any attempt by Lucky Family to acquire HIDC status through her.  *Courtesy Fin., supra*, 424 So. 2d at 1175 (immediate payee of note not entitled to HIDC status).

Second, and more fundamentally, even if Mrs. Lollar were an HIDC the shelter rule could not transfer rights of her HIDC status to protect Lucky Family against claims by Mrs. Lollar herself.  La. R.S. 10:3-202(b) permits rescission of a negotiation except against a "subsequent holder in due course."   "By virtue of the shelter rule, a transferee from a holder in due course obtains the same protection against rescission of a negotiation as its transferor."  Lawrence's Anderson U.C.C. § 3-202:6 [Rev] (3d. ed.).  Any HIDC status held by Mrs. Lollar could not be bootstrapped into giving Lucky Family HIDC against Lollar's claims for restitution, which arose after Carr could have been a HIDC.  The acquisition of a prior party's HIDC rights presupposes a valid "transfer" of the instrument, and the "shelter rule" will not function where the transfer is void or voidable.  11 Am. Jur. 2d Bills and Notes § 226; Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 247, 926 A.2d 362, 368 (App. Div. 2007).  Thus, Lucky Family is not an HIDC, and took the note subject to Mrs. Lollar's restitution claim of the note and its cash proceeds under R.S. 10:3-202(b) and 10:3-306.

Finally, Lucky Family was aware of other adverse claims regarding the Note which prevent Lucky Family's HIDC status.  Vickie Lucky knew of the claims in Lucky II in which he alleged the Note transactions were null due to simulation.[56]   Further, Vickie Lucky testified in her deposition that she was informed her of the Note going to sale by Mr. Lucky's counsel, Curtis Shelton[57] and the day before the sale Mr. Shelton sent 4 emails with attachments to Vickie Lucky's

---

[56] See **Exhibit 9** for excerpt from the deposition of Vickie Talley Lucky at p. 12:9-18, Vickie Lucky is aware of Lucky II and the Note's involvement; See also p. 16: 1-18.

[57] See **Exhibit 10** for copy of Lucky Family's responses to Interrogatories at p. 4, Int. No. 7 where respondent states Vickie Lucky was involved throughout the litigation of Lucky I and Lucky II. See also

attorney, David Touchstone, which concerned "the lawsuits, Note and foreclosure."[58]  The October

23, 2018 emails were not produced based on a privilege assertion by Mr. Lucky and now are the

subject of a Motion to Compel in this matter filed by Mrs. Lollar (Rec. Doc. 71).

> ### c.    Alternatively, Veil-Piercing is Warranted to Prevent Circumvention of Restitution Obligation.

Third, assuming for sake of argument that restitution of the note requires some sort of veil-

piercing, the elements for such relief are present.  The Fifth Circuit has recognized that veil-

piercing a limited liability company under Louisiana does not require actual fraud nor the presence

of the "five *Riggins* factors" in such cases.  Rather, the decision to pierce the veil is made by the

finder of fact based upon the "totality of circumstances." *Hollowell v. Orleans Reg'l Hosp. LLC*,

217 F.3d 379, 386–87 (5th Cir. 2000); *ORX Res., Inc. v. MBW Expl., L.L.C.,* 2009-0662 (La. App.

4 Cir. 2/10/10), 32 So. 3d 931, 935, writ denied 2010-0530 (La. 5/7/10), 34 So. 3d 862.

Louisiana courts have recognized that veil-piercing is permitted in cases where an individual uses

a subsidiary LLC to circumvent an obligation or restriction that the individual owes.  For example,

in *Keller v. Haas*, 202 La. 486, 490–93, 12 So. 2d 238, 240 (1943), the Louisiana Supreme Court

addressed use of a subsidiary corporation to evade obligations to co-owners of property.  In *Keller*,

the plaintiff had allowed his property to be acquired at tax sale by a co-owner.  Under the law, the

plaintiff had the right to reacquire his interest in the property by paying the acquiring owner his

proportionate share of the taxes due.  Before the plaintiff exercised this right, however, the co-

owner transferred the property to a corporation in which he was principal stockholder.  The

plaintiff sued both the co-owner and his corporation. In allowing the claim against the corporation

to proceed, the Louisiana Supreme Court reasoned that an individual may not "use the screen of

---

**Exhibit 9** for excerpt from the deposition of Vickie Talley Lucky at p. 13:14-21 also stating that she learned about the Note being sold from Mr. Lucky's attorney, Curtis Shelton.
[58] See **Rec. Doc. 78-1**, Declaration of Curtis R. Shelton, at p. 2.

corporate entity to absolve himself from responsibility" when that individual forms a corporation where he is the sole stockholder, or controls the stock to such an extent that the act of the corporation is his own. 202 La. 486 at 490–93, 12 So. 2d at 240.  A similar approach was used in *Glazer v. Comm'n on Ethics for Pub. Employees*, 431 So. 2d 752, 758 (La. 1983), where a public employee was individually prohibited from engaging in certain business, but attempted to engage in such business through a wholly-owned corporation.  The court in Glazer disregarded the corporate entity. *Glazer*, 431 So. 2d at 758. *Keller* was more recently applied in *Tealwood Props., LLC v. Succ'n of Graves*, 64 So. 3d 397 (La. App. 2nd Cir. 2011).  In that case, two spouses transferred land to the plaintiff with no reservation under a warranty of title.   However, the warranting transferors owned a corporation which held a mineral servitude on the property.  Although the trial court rejected claims for "alter ego" liability, the appellate court reversed.   The court examined *Keller*, other decisions and commentary, and noted that the type of veil-piercing at issue before was not the type by which individual liability was imposed for corporate debt, but was rather to prevent circumvention of legal requirements of the shareholder.  It explained: "in the circumvention type of case the court is being asked to disregard the separate existence of a corporation in order to prevent the shareholder of the corporation from getting around some restriction on his own freedom of action. *Tealwood*, 64 So. 3d at 406.   The court held that the subsidiary could be named as a defendant in the case.   It specifically ruled that a cause of action for circumvention veil-piercing, per *Haas* did not depend on showing of bad faith or fraud. *Id*. at 407.  See also *Coleman v. Burgundy Oaks*, LLC, 71 So. 3d 352 (La. App. 2nd Cir. 2011)

The present case is precisely the sort of situation contemplated by the *Haas* and *Tealwood* decisions.  If the Luckys, as judgment creditors, had individually acquired the note at sheriff's sale, there is no question that they would be required to restore the note to Mrs. Lollar when their

judgment was voided by appeal.  It would be absurd and utterly inequitable if the Luckys' could circumvent this requirement, and reap a $1.7 million dollar windfall, through the simple expedient of causing an LLC owned by either of them to make the purchase.

Although bad intent is not required for such an alter ego claim, the need to defeat circumvention is even more pronounced under the totality of the circumstances here, where:  (1) Mr. Lucky was able to successfully manipulate the appraisal process to pick the third-party appraiser and obtain an appraisal at less than 6% of the face amount of the note; and (2) despite the judgment being reversed and voided for error, The Luckys seek to use the LLC formality both as a shield against restoring the Note seized from Mrs. Lollar, and a sword[59] to recover the full $1.7 million dollar value of the Note. The need to disregard the LLC entity to prevent circumvention of the Lucky restoration obligation is even more crucial than in *Keller* or *Tealwood*.

### d. *Restitution of the Note Is Appropriate Under Louisiana Law.*

Restitution of the Note to Mrs. Lollar is a central issue within Mrs. Lollar's *Memorandum in Support of Motion for Partial Summary Judgment* at Rec. Doc. 80-1 and plaintiffs incorporate Mrs. Lollar's arguments herein by reference; the present section is intended as a summary of that argument, and to address the authorities cited by Mr. Lucky.[60]  Mr. Lucky's argument against restitution relies primarily on *Wetherbee v. Lodwick Lumber Co.*,[61] a case involving judicial partition of real estate.  *Lodwick* was decided long before *Gootee, supra,* under prior versions of various statues and code articles relating to judicial sale, and is not applicable here for several reasons. *Lodwick* and the cases relied upon by it involved execution through sheriff's sale of

---

[59] See **Rec. Doc. 80-4** for October 29, 2018 letter where Curtis Shelton informs counsel for Mrs. Lollar and Magnolia that they are collectively subject to over 4.3 million dollars owed to Mr. Lucky (as deficiency caused by the low sales price of the Note) and to Lucky Family, L.L.C. (for enforcement of the full value of the Note with interest accruing).

[60] **Rec. Doc. 80-1**, page 12-21.

[61] 194 La. 352, 193 So. 671 (1940).

immovable property. Stability of title as to immovable property is an important public policy in Louisiana. See *Gulf Oil Corp. v. State Mineral Bd.,* 317 So. 2d 576, 597 (La. 1974).  In a judicial sale of immovable property, the sale of the immovable is in exchange for money in the hands of the judgment creditor.  Although *Gootee* supports restoration of property when acquired by the judgment creditor and a judgment is voided, it also supports restoration of any money received from the sale of property in the hands of the seizing creditor in the same scenario.  *Gootee* explains: When a judgment creditor obtains money in execution on a judgment under devolutive appeal, such creditor is subject to an action for the return of the funds received upon judgment reversal.[62]

Here, what was purportedly obtained through sheriff's sale was not land but a promissory note, a form of negotiable instrument, which is "an unconditional promise or order to pay a fixed amount of money. ..."  La. R.S. 10:3-104.   Here, Vickie Lucky's company purported to acquire a right to receive payment of over $1.7 million dollars in cash, in return for the purchase price of only $105,000. Lucky Family seeks to enforce that very right to payment in this case.

Under Louisiana property law a check or promissory note is classified as an incorporeal movable, subject to Chapter 3 of the UCC.  *Succession of Love*, 2016-245 (La. App. 3 Cir. 9/28/16), 201 So. 3d 1027, 1037 (citing 7 La. C.C. art. 473; *Succession of Franklin*, 968 So.2d 811, 42,496 (La. App. Cir.  10/17/07).  Chapter 3 of the UCC was adopted by Louisiana in 1974. 1974, La. Acts No. 92, § 1; 24 La. Civ. L. Treatise, Sales § 1:4.  Chapter 3 by its terms governs not only voluntary transfers of negotiable instruments but "involuntary" transfers.  La. R.S. 10:3-201.   It provides that a party acquiring a negotiable instrument takes the instrument subject to third party claims to rescind or recover the "instrument or its proceeds" except as against a "holder in due

---

[62] *Gootee Const., Inc. v. Amwest Sur. Ins. Co.,* 2003-0144 (La. 10/10/03), 856 So. 2d 1203, 1206 (quoting *Lisi Realty, Inc.,* 306 So.2d at 921).  See also *Classic Syndicate, Inc. v. Robert E. Bethard*, 139 F.3d 899 (5th Cir. 1998).

course." La. R.S. 10:3-202(b), 10:3-306.  Significantly, Chapter 3 specifically denies HIDC status to a person who acquires an instrument "taken by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding. ..."  La. R.S. 10:3-302(c)(i).  UCC 3 would control here, and it allows Mrs. Lollar to seek restitution of the note and its proceeds.

*Lodwick* was also decided long before *Gootee*, where the Louisiana Supreme Court expressly found a right to restitution of funds voluntary paid or obtained through execution by a judgment creditor after reversal of judgment.  *Gootee* allows recovery of any money obtained through execution of judgment.  *Id*.  Any money the purported judgment creditor receives as payment on a promissory note seized from the former judgment debtor is, by definition, money obtained through execution of judgment.  Allowing Vickie to collect the promissory note puts $1.7 million dollars into the hands of Vickie Lucky that would never have been recoverable but for the voided judgment.  The Luckys are obligated to restore the Note or any funds obtained through the reversed judgment.  *Lodwick* was decided long before the adoption of Chapter 3 and the holding of *Gootee*.  *Lodwick* involves a sheriff's sale of land, while *Gootee* and Chapter 3 are specifically addressed to incorporeal immovables, such as checks and promissory notes, and the proceeds paid on the same.  *Lodwick* also did not involve the unique set of facts at issue here, where the purported judgment creditor was allowed to manipulate the appraisal process and buy the property at an artificially deflated price through an intermediary.  For these reasons, defendants' reliance on *Lodwick* is misplaced.

Respectfully submitted by,

_____/s/ J. Davis Powell_____
Randall S. Davidson, LSBA No. 4715, TA
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA 34947
Harold R. Bicknell III, LSBA 36801
DAVIDSON SUMMERS, APLC
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342 | (318) 226-0168
E:      rsdav@davidsonsummers.com
        dpowell@davidsonsummers.com
        dmartin@davidsonsummers.com
        hbicknell@davidsonsummers.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing was filed electronically with

the Clerk of Court using the CM/ECF filing system, and notice of the same will be sent to counsel

of record by operation of the court's electronic noticing system.

Shreveport, Louisiana, on this 21st day of January, 2020.

_____*s/ J. Davis Powell*_____
                OF COUNSEL

26