UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MAGNOLIA ISLAND PLANTATION,           CIVIL ACTION NO. 5:18-CV-1526
ET AL.

VERSUS                                DISTRICT JUDGE:
                                      HON. S. MAURICE HICKS, JR.

LUCKY FAMILY, L.L.C., ET AL.          MAGISTRATE JUDGE:
                                      HON. KAREN L. HAYES

**DAUBERT MOTION TO EXCLUDE
OPINIONS OF JOHN W. DEAN**

# EXHIBIT A

# Rule 26 report of John W. Dean

*MAGNOLIA ISLAND PLANTATION, LLC, et al, v. LUCKY FAMILY, LLC*
*Docket No. 5:18-cv-1526*

Expert Report

John W. Dean, CPA, ABV
Business Valuation Consultants, L.L.C.

August 28, 2019

*MAGNOLIA ISLAND PLANTATION, LLC, et al, v. LUCKY FAMILY, LLC*
*Docket No. 5:18-cv-1526*

Table of Contents

| | Page(s) / Exhibits |
|---|---|
| Report on Calculation of Value | Pages 1 – 6 |
| John W. Dean – Calculation of Note Value, October 16, 2018 | Exhibit A |
| Amortization Schedule – Lollar Note – October 2018 Revised | Exhibit B |
| Excerpt from August 15, 2019 Wall Street Journal | Exhibit C |
| Patrick Lacour's Letter Dated October 22, 2018 | Exhibit D |
| Chad M. Garland, CPA, LLC Letter Dated October 5, 2018 | Exhibit E |
| List of Documents Reviewed | Exhibit F |
| Curriculum Vitae of John W. Dean, CPA, ABV | Exhibit G |



August 28, 2019

Mr. Davis Powell
Mr. Randy Davidson
Davison Summers, APLC
350 Marshall Street, Suite 1114
Shreveport, Louisiana 71101

        RE:   Magnolia Island Plantation, LLC v. Lucky Family, LLC
              Docket No. 5:18-cv-1526

Dear Sirs,

## INTRODUCTION

I have been retained by Davidson Summers, APLC (representing Magnolia Island Plantation, LLC, et al) to update my letter dated October 16, 2018 in which I performed a calculation of value of a promissory note dated November 2, 2017 (the "Magnolia Note") (see Exhibit A). I have also been asked to review Chad Garland's letter dated October 5, 2018 (Exhibit E) and Patrick Lacour's letter dated October 22, 2018 (Exhibit D); both of these letters communicate opinions relative to the note referenced above. I was asked to provide any comments or observations I had concerning the opinions, methodology, and conclusions of value expressed in these letters/reports.

## BACKGROUND

The Magnolia Note originated in connection with a Credit Sale Deed executed on November 2, 2017. Property located in Bossier Parish was transferred by Mrs. Lollar to Mr. Lollar for $1,800,000; a cash down payment in the amount of $70,000 was made; the remainder of the consideration was a $1,730,000 mortgage note (the "Magnolia Note"). On or about that same time, the property was conveyed by Mr. Lollar to Magnolia Island Plantation, LLC. The mortgage was assumed as part of this transaction. I was asked to value the Magnolia Note on or about the date it was subject to Sheriff Sale in Bossier Parish.

### *Valuation Principles*

It is universally accepted by valuation analysts that the fair market value of a financial asset is equal to the present value of its future economic benefits. In the case of a mortgage note, the future economic benefits equate to the principal and interest payments which are required under the terms of the instrument. These scheduled payments are then converted to present value by using an appropriate discount rate; this is also known as the required "yield" on the Magnolia Note. The appropriate discount rate would usually consider three factors:

1.   The time value of money.

333 Texas Street, Suite 1525 | Shreveport, Louisiana 71101
ph (318) 213-7611 | fax (318) 429-2070 | www.hnwcpa.com

2.  Discount for lack of liquidity/marketability.

3.  The risk which quantifies the possibility that some or all of the scheduled payments will not be made or will not be made on a timely basis.

The last factor usually presents the biggest challenge for a valuation analyst. One would measure risk by considering the credit worthiness of the borrower, the security/collateral for the note, and other appropriate factors.

### *Empirical Evidence for Discounts/Yield*

If a valuation analyst merely uses professional judgement to measure the risk identified above, the resulting discount rate may become a little more than a single person's speculation; therefore, analysts often look at empirical evidence that exists in various similar, although not identical, markets as an indication of the appropriate risk (discount) measurement to apply to a particular instrument. To determine the risk free rate to be applied to note payments, one would ordinarily look to US Agency bonds. One would select the bond or group of bonds which most closely resembles the subject note in terms of duration, interest payments, and other factors. Corporate bonds/notes are also traded on established exchanges and offer insights into appropriate interest rates. These types of bonds help quantify the risk associated with different classifications of debt.

The Wall Street Journal regularly publishes bond benchmarks which offer empirical evidence derived from transactions in established markets which help the analyst in determining the appropriate discount rates. For example, on August 15, 2019, published benchmarks for short-term and long-term US agency notes and bonds are provided (see Exhibit C). On this date, one can see the price on these instruments produces a yield ranging from 1.76% to 2.12%. On that same date, US corporate indexes indicated yields ranging from 2.34% to 3.58%; high yield bonds (often referred to as junk bonds) involve a much higher degree of risk as indicated by the yields which range from 3.208% to 12.224%. The Wall Street Journal also publishes indexes on mortgage backed securities. These generally include home mortgages which are insured by the Federal government (i.e., low risk) which have been packaged/securitized and generally have good collateral. Again, on August 15, 2019, the published indexes in the Wall Street Journal ranged from 1.392% to 2.52%. All of this information is useful to the valuation analyst in calculating the value for a particular note. These indexes are taken from actual transactions which occur in the open market and provide a good representation of the yields agreed upon between willing buyers and willing sellers. However, it would be inappropriate to use these yields alone in order to determine the valuation of a private mortgage because the assets differ in at least two important respects.

First, mortgage backed securities and high yield bonds offer yields for publicly traded or highly marketable assets. A private note doesn't enjoy this degree of liquidity/marketability; therefore, one would anticipate the yields required by a willing buyer and the yield which a willing seller would accept will be significantly higher for a "private" note than those of assets traded in established markets. There have been a number of empirical studies which attempt to quantify an appropriate adjustment (discount) for lack of liquidity and marketability. For equities, these empirical studies generally indicate a discount in the range of 15% to 30%. One would expect a mid-term (5 year) note to have a significantly smaller discount than would apply to equities.

Secondly, the credit risk on private notes (the risk that some or all of the payments will not be made at their scheduled times) may be significantly higher or lower for private notes than the risk

indicated in the pricing of mortgage backed securities and high yield bonds. Accordingly, the analyst must look at the factors that are unique to a particular instrument in order to determine the appropriate adjustment to make for this factor.

For unsecured notes, the credit condition of the borrower is of the utmost importance. For example, a private note issued by a company or individual which has an extremely high net worth would enjoy a higher price/lower yield (less risk) than an amount owed by a borrower who was of questionable net worth.

In the case of a mortgage note or a note otherwise secured by property, the value of the underlying collateral is an extremely important consideration in determining the appropriate risk or discount rate. While the credit worthiness of the borrower is still a factor to consider, it is a minor factor when compared to the value of the collateral. To help quantify this risk, the difference between the value of the property securing the mortgage and the outstanding mortgage balance, generally referred to as the loan to value ratio, is often used to measure the risk associated with a particular instrument. In the case of the Magnolia note, the value of the real estate securing the mortgage (both value of the surface rights and the mineral rights) should be the primary factor which determines the proper adjustment to make to the risk free, marketable yield reflected in the published markets.

Another indication of an appropriate discount rate could be reflected in private mortgage transactions. Most every real estate lawyer and CPA is involved in numerous transactions where the seller of real estate or other financial assets accepts a promissory note (usually secured by collateral) in lieu of cash at closing. A number of factors including the amount of the down payment, credit worthiness of the purchasers, and the value of the collateral are all considered by the buyer and seller in these transactions. Since these notes are not easily liquidated/marketed, they provide an excellent reference point to be utilized in the valuation analysis. In my recent experience, rates in excess of 10% are extremely rare for these types of transactions.

## UPDATE OF JOHN DEAN LETTER DATED OCTOBER 16, 2018

Since I rendered my calculation of value via my October 16, 2018 letter, it has come to my attention that the November 1, 2018 note payment in the amount of $100,046 had been pre-paid prior to the valuation date. Accordingly, this requires an adjustment to reflect the fact that a purchaser of the Magnolia Note in October 2018 would only receive three annual payments (November 1, 2019-2021) in the amount of $100,046 and a balloon payment due November 1, 2022 in the amount of $1,662,752.32. This reduces my conclusion on the Magnolia Note value from $1,478,048.68 to $1,378,439.33. The calculation of this value is provided in Exhibit B attached. All other assumptions and conclusions contained in my letter of October 16, 2018 remain unchanged. Accordingly, my current calculation of the Magnolia Note value as of October 16, 2018 is now:

### $1,378,439.33.

As stated in my October 16, 2018 letter, I would like to respectfully reserve the right to supplement or modify this conclusion should additional information or other facts come to my attention.

## PATRICK LACOUR LETTER DATED OCTOBER 22, 2018

Mr. Patrick Lacour of Whitehall Advisors, LLC's letter dated October 22, 2018 provides a calculation of value which concludes as follows:

| | |
|---|---|
| Appraisement of said property | $ 157,009.22 |
| 2/3 of Appraisement of said property: | $ 104,672.81 |

It is my understand that Mr. Lacour's letter offers a "calculation of value"; this term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants and the Professional Standards of the National Association of Certified Valuation Analysts. In a calculation of value, the analyst generally does not have the time to conduct a proper analysis and is limited with respect to the scope of information and documentation which is provided to him/her. Accordingly, it would be inappropriate to issue an "unqualified" opinion with respect to the fair market value of an asset. This is the same approach that I utilized in my original report and I believe it is entirely appropriate under the circumstances. It is important to note that a calculation of value is not nearly as complete as an "opinion of value" under the standards. It is, by definition, less precise and, accordingly, should not be given the same weight as a properly conducted opinion of value.

While I agree with Mr. Lacour's general methodology, I believe his application of that methodology to the Magnolia Note is significantly flawed. His letter includes a worksheet indicating his application of various adjustments and discounts to a base yield in order to arrive at an annual required yield. He has concluded that a willing buyer and a willing seller would agree to a discount on the Magnolia Note in an amount sufficient to produce a yield of 95% per annum. In other words, he believes a willing seller would accept $157,009.22 in exchange for a note that will produce total payments in the amount of $1,962,890.32 over a period of a little in excess of four years. An analysis of the empirical evidence indicates appropriate yields for this type of asset are far below those indicated by Mr. Lacour. The Note being valued is secured by assets which have a total value well in excess of the payments required under the Magnolia Note. Accordingly, I can see no reasonable basis for the conclusions expressed in Mr. Lacour's worksheet. A few specific comments on the worksheet may help illustrate this point:

1.  For the base yield in Mr. Lacour's worksheet, he uses a U.S. Prime Rate of 5.25% plus 2.25% (which is unexplained) for a total of 7.5%. A more appropriate benchmark from which to start would be U.S. Treasury Bills with similar payment and maturity schedules to the Magnolia Note (around 2% in October 2018).

2.  Mr. Lacour indicates the required yield would be increased by around 15% due to the lack of protected covenants and another 15% for restrictive covenants; he then adds another 15% for the quality of the borrower (note that the percentages contained in his schedule are not annualized which requires that they be multiplied by approximately 150% to obtain comparable annual numbers). All of these factors are associated with the risk that some or all of the payments will not be made (as discussed in the background section above). With a note that has adequate collateral, the impact of these factors is negligible since the holder of the note will undoubtedly be looking to value of the underlying collateral to assess the risk associated with the possibility that some or all of the payments will not be made. Many mortgage notes do not even contain covenants (I do not recall ever seeing a mortgage note with covenants). Compare the yields on corporate junk bonds (which usually contain covenants) to the yield on securitized long-term private mortgage notes (usually without covenants).

333 Texas Street, Suite 1525 | Shreveport, Louisiana 71101
ph (318) 213-7611 | fax (318) 429-2070 | www.hmvcpa.com

3. Lacour includes a 22% annual increase in yield for lack of liquidity. This implies that any private note should at a minimum have 22% added to the risk free yield (virtually all private mortgages are not liquid/marketable).

4. The Lacour letter adds over 10% to the required yield due to "cloudy title". Quantifying the risk associated with the outcome of a legal dispute probably should be done by an attorney or judge, not a valuation analyst; I did not consider this factor in my calculation.

5. Yield was increased 6% by Lacour to cover loan term "based on 30 year term rather than commercial terms of 10-15 years. The Magnolia Note had only 4 years until maturity at the valuation date.

6. Lacour's valuation of collateral only considers the value of surface rights and ignores the mineral value even though the Coutret and Associates' appraisal was provided to him. The omission of this significant piece of collateral which greatly reduces risk is inappropriate based on my understanding of the facts.

In addition to the problems with analysis outlined above, Mr. Lacour's Note Valuation Table computes a value at the issue date of the note instead of October 19, 2018. For example, the $100,046 payment due on November 1, 2018 shows a present value of $51,305.68. This was derived by using a full year present value factor instead of the 12 days from October 19th through November 1st. The other present value factors appear to be understated in a similar manner.

Each of the adjustments indicated in Mr. Lacour's worksheet should be closely scrutinized for reasonableness. A "common sense" examination of his calculated required yield in the amount of 95% simply does not pass the "smell test". Imagine for a moment that you are the hypothetical willing seller which the analyst must consider in valuing an asset. Would you really accept $157,000 for a note with total payments of $1,963,000 over the next four years?

## CHAD M. GARLAND, CPA, LLC LETTER DATED OCTOBER 5, 2018

Mr. Garland's letter dated October 5, 2018 (Exhibit E) indicates an opinion on the fair market value of the Magnolia Note at $173,000. Mr. Garland indicates that this is an opinion of value rather a calculation of value as discussed above. His one page report contains no support or description of the analysis he conducted in arriving at this conclusion. Accordingly, it is clearly in violation of the standards. In my opinion, this is a fatal flaw for which I can see no remedy; the report contains no analysis to support his conclusions.

## CONCLUSION

I believe an appropriate valuation of the Magnolia Note in October 16, 2018 is $1,378,439.33. In addition, while I freely admit that different valuation analysts can arrive at different numbers given the assumptions and empirical evidence they observe, I believe a required yield calculation of 95% is clearly outside the bounds of reasonableness.

This report has been prepared based on my understanding of the facts and information made available to me.  I would like to respectfully reserve the right to supplement or modify this report should additional information or facts come to my attention.

Sincerely,

John W. Dean, CPA, ABV

JWD:krf
Enclosures

**EXHIBIT A**

*BARBARA MARIE CAREY CARR LOLLAR NOTE*
*DATED NOVEMBER 2, 2017; FACE AMOUNT $1,730,000*

Calculation of Note Value

John W. Dean, CPA, ABV
Business Valuation Consultants, L.L.C.

October 16, 2018

*BARBARA MARIE CAREY CARR LOLLAR NOTE*
*DATED NOVEMBER 2, 2017; FACE AMOUNT $1,730,000*

Table of Contents

| | Page(s) / Exhibits |
|---|---|
| Report on Calculation of Value | Pages 1 – 4 |
| Promissory Note | Exhibit A |
| Cash Sale Deed | Exhibit B |
| Amortization Schedule - Original | Exhibit C |
| Amortization Schedule - Revised | Exhibit D |
| List of Documents Reviewed | Exhibit E |
| Curriculum Vitae of John W. Dean, CPA, ABV | Exhibit F |



**BVC**
Business Valuation
Consultants llc

October 16, 2018

Mr. Davis Powell
Mr. Randy Davidson
Davison Summers, APLC
350 Marshall Street, Suite 1114
Shreveport, Louisiana 71101

        RE:    Barbara Marie Carey Carr Lollar Note
               Dated November 2, 2017; Face Amount $1,730,000

Dear Sirs,

**INTRODUCTION**

I have been retained by Davidson Summers, APLC (representing Barbara Marie Carey Carr Lollar) to perform a calculation of value of a certain promissory note dated November 2, 2017 with a face amount of $1,730,000, payable from Ronald William Lollar (the "Maker"), to Barbara Marie Carey Carr Lollar (the "Payee"). In a calculation of value engagement, the valuation analyst executes specific valuation approaches and valuation methods in order to perform an estimate of the value of the subject interest. A calculation engagement does not include all the procedures required in a valuation engagement as that term is defined under the Statement of Standards for Valuation Services (SSVS).

**BACKGROUND**

This note (Exhibit A) originated in connection with a Credit Sale Deed executed on November 2, 2017 (Exhibit B). Property located in Bossier Parish was transferred for $1,800,000; a cash down payment in the amount of $70,000 was made; the remainder of the consideration was the $1,730,000 mortgage note ("Lollar Note"). On or about that same time, the property was conveyed by Mr. Lollar to Magnolia Island Plantation, LLC. The mortgage was assumed as part of this transaction.

**OTHER ISSUES**

There have been various disputes and proceedings relative to the above-mentioned transactions. I have been asked to perform a calculation of the note value as of October 16, 2018. In the course of my analysis, I have calculated value without giving any weight to these disputes and other circumstances. If an asset is involved in legal proceedings and/or disputes, this may affect value; the value for such an asset may be lower than the value of the same asset unencumbered with these complications depending on the specific facts and circumstances of the situation. Accordingly, my calculations assume the collateral for the note is "free and clear" as any other standard of value would be legal in nature and outside the scope of my expertise.

## DISCUSSION OF NOTE VALUE

Fair market value (FMV) is generally defined as the price for which an asset would change hands between a willing buyer and willing seller, both parties having reasonable knowledge of the facts and circumstances, and neither being under any particular compulsion to buy or sell. For an economic valuation such as the note in question, the FMV generally equals the present value of the future economic benefits (cash flows) generated by the asset over its useful life.

The Lollar Note provides for a five-year term, 4% interest rate, four annual payments in the amount of $100,046.00, and a final balloon payment equal to all remaining principal and interest then thereunder. An amortization schedule is attached (Exhibit C).

The first payment under the note is due November 1, 2018. I have not been provided with any information which would lead me to believe that this payment and subsequent payments as required by the note will not be timely paid.

In a FMV analysis, the buyer and seller will consider a number of factors that generally can be broken down into three areas:

1.  An investor must consider any risk that some, or all, of the payments required under the note will not be made on a timely basis.

2.  The interest rate, or discount rate, which is required to compensate the buyer/seller.

3.  Since the economic benefits (payments) will be made over a period of time, the note must also compensate its holder for the value associated with delaying receipt of cash over the term of the note. This is more commonly referred to as the time value of money.

To illustrate these factors, consider a five-year treasury obligation which was issued on October 31, 2017 (CUSIP #9128283C2). This obligation provides for a coupon rate of interest equal to 2% paid semi-annually with the principal/par amount of the note maturing on October 21, 2022. Since the treasury obligation is backed by the full faith and credit of the United States government, it is generally considered "risk free".

A hypothetical buyer of the Lollar Note would consider other investment alternatives such as the treasury obligation described above. The notes have very similar terms. However, any private mortgage note clearly involves more risk than a treasury obligation. Accordingly, the 4% interest rate on the Lollar Note was designed to compensate the holder for this additional risk.

In my opinion, it would be inappropriate to value the Lollar Note at October 16, 2018 at its face amount of $1,730,000 for three reasons:

1.  The first payment under the note in the amount of $100,046 is due to be paid on November 1, 2018. Thus, the holder of the note only has to wait a few days in order to receive this first payment. Therefore, a hypothetical buyer would generally pay more than face value for the note to allow for the fact that the term on October 16, 2018 is four years and one half month instead of the five year term which existed on the date of creation.

2.  Interest rates from November 2, 2017 through September 30, 2018 have increased slightly. This will serve to decrease the value of the note from face value to compensate

2

a hypothetical buyer for the fact that he/she could invest in other financial instruments with higher "coupon" yields than the Lollar Note. To illustrate this factor, consider the five-year Treasury note discussed above. The original coupon rate was 2%; however, the bond can be purchased for approximately 96% of face value. This will increase the yield to maturity to a little under 3%. Thus, the "price" of the treasury note and the Lollar Note must be reduced in order to increase the yields to current market rates.

3. Lack of marketability – Most valuation analysts would agree that a private mortgage bond is not as marketable as a U.S. Treasury obligation since the Treasury bill can be sold on established market exchanges and, therefore, converted to cash at any time. A mortgage note is much more difficult to market and sell and, accordingly, a higher yield (lower price) will be necessary to account for this factor. The exact amount of the discount for the lack of marketability is subject to much discussion and controversy. Most would argue, for a short-term obligation, that this discount is much smaller than it would be for a long-term obligation such as a thirty-year mortgage since the limitation on converting the Lollar Note to cash at maturity is slightly over four years. Others would also point out that this lack of marketability is an additional reason that the coupon rate on the U.S. Treasury was 2% while the interest rate on the mortgage is 4%, exactly double.

## CALCULATION OF VALUE

It is my opinion that the value of the Lollar Note can be calculated as follows:

| Description | Amount |
|---|---|
| Face amount | $ 1,730,000.00 |
| Current value | 1,478,048.68 |
| Ratio of current value to market value (rounded) | 85% |
| Implied discount (rounded) | 15% |

In arriving at this conclusion, I have anticipated that a willing buyer would expect a yield of 10% in order to be adequately compensated for the factors enumerated above. An amortization schedule calculating this value is attached as Exhibit D.

I was provided with appraisals of the property which serves as collateral for the mortgage. These appraisals indicate a combined value for the surface and minerals associated with the property which serve as security for the note at approximately $2.4 million. This produces a loan to value ratio of approximately 72%. It certainly indicates enough "equity" in the collateral to provide an investor with ample assurance that the risk of any forfeiture under the note is very remote unless there is a flaw in the title or other complication which would somehow put the value of this collateral in doubt.

It is also significant to note that these appraisals represent values in late 2016. With respect to the minerals in particular, the current values should have increased substantially from late 2016 until October 16, 2018, thereby providing additional equity in the note.

## CONCLUSION

It is my opinion that the current value of the Lollar Note is $1,478,048.68.

3

This report has been prepared based on my understanding of the facts and information made available to me. I would like to respectfully reserve the right to supplement or modify this report should additional information or facts come to my attention.

Sincerely,

John W. Dean, CPA, ABV

JWD:krf
Enclosures

4

## PROMISSORY NOTE

$1,730,000.00                                                                                      November 2, 2017

FOR VALUE RECEIVED, Ronald William Lollar (the "Maker"), promises to pay to Barbara Marie Carey Carr Lollar (the "Payee"), or his order, the full sum of ONE MILLION SEVEN HUNDRED THIRTY THOUSAND and NO/100 DOLLARS ($1,730,000.00), plus interest thereon at the rate of four percent (4.0%) per annum until paid as provided for herein. This Note shall be due and payable in four (4) consecutive annual installments of $100,046.00, and a final BALLOON PAYMENT equal to all remaining principal and interest then due hereunder. The first installment is due and payable on November 1, 2018, and subsequent annual installments shall be due on November 1st of each following calendar year, with the final balloon payment due and payable on November 1, 2022. Maker may prepay all or any portion of the principal due under this Note without penalty. If the note is prepaid in part, the prepayment amount will be applied to the installments due under the note in inverse order of maturity.

All payments due hereunder will be payable at 6225 Tributary Court, Bossier City, Louisiana 71112, or such other address as Payee shall direct in writing.

An Event of Default under this Note shall be deemed to have occurred if Maker fails to pay any payment due hereunder on or before the date such payment is due if such failure is not cured by Maker within fifteen (15) days of Maker's receipt of written notice of default. Upon the occurrence of an Event of Default, provided the default is not cured, the entire principal balance and interest due on this Note may at the option of Payee be declared due and owing in full and if not paid in full. Upon such Event of Default, this Note may be placed in the hands of an attorney for collection, and if suit is filed hereon, Maker agrees and is to pay, in addition, to Payee or any holder, a reasonable attorneys' or collection fee not to exceed five percent (5%) of the principal amount of the Note. Any notice required or permitted by this Note may be delivered to Maker and Endorsers at 6225 Tributary Court, Bossier City, Louisiana 71112, or such other address as Maker shall direct in writing. The exclusive venue for collection of the Note or for any dispute arising with respect to the Note shall be Caddo Parish, Louisiana, and Maker and Payee consent to venue and jurisdiction in such forum for such purposes.

The makers, endorsers, guarantors, and sureties of this Note hereby severally waive presentment for payment, demand, notice of non-payment and protest, all pleas of division or discussion, and consent that time of payment may be extended without notice hereof.

Executed at Shreveport, Louisiana as of the date above written.

MAKER:

_Ronald William Lollar_
Ronald William Lollar

Jill M. Sessions
Bossier Parish Clerk of Court

**1179265**

Recorded On: 11/03/2017  10:05 AM

STATE OF LOUISIANA
PARISH OF BOSSIER

## CREDIT SALE DEED WITH
## VENDOR'S LIEN AND SPECIAL MORTGAGE

BEFORE ME, the undersigned authority, came and appeared:

BARBARA MARIE CAREY CARR LOLLAR, formerly Barbara Marie Carey Carr, who is married to Ronald William Lollar but who is dealing herein with her separate property, whose address is 6225 Tributary Court, Bossier City, Louisiana 71112 ("Seller")

WHO DECLARED that Seller does by these presents GRANT, BARGAIN, SELL, CONVEY AND DELIVER, with full guarantee of title, and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the Property herein conveyed, together with all rights of prescription, whether acquisitive or liberative, to which said Seller may be entitled, unto:

RONALD WILLIAM LOLLAR, who is married to Barbara Marie Carey Carr Lollar but who is acquiring the property set forth herein as his separate property, whose address 6225 Tributary Court, Bossier City, Louisiana 71112, ("Purchaser")

the immovable Property as more fully described on the property description attached hereto and made a part hereof as Exhibit "A" (the "Property").

TO HAVE AND TO HOLD the said described Property unto said Purchaser, Purchaser's successors and assigns, FOREVER.

The parties affirm and declare that the Property is in fact the separate property of Seller, having been acquired prior to marriage with her separate funds. The Note given in payment hereunder, being proceeds from the sale of Seller's separate property, shall likewise be and remain the separate property of Seller. The parties also affirm and declare the property is being acquired as the separate property of the Purchaser.

The parties further affirm and declare that the Purchaser is acquiring the property herein with his separate funds, and that the Property shall be held by Purchaser as his separate property.

This sale is made for and in consideration of the mutual obligations of the parties set forth herein, and the payment by Purchaser of the full sum of ONE MILLION EIGHT HUNDRED THOUSAND and No/100ths ($1,800,000.00), paid as follows:

(a)    Cash in the amount of Seventy Thousand Dollars ($70,000.00), paid at Closing, the receipt of which is hereby acknowledged; and

(b)    Delivery to Sellers of a promissory note from Purchaser to Sellers in the principal amount of One Million Seven Hundred Thirty Thousand and No/100ths Dollars ($1,730,000.00) plus interest thereon at the rate of four percent (4.0%) per annum until paid as provided for herein. This Note shall be due and payable in four (4) consecutive annual installments of $100,046.00, the first such installment being due and payable on November 1, 2018, and a final BALLOON PAYMENT equal to all remaining principal and interest then due hereunder, due and payable on November 1, 2022 (the "Note"). The Note may be prepaid by Purchaser without penalty.

The Note shall be secured by a vendor's lien and special mortgage, as follows:

State of Louisiana, Parish of Bossier
I hereby certify this to be a true and correct copy of an original instrument filed in my office on the date and hour and under the registry number stamped hereon
Conveyances - Volume _____ Page _____
to be recorded in
Mortgages    Volume _____ Page _____
Given under my hand and seal of office on this the _____ day of _____ 20___
_____
Deputy Clerk and Ex-Officio Deputy Recorder
Parish of Bossier, State of Louisiana

## VENDOR'S LIEN AND SPECIAL MORTGAGE

In order to secure the full prompt and punctual payment of said Note, together with interest, attorney fees charges and costs, according to the stipulations herein written, in addition to the Vendor's lien and privilege granted by law which is specifically retained by the Seller, said Purchaser does by these presents SPECIALLY MORTGAGE AND HYPOTHECATE unto and in favor of the Seller, or any future holder or holders of said Note, the above described Property ("Seller's Mortgage").

The Purchaser binds and obligates itself, its successors, and assigns not to sell, alienate, deteriorate, or encumber said Property to the prejudice of this Seller's Mortgage.  For so long as the Note is outstanding, Purchaser further agrees and covenants as follows:

**Insurance and Taxes**

Purchaser agrees to keep any existing buildings on the Property insured for all hazards for their appraised value, with a loss payable clause in favor of Seller's and to purchase.  Purchaser agrees that on default in payment of taxes or insurance premium at any time, any holder of the Note may pay said taxes or insurance premiums and charge same to Purchaser, and the amount so paid shall bear the same rate of interest as said Note and be enforceable as apart of the original obligation, including attorney fees.  The Seller, or other holder of the Note, shall, however, be under no obligation to pay said taxes or insurance premiums; interest past due shall draw the same rate of interest as the principal obligation.

**Default:**

An Event of Default shall be deemed in effect under this Seller's Mortgage upon the occurrence of any of the following events:

    A.    Failure to pay any sum due under the Note secured by this Seller's Mortgage within fifteen (15) days of receipt by Purchaser of a written notice of default.

    B.    A default under any provision of this Seller's Mortgage, other than a payment default, which is not cured by Purchaser within thirty (30) days of Mortgagor's receipt of a notice of default.

    C.    Any sale of the Property prior to payment of the Note, unless the Seller consents in writing to the assumption of the Note and the Seller's Mortgage by the proposed purchaser as described below.

Upon an Event of Default, provided such default is not cured, Seller may accelerate all sums due under the Note by written notice to Purchaser and demand for payment in full of the Note, and if such amount is not paid in full within fifteen (15) days of Seller's written notice of acceleration and demand for payment, Seller may proceed to seek judgment on the Note as therein provided, and foreclosure under this mortgage for satisfaction of any judgment.

**Assumption:**

This Seller's Mortgage may not be assumed by any subsequent purchaser of the Property without the Seller's express written consent, which may be withheld for any reason.  Seller may require proof of credit worthiness and good standing or other evidence that the subsequent purchaser is fully authorized to purchase the Property and assume the Seller's Mortgage.

**Appointment of Keeper:**

Upon the occurrence of an Event of Default, Seller may cause a receiver or keeper to be appointed to take possession of the Property to manage, administer, operate and conserve the value thereof and collect the rents, issues, revenues, proceeds and profits thereof.  The receiver or keeper may also take possession of, and for these purposes use any and all licenses, permits and movable property contained in or on the premises and used by Purchaser in the operation thereof or any part thereof, whether or not the same is covered by this Seller's Mortgage.  After paying

2

costs of collection and any other expenses incurred, the proceeds shall be applied to the payment of the indebtedness represented by the Note in such order as Seller shall elect, and Seller shall not be liable to account to Purchaser for any loss, damage or neglect suffered to or by the Property, or Purchaser as a consequence thereof, except such as are caused by the willful misconduct or gross negligence of Seller's own employees or agents. Seller may designate any firm, person or corporation to be the receiver or keeper of the Property as provided by La. R.S. 9:5132 and similar statutes.

**General Provisions:**

Purchaser specially waives the notice and delay provided under article 2331 of the Louisiana Code of Civil Procedure.

The certificate of mortgage is hereby waived by the parties.

All 2017 ad valorem or property taxes asserted against the property will be paid by Seller.

Purchaser and Seller each acknowledge that the undersigned Notaries have not been asked to examine title to the Property and has not given any opinion or assurance with regard thereto except as may be expressly set forth in writing in a separate instrument.

All of the rights and obligations set forth herein shall inure to the benefit of and be binding upon Purchaser and Seller and their heirs, successors and assigns, as their rights and obligations may appear.

This instrument may be signed in counterpart originals and each signed original, taken together, shall constitute one and the same Agreement.

THUS DONE AND SIGNED in the presence of me, Notary, and the two undersigned competent witnesses on this 2nd day of November, 2017.

WITNESSES:                                    SELLER:

_____                       _____
Printed Name ( _Nicholas O'Connor_ )           Barbara Marie Carey Carr Lollar

_____
Printed Name ( _Veronica M. Ogle_ )

IVY E. M. JOHNSON
Notary Public
State of Louisiana
Caddo Parish
Notary ID # 92070
My Commission is for Life

_____
NOTARY PUBLIC

THUS DONE AND SIGNED in the presence of me, Notary, and the two undersigned competent witnesses on this 2nd day of November, 2017.

WITNESSES:                                    PURCHASER:

_____                       _____
Printed Name ( _Madelyn Bryan_ )               Ronald William Lollar

_____
Printed Name ( _Lori Wright_ )

_____
NOTARY PUBLIC

J. DAVIS POWELL
Notary Public
State of Louisiana
Caddo Parish
Bar Roll # 33631
My Commission is for Life

3

EXHIBIT "A"

## PROPERTY DESCRIPTION

BEING DESCRIBED AS A 365.135 ACRE (MORE OR LESS) TRACT OF LAND IN SECTION 19, SECTION 20 AND SECTION 29, TOWNSHIP 17 NORTH, RANGE 12 WEST, BOSSIER PARISH, LOUISIANA AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Commence at the south quarter corner of said Section 20 which is monumented with a concrete monument;

Thence proceed North 00° 09' 05" East along the east line of the southwest quarter of said Section 20 for a distance of 1464.33 feet to the Point of Beginning of the tract herein described which is monumented with a ½" iron rod;

Thence proceed South 62° 29' 42" West for a distance of 428.94 feet;

Thence proceed South 61° 10' 42" West for a distance of 115.61 feet;

Thence proceed South 81° 54' 53" West for a distance of 471.62 feet;

Thence proceed South 04° 31' 33" East for a distance of 75.70 feet;

Thence proceed South 17° 34' 30" East for a distance of 95.15 feet;

Thence proceed South 48° 07' 35" West for a distance of 101.48 feet;

Thence proceed South 01° 42' 50" West for a distance of 702.23 feet;

Thence proceed South 28° 36' 24" West for a distance of 466.19 feet to the north right of way line of Sligo Road (LA Highway No. 612) and a ½" iron rod;

Thence proceed North 87° 23' 53" West along said right of way line for a distance of 247.88 feet to the centerline of Flat River;

Thence proceed North 32° 36' 01" East along said centerline for a distance of 332.70 feet;

Thence proceed North 34° 57' 31" East along said centerline for a distance of 147.14 feet;

Thence proceed North 07° 04' 02" East along said centerline for a distance of 146.17 feet;

Thence proceed North 14° 57' 03" West along said centerline for a distance of 205.32 feet;

Thence proceed North 39° 53' 26" West along said centerline for a distance of 244.73 feet;

Thence proceed North 76° 26' 13" West along said centerline for a distance of 324.67 feet;

Thence proceed North 84° 31' 20" West along said centerline for a distance of 134.99 feet;

Thence proceed South 80° 14' 35" West along said centerline for a distance of 309.37 feet;

Thence proceed South 68° 49' 51" West along said centerline for a distance of 340.47 feet;

Thence proceed South 80° 47' 53" West along said centerline for a distance of 370.00 feet;

Thence proceed South 82° 51' 53" West along said centerline for a distance of 851.25 feet;

## EXHIBIT "A"

Thence proceed North 88° 00' 54" West along said centerline for a distance of 360.70 feet;

Thence proceed South 81° 45' 57" West along said centerline for a distance of 343.85 feet;

Thence proceed South 76° 15' 45" West along said centerline for a distance of 201.20 feet;

Thence proceed North 26° 16' 01" West for a distance of 2695.16 feet to the centerline of Flat River;

Thence proceed North 01° 14' 51" West along said centerline for a distance of 154.01 feet;

Thence proceed North 11° 50' 29" East along said centerline for a distance of 375.12 feet;

Thence proceed North 16° 49' 19" West along said centerline for a distance of 407.46 feet;

Thence proceed North 21° 35' 49" West along said centerline for a distance of 462.34 feet;

Thence proceed North 11° 40' 47" East along said centerline for a distance of 232.17 feet;

Thence proceed North 36° 28' 45" East along said centerline for a distance of 301.66 feet;

Thence proceed North 73° 51' 54" East along said centerline for a distance of 404.69 feet;

Thence proceed North 44° 46' 19" East along said centerline for a distance of 247.24 feet;

Thence proceed North 25° 01' 48" East along said centerline for a distance of 250.51 feet;

Thence proceed North 11° 44' 59" East along said centerline for a distance of 277.13 feet to the north line of said Section 19;

Thence proceed South 88° 47' 36" East along the north line of said Section 19 for a distance of 916.66 feet to a ¾" iron rod;

Thence proceed South 48° 21' 57" East along said north line for a distance of 158.35 feet to a ¾" iron rod;

Thence proceed South 89° 13' 15" East along said north line for a distance of 31.37 feet to the northwest corner of the northeast quarter of the northeast quarter of said Section 19 which is monumented with a ¾" iron rod;

Thence proceed South 89° 24' 15" East along the south line of the northeast quarter of the northeast quarter of said Section 19 for a distance of 1320.00 feet to the east line of said Section 19 and a ¾" iron rod;

Thence proceed South 00° 11' 53" West along the east line of said Section 19 for a distance of 1321.91 feet to the east quarter corner of said Section 19 which is monumented with a ¾" iron rod;

Thence proceed South 89° 40' 10" East along the north line of the southwest quarter of said Section 20 for a distance of 2670.01 feet to the center quarter corner of said Section 20 which is monumented with a ¾" iron rod;

Thence proceed South 00° 09' 03" West along the east line of the southwest quarter of said Section 20 for a distance of 1154.29 feet to the Point of Beginning of the tract herein described, containing 365.135 acres, more or less.

### LESS AND EXCEPT:

A 9.990 acre tract (more or less) conveyed in Instrument No. 506056 and a 2.000 acre tract (more or less) conveyed in Instrument No. 497459 of the Conveyance Records of Bossier Parish, Louisiana.

Being the property described in that certain Credit Sale Deed by and between, Land Connection, Inc., as Seller, and Barbara Marie Carey Carr as Purchaser, dated April 14, 2003 and filed of record at Instrument No. 772311 of the Bossier Parish, Louisiana conveyance records.

2

EXHIBIT "A"

LESS AND EXCEPT:

BEING DESCRIBED AS AN 85.000 ACRE (MORE OR LESS) TRACT OF LAND IN SECTION 19, TOWNSHIP 17 NORTH, RANGE 12 WEST, BOSSIER PARISH, LOUISIANA AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Commence at the northeast corner of said Section 19 which is monumented with a ½" iron rod;

Thence proceed South 00° 11' 53" West along the east line of said Section 19 for a distance of 1321.91 feet to the Point of Beginning of the tract herein described which is monumented with a ½" iron rod;

Thence proceed South 00° 11' 53" West along said east line for a distance of 1321.91 feet to the east quarter corner of said Section 19 which is monumented with a ½" iron rod;

Thence proceed South 00° 11' 53" West for a distance of 139.95 feet;

Thence proceed North 67° 23' 35" West for a distance of 191.20 feet to the point of curvature of a curve to the left;

Thence proceed along said curve (having a long chord bearing of North 77° 10' 53" West and a radius of 446.48 feet) for an arc distance of 152.81 feet;

Thence proceed North 86° 59' 11" West for a distance of 23.98 feet to the point of curvature of a curve to the right;

Thence proceed along said curve (having a long chord bearing of North 81° 34' 25" West and a radius of 3894.41 feet) for an arc distance of 735.82 feet to a point of compound curvature;

Thence proceed along said curve (having a long chord bearing of North 69° 37' 18" West and a radius of 500.00 feet) for an arc distance of 114.13 feet to a point of compound curvature;

Thence proceed along said curve (having a long chord bearing of North 60° 43' 41" West and a radius of 2373.43 feet) for an arc distance of 195.06 feet to a point of reverse curvature;

Thence proceed along said curve (having a long chord bearing of North 60° 00' 52" West and a radius of 500.00 feet) for an arc distance of 28.64 feet to a point of reverse curvature;

Thence proceed along said curve (having a long chord bearing of North 53° 31' 46" West and a radius of 1312.96 feet) for an arc distance of 372.41 feet to a point of compound curvature;

Thence proceed along said curve (having a long chord bearing of North 32° 48' 53" West and a radius of 250.00 feet) for an arc distance of 109.86 feet to a point of reverse curvature;

Thence proceed along said curve (having a long chord bearing of North 39° 19' 48" West and a radius of 1065.55 feet) for an arc distance of 710.49 feet to a point of reverse curvature;

Thence proceed along said curve (having a long chord bearing of North 54° 29' 06" West and a radius of 250.00 feet) for an arc distance of 34.42 feet to a point of reverse curvature;

Being the property described in that certain Cash Sale Deed by and between, Barbara Marie Carey Carr, as Seller, and Hummer and Son Honey Farm, L.L.C. as Purchaser, dated December 2, 2004 and filed of record at Instrument No. 821131 of the Bossier Parish, Louisiana conveyance records.

Said tract conveyed being further identified as Lot 2, Carr Subdivision on that certain Plat of Survey, prepared by French Engineering, Inc., dated January 27, 2005 and recorded in Conveyance Book 1207, Page 738, under Entry No. 834511 of the records of the office of the Clerk of Court for Bossier Parish, Louisiana.

Leaving a balance of 280.135 acres, more or less, being conveyed herein.

3

Exhibit C

**LOLLAR NOTE**

**Amortization Schedule – Nominal Annual Rate:  4.000%**

| Date | Payment | Interest | Principal | Balance |
|------|---------|----------|-----------|---------|
| 2017 Loan Balance | | | | 1,730,000.00 |
| 2018 Totals | 100,046.00 | 69,010.41 | 31,035.59 | 1,698,964.41 |
| 2019 Totals | 100,046.00 | 67,958.58 | 32,087.42 | 1,666,876.99 |
| 2020 Totals | 100,046.00 | 66,675.08 | 33,370.92 | 1,633,506.07 |
| 2021 Totals | 100,046.00 | 65,340.24 | 34,705.76 | 1,598,800.31 |
| 2022 Totals | 1,662,752.32 | 63,952.01 | 1,598,800.31 | 0.00 |
| Grand Totals | 2,062,936.32 | 332,936.32 | 1,730,000.00 | |

**Exhibit D**

**LOLLAR NOTE**

**Amortization Schedule – Nominal Annual Rate:  10.000%**

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| 2017 Loan Balance | | | | 1,478,048.68 |
| 2018 Totals | 100,046.00 | 12,958.24 | 87,087.76 | 1,390,960.92 |
| 2019 Totals | 100,046.00 | 139,096.09 | 39,050.09- | 1,430,011.01 |
| 2020 Totals | 100,046.00 | 143,001.10 | 42,955.10- | 1,472,966.11 |
| 2021 Totals | 100,046.00 | 147,296.61 | 47,250.61- | 1,520,216.72 |
| 2022 Totals | 1,672,238.39 | 152,021.67 | 1,520,216.72 | 0.00 |
| Grand Totals | 2,072,422.39 | 594,373.71 | 1,478,048.68 | |

**Exhibit E**

### LIST OF DOCUMENTS REVIEWED

- ❖ Executed Promissory Note dated November 2, 2017 in the amount of $1,730,000.

- ❖ Cash Sale Deed with Vendor's Lien and Special Mortgage Recorded on November 3, 2017 at the Bossier Parish Clerk of Court office.

- ❖ Exchange Deed, with Assumption of Mortgage Recorded on November 3, 2017 at the Bossier Parish Clerk of Court office.

- ❖ Appraisal Report for the "Carr Property" Flat River Road, Bossier Parish, Louisiana, Prepared by Glenn A. Wilson, Jr., MAI and Glen A. Wilson, III with Appraiser Associates of Louisiana, Inc. dated September 12, 2013.

- ❖ Economic Evaluation and Fair Market Value Determination of the Mineral Interest of Carr Acreage in Producing and Undeveloped Properties; Sections 19, 20, and 29 of T17N-R12W; Bossier Parish, Louisiana; effective date - December 1, 2016; prepared by Mr. Buddy Lucky with Coutret and Associates, Inc. dated December 7, 2016.

<u>**Exhibit F**</u>

**CURRICULUM VITAE**
**JOHN W. DEAN, CPA, ABV**
333 Texas Street, 15th Floor
Shreveport, Louisiana 71101

## <u>PROFESSIONAL QUALIFICATIONS</u>

Certified Public Accountant (CPA) - Licensed to practice by the State Board of CPAs.
Certified Valuation Analyst (CVA) - Board tested and certified by the National Association of Certified
    Valuators and Analysts
Accredited in Business Valuation (ABV) - Board tested and certified by the American
    Institute of Certified Public Accountants (AICPA).

## <u>EDUCATION</u>

The University of Texas                                  M.P.A./Specializing in Taxation
Austin, Texas 78712
    September 1977 – May 1979

Louisiana State University                          B.S./Accounting
Shreveport, Louisiana 71105
    September 1973 – May 1977

## <u>EMPLOYMENT</u>

Business Valuation Consultants, L.L.C. – 1995 - Present
    <u>Partner Of Counsel</u>: Business Valuations

Heard, McElroy and Vestal, L.L.C. – June 1981 - Present
    <u>Partner Of Counsel</u>: Concentration in areas of taxation, business valuations and litigation services.

Price Waterhouse and Co. – June 1979 - June 1981
    <u>Staff Accountant</u>: Exposure to all areas of taxation with a concentration in real estate and small
business.

## <u>LITIGATION SERVICES</u>

Qualified as an expert in federal and various state jurisdictions:
    Certified Valuation Analyst
    Accredited in Business Valuation

Areas of Experience:
    Business valuation
    Business interruption
    Personal injury
    Insurance defense
    Contract disputes
    Property settlements
    Lost profits
    Other commercial damages
    Consultation and analysis relative to cross examination of opposing expert

## COURTROOM TESTIMONY AND/OR DEPOSITIONS DURING LAST FOUR YEARS

Louisiana Department of Transportation and Development versus Kansas City Southern Railway Company; Docket Number 417,190-B; First Judicial District Court, Caddo Parish, Louisiana.

W. Patrick Aertker, Jr., et al vs. Placid Holding Company, et al, Case No. 3:07-cv-00473-CJB-AC, United States District Court for the Middle District of Louisiana, Baton Rouge Division.

Slattery Company, Inc., v. Chesapeake Louisiana, L.P., et al., Case No. 5:10-cv-01399, United States District Court for the Western District Court of Louisiana, Shreveport Division.

Ellerbe Energy, L.L.C., et al., v. Chesapeake Louisiana, L.P., et al., No. 14-3474; United States District Court for the Western District Court of Louisiana, Shreveport Division.

Top Dollar Pawn, Gun and Car Audio #5, L.L.C. v. Caddo Parish, Louisiana, et al, No. 5:12-cv-00577; Western District of Louisiana, Shreveport Division.

Encana Oil & Gas (USA), Inc. v. Westdale-RX, LLC; QuDo, LLC; and Rex L. Young and Sandra Young, No. 5:2017cv01224; Western District of Louisiana, Shreveport Division.

James C. Berry, III, et al. v. Chesapeake Louisiana L.P. and Chesapeake Operating L.L.C., No. 5:2017cv00297; Western District of Louisiana, Shreveport Division.

Marioneaux v. Lucien Harry Marioneaux, Sr., et al; Number: 555,685-A; First Judicial District Court; Caddo Parish, Louisiana

Rives Plantation, LLC v. BHP Billiton Petroleum Properties (N.A.), LP, No. 591,555-A; First Judicial District Court, Caddo Parish, Louisiana

J & L Family, LLC v. BHP Billiton Petroleum Properties (N.A.), LP, et al, No. 5:16-CV-01193; United States District Court, Western District of Louisiana, Shreveport Division

## ACTIVITIES

### *Professional and Civic*

Member – Louisiana Society of Certified Public Accountants, American Institute of Certified Public Accountants and Estate Planning Council
President – Grayson Foundation
Past Board Member – Holy Angels Residential Facility
Trustee – Zita Trust
Advisory Committee – Communities in Schools
President – Step Forward
Member and Chairman – LSU-S College of Business Board of Visitors
Past Board Member, Strategic Planning Committee - Christus Schumpert Health Systems
Past President, Government Committee – Committee of One Hundred
Past Board Chairman – Volunteers of America
Member – Southern University Chancellor's Advisory Council (2007-2008)
Past President – NACVA Louisiana State Chapter
Past Board of Directors – LSCPA
Past Chairman – LSCPA Strategic Planning Committee
Past President – Shreveport Society of Certified Public Accountants
Past President (1986-1987) – Ark-La-Tex Tax Institute
Past Vanguard Chairman – United Way
Past Board Member - LANO
Past President, Government Committee, Education Committee – Committee of One Hundred
Past Chairman of the Board – Greater Shreveport Chamber of Commerce
Past Board of Directors, Chairman - Greater Shreveport Economic Development Foundation, Inc.
Past Chairman – Volunteers of America
Past Vice-President – Holiday-In-Dixie
Past Board Member - Caddo Career & Technology Center Scholarship

**<u>AWARDS</u>**

AICPA National Public Service Award – 2010
LSCPA Public Service Award – 2010
Greater Shreveport Chamber of Commerce Business Leader of the Year – 2010

**Exhibit B**

### MAGNOLIA NOTE

**Amortization Schedule – Nominal Annual Rate:  10.000%**

| Date | Payment | Interest | Principal | Balance |
|------|---------|----------|-----------|---------|
| October 16, 2018 | | | | 1,378,439.33 |
| November 1, 2019 | 100,046.00 | 144,490.65 | (44,444.65) | 1,422,883.98 |
| November 1, 2020 | 100,046.00 | 142,288.40 | (42,242.40) | 1,465,126.38 |
| November 1, 2021 | 100,046.00 | 146,512.64 | (46,466.64) | 1,511,593.02 |
| November 1, 2022 | 1,662,752.32 | 151,159.30 | 1,511,593.02 | 0.00 |
| Grand Totals | 1,962,890.32 | 584,450.99 | 1,378,439.33 | |

<u>Exhibit C</u>

## EXCERPT FROM AUGUST 15, 2019 WALL STREET JOURNAL

# Bonds | WSJ.com/bonds
## Tracking Bond Benchmarks
Return on investment and spreads over Treasurys and/or yields paid to investors compared with 52-week highs and lows for different types of bonds

| Total return close | YTD total return (%) | Index | Yield (%) Latest | Low | High |
|---|---|---|---|---|---|
| **Broad Market** Bloomberg Barclays | | | | | |
| 2119.98 | 8.6 | U.S. Aggregate | 2.240 | 2.230 | 3.660 |
| **U.S. Corporate Indexes** Bloomberg Barclays | | | | | |
| 3097.24 | 13.0 | U.S. Corporate | 2.910 | 2.910 | 4.370 |
| 2846.27 | 8.5 | Intermediate | 2.550 | 2.540 | 4.060 |
| 4497.61 | 22.6 | Long term | 3.580 | 3.580 | 5.050 |
| 635.04 | 10.2 | Double-A-rated | 2.340 | 2.340 | 3.740 |
| 812.240 | 13.9 | Triple-B-rated | 3.240 | 3.240 | 4.720 |
| **High Yield Bonds** ICE Data Services | | | | | |
| 447.21 | 9.6 | High Yield Constrained | 6.270 | 5.982 | 8.107 |
| 418.10 | 4.6 | Triple-C-rated | 12.224 | 9.691 | 13.784 |
| 3064.09 | 9.1 | High Yield 100 | 5.750 | 5.423 | 7.825 |
| 403.95 | 9.2 | Global High Yield Constrained | 5.952 | 5.594 | 7.561 |
| 318.80 | 8.0 | Europe High Yield Constrained | 3.208 | 2.841 | 4.869 |
| **U.S Agency** Bloomberg Barclays | | | | | |
| 1768.28 | 6.0 | U.S. Agency | 1.830 | 1.830 | 3.210 |
| 1552.30 | 4.0 | 10-20 years | 1.760 | 1.750 | 3.310 |
| 3912.33 | 15.5 | 20-plus years | 2.120 | 2.120 | 3.700 |
| 2690.17 | 9.7 | Yankee | 2.630 | 2.630 | 4.050 |

| Total return close | YTD total return (%) | Index | Yield (%) Latest | Low | High |
|---|---|---|---|---|---|
| **Mortgage-Backed** Bloomberg Barclays | | | | | |
| 2116.28 | 5.0 | Mortgage-Backed | 2.490 | 2.410 | 3.810 |
| 2074.07 | 4.7 | Ginnie Mae (GNMA) | 2.420 | 2.340 | 3.780 |
| 1245.22 | 5.1 | Fannie mae (FNMA) | 2.520 | 2.450 | 3.820 |
| 1915.63 | 5.2 | Freddie Mac (FHLMC) | 2.510 | 2.440 | 3.840 |
| 566.05 | 7.1 | Muni Master | 1.459 | 1.459 | 2.908 |
| 400.12 | 8.1 | 7-12 year | 1.392 | 1.392 | 2.941 |
| 452.71 | 8.9 | 12-22 year | 1.764 | 1.764 | 3.317 |
| 440.92 | 9.9 | 22-plus year | 2.214 | 2.214 | 3.758 |
| **Global Government** J.P. Morgan¹ | | | | | |
| 594.08 | 8.1 | Global Government | 0.790 | 0.790 | 1.880 |
| 824.98 | 6.6 | Canada | 1.290 | 1.290 | 2.540 |
| 409.58 | 9.5 | EMUS⁶ | 0.238 | 0.238 | 1.469 |
| 788.22 | 9.6 | France | -0.090 | -0.090 | 0.980 |
| 557.23 | 7.3 | Germany | -0.530 | -0.530 | 0.580 |
| 304.31 | 4.3 | Japan | 0.000 | -0.020 | 0.520 |
| 621.58 | 8.4 | Netherlands | -0.430 | -0.430 | 0.670 |
| 1036.52 | 10.7 | U.K. | 0.880 | 0.880 | 1.900 |
| n.a. | n.a. | Emerging Markets ** | n.a. | n.a. | n.a. |

¹Constrained indexes limit individual issuer concentrations to 2%; the High Yield 100 are the 100 largest bonds   ¹ In local currency  6 Euro-zone bonds   ** EMBI Global Index

Sources: ICE Data Services; Bloomberg Barclays; J.P. Morgan

# WHITEHALL ADVISORS, LLC
3820A BAYOU RAPIDES RD • ALEXANDRIA, LA 71303

October 22, 2018

Hon. Julian C. Whittington
Bossier Sheriff's Office
204 Burt Boulevard
Benton, LA 71006

RE:   FMV of Promissory Note
      100% Interest

Dear Sheriff Whittington,

I have performed a calculation engagement in accordance with the Statement on Standards for Valuation Services *("SSVS")* of the American Institute of Certified Public Accountants and the professional standards of the National Association of Certified Valuation Analysts.

I have performed certain calculation procedures to estimate the fair market value, as of October 19, 2018, of that certain original promissory note dated November 2, 2017 made by Ronald William Lollar payable to Barbara Marie Carey Carr Lollar or her order in the principal amount of One Million Seven Hundred Thirty Thousand and No/100ths Dollars ($1,730,000.00) plus interest thereon at the rate of four percent (4%) per annum until paid, payable in four (4) consecutive annual installments of $100,046.00, the first such installment being due and payable on November 1, 2018, and a final balloon payment equal to all remaining principal and interest then due hereunder, due and payable on November 1, 2022 ("said property").

My procedures and calculation were based on information drawn from public records recorded with the Bossier Parish clerk of court. The calculated value in this report is intended to be used for the public auction on or about Wednesday, October 24, 2018. A calculation engagement does not include all of the procedures required in a valuation engagement; had a valuation engagement been performed, the results may have been different. While a calculation engagement was more appropriate given the abbreviated time schedule, I have acted fairly and impartially and do hereby offer my sincere opinion of true value of the said property in cash to the best of my knowledge, information, and belief.

> *Appraisement of said property:*              **$ 157,009.22**

> *2/3rds of Appraisement of said property:*    **$ 104,672.81**

I appreciate this opportunity to serve you. My worksheet of these calculations and my curriculum vitae are attached for your records. Should you have any questions with respect to the issues we have discussed, we encourage you to call me.

Patrick Lacour, CIA, CVA

*Attachment*

Worksheet - FMV for Public Auction
Promissory Note of Magnolia Island Plantation, LLC
26th JDC, Dockets 127,573, Div "F" and 155,382, Div "A"
As of October 24, 2018

The fair market value of a promissory note was lower than the sum of unpaid principal and accrued interest.
To the lender, the fair market value of a promissory note equals the present value of future principal and
and interest payments discounted at a risk-adjusted rate of return to the valuation date.

To value a debt instrument, the following are taken into consideration:
1.) the history of the debt instrument; and
2.) the terms of the legal documents governing the obligation; and
3.) the financial position and credit risk of the debtor; and
4.) any assets that serve as collateral or otherwise affect the creditor's position; and
5.) the probability that the creditor will be repaid in full on time.

### Schedule of Required Yield for FMV Instrument

| | | |
|---|---|---|
| Base yield | 7.5% | Current U.S. Prime 5.25% plus 2.25% |
| **Adjustments:** | | |
| 1.) Lack of liquidity | 10.0% | Vendor's lien attached; borrowing company formed two days before transaction |
| 2.) Lack of marketability | 5.0% | Related party transaction between husband and wife; no personal guarantee given |
| 3.) Quality of borrower | 10.0% | Magnolia Island Plantation, LLC formed 10/31/17; no credit history, no payment history |
| 4.) Quality of collateral | 7.0% | Cloudy title; Notice of Lis Pendens filed 2/20/18, Instrument #1185201 |
| 5.) Coverage of collateral to note | 5.0% | Per Glenn A. "Russ" Wilson, Jr, MAI 280.135 acres @ $4k/acre is only ~$1.12M (~65%) |
| 6.) Loan duration/term | 4.0% | Based on 30 year term rather than commercial terms of 10 to 15 years |
| 7.) Payment frequency | 0.0% | Annual; commercial loan standards are monthly; conversion to monthly performed to adjust |
| 8.) Default provisions | 0.0% | Evident |
| 9.) Protective covenants | 10.0% | Working capital requirements, interest coverage and debt/equity ratios etc. absent from credit sale deed |
| 10.) Restrictive covenants | 10.0% | Seller's mortgage (not assignable); transferability of note depends on approval of borrower |
| | | |
| Monthly payout rate | 68.5% | |
| Convert to annual convention | 94.7% | |
| | | |
| Required yield used | 95.0% | |

### Note Valuation Table

Terms of the Note:

| | | |
|---|---|---|
| Principal balance (face value) | $ | 1,730,000 |
| Annual interest rate | | 4.0% |
| Annual installment payment | | $100,046.07 |
| Required yield (market interest rate) | | 95.0% |
| Issue date | | 11/2/2017 |
| Maturity date | | 11/1/2022 |
| Valuation date | | 10/19/2018 |

| Year/Period | Date | Beginning Principal | Principal Payments | Interest Payment | Ending Balance | PV Factor | PV of Cash Flow |
|---|---|---|---|---|---|---|---|
| 1 | 11/1/2018 | $ 1,730,000.00 | 30,846.07 | $ 69,200.00 | $ 1,699,153.93 | 0.513 | $51,305.68 |
| 2 | 11/1/2019 | 1,699,153.93 | 32,079.91 | 67,966.16 | 1,667,074.01 | 0.263 | $26,310.60 |
| 3 | 11/1/2020 | 1,667,074.01 | 33,363.11 | 66,682.96 | 1,633,710.90 | 0.135 | $13,492.62 |
| 4 | 11/1/2021 | 1,633,710.90 | 34,697.64 | 65,348.44 | 1,599,013.27 | 0.069 | $6,919.29 |
| 5 | 11/1/2022 | 1,599,013.27 | 1,599,013.27 | 63,960.53 | - | 0.035 | $58,981.03 |
| Totals | | | $ 1,730,000.00 | $ 333,158.08 | | | $157,009.22 |

**Lacour 384**

*Patrick Lacour, CIA, CVA*
*3820A Bayou Rapides Road*
*Alexandria, Louisiana  71303*

EDUCATION

| | |
|---|---|
| Louisiana State University, <br> Baton Rouge, Louisiana; B.S. Accounting | 1993 |

LICENSES ANDACCREDITATIONS

| | |
|---|---|
| Certified Internal Auditor | 1996 |
| Certified Valuation Analyst | 2013 |

PROFESSIONAL AFFILIATIONS - CURRENT

Member of Institute of Internal Auditors
Member of National Association of Certified Valuation Analysts

WORK EXPERIENCE

| | |
|---|---|
| Whitehall Advisors, L.L.C. <br> Co-Owner and Manager | 2007 – Present |
| Cleco Corporation <br> Sr. Internal Auditor / Director of Controls | 2000 – 2007 |
| Exxon Company, USA <br> Sr. Internal Auditor | 1992 - 2000 |

FORENSICS AND VALUATION EXPERIENCE

Mr. Lacour has been admitted as an expert witness in the 4th, 9th and 12th judicial districts of
the State of Louisiana and the U.S. District Court for the Middle District of Louisiana.  He has
performed valuations of:

- Federal Gift and Estate Taxes
- Community Property Settlements
- Automotive Dealers
- Construction and Contracting Companies
- Convenience Stores
- Oil and Gas Distribution Companies
- Oilfield Service Companies

- Professional Services Companies
- Medical Clinics
- Ambulatory Surgical Centers
- Mergers and Acquisitions
- Non-profit organizations
- Real Estate Investment Companies
- Rental Car Agencies

**Lacour 385**



**CHAD M. GARLAND** CPA, LLC

October 5, 2018

Ayres, Shelton, Williams, Benson & Paine, LLC
Curtis Shelton, Attorney at Law
333 Texas Street, Suite 1400
Shreveport, LA 71101

RE:   **Valuation of Promissory Note between Barbara Marie Carey Carr Lollar and Ronald William Lollar**

Dear Mr. Shelton:

As you requested, I prepared and enclose, herewith, my valuation report on the promissory note between Barbara Marie Carey Carr Lollar and Ronald William Lollar. The purpose of the valuation is to render an opinion as to the *fair market value* of the promissory note and to assist you and the presiding Sheriff in the sale of the promissory note at a Sheriff's sale.

The standard of value used in my valuation is *fair market value*, which is commonly defined as:

> *...the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.*

My opinion of the *fair market value* of the promissory note between Barbara Marie Carey Carr Lollar and Ronald William Lollar is:

**$173,000**

An *opinion of value* is intended to be the most unambiguous expression of value and is expressed as a single amount. The *fair market value* presented in this report is an *opinion of value*.

Users of this valuation report should be aware valuations of promissory notes are based on future earnings potential which may or may not materialize.

This valuation and report were completed in accordance with the professional standards of the *National Association of Certified Valuators and Analysts* and the *American Institute of Certified Public Accountants* for conducting and reporting on business valuations.

I am independent regarding all parties to this promissory note. My fees for this valuation are based upon my normal hourly billed rates and are in no way contingent upon the results of my findings. I have no responsibility to update this report for events and circumstances occurring subsequent to the date of its issuance.

This report has been prepared for the specific purpose of valuing a promissory note between Barbara Marie Carey Carr Lollar and Ronald William Lollar, which value is to be used to assist the presiding Sheriff in the sale of the promissory note at a Sheriff's sale. This report is valid only for this valuation date and this purpose. This report is not to be copied or made available to anyone other than Mr. Curtis Shelton, the presiding Sheriff, and other specifically interested parties, nor is it to be used for any other purpose, without the express written consent of Chad M. Garland, CPA.

Respectfully submitted,

*Chad M. Garland*

Chad M. Garland
CPA/ABV/CFF/CGMA
ASA, CVA, MAFF, CFE, CTP, MBA

CMG/eap

**Exhibit F**

### LIST OF DOCUMENTS REVIEWED

- ❖ Executed Promissory Note dated November 2, 2017 in the amount of $1,730,000.

- ❖ Cash Sale Deed with Vendor's Lien and Special Mortgage Recorded on November 3, 2017 at the Bossier Parish Clerk of Court office.

- ❖ Exchange Deed, with Assumption of Mortgage Recorded on November 3, 2017 at the Bossier Parish Clerk of Court office.

- ❖ Appraisal Report for the "Carr Property" Flat River Road, Bossier Parish, Louisiana, Prepared by Glenn A. Wilson, Jr., MAI and Glen A. Wilson, III with Appraiser Associates of Louisiana, Inc. dated September 12, 2013.

- ❖ Economic Evaluation and Fair Market Value Determination of the Mineral Interest of Carr Acreage in Producing and Undeveloped Properties; Sections 19, 20, and 29 of T17N-R12W; Bossier Parish, Louisiana; effective date - December 1, 2016; prepared by Mr. Buddy Lucky with Coutret and Associates, Inc. dated December 7, 2016.

- ❖ Patrick LaCour Documents 001 through 385

- ❖ Chad M. Garland, CPA, LLC Documents 1 through 216

**Exhibit G**

# CURRICULUM VITAE
## JOHN W. DEAN, CPA, ABV
333 Texas Street, 15th Floor
Shreveport, Louisiana 71101

## PROFESSIONAL QUALIFICATIONS

Certified Public Accountant (CPA) - Licensed to practice by the State Board of CPAs.
Certified Valuation Analyst (CVA) - Board tested and certified by the National Association of Certified Valuators and Analysts
Accredited in Business Valuation (ABV) - Board tested and certified by the American Institute of Certified Public Accountants (AICPA).

## EDUCATION

The University of Texas                    M.P.A./Specializing in Taxation
Austin, Texas 78712
    September 1977 – May 1979

Louisiana State University                 B.S./Accounting
Shreveport, Louisiana 71105
    September 1973 – May 1977

## EMPLOYMENT

Business Valuation Consultants, L.L.C. – 1995 - Present
    Partner Of Counsel:  Business Valuations

Heard, McElroy and Vestal, L.L.C. – June 1981 - Present
    Partner Of Counsel:  Concentration in areas of taxation, business valuations and litigation services.

Price Waterhouse and Co. – June 1979 - June 1981
    Staff Accountant:  Exposure to all areas of taxation with a concentration in real estate and small business.

## LITIGATION SERVICES

Qualified as an expert in federal and various state jurisdictions:
    Certified Valuation Analyst
    Accredited in Business Valuation

Areas of Experience:
    Business valuation
    Business interruption
    Personal injury
    Insurance defense
    Contract disputes
    Property settlements
    Lost profits
    Other commercial damages
    Consultation and analysis relative to cross examination of opposing expert

## COURTROOM TESTIMONY AND/OR DEPOSITIONS DURING LAST FOUR YEARS

Louisiana Department of Transportation and Development versus Kansas City Southern Railway Company; Docket Number 417,190-B; First Judicial District Court, Caddo Parish, Louisiana.

W. Patrick Aertker, Jr., et al vs. Placid Holding Company, et al, Case No. 3:07-cv-00473-CJB-AC, United States District Court for the Middle District of Louisiana, Baton Rouge Division.

Slattery Company, Inc., v. Chesapeake Louisiana, L.P., et al., Case No. 5:10-cv-01399, United States District Court for the Western District Court of Louisiana, Shreveport Division.

Ellerbe Energy, L.L.C., et al., v. Chesapeake Louisiana, L.P., et al., No. 14-3474; United States District Court for the Western District Court of Louisiana, Shreveport Division.

Top Dollar Pawn, Gun and Car Audio #5, L.L.C. v. Caddo Parish, Louisiana, et al, No. 5:12-cv-00577; Western District of Louisiana, Shreveport Division.

Encana Oil & Gas (USA), Inc. v. Westdale-RX, LLC; QuDo, LLC; and Rex L. Young and Sandra Young, No. 5:2017cv01224; Western District of Louisiana, Shreveport Division.

James C. Berry, III, et al. v. Chesapeake Louisiana L.P. and Chesapeake Operating L.L.C., No. 5:2017cv00297; Western District of Louisiana, Shreveport Division.

Marioneaux v. Lucien Harry Marioneaux, Sr., et al; Number: 555,685-A; First Judicial District Court; Caddo Parish, Louisiana

Rives Plantation, LLC v. BHP Billiton Petroleum Properties (N.A.), LP, No. 591,555-A; First Judicial District Court, Caddo Parish, Louisiana

J & L Family, LLC v. BHP Billiton Petroleum Properties (N.A.), LP, et al, No. 5:16-CV-01193; United States District Court, Western District of Louisiana, Shreveport Division

Oday Lavergne, Jr. and Julie Lavergne v. State Farm Mutual Automobile Insurance Company, No. 263084-F; 9th Judicial District, Parish of Rapides, Louisiana

Elizabeth Busch Miller v. J-W Operating Company, No. 16-0764, United States District Court, Western District of Louisiana, Shreveport Division

## ACTIVITIES

### Professional and Civic

Member – Louisiana Society of Certified Public Accountants, American Institute of Certified Public Accountants and Estate Planning Council
President – Grayson Foundation
Past Board Member – Holy Angels Residential Facility
Trustee – Zita Trust
Advisory Committee – Communities in Schools
President – Step Forward
Member and Chairman – LSU-S College of Business Board of Visitors
Past Board Member, Strategic Planning Committee - Christus Schumpert Health Systems
Past President, Government Committee – Committee of One Hundred
Past Board Chairman – Volunteers of America
Member – Southern University Chancellor's Advisory Council (2007-2008)
Past President – NACVA Louisiana State Chapter
Past Board of Directors – LSCPA
Past Chairman – LSCPA Strategic Planning Committee
Past President – Shreveport Society of Certified Public Accountants
Past President (1986-1987) – Ark-La-Tex Tax Institute
Past Vanguard Chairman – United Way
Past Board Member - LANO

Past President, Government Committee, Education Committee – Committee of One Hundred
Past Chairman of the Board – Greater Shreveport Chamber of Commerce
Past Board of Directors, Chairman - Greater Shreveport Economic Development Foundation, Inc.
Past Chairman – Volunteers of America
Past Vice-President – Holiday-In-Dixie
Past Board Member - Caddo Career & Technology Center Scholarship

**AWARDS**

AICPA National Public Service Award – 2010
LSCPA Public Service Award – 2010
Greater Shreveport Chamber of Commerce Business Leader of the Year – 2010