## OIL, GAS AND LIQUID HYDROCARBONS LEASE AGREEMENT

This Oil, Gas and Liquid Hydrocarbons Lease Agreement (the "Lease"), is entered into effective as of November 1, 2018, between WILLIAM A. LUCKY, III, , hereinafter called "Lessor," and **GEP HAYNESVILLE, LLC**, represented herein by _____, its duly authorized _____, whose mailing address is 1425 Lake Front Circle, The Woodlands, Texas 77380, hereinafter called "Lessee."

**WITNESSETH THAT:**

Lessor, in consideration of the sum of <u>Ten and No/100 Dollars and Other Valuable Consideration</u> ($10.00 & OVC), hereby leases and lets unto Lessee: (a) the right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, and other liquid hydrocarbons (excluding all solid minerals except sulphur to the extent that sulphur is produced in conjunction with oil and gas or other liquid hydrocarbons), together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith); and (b) as provided herein the right (but not exclusive of similar use by Lessor, its successor, assigns, grantees or licensees) of laying pipelines, storing oil, building tanks (but not tank farms), and constructing and laying power lines and stations, telephone lines, roads and other structures to the extent necessary to produce and save oil and gas attributable to the Leased Premises; and (c) non-exclusive ingress and egress to and from said lands at all times for such purposes.

The property (the "Leased Premises") to which this Lease applies is situated in Bossier Parish, Louisiana, being further described as shown on **Exhibit "A"** attached hereto and made a part hereof. Lessor and Lessee agree that, as of the date of execution, Lessor does not have a current ownership interest in the Leased Premises. This is a top lease, and Lessor and Lessee agree that the Lease shall extend and apply to any and all interest in the Leased Premises which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

This Lease shall be for a term of Ten (10) years from the effective date hereof (called "Primary Term") and so long thereafter as oil, gas or other liquid hydrocarbons are being produced or drilling operations are conducted either on this land or on acreage pooled therewith, all as hereinafter provided for; all subject to the following conditions and agreements:

1. This is a paid-up mineral Lease during the Primary Term.

2. Subject to the terms and limitations provided herein, Lessee, at its option, is hereby given the right and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this Lease, or any portion thereof, with other land, lease or leases, royalty and mineral interests in the immediate vicinity thereof, when, in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate the Leased Premises so as to promote the conservation of oil, gas or other liquid hydrocarbons in and under and that may be produced from the Leased Premises or to comply with the spacing rules or permits or unitization order of any Regulatory Body of the State of Louisiana or of the United States having jurisdiction. The term "Regulatory Body" shall include any governmental tribunal or group (civil or military) issuing orders governing the drilling of wells or the production of minerals, irrespective of whether said orders are designed to promote conservation or to conserve materials or equipment for National Defense or similar purposes. Such pooling shall be of tracts which will form one contiguous body of land for each unit and the unit or units so created shall not exceed Forty (40) acres each, surrounding each oil well and One Hundred Sixty (160) acres each for each gas or gas-distillate well, unless a larger spacing pattern or larger drilling or producing units (including a field or pool unit) have been allowed, permitted or established by an order of a Regulatory Body of the State of Louisiana or of the United States, in which event the unit or units may be of the size fixed by said order. Lessee shall execute and record in the Conveyance Records of the parish in which the land herein leased is situated an instrument identifying and describing the pooled acreage; and upon such recordation, the unit or

units (each of which is hereinafter sometimes called "production unit") shall thereby become effective. Lessee shall have the right and power to reduce and diminish the extent of any unit created under the terms of this paragraph so as to eliminate from said unit any acreage or lease upon which there is or may be an adverse claim without affecting the validity of the unit as to the acreage or leases remaining affected thereby; and Lessee may also reform any unit to conform with an order of a regulatory body issued after the unit was originally established; provided however, that in the event of any such reformation, Lessor shall not be required to reimburse or return or otherwise account for any royalty which has been paid to Lessor. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee, which shall identify and describe the lands included in the unit as revised and shall be recorded in the conveyance records of the Parish where the lands herein leased are located.

In lieu of the royalties elsewhere herein specified and subject to the provisions of Paragraph 37 hereof, Lessor shall receive from production from the unit so pooled only such portion of the royalties stipulated herein as the amount of his acreage placed in the unit, or his royalty interest therein, bears to the total acreage so pooled in the particular unit involved. Any unit formed by Lessee hereunder may be created either prior to or during the drilling or after the completion of the unit well; and separate units may be created for oil and for gas even though the areas thereof overlap. Lessee may also re-form any unit to conform to an order of a Regulatory Body issued after said unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee, which shall identify and describe the lands included in the unit as revised and shall be recorded in the conveyance records of the parish where the lands herein leased are situated. If this Lease now or hereafter covers separate tracts, no pooling or unitization of royalty interest as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this Lease, but Lessee shall nevertheless have the right to pool as provided above with consequent allocation of production as above provided. As used in this Paragraph 2, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the Leased Premises.

Notwithstanding the foregoing, Lessee shall not, without the prior written consent of Lessor, which shall not be unreasonably withheld: (1) institute and/or participate in any action or effort to reform, modify or rescind the existing Louisiana Office of Conservation HA RA SUV unit which is the subject of Louisiana Order of Conservation Order No. 8-N-20 effective October 5, 2010; or (2) combine or unitize any of the Leased Premises with lands encompassed within Barksdale Air Force Base ("Barksdale Properties"). To the extent the Barksdale Properties, or portions thereof, are sought to be forced pooled with the Leased Premises, or portions thereof, Lessee shall actively and diligently oppose such efforts and actions. Except as provided for herein, under no circumstances, including, without limitation, unit and/or non-unit operations, Lessee shall not conduct any activities on the surface or subsurface of the Leased Premises which proceed on or under the Barksdale Properties.

3. In the event a portion or portions of the land herein leased is pooled or unitized with other land so as to form a pooled unit or units, continuous drilling operations on or production in paying quantities from such unit or units will maintain this Lease in force only as to the land included in such unit or units, as further provided in Paragraph 6 below. Also, subject to the provisions of Paragraph 6 hereof, this Lease may be maintained in force as to any land covered hereby and not included in such unit or units in any manner provided for herein.

4. Should Lessee be engaged in actual drilling or reworking operations on a well on the Leased Premises at the end of the Primary Term, Lessee may maintain all rights granted under this Lease after the Primary Term by continuing such operations without the lapse of more than Ninety (90) days between abandonment of actual drilling or reworking operations on one well and beginning of actual drilling or reworking operations on another, which is hereinafter referred to at times as continuous drilling operations.

If after discovery and production of oil, gas or other liquid hydrocarbons from a production unit, the production thereof in paying quantities should cease from any cause, this Lease shall not terminate as to such production unit if Lessee commences actual drilling or reworking operations on said production unit within Ninety (90) days thereafter and prosecutes such drilling or reworking operations with no cessation of more than Ninety (90) consecutive days, and if such operations result in the production of oil, gas or other liquid hydrocarbons, the

**Exhibit B**

lease as to such production unit shall remain in force and effect down to and including One Hundred feet (100') below the depth of production from that unit as formed and defined by order of the Office of Conservation of the State of Louisiana so long thereafter as oil, gas or other liquid hydrocarbons are produced in paying quantities from said production unit.

  5. As a reasonably prudent operator, if at any time during this Lease a well producing oil, gas or other liquid hydrocarbons in paying quantities is brought in on adjacent lands not owned by Lessor at a location within Six Hundred Sixty feet (660') of any boundary of the land held hereunder and said well is not included in a pooled unit of the land held hereunder, Lessee in order to maintain the rights granted, shall within One Hundred Twenty (120) days following the completion of said well begin and prosecute with reasonable diligence the drilling of an offset well to protect the land held hereunder from drainage; provided, that if a well is located on the Leased Premises or lands pooled therewith which produces from the same strata as the well brought in on adjacent lands and which adequately protects the land held hereunder from drainage, no additional offset well shall be required.

  6. If at the end of the Primary Term of this Lease, there exists on the Leased Premises, or on land pooled therewith, a well or wells producing, or tested as capable of producing oil, gas, or other hydrocarbons in paying quantities and this Lease is not otherwise being maintained by continuous operations as elsewhere herein provided, this Lease shall terminate as to all depths below the deeper of: (1) One Hundred feet (100') below the deepest set of production perforations, or the stratigraphic equivalent thereof in said well; or (2) One Hundred feet (100') below the base of the deepest unitized formation as defined by order of the Office of Conservation of the State of Louisiana (or stratigraphic equivalent thereof) then producing in paying quantities or tested by surface testing as being capable as producing oil, gas, or other hydrocarbons in paying quantities whether or not such horizon is producing at end of said primary term.

  It is understood and agreed that upon the expiration of the Primary Term of this Lease, or, if applicable, upon cessation of the operations period provided for elsewhere in the "continuous operations" clause in this Lease, whichever occurs last (the "Termination Date"), this Lease shall terminate as to the depths lying more than either: (a) One Hundred feet (100') below the bottom or base of the deepest set of production perforations, or the stratigraphic equivalent thereof, underlying the Leased Premises, in a conventionally drilled, vertical or directional drilled well located on the Leased Premises, or on a unit with which all or a part of the Leased Premises has been unitized; or (b) One Hundred feet (100') below the base of the deepest unitized formation as defined by order of the Office of Conservation of the State of Louisiana, underlying the Leased Premises, in any horizontally drilled well located on the Leased Premises, or on a unit with which all or part of the Leased Premises has been unitized, whichever is applicable. By way of example, if a conventional, vertical or directional well were to be drilled on the Leased Premises, or on lands unitized therewith, to a total vertical depth of Ten Thousand feet (10,000') (electrical log measurements) and the bottom or base of the deepest set of well bore perforations through which production was being obtained on the Termination Date was a total vertical depth of Nine Thousand Four Hundred feet (9,400') (electrical log measurements), this Lease would terminate as to the depths and rights lying below the total vertical depth of Nine Thousand Five Hundred feet (9,500') (electrical log measurements), or the stratigraphic equivalent thereof, underlying the Leased Premises. By way of further example, if a well utilizing a horizontal lateral were to be drilled and producing from the horizontal lateral on the Leased Premises, or on lands unitized therewith, and if the bottom or base at the deepest unitized formation as defined by order of the Office of Conservation, and said base depth was at Ten Thousand Five Hundred Feet (10,500') (electrical log measurements), this Lease would terminate on the Termination Date as to all depths and rights lying below Ten Thousand Six Hundred feet (10,600') (electrical log measurements), or the stratigraphic equivalent thereof, underlying the Leased Premises. Notwithstanding all of the foregoing, in no event shall this Lease be maintained beyond the Termination Date at a depth below the base of the deepest unitized formation (as defined by order of the Office of Conservation of the State of Louisiana) containing well bore perforations from which oil and gas is being produced as of the Termination Date from a well drilled on the Leased Premises or on a unit that includes part or all of the Leased Premises. This depth determination will be made on a unit-by-unit basis and if more than one well has been drilled on a unit, the depth underlying the Leased Premises below which this Lease will terminate will be determined by the deepest formation applicable with respect to such unit, as determined by reference to alternative (a) or (b) above, as applicable, subject to the limitations set forth in the

GEP 0000746

**Exhibit B**

immediately preceding sentence. If the applicable well is a "lease" well as opposed to a unit well, the depth determination will be made on a well-by-well basis. Following the Termination Date, Lessee will execute and file of record an appropriate Act of Partial Release. As used herein, the Haynesville Zone formation shall mean the Haynesville Zone as defined by Louisiana Office of Conservation Order No. 109-X or its stratigraphic equivalent underlying the Leased Premises or lands pooled therewith.

7.  Should Lessee by the drilling of any well located on the land or on property pooled therewith, discover gas or gaseous substances capable of production in paying quantities but which Lessee is unable to produce (or which although previously produced Lessee is unable to continue to produce) because of lack of commercial market or marketing facilities or governmental restrictions, then Lessee's rights in the production unit on which said well is located shall continue in the absence of production for Ninety (90) days after such well is shut-in, and if within said Ninety (90) day period, Lessee shall pay as royalty the "shut-in royalty" as hereinafter provided, it shall be deemed for all purposes of this Lease that such well is producing gas in commercial quantities. Such "shut-in royalty" shall be payable:

(a) on or before the expiration of Ninety (90) days after cessation of production or the shutting in of said well, and

(b) in the amount of Twenty-Five and No/100 Dollars ($25.00) per year for each acre of Lessor's land included in any unit on which the well is located or, in the absence of a unit, Forty (40) acres;

(c) provided, however, that after expiration of the Primary Term or any extension of the Primary Term of this Lease, in no event shall Lessee's rights be extended by the payment of "shut-in gas royalty" and without drilling operations or production of oil, gas or other liquid hydrocarbons in paying quantities for more than Two (2) consecutive years.

8.  Subject to the provisions of Paragraphs 2 and 37 hereof, the royalties to be paid by Lessee to Lessor are as follows:

(a) <u>Royalty</u>

1.  As royalties, Lessee agrees:

i.  To deliver free of cost to Lessor at the wells or to the credit of Lessor at the pipeline to which the wells may be connected, Twenty Percent (20%) (the "Royalty Percentage") of all oil and other liquid hydrocarbons produced and saved from the Leased Premises; provided, however, that Lessor will require Lessee to purchase any royalty oil or other liquid hydrocarbons in Lessee's possession, unless otherwise notified, and allocated to Lessor's royalty, paying the market price therefor prevailing for the field where produced on the date same is produced and run to the pipeline or storage tank therefor (or if there is no market price prevailing for such field on such date, then the market price prevailing in the nearest field in which there is a market price on such date for oil or liquid hydrocarbons, such price to be appropriately adjusted for any differences in grade, gravity and quality); provided, however, in no event shall the royalty be based on an amount less than the gross proceeds received from any sale of such oil. Lessee shall not enter into any contract or marketing arrangement expressly regarding oil or other hydrocarbons which are produced from wells located on the Leased Premises or lands pooled with the Leased Premises which obtain for Lessee any advances, payment or other monetary payment or gain or other commitment that may be of value to Lessee and that may not be of value to Lessor.

ii.  To pay to Lessor:

(1) On gas, including casinghead gas or other gaseous substances, produced from the Leased Premises and sold by Lessee or used off the Leased Premises and to which the following subparagraphs (2) and (3) do not apply, the Royalty Percentage of the market value at the point of sale, use, or other disposition, but in no event shall the royalty be based on an amount less than the gross proceeds received from any sale of gas.

(2) On gas, including casinghead gas or other gaseous substances, produced from the Leased Premises that is processed in a processing plant in which Lessee or an affiliate of Lessee has a direct or indirect interest, the higher of: (a) the Royalty Percentage of the market value of the gas at the inlet to the processing plant, or (b) the Royalty Percentage of the market value of all processed liquids saved from the gas at the plant plus the Royalty Percentage of the market value of all residue gas at the point of sale, use, or other disposition, but in no event shall the royalty be based on an amount less than the gross proceeds received from any sale of gas and processed liquids.

(3) On gas produced from the Leased Premises that is not sold prior to processing, and which gas is processed in facilities other than a processing plant in which Lessee or an affiliate of Lessee has a direct or indirect interest, the Royalty Percentage of the market value at the plant of all processed liquids credited to the account of Lessee and attributable to the gas plus the Royalty Percentage of the market value of all residue gas at the point of sale, use, or other disposition, but in no event shall the royalty be based on an amount less than the gross proceeds received from any sale of gas and processed liquids.

(b) The market value of gas will be determined at the specified location by reference to the gross heating value (measured in British thermal units) and quality of the gas. The market value used in the calculation of oil and gas royalty will never be less than the total proceeds received by Lessee in connection with the sale, use, or other disposition of the oil or gas produced or sold, as negotiated by Lessee with an unaffiliated and unrelated entity in good faith and at arm's length on terms, conditions and price which are fair and reasonable at the time and in the circumstances existing when such contract or any amendment thereto is negotiated. For purposes of this paragraph, if Lessee receives from a purchaser of oil or gas any reimbursement for all or any part of severance or production taxes or any other reimbursement or credit, then the reimbursement (or credit) will be added to the total proceeds received by Lessee. If gas is used off the Leased Premises prior to committing same to a gas purchase contract, or should gas be sold by Lessee to an affiliated or related entity or in a transaction that is not negotiated at arm's length, royalties on gas, including casinghead gas, shall be Twenty Percent (20%) of the market value of the gas so used or sold, and, in this case, market value shall be deemed to be the best price reasonably obtainable from time to time at the inlet flange of the interconnection with an Interstate Pipeline in the field or area where the gas is produced. The phrase "Interstate Pipeline" means a natural gas transmission pipeline that is subject to regulation by the Federal Energy Regulatory Commission under the Natural Gas Act (15 U.S.C. 717, *et seq.*) or an "intrastate" natural gas transmission pipeline which is subject to the jurisdiction of the FERC pursuant to the Natural Gas Policy Act of 1978 and whose rates and charges are fair and equitable and do not exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service. Interstate Pipeline does not include any pipeline or facility comprising any part of a gathering system.

(c) Each and all of the royalties hereinabove described shall be computed without any deduction or charge by Lessee for any cost or expense whatsoever, including, without limitation, production, transportation, delivery, processing, marketing, storing, compressing, dehydrating, treating, or any other cost or expense (including fuel charges, depreciation and shrinkage). Lessor's royalty will never bear, either directly or indirectly, any part of the costs or expenses of production, separation, gathering, dehydration, compression, transportation, trucking, processing, treatment, storage, or marketing of the oil or gas produced from the Leased Premises or any part of the costs of construction, operation, or depreciation of any plant or other facilities or equipment used in the handling of oil or gas incurred on the Leased Premises or incurred prior to the sale of such oil and gas to the first non-affiliate of Lessee. Lessor shall bear only its proportionate share of all severance or production taxes.

(d) Notwithstanding the foregoing, the price for gas utilized to calculate the Royalty Percentage due unto Lessor shall not be less than the Index price for Texas Eastern Transmission Corp West Louisiana Zone ("Market Price") as posted in Platts Inside FERC's Gas Market Report under Prices of Spot Gas Delivered to Pipelines, first day of the month ("Market Report"). If the Market Report or Market Price ceases to be published/reported, then another comparable publication and/or price shall be agreed upon by the parties acting reasonably and in good faith. In the event the parties are unable to agree upon an acceptable replacement Market

Report or Market Price, then either party shall be entitled to seek judicial determination thereof in the Twenty Sixth Judicial District Court, Bossier Parish, Louisiana.

(e) Lessor shall be paid the Royalty Percentage of all payments and other benefits made under any oil or gas sales contract or other arrangement, including take-or-pay payments and payments received in settlement of disputes; but only to the extent that such payments and benefits are attributable to gas produced from or attributable to the Leased Premises; provided that if Lessor receives a take-or-pay payment or similar payment for gas that has not been produced, and if the gas purchaser "makes up" such gas within the period called for in the gas contract and Lessee is required to give such purchaser a credit for gas previously paid for but not taken, then Lessor shall not be entitled to royalty on such "make up" gas, but only to the extent such "make up" gas is attributable to payments or benefits received by Lessor. Further, Lessor shall be entitled to the Royalty Percentage of the value of any benefits obtained by or granted to Lessee from any gas purchaser and/or transporter for the amendment, modification, extension, alteration, consolidation, transfer, cancellation or settlement of any gas purchase contract and/or transportation agreement, but only to the extent that such benefits are attributable to gas produced from or attributable to the Leased Premises.

(f) As used in this paragraph, "affiliate" means any person or entity: (i) which directly or indirectly controls, or is controlled by, or is under common control with the Lessee or a subsidiary of Lessee ("Subsidiary"); (ii) which directly or indirectly beneficially owns or holds Five Percent (5%) or more of any class of voting stock or voting power of Lessee or any Subsidiary; or (iii) Five Percent (5%) or more of the voting stock or voting power of which is directly or indirectly beneficially owned or held by Lessee or a Subsidiary. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a person or entity whether through the ownership of voting securities or voting power by contract or otherwise.

(g) Acceptance by Lessor of royalties that are past due will not act as a waiver or estoppel of its right to receive interest due thereon unless Lessor expressly so provides in writing signed by Lessor, nor shall such acceptance act as a waiver of any other right or remedy available to Lessor.

(h) The receipt by Lessee from a purchaser or a pipeline company of proceeds of production for distribution to Lessor will not result in Lessee acquiring legal or equitable title to those proceeds, but Lessee will at all times holds the proceeds in trust for the benefit of Lessor. Notwithstanding the insolvency, bankruptcy, or other business failure of a purchaser of production from the Leased Premises or pipeline company transporting production from the Leased Premises, Lessee will remain liable for payment to Lessor for, and agrees to pay Lessor all royalties due Lessor together with interest if not timely paid.

(i) Oil royalties shall be delivered to Lessor free of expense at Lessor's option, in tanks furnished by Lessor at the well or to Lessor's credit in any pipeline connected therewith. In the event Lessor does not furnish tanks for such royalty oil and no pipeline is connected with the well, the Lessee shall sell Lessor's royalty oil at the best market price reasonably obtainable and pay Lessor the price received therefor.

(j) In the event of production, Lessee shall render unto Lessor monthly detailed reports (by statements provided with monthly royalty payments or by separate statements) adequate in form and content to permit Lessor to verify that the volumes of monthly production in respect of which royalty payments are being made to Lessor are identical to the volumes of monthly production reported by Lessee to the Louisiana Office of Conservation on official forms provided by that office, and to permit Lessor also to verify the value or price at which such royalties are calculated. Lessee shall at all times reasonably cooperate with Lessor in furnishing information reasonably satisfactory to Lessor and to Lessor's accountants, which will enable Lessor to determine: (a) that royalties are being timely and properly paid on all volumes of oil and gas produced; (b) the price or value at which such royalties are being calculated; and (c) all allowed deductions which are charged against Lessor's royalty, if any, with data to support all prices and deductions. A copy of all contracts under which gas is sold or processed and all subsequent agreements and amendments to such contracts, as well as the books, accounts and all other records pertaining to production, transportation, sale and marketing of oil or gas

from the Leased Premises shall at any time during normal business hours be subject to inspection and examination by Lessor.

Should Lessor believe that Lessee's obligations as provided in 8(a)-(j) above, including payment of royalties or any portion thereof, are not being performed in compliance herewith, Lessor shall provide Lessee with written notice of the asserted non-compliance and Lessee shall have a period of Thirty (30) days from receipt of said notice within which to correct the identified non-compliance.

9. With respect to each well on the Leased Premises or on land pooled therewith, initial royalty payments for oil and/or gas shall be made on or before the end of the third calendar month following the month of first production. Thereafter, all royalties which are required to be paid hereunder to Lessor shall be due and payable in the following manner: Royalty on oil shall be due and payable on or before the end of the first calendar month following the month of production, and royalty on gas shall be due and payable on or before the end of the second calendar month following the month of production. If payments to be made by Lessee to Lessor are not made when due for whatever reason, the unpaid portion shall bear interest at the lower of: (1) the prime rate as published by the Wall Street Journal in its "Money Rates" section plus 2%; or (2) the highest rate allowed by law. If Lessee is in default hereunder and this matter is turned over to an attorney for collection, or is collected by suit, Lessee agrees to pay all reasonable attorney fees and costs incurred by Lessor, should Lessor prevail.

10. The royalties as hereinabove provided shall be due and payable without any duty or obligation by Lessor to sign, execute or ratify any division orders, transfer orders, unitization agreements or similar instruments. If so requested by the Lessor, Lessee agrees to provide the Lessor with photocopies of division order title opinions or other documents or instruments relating to Lessor's interest ownership in any producing well(s) located on the Leased Premises or on lands unitized therewith, such information shall be kept confidential. Lessee does not warrant the accuracy or completeness of any information contained in the requested Division Order Title Opinions and other documents and instruments furnished by Lessee, and neither Lessee nor any person(s) rendering or preparing such Division Order Title Opinions, documents or instruments that are furnished shall be liable to the Lessor should the Lessor suffer any loss or expense as a result of reliance therein, subject to the provisions of the next sentence. Notwithstanding anything contained in the preceding sentence, the Lessor shall not be precluded from asserting any claim or cause of action against Lessee, or the assigns of Lessee, and the language contained in the preceding sentence shall not be applicable in the event the Lessor disagrees with or contests the mineral or royalty interests credited to the Lessor in any Division Order Title Opinion, documents and instruments to be furnished to by the Lessee pursuant to the terms of this paragraph, it being understood by the parties hereto that the Lessor reserves herein for itself any and all rights: (a) to challenge and contest at any time the mineral and royalty interests credited to Lessor in any Division Order Title Opinion, or other document or instrument furnished by Lessee pursuant to this paragraph; and (b) to challenge and contest any amounts tendered by Lessee as payment of delay rental or royalty due under the terms of this Lease.

11. The Lessee shall be responsible, and shall indemnify, hold harmless and defend Lessor, for all injuries and damages to persons or property and for all costs of regulatory compliance caused by or connected with Lessee's operations, including, not by way of limitation, any damages or costs resulting from pollution or toxic wastes or the abatement thereof. Lessee, at its own expense, shall defend any suit, action, administrative order or other claim brought against Lessor based on any such alleged injuries or damages, and shall pay all damages, costs, and expenses resulting therefrom, including reasonable attorney's fees and costs in connection therewith or related thereto; but Lessor shall have the right to participate in such suit, action or administrative proceeding if it so elects at its sole cost and expense. Lessee shall also be responsible, and shall indemnify and hold Lessor harmless, for any increase in taxes resulting from buildings or other improvements placed upon the land by Lessee. Notwithstanding the foregoing, any obligation to indemnify, defend or hold Lessor harmless are limited to the extent that any such claims, damages or injuries are not caused by the intentional acts and/or gross negligence of Lessor or its agents. Lessee shall be obligated to plug and abandon all wells on the Leased Premises no longer necessary for operations or production on the Lease, to remove from the Leased Premises all structures and facilities serving said wells, and to restore the surface of the land to substantially its same condition as at the commencement of this Lease, all at Lessee's sole risk, cost and expense and subject to compliance with all applicable laws and regulations. In

addition to restoration of the Leased Premises as contemplated by this Lease, Lessee shall be responsible for all damages to the Leased Premises caused by or connected to Lessee's actions or operations, including, not by way of limitation, all damages to any timber, crops, roads, buildings, fences and other improvements thereon.

12. At all times during the lease term, Lessee shall remain in Environmental Compliance and shall diligently endeavor to prevent the existence of any Environmental Condition, caused in whole or in part as a result of the Lessee's operations and enjoyment of this Lease, in, on, or under the Leased Premises which are deemed hazardous during the lease term, by any state, federal, or governmental environmental agency. If Lessor becomes obligated by order, resolution, rule or other such mandate of any state, federal, or governmental environmental agency to investigate, remove, clean up, remediate or otherwise expend funds as a result of the Lessee's activities under this Lease, Lessee agrees that it will promptly perform such investigation, clean up or remediation activities at its sole cost, risk and expense. Except to the extent any claim is caused by the intentional acts and/or gross negligence of Lessor or its agents, if Lessor is required to defend any suit brought by any third party against it arising from or in connection with Lessee's operations or the operations of Lessee's successors or assigns, Lessee, at Lessor's option, agrees to promptly: (i) indemnify the Lessor for defense of any such suit; or (ii) furnish Lessor a complete defense to any such suit and Lessee shall pay all reasonable court costs, attorneys' fees and other out-of-pocket costs incidental to such action. Furthermore, Lessee hereby agrees to indemnify, defend (with counsel acceptable to Lessor) and hold Lessor, its officers, employees, contractors, agents, customers, licensees, invitees, and/or visitors, and any other person for or to whom Lessee may be liable, harmless from and against any and all claims, obligations, liabilities, costs, expenses, (including attorneys' fees), losses, suits, fines, penalties or demands of whatever nature or kind, contingent or otherwise, known or unknown, made or sought by or on behalf of any person, firm, corporation or government authority whomsoever, based upon or arising out of the existence of any Environmental Condition on the Leased Premises which exists in whole or in part as a result of Lessee's operations or other enjoyment of the Lease, except to the extent any such Environmental Condition is caused by the intentional acts and/or the gross negligence of Lessor or its agents. Lessee shall be responsible for, and the foregoing indemnification shall also specifically cover, without limitation, all costs incurred in connection with any investigation of site conditions, or any cleanup, remedial, removal, or restoration work required by any federal, state, or local governmental agency or political subdivision. Without limitation of the foregoing, Lessee agrees to restore to pre-lease conditions any Environmental Condition on the Leased Premises which exists in whole or in part as a result of Lessee's operations or as a result of any other activities related to or arising under this Lease. The foregoing environmental obligations shall survive the expiration or termination of this Lease and/or any transfer of any portion of the premises or of any interest in this Lease. "Environmental Compliance" shall mean compliance with all federal, state, and local environmental laws, regulations, and ordinances and all conditions of all permits issued to Lessee for its operations during the Lease term. "Environmental Condition" shall mean the presence on the Leased Premises of any "hazardous substance," "hazardous material," "toxic substance" or "hazardous waste" as those terms are defined in any federal, state or local law, regulation or ordinance, and any contaminant oil, produced water, petroleum product, or byproduct, radioactive material, or byproduct, mining or drilling waste, or other material removal which is required or the existence or management of which is prohibited, penalized or regulated by any federal estate or local governmental authority. Additionally, and without limitation of the foregoing, "Environmental Condition" shall also mean and include any spilled salt-water, and other spilled toxic, hazardous or corrosive liquid, gas, solid, chemical or material, and any spilled petroleum or petroleum constituent or by-product. Lessor acknowledges that it is herein reserving the right of use to the surface for itself and for third parties and Lessee's liability under this paragraph is limited to such "Environmental Conditions" as result in whole or in part from operations or enjoyment of this Lease by Lessee, or by Lessee's successors and assigns under this Lease.

13. At least Thirty (30) days prior to constructing any drill site, access roadway, pipeline, power line, or other surface use ("Surface Use") on the Leased Premises, Lessee shall consult with Lessor regarding the proposed location of such Surface Use and Lessee shall accommodate the reasonable requests of Lessor with respect to the location of Lessee's surface operations. Within One Hundred Eighty (180) days after the completion of a well on the involved well site, Lessee shall restore the well site to good condition, covering and leveling all pits and removing all debris, and Lessee shall fill slush pits or any excavations made in Lessee's

operations and agrees to remove any and all machinery and equipment therefrom within One Hundred Eighty (180) days, except such as is necessary in the continued operations for production. Notwithstanding the foregoing, in the event Lessee commences the drilling of another well within the provided One Hundred Eighty (180) day period, the obligation to restore the well site shall be extended until One Hundred Eighty (180) days following completion of said well. Lessee shall be entitled to further extend the well site restoration obligation by the commencement of an additional well or wells on the involved well site within the applicable One Hundred Eighty (180) day period. Lessee shall conduct its operations so as to maintain the Leased Premises in such a manner that excess equipment, scrap material and/or junk shall not accumulate thereon. Lessee shall not store chemicals on the Leased Premises in a quantity greater than what is needed for current operations or planned operations scheduled to occur within the next Ninety (90) days.

14. Except as specifically provided herein, Lessee shall not be entitled to utilize surface or subsurface water from the Leased Premises. Notwithstanding the foregoing, Lessee, may utilize water from Lessee's "catfish ponds" (located in Section 16, Township 17 North, Range 12 West), for use in its well completion operations. Lessee shall pay Lessor the amount of Fifteen Cents ($0.15) per barrel for any and all water used from said catfish ponds. All water utilized by Lessee shall be measured through an accurate water meter installed and maintained at Lessee's expense or by other accurate measurement means reasonably acceptable to Lessor. Lessee shall pay Lessor within Thirty (30) days of the end of the month in which said water is used. Damage to Lessor's domestic water supply due to testing, drilling or production (including injection or secondary recovery methods) is a separate damage not paid for in this act and shall be considered additional damages. Lessee shall be entitled to lay temporary water lines across the Leased Premises for use in its well completion operations at no additional cost to Lessee.

Notwithstanding the foregoing, Lessee shall have the right to drill One (1) water well per drill site and to use water therefrom for drilling operations customarily performed via use of a drillsite water well; however, expressly excluding downhole fracing operations. Within One Hundred Eighty (180) days of the completion of Lessee's operations as to each well site, Lessee shall provide written notice unto Lessor and Lessor shall have thirty (30) days from the date of receipt of said notice to accept and receive said water well (cased hole), without payment obligation therefore. In the event Lessor accepts the water well as provided herein, Lessor shall be the sole owner thereof and Lessee shall have no further right or obligation therefore. In the event Lessor does not elect to accept said water well, then Lessee agrees to properly plug and abandon any and each utilized water well thereon, in full compliance with all applicable laws and regulations.

15. Lessee shall not be entitled to utilize dirt or soil from the Leased Premises. For pad and other surface facilities provided for herein, Lessee shall remove and bank the top soil. To the extent the surface is required to be leveled, unless otherwise agreed to by Lessor, soil from the Leased Premises shall not be utilized. Lessee shall bring in clean suitable soil so as to construct well drill pads and other surface locations. Upon conclusion of the use of the well drill pad and other surface facilities, the property shall be restored as near as reasonably possible to its original grade and condition as before commencement of operations, restoring the banked topsoil so as to restore the tillability of the land.

16. Lessee shall not dispose of timber, brush, debris, trash or other materials ("Trash") by burying said materials on the Leased Premises. All Trash shall be timely and properly removed from the Leased Premises and disposed of properly. Upon reasonable request by the Lessor, Lessee will implement the use of reasonably available barriers, landscaping or other appropriate visual borders and Lessee will implement the use of reasonably available noise abatement technology in connection with its operations on the surface locations as reasonably directed by the Lessor.

17. Lessee shall not be restricted on its rights of ingress and egress to any and all portions of the Leased Premises and/or any existing Oil and Gas Lease between Lessor and Lessee. Lessor and Lessee do hereby further agree to enter appropriate contractual agreements reasonably necessary so as to insure Lessee's ingress and egress in and to Lessee's Lease facilities as well as Lessee's continued development and production pursuant to this Lease. Access and other roads, if required, will be constructed and maintained pursuant to the terms and requirements hereof. Except as limited above, Lessee shall be entitled to the use of existing

roads, as well as the right to construct new roads, as reasonably necessary for the exercise of Lessee's rights. Any new roads constructed by Lessee shall not exceed Thirty feet (30') in width, however, Lessee shall be entitled to use of additional property as reasonably needed for entrance and exist flairs and turns.

18. Pipeline rights-of-way shall not exceed Twenty feet (20') in width at any point of the right-of-way, with an additional Fifteen feet (15') wide temporary work construction easement. Lessee shall remove no top soil or pad dirt from the rights-of-way herein granted. Lessee shall lay no above ground pipelines, except flowlines across drill site pads and temporary water lines as provided for herein, without prior written consent of Lessor, not to be unreasonable withheld. Anything herein to the contrary notwithstanding, Lessee shall not construct any pipeline on the Leased Premises except for the transportation of products produced from a well or wells located on the Leased Premises or lands unitized therewith. Lessee shall not place any pipeline on the Leased Premises or use any pipeline located on the Leased Premises for the transportation of products produced from wells located off the Leased Premises without Lessor's prior written consent, which consent will not be unreasonably withheld; provided however, that in the event well(s) located off the Leased Premises pool or unitize the Leased Premises or a part hereof with other lands on which such wells are located, the Lessee shall have the right to construct any pipeline on the Leased Premises or use any pipeline located on the Leased Premises for the transportation of products produced from such wells. Unless otherwise required by applicable law or requirement, Lessee shall bury all pipelines to a minimum depth of Thirty Six inches (36") below the surface. Lessee is expressly prohibited from locating aboveground appurtenances on said rights-of-way without the written consent of Lessor. Where a pipeline crosses a roadway, the soil shall be compacted to prevent cave-ins and to restore the foundation of the roadway. After construction, the privilege to use, maintain, repair and operate said pipelines shall be for the purpose of the transmission of oil, gas, other liquid hydrocarbons, water, salt water, carbon dioxide and other secondary recovery materials from the Leased Premises only or lands pooled therewith for the period of the Lease and that period only. Once the pipelines are laid, any change in its location or pipe size will constitute installation of a new pipeline. Lessee shall reseed all land disturbed by the construction of pipelines at its sole cost. Lessee shall maintain the rights of way and keep same free from debris, undergrowth and brush, including overhanging limbs and branches, with said maintenance activities, including, but not being limited to, mowing and trimming the rights of way at least once a year, said mowing and trimming to be performed on or before September 1 of each year.

19. After the depletion of the oil, gas or hydrocarbons on this Lease or cessation of the use of the pipelines provided for herein for production from the Leased Premises or pooled lands on which Lessor is being paid royalty, Lessee shall discontinue the use of said pipeline(s). Upon termination, Lessee shall have a period of Ninety (90) days within which to remove said pipeline(s). Lessee shall not place any pipelines and/or facilities on any land owned by Lessor unless actively used for Lease operations. Lessee shall mark all pipelines so as not to create a hidden danger for excavations on the Leased Premises. Lessee shall keep all rights-of-way well marked with signs that include Lessee's emergency telephone number.

20. Lessee shall install diversions (water bars) along the rights-of-way so as to cause rainwater to cross over and not run down the rights of way thereby causing erosion.

21. All activities of Lessee pursuant to this agreement shall be conducted in a good and workmanlike manner. Lessee shall maintain well sites, access roads and pipelines free of weeds and sprouts. A gate shall be constructed by Lessee at a point agreeable to Lessor and be kept closed and locked, provided that Lessee may permit the gate(s) to remain open while moving the rig(s) onto the wellsite location(s), and while conducting drilling and completion operations; however, during such periods that the gate is permitted to remain open, Lessee, at its sole cost and expense, shall cause a guard to be located at the entrance of the access road Twenty-Four (24) hours a day, Seven (7) days a week, thereby securing the Leased Premises.

This agreement and all rights hereunder are for the exclusive benefit of Lessee and Lessee's agents and employees, but only when such agents and employees are on duty and directly engaged in Lessee's business activities related to Lessee's properties. Lessee shall not grant, attempt to grant or permit any other person to exercise any of the rights granted Lessee hereunder, for any purpose, unless with the express written consent of Lessor.

**Exhibit B**

Lessor expressly reserves the right to fence all or any part of the land subject to the rights herein granted for the purpose of containing livestock, exotic animal species or other purposes, provided that Lessee's rights hereunder are not unreasonably interfered with.

Lessee's authorized employees and agents shall be prohibited from carrying firearms of any nature or type, archery equipment or fishing equipment of any kind, either on their person or in their vehicles, while such agents or employees are on Lessor's property.

Lessee shall install and maintain, at Lessee's sole cost and expense, a cattle-type gate across any access point created to the Leased Premises and shall keep such gate locked at all times, except while operations are being conducted on the Leased Premises. During such operations, Lessee shall take reasonable measures (*e.g.* temporary fences, etc.) to keep Lessor's livestock and other animals contained. Keys to such gate (or the combination) shall be provided to Lessor. Lessee agrees that any and all access roads and/or pipelines hereunder shall remain private, and Lessee shall, at its own cost and without claim for compensation, erect, post and keep posted, signs made of durable material, meaning not less than Two feet (2') high by Four feet (4') long by One inch (1") thick (or on metal not less than $1/8^{th}$ inch thick), to be clearly visible for a reasonable distance, to bear the following legend in strong contrast to its background, in letters not less than Four inches (4") high: "NO TRESPASSING." Said signs shall be located at any place or places where roadways or pipelines may cross any boundary line of the Leased Premises. For gate signs, this additional language shall be included: "THIS GATE IS TO BE CLOSED AND LOCKED AT ALL TIMES."

22. In the event Lessee shall conduct, or shall cause to be conducted by third parties, agents or assigns, any type of environmental audit or site assessment (including, but not limited to, a Phase I, Phase II, Phase III or Phase IV assessment) on the Leased Premises, Lessor shall be provided at no cost with a copy of the report. Lessor herein agrees to keep the information contained in said report confidential, unless disclosure is required by applicable law or regulations.

23. Lessee agrees that it will not permit any roads existing at the time this Lease is executed on the Leased Premises to be rendered unusable for an unreasonable period of time as a result of the Lessee's operations on the Leased Premises. Lessee further agrees that it will restore the condition of any road on the Leased Premises used by Lessee to the condition that existed prior to the execution of this Lease. Lessee agrees to maintain the gravel on roads in an "all weather" condition at all times using small rock (SB2) for as long as Lessee, or its successors or assigns, continue to utilize said roads in connection with its operations. Lessor, its respective employees, agents, tenants, permittees and representatives shall, without obligation of maintenance, have the right to use said roads for any and all passage purposes. Lessee will limit its travel on the Leased Premises to the existing roads and roads as constructed hereunder.

24. This Lease does not include the right to conduct seismic operations and there shall be no seismic operations on the Leased Premises without the prior written consent of Lessor.

25. For purposes of this Lease, drilling operation shall mean that a derrick, a rig and machinery capable of drilling to a depth sufficient to test the prospective oil or gas horizon at the permitted depth have been erected on the Leased Premises and that such rig is rotating under power and the bit has actually penetrated the earth ("bit turning to the right"). Notwithstanding anything herein to the contrary, if this Lease is extended beyond the Primary Term as a result of any ongoing drilling operation, application of the pugh clauses provided in Paragraphs 3 and 6 of this Lease shall be determined at the completion/conclusion of the then ongoing drilling operation, which shall be performed and completed/concluded in good faith and with due diligence.

26. No structures may be built on the Leased Premises that could be construed as being used as a permanent dwelling for Lessee's employees.

27. It is intended that this Lease cover only oil and gas or other minerals necessarily produced with them and, accordingly, notwithstanding anything contained herein to the contrary, wherever the terms "oil, gas and all other minerals," "oil, gas or other minerals," "oil, gas, sulfur or other minerals," are used, the following terms shall be substituted therefor:

GEP 0000754

**Exhibit B**

... oil, gas and any other liquid or gaseous minerals in solution and produced with oil and gas ...

and all references to sulphur or other such minerals shall be deleted.

28. Notwithstanding any provision in the Lease to the contrary, this Lease and the rights provided unto Lessee shall apply only to lands as specifically described herein. Lessee shall not be entitled and is expressly precluded from using any additional or adjoining property of Lessor. Notwithstanding the foregoing, for use in Lessee's development of minerals pursuant to this Lease and subject to the limitations and requirements provided herein, Lessor does grant unto Lessee the right to use existing pipelines and/or to install additional pipelines on Lessor's adjoining properties. Lessee's use of Lessor's adjoining acreage as provided herein, shall be subject to the terms, conditions and requirements of this Lease and any other lease with Lessor, to the extent compatible. In the event of conflict, the terms of this Lease or the other applicable lease, whichever is more favorable to Lessor, shall control.

29. Lessee shall not have the right to dispose of salt water on or under the Leased Premises.

30. The drilling of a well or wells within the broad language of this Lease shall not be construed as an agreement or construction on the part of Lessor that such drilling would constitute reasonable development of the Leased Premises, and Lessee agrees to drill any and all wells on the Leased Premises, or such portion or portions thereof as may be in force from time to time, as may be necessary to reasonably explore and develop the same for the production of oil and gas. If oil and/or gas are discovered on the land covered by this Lease, or on land pooled therewith, Lessee agrees to further develop said land covered by this Lease as a reasonable prudent operator would under the same or similar circumstances.

31. Lessee shall execute and record a formal act releasing from the operation of this Lease any acreage or any strata no longer subject to the operation or held under the terms hereof. Specifically, within Thirty (30) days after the partial termination of this Lease, as provided under any of the terms and provisions of this Lease, Lessee shall deliver to Lessor a recordable release properly describing the lands and depths to be retained by Lessee around each producing well. If this Lease terminates in its entirety, then Lessee shall deliver a complete, fully executed, recordable release to Lessor within Thirty (30) days of termination. If such release complies with the requirements of this section, Lessee shall record such release and furnish Lessor with a certified copy thereof. If Lessee fails to timely deliver a release, within Thirty (30) days after receipt of written demand from Lessor, complying with the requirements of this section, then, in addition to all other damages to which Lessor may be entitled, Lessee shall pay Lessor an amount equal to Five and No/100 Dollars ($5.00) per day for each acre of the Leased Premises that should have been released, beginning with the 30th day after the release or partial release was due and continuing until such release has been executed and delivered to Lessor.

32. In the event Lessor is required to retain the services of an attorney to enforce the terms and/or conditions of this Lease, then in addition to all other remedies and recoveries available to Lessor, Lessor shall be entitled to reimbursement of reasonable attorneys' fees and costs.

33. Should this Lease be extended beyond the Primary Term and thereafter remain in effect, in whole or in part, for a period of Six (6) years following expiration of the Primary Term, then, in that event, Lessee shall promptly cause the original Lease to be recorded in the Conveyance Records in and for Bossier Parish, Louisiana, and a certified copy thereof shall be furnished to Lessor.

34. Nothing in this Lease negates the usual implied covenants imposed upon Lessee.

35. Notwithstanding any express or implied provisions of this Lease to the contrary, Lessee shall not unreasonably interfere with the activities of the Lessor or Lessor's surface lessee with respect to the Leased Premises. The surface of the Leased Premises is currently being used for residential use, farming, ranching, timbering, hunting and other operations. All operations conducted by or for Lessee on the Leased Premises shall be performed in such a manner as to not unduly or unnecessarily interfere with the use of the surface by Lessor or others deriving rights

through Lessor. Lessee shall construct a barb wire or panel fence entirely around any wells, production facilities or any other types of facilities established by Lessee or its agents or assigns on the Leased Premises. The fence will be maintained in good condition as long as the well(s) or surface activities are in operation.

36. All provisions hereof shall extend to and bind the successors and assigns (in whole or in part) of Lessor and Lessee; but no change in the ownership of the land or any interest therein or change in the capacity or status of Lessor, whether resulting from sale, inheritance or otherwise, shall impose any additional burden on Lessee nor shall any change in ownership or in the status or capacity of Lessor impair the effectiveness of payments made to Lessor herein named unless the then record owner of said Lease shall have been furnished Thirty (30) days before payment is due, with a certified copy of the recorded instrument or judgment evidencing such transfer, inheritance or sale or evidence of such change in status or capacity of Lessor. The furnishing of such evidence shall not affect the validity of payments theretofore made in advance. The rights of Lessee under this Lease shall not be assigned or subleased in whole or in part without the prior written consent of Lessor, which consent shall not be unreasonably withheld. Upon Lessor's receipt of Lessee's written request provided by certified mail for consent to assign, Lessor shall have Ten (10) business days to notify Lessee whether Lessor elects to consent to such assignment, which consent shall not be unreasonably withheld. Failure of Lessor to reply within the period above specified shall constitute an election by Lessor to consent to Lessee's request for consent to assign. Upon Lessor's grant to consent to assign or sublease (by Lessee) of the Lease, either as to the whole, or as to a segregated portion of the Leased Premises, or as to any undivided interest in this Lease, Lessee shall be discharged from and relieved of all obligation and liabilities with respect to this Lease, or segregated portion, or undivided interest so assigned or subleased.

37. Anything in this Lease to the contrary notwithstanding, the parties further agree that for all purposes of this Lease, the rights granted the Lessee are limited to those owned by Lessor and/or those subsequently acquired by Lessor, and Lessor makes no representation or warranty as to its title or as to its ownership of the rights or interests in the Leased Premises, or as to the existence, quality or location of oil and gas on, in or under the Leased Premises, either expressed or implied, not even as to return of the bonus money or the return of any other payments made to Lessor. Lessor and Lessee further agree herein that the Lessor shall have no obligation to return to Lessee any bonus payment, royalty payment, rental payment, surface use payment, or any other payment made to Lessor by the Lessee or others. Specifically, once paid, Lessor shall not be obligated to return or repay any amounts for any reason whatsoever, including, without limitation, a claim for "payment of a thing not due" or other legal theory/basis.

38. In the event that Lessor at any time considers that operations are not being conducted in compliance with this Lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if legally required to conduct operations in order to maintain the Lease in force shall have Sixty (60) days after receipt of such notice in which to commence the necessary operations to comply with the requirements hereof.

39. If the land herein described is owned in divided or undivided portions by more than one party, this instrument may be signed in any number of counterparts each of which shall be binding on the party or parties so signing regardless of whether all of the owners, join in the granting of this Lease.

40. The requirements hereof shall be subject to any State and/or Federal law or order regulating operations on the land.

41. For the duration of this Lease, Lessee shall, at its expense, maintain in force and effect, in customary and reasonable amounts for the involved activities, which nonetheless provide, as a minimum, the following coverage relative to Lessee's activities hereunder:

    (a) Workmen's Compensation and Employers' Liability Insurance, in accordance with all applicable State and Federal laws and endorsed specifically to include the following:

        i. Employers' Liability, subject to a limit of liability of not less than $1,000,000 any one accident or occurrence.

ii. "Borrowed Servant" endorsement, stating that a claim brought against Lessor as a "Borrowed Servant" by an employee of Lessee, will be treated as a claim against Lessee.

iii. In all cases where Lessee's employees (defined to include Lessee and its direct, borrowed, special, or statutory employees) are covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021, *et seq.*, or any other applicable law, Lessor and Lessee agree that all services and operations performed by Lessee and Lessee's employees pursuant to this contract are an integral part of and are essential to the ability of Lessor to generate Lessor's goods, products, and services for the purpose of La. R.S. 23:1061(A)(1) or any other applicable law. Furthermore, if Lessee's employees (as defined in the preceding sentence) are covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021, *et seq.*, or any other applicable law, Lessor and Lessee agree that Lessor is the statutory employer of Lessee's employees for purposes of La. R.S. 23:1061(A)(3) or any other applicable law. Irrespective of Lessor's status as the statutory or special employer (as defined in La. R.S. 23:1031(C) or any other applicable law) of Lessee's employees, Lessee shall remain primarily responsible for the payment of all Louisiana workers' compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Lessor; moreover, Lessor shall be entitled to the indemnity from Lessee provided under La. R.S. 23:1061(B) or any other applicable law to the extent Lessor becomes liable to pay any worker's compensation with respect to any of Lessee's employees.)

(b) Comprehensive General Liability Insurance, with limits of liability of not less than the following: Bodily Injury/Property Damage, Combined anyone occurrence: $1,000,000. Such insurance shall include the following:

i. Contractual Liability, insuring the indemnity agreements contained in this contract.

ii. Coverage for property damage due to blasting and explosion, structural property damage, underground property damage, and surface damage from blowout and cratering.

iii. Lessee shall purchase Extended Reporting Provision if policy is written on a claims-made basis and is non-renewed or canceled.

(c) Comprehensive Automobile Liability Insurance, with limits of liability of not less than the following: Bodily Injury/Property Damage/Combined, anyone accident or occurrence: $2,000,000.00. Such coverage shall include owned, hired and non-owned vehicles.

(d) Operators Extra Expense insurance covering control of well, re-drill and seepage & pollution including the following coverage extensions: underground blowout, extended re-drill, contingent joint ventures liability, making wells safe, care custody & control and unlimited re-drill with a limit of liability of not less than the following: $2,000,000 any one occurrence.

(e) Each insurance policy maintained by Lessee, must be endorsed as follows:

i. Lessor and its members, employees, officers, and agents shall be named as "Additional Insured." (Except for Workmen's Compensation policy).

ii. All coverages shall contain waivers of subrogation (whether by loan receipts, equitable assignment, or otherwise) against Lessor, its members, subsidiaries and affiliated companies, as well as their employees, officers and agents.

iii. The coverage afforded herein shall be primary in relation to any policies carried by Lessor, its subsidiaries, owners and affiliated companies, as well as their employees, officers and agents.

iv. All liability coverage afforded herein shall include a pollution liability coverage endorsement with a combined single limit of $2,000,000.00, per occurrence,

Page 14 of 20

GEP 0000757

**Exhibit B**

including coverage for contractual liability. Such coverage shall be maintained for the life of this Lease.

(f) Upon written request, Lessee shall furnish Lessor with certificates of insurance evidencing compliance with its insurance obligation prior to commencement of operations hereunder and shall give Lessor Thirty (30) days' notice of any proposed change of insurance carriers or coverage. Lessee shall furnish Lessor with renewed certificates of insurance, no less frequently than annually throughout the life of the Lease, evidencing that coverage is being provided and maintained on an annual basis.

42. Upon written request by Lessor, Lessee shall furnish Lessor copies of any or all of the following types of data, unless Lessee is contractually prohibited from doing so, which Lessee has obtained for its own purposes after executing this Lease, relating to wells drilled by Lessee on the Leased Premises wireline surveys; core descriptions; drill stem and production test data; daily drilling reports; production data; gas sales contracts; seismic data. Any of the foregoing data furnished to Lessor shall be kept confidential and not disclosed to third parties for a period of time ending one year after Lessee has concluded its operations herein or on lands pooled therewith. Nothing herein shall be construed to require Lessee to furnish any interpretation of any of such data.

43. Lessee shall not be entitled to and is hereby expressly precluded from utilizing the surface and/or subsurface of the Leased Premises, in whole or in part, for the exploration, development and/or production of oil, gas or other minerals from properties encompassed within or forming a part of the Barksdale Properties, including, but not limited to, the location of wells or other surface or subsurface facilities on the Leased Premises for the drilling, completion and/or production of a well or wells to be bottomed under the Barksdale Properties. The parties expressly represent and recognize that this limitation represents a material provision of this Lease, which without the effects hereof, Lessor would not have entered this Lease.

44. The consideration paid by Lessee to Lessor, and the additional obligations of Lessee under this Lease, are accepted as full and adequate consideration for all rights, options and privileges herein granted.

45. Upon Lessee's receipt of this Lease, as executed by Lessor, Lessee shall tender a lump sum payment in the amount of Thirty Nine Thousand Two Hundred Fifty and No/100 Dollars ($39,250.00) ("Initial Bonus Payment") unto Lessor. The Initial Payment shall be made by wire transfer unto Lessor as follows:

> First National Bankers Bank
> Baton Rouge, Louisiana
> AB 065403370
> For Credit to:
> Ouachita Independent Bank
> Account #111103650
> For Further Credit to:
> The Lucky Family Trust
> Account #1210424

Lessor and Lessee agree and acknowledge that this Lease extends and applies to any and all interest in the Lease Premises which Lessor currently owns or may hereafter acquire. Lessor and Lessee further agrees that, should Lessee hereinafter acquire any additional interest in the Leased Premises, then Lessee shall, to the extent said interest is merchantable and not subject to a contradictory ownership claim by any other person or entity, tender an additional payment to the Lessee in the amount of Two Thousand Two Hundred Fifty and No/100 Dollars ($2,250.00) per net mineral acre so acquired by the Lessor, payable as set forth below or otherwise directed by Lessor ("Conditional Bonus Payment").

46. If Lessor owns a less interest in the Leased Premises than the entire and undivided fee simple interest therein, then the payments herein provided (other than the "Initial Payment" and "Conditional Bonus Payment")) shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

47. In case of suit, adverse claim, dispute or question as to the ownership of the Leased Premises (or some part thereof) or of the royalties (or some part thereof) payable under this Lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the Lessor's ownership of the Leased Premises (or some part thereof) or right or interest of Lessee hereunder be disputed by Lessor or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the Lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

*[Remainder of Page Intentionally Left Blank – Signature Pages Follow]*

IN WITNESS WHEREOF, this Lease is effective as of the date first above written.

**WITNESSES:**  **LESSOR:**

**WILLIAM A. LUCKY, III**

_____    _____
Signature

_____
Print Name

_____
Signature

_____
Print Name

**STATE OF LOUISIANA**

**PARISH OF** _____

On this ____ day of _____, 2018, before me, the undersigned authority, personally appeared William A. Lucky, III, to me known to be the person described in and who executed the foregoing Lease and acknowledged to me that he executed the same as his free act and deed for the purposes and considerations and in the capacity therein expressed.

_____
Notary Public
Printed: _____
State of Louisiana
Parish of _____
Notary/Bar No. _____

IN WITNESS WHEREOF, this Lease is effective as of the date first above written.

**WITNESSES:**  **LESSEE:**

GEP HAYNESVILLE, LLC

_____  By:_____
Signature                   Printed:_____

_____  Its: _____
Print Name

_____
Signature

_____
Print Name


**STATE OF** _____

**PARISH/COUNTY OF** _____

On this ____ day of _____, 2018, before me appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of GEP HAYNESVILLE, LLC, and that said instrument was signed in behalf of said Company by authority of its _____ and said _____ acknowledged said instrument to be the free act and deed of said Company.

_____
          Notary Public
Printed: _____
       State of _____
       Parish/County of _____
       Notary/Bar No. _____

Page 18 of 20

GEP 0000761

**Exhibit B**

**EXHIBIT "A"**
**Attached to that certain**
**Oil, Gas and Liquid Hydrocarbons Lease Agreement**
**By and Between William A. Lucky, III, and GEP Haynesville, LLC**

<u>Sections 18 and 19, Township 17 North, Range 12 West</u>

Lot 2 of the Carr Subdivision, as identified on that Plat of Survey, prepared by French Engineering, Inc., dated January 27, 2005 and recorded in Conveyance Records of Bossier Parish, Louisiana under Instrument No. 834511 in Book 1207, Page 738, BUT INSOFAR AND ONLY INSOFAR AS said Lot 2 is included within the geographic limits of the HA RA SUV drilling and production unit for the Sligo Field, Bossier Parish, Louisiana, as defined by Louisiana Office of Conservation Order No. 8-N-20 (effective October 5, 2010).