The Deposition of

# KIMBERLY FLOURNOY

In the Matter of

# MAGNOLIA ISLAND PLANTATION, ET AL

versus

# LUCKY FAMILY, L.L.C, ET AL

Taken On

# OCTOBER 26, 2022



**EXHIBIT C**

**1**

```
 1              UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF LOUISIANA
 3                  SHREVEPORT DIVISION
 4
 5   MAGNOLIA ISLAND PLANTATION,     CIVIL ACTION NO.
     L.L.C.; and BARBARA MARIE       5:18-CV-1526
 6   CAREY LOLLAR
                                     CHIEF JUDGE MAURICE
 7   VERSUS                          HICKS, JR.
 8   LUCKY FAMILY, L.L.C.; W.A.      MAGISTRATE JUDGE
     LUCKY, III; BOSSIER PARISH      KAYLA D. McCLUSKY
 9   SHERIFF JULIAN C.
     WHITTINGTON, in his official
10   capacity.                       JURY TRIAL DEMANDED
     ***************************************************
11
12       The deposition of KIMBERLY FLOURNOY, taken in
13   connection with the captioned cause, pursuant to the
14   following stipulations before Jeanne Bain, Certified
15   Court Reporter, at Langley Parks, 4444 Viking Drive,
16   Suite 100, Bossier City, Louisiana 71111, on the
17   26th day of October, 2022, beginning at 1:15 p.m.
18
19
20
21
22
23
24
25
```

**2**

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFFS, MAGNOLIA ISLAND PLANTATION,
     L.L.C.; AND BARBARA MARIE CAREY LOLLAR:
 4
 5       ANDREW D. MARTIN
         DAVIDSON SUMMERS
 6       330 MARSHALL STREET, SUITE 1114
         SHREVEPORT, LOUISIANA  71101
 7       dmartin@davidsonsummers.com
 8
 9   FOR DEFENDANT, W.A. LUCKY, III:
10
         CURTIS R. SHELTON
11       AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC
         333 TEXAS STREET, SUITE 1400
12       SHREVEPORT, LOUISIANA 71101
         curtisshelton@arklatexlaw.com
13
14   FOR DEFENDANT, LUCKY FAMILY, LLC:
15
         ALLISON JONES
16       DOWNER, JONES, MARINO & WHITE, LLC
         401 MARKET STREET, SUITE 1250
17       SHREVEPORT, LOUISIANA 71101
         ajones@djmw-law.com
18
19   FOR DEFENDANTS, SHERIFF JULIAN C. WHITTINGTON AND
20   KIMBERLY FLOURNOY:
21
         GLENN L. LANGLEY
22       LANGLEY, PARKS LLC
         4444 VIKING DRIVE, SUITE 100
23       BOSSIER CITY, LOUISIANA 71111
         glangley@langleyparks.com
24
25
```

**3**

```
 1              S T I P U L A T I O N
 2       It is hereby stipulated by and among counsel for
 3   plaintiff and counsel for defense that the
 4   deposition of
 5            KIMBERLY FLOURNOY
 6   be taken before Jeanne Bain, Certified Court
 7   Reporter, by counsel for the defense for all
 8   purposes, pursuant to notice and to the provisions
 9   of the appropriate statutes of the Code of Civil
10   Procedure of the State of Louisiana.
11       The parties hereto waive all formalities in
12   connection with the taking of said deposition,
13   except the reading and signing thereof and the
14   swearing of the witness.
15       Per Article 1443(D) of the Louisiana Code of
16   Civil Procedure, counsel for all parties reserve all
17   objections until trial or other use of the
18   deposition.
19
20
21
22
23
24
25
```

**4**

```
 1                     INDEX
 2
 3   EXAMINATION:
 4       BY MR. MARTIN   . . . . . . . . . . . . . . .   6
 5       BY MR. SHELTON  . . . . . . . . . . . . . .  162
 6
 7   OBJECTIONS:
 8       BY MR. LANGLEY  . . . . . . . . . . . . . .   17
 9       BY MS. JONES    . . . . . . . . . . . . . .   25
10       BY MR. SHELTON  . . . . . . . . . . . . . .  124
11
12   EXHIBITS:
13       EXHIBIT #1 - NOTICE OF DEPOSITION   . . . . . . 8
14       EXHIBIT #2 - SECOND AMENDED AND RESTATED
                      COMPLAINT TO AN ALL SHERIFF SALE AND OTHER
15       RELIEF   . . . . . . . . . . . . . . . . . .   8
16       EXHIBIT #3 - NOTICE OF SUMMONS   . . . . . . . 9
17       EXHIBIT #4 - LA REVISED STATUTE 13:4365  . . .16
18       EXHIBIT #5 - WRITE OF FIERI FACIAS  . . . . . 28
19       EXHIBIT #6 - NOTE OF 6/12/2018   . . . . . . .29
20       EXHIBIT #7 - LETTER OF 7/5/2018    . . . . . .44
21       EXHIBIT #8 - LETTER..........   . . . . . . . 45
22       EXHIBIT #9 - LETTER OF 9/6/2018    . . . . . .55
23       EXHIBIT #10 - E-MAIL FROM KIM FLOURNOY TO CURTIS
             SHELTON   . . . . . . . . . . . . . . . . 62
24
         EXHIBIT #11 -E-MAIL FROM CURTIS SHELTON TO KIM
25       FLOURNOY REGARDING SUIT 127573   . . . . . . . 68
```

**5**

1    EXHIBIT #12 - NOTICE OF SEIZURE  . . . . . . 69
2    EXHIBIT #13 - E-MAIL FROM CURTIS SHELTON TO KIM
     FLOURNOY 9/14/2018  . . . . . . . . . . . 72
3
     EXHIBIT #14 - E-MAIL BETWEEN CURTIS SHELTON AND
4    KIM FLOURNOY ABOUT ADVERTISEMENT FORM  . . 73
5    EXHIBIT #15 - AD AND INVOICE FROM BOSSIER PRESS-
     TRIBUNE  . . . . . . . . . . . . . . . . . 74
6
     EXHIBIT #16 - E-MAIL BETWEEN CURTIS SHELTON AND
7    KIM FLOURNOY - 9/17/2018  . . . . . . . . . 77
8    EXHIBIT #17 - AFFIDAVIT  . . . . . . . . . . 79
9    EXHIBIT #18 - E-MAIL BETWEEN CURTIS SHELTON AND
     KIM FLOURNOY - 9/21/2018  . . . . . . . . . 95
10
11   EXHIBIT #19 - E-MAIL 10/12/2018  . . . . . . 95
12   EXHIBIT #20 - E-MAIL 10/12/2018  . . . . . . .99
13   EXHIBIT #21 - E-MAIL. . . . . . . . . . .103
14   EXHIBIT #22 - E-MAIL. . . . . . . . . . .106
15   EXHIBIT #23 - E-MAIL 10/18/2018  . . . . . .114
16   EXHIBIT #24 - FORM  . . . . . . . . . . 119
17   EXHIBIT #25 - APPRAISAL  . . . . . . . . . . 119
18   EXHIBIT #26 - E-MAIL 10/22/2018  . . . . . .129
     EXHIBIT #27 - INVOICE FROM LACOUR  . . . . . 164
19
20
21
22
23
24
25

**6**

```
 1                KIMBERLY FLOURNOY,
 2   after having been duly sworn was examined and did
 3   testify as follows:
 4   EXAMINATION BY MR. MARTIN:
 5   Q   Good afternoon.  I'm Drew Martin.  How are you?
 6   A   I'm good.
 7   Q   Can you state your full name for the record?
 8   A   It's Kimberly Dawn Flournoy.
 9   Q   Thank you for being with us, Ms. Flournoy.  You
10       feeling okay today?  Feel capable of giving a
11       deposition?
12   A   Yes, sir.
13   Q   Okay.  Have you ever given a deposition?
14   A   No, sir.
15   Q   Okay.  I'm going to try to make it go as
16       smoothly as possible.  I don't want to be here
17       anymore than you do.  To do that, put down some
18       ground rules of how to make it flow faster, go
19       better.  If at any point you want a break, just
20       tell me I'd like to take a break.
21   A   Okay.
22   Q   I will let you take a break, if you need to go
23       to the bathroom or just want to catch your
24       breath.  The only thing I ask is if a question
25       is pending, if I've asked you a question, you
```

**7**

```
 1       haven't answered it yet, wait til the question
 2       is answered and then say I'd like to take a
 3       break.  If you need me to repeat a question -- I
 4       might not say a question very clearly.  That
 5       often happens.  Just say can you repeat a
 6       question.  If I ask a question and someone makes
 7       an objection, I'm going to ask you to answer it
 8       anyway.  If someone instructs you not to
 9       answer -- if your lawyer instructs you not to
10       answer I will talk with him, but otherwise I'm
11       going to ask you just answer the question I
12       asked.  If you need me to repeat it at that
13       point just say so.  I've given everybody some
14       documents here -- the other lawyers some
15       documents, which may serve as exhibits.  I'm
16       going to identify the ones that I'm using and
17       hand a copy to you.
18   A   Okay.
19   Q   And those will serve as the court reporter's
20       exhibits for the transcript here.  If you don't
21       recognize a document, you can tell me.
22   A   Okay.
23            MR. LANGLEY:
24              Mr. Martin represents the plaintiffs in
25       this case who are suing you.
```

**8**

```
 1            WITNESS:
 2              Oh, okay.
 3   Q   Okay.  I'm going to hand you a document I'm
 4       marking as Exhibit #1.  It's called Notice of
 5       Deposition.  Have you seen this document?
 6   A   Yes, sir.
 7   Q   Okay.  You understand that it orders you to be
 8       here and you're here?
 9   A   Yes, sir.
10   Q   Okay.  Are you aware of why you're giving this
11       deposition?
12   A   Yes, sir.
13   Q   Okay.  Tell me briefly your understanding what's
14       going on.
15   A   I'm required to be here.
16   Q   Okay.  You know you've been sued?
17   A   Yes, sir.
18   Q   Okay.  I'm going to hand you a document I'm
19       going to mark as Exhibit #2 -- that's a big one.
20       It's got a whole lot of attachments, but it's
21       called "Second Amended and Restated Complaint to
22       an All Sheriff Sale and Other Relief".  Have you
23       seen that document?
24   A   Yes, sir.
25   Q   Okay.  Have you read it?
```

**EXHIBIT C**

**9**

1    A    In its entirety, no, sir.
2    Q    And it's a long document.  It's not exciting
3         reading.  Have you read any parts of it?
4    A    (Witness examines document.)  I believe so, yes.
5    Q    Okay.  We'll get back to the specifics of it in
6         a little bit, but I'll just tell you that's the
7         lawsuit, the petition --
8    A    Okay.
9    Q    -- complaint filed that named you as a
10        defendant.  I'm going to hand you a document I'm
11        labeling Exhibit #3.  It's a Notice of Summons.
12             COURT REPORTER:
13                 Do you have a #2?
14             MR. MARTIN:
15                 I do.
16             COURT REPORTER:
17                 Oh, part of that was -- oh, okay.
18             MR. MARTIN:
19                 We're at #2 still, the big one.
20   Q    Have you seen that document that I've handed
21        you?
22   A    No, sir.
23   Q    Okay.  But you understand generally you've been
24        sued by my client?
25   A    Yes, sir.

**10**

1    Q    Ms. Lollar, Mr. Lollar, Magnolia Island
2         Plantation.  You're currently employed by the
3         Bossier Parish Sheriff's Office; is that right?
4    A    Yes, sir.
5    Q    And what's your job title there?
6    A    Records.
7    Q    And how long have you been there?
8    A    With the sheriff's office?
9    Q    Yeah.
10   A    I have been there fifteen plus years.
11   Q    A long time?  How long have you had your current
12        job title as records?
13   A    Two years I believe.
14   Q    Two years?
15   A    Two, maybe three.
16   Q    Okay.
17   A    I'm not --
18   Q    Back in 2018, what was your job title?
19   A    Civil department.
20   Q    Civil department.
21   A    Uh-huh.
22   Q    And how long had you been in that role?
23   A    I'm going to -- one to two years.
24   Q    Relatively new at that point?
25   A    No, sir.

**11**

1    Q    No?  You thought one or two years was long
2         enough time you didn't consider yourself a
3         neophyte at that position in 2018?
4    A    No, one to two years.  I wasn't sure of the
5         exact --
6    Q    Okay.
7    A    -- how long I had been --
8    Q    Yeah.
9    A    -- in that position in 2018.
10   Q    Okay.  What was your training for that position
11        like?  Did you have any formal training?
12   A    I was trained by Pat Taylor.
13   Q    Who is Pat Taylor?
14   A    She is the lady that also worked in Civil --
15   Q    Okay.
16   A    -- with me.  There were two of us.
17   Q    Uh-huh.  So, it was kind of a personal hands-on
18        training?  It wasn't a -- you didn't take
19        classes?
20   A    Correct.
21   Q    It was -- you had previously been working in
22        some other capacity with the sheriff's office?
23   A    Yes, sir.
24   Q    Okay.  Where were you at that point when you
25        came to Civil?

**12**

1    A    Oh, I worked in administration a little also.
2    Q    Okay.  What took you to Civil?
3    A    I don't really recall.
4    Q    Okay.
5    A    I'm sorry, I don't --
6    Q    That's fine.  But at some point I guess that
7         would be 2016-ish if you had been -- at 2018 you
8         had been there about a year or two?  2016 or
9         2017 you moved from administrative to Civil?
10   A    I'd have to look at the personnel records,
11        but --
12   Q    That's okay.  Sounds vaguely right?
13   A    I'm guessing.  I --
14   Q    Okay.  It's not a quiz.  I'm not -- I can't
15        grade your homework.  I can't --
16   A    Without looking at the --
17   Q    Right.
18   A    -- records.
19   Q    Okay.  But Pat Taylor -- Ms. Pat Taylor gives
20        you hands-on training that you learn as you go
21        basically?
22   A    I -- I'd say somewhat accurate.
23   Q    Okay.  You can characterize it how you want.
24        You've got the floor.  You didn't take classes
25        we said?  You didn't --

**EXHIBIT C**

**13**

1   A   Correct.
2   Q   -- engage in some sort of break where you, you
3       know, read a bunch of books of how to do this --
4   A   No, sir.
5   Q   -- job, how to do this job?
6   A   No, sir.
7   Q   You got shifted over to Civil?
8   A   Correct.
9   Q   And you started working?
10  A   Correct.
11  Q   And you were given some responsibilities and Ms.
12      Taylor helped you along?
13  A   Correct.
14  Q   Okay.  What all did the civil department job
15      that you had entail?  What were you doing on a
16      day-to-day basis?
17  A   We did sheriff's sales, foreclosures, any type
18      of service papers and that's the best --
19  Q   Yes.
20  A   -- description --
21  Q   Okay.
22  A   -- I can --
23  Q   So, sheriff's sales were something you were
24      doing on a daily basis?  You were given case
25      files and processing them and --

**14**

1   A   (Witness nods head.)
2           COURT REPORTER:
3               You need to say yes.
4           WITNESS:
5               Oh, I'm sorry.
6   A   Correct.
7           COURT REPORTER:
8               That's okay.
9   Q   And I should have told you that.
10  A   I apologize.
11  Q   I'm sorry.  So, as I was saying earlier to make
12      it go smoother, in conversation a lot of times
13      we communicate through body language, uh-huh or
14      uh-uh, but often the court reporter can't pick
15      that up --
16  A   Okay.
17  Q   -- so yes or no if you can.  Often in
18      conversations people finish each other's
19      sentences.  Let's try not to do that just
20      because it doesn't make for a clean record and
21      we're just trying to get your story out here at
22      this point.  So, you're doing sheriff's sale,
23      you're doing foreclosures and you're learning
24      on -- as you're going with help from Ms. Pat
25      Taylor.  Anybody else had to help you in the

**15**

1       learning process here?
2   A   Any questions we would ask our supervisor about.
3   Q   Who was the supervisor?
4   A   Jean Horne.
5   Q   Okay.  Jean Horne's in the civil department and
6       she's your supervisor?
7   A   Correct.
8   Q   Who else is on your level that Jean Horne's
9       going to?
10  A   If we had any questions we would go to Jean
11      Horne.  Jean Horne would consult with David
12      Miller or our attorney, Mr. James Sutherland.
13  Q   But who is the "we"?  Who else would go to Jean
14      Horne with questions?
15  A   Pat.
16  Q   Pat?
17  A   Yes, sir.
18  Q   Okay.  Was Pat the only other one?
19  A   In Civil?  I believe at the time, yes.
20  Q   Okay.  So, when y'all got a file it was either
21      you or Pat that was --
22  A   Correct.
23  Q   -- doing the work?  Okay.  And I take it
24      probably she's more experienced, so you're going
25      to her more often --

**16**

1   A   Correct.
2   Q   -- than Ms. Horne?  Okay.  So, you were doing
3       sales -- sheriff sales?
4   A   Correct.
5   Q   And you got acquainted with these quickly?  You
6       had a bunch of these.  How often would you say
7       you -- how many files at one time did you have?
8   A   I guess it depended on the process.
9   Q   Uh-huh
10  A   Where the sale was -- I'm not sure.  I don't
11      have an accurate number.  I'd say maybe five to
12      ten possibly.
13  Q   Okay.
14  A   I'm --
15  Q   Okay.  I'm going to hand you a document I've
16      marked as #4.  This maybe totally foreign to
17      you, but it's called "Louisiana Revised Statute
18      13:4365".Have you ever looked at that statute in
19      a book or --
20  A   No, sir.
21  Q   -- online? Okay.  In the course of doing the
22      sheriff sales, how often -- let me back up.  In
23      the course of doing the sheriff sales, typically
24      what's the role of the appraisers in these?
25          MR. LANGLEY:

**EXHIBIT C**

**17**

1    Object to the form of the question, but
2    you can answer if you have the answer.
3  A  Could you repeat that, I guess?
4  Q  Sure.
5  A  I'm not --
6  Q  Restate it more clearly?  My understanding of
7    sheriff sales is that usually one side of --
8    let's say a seized piece of property gets -- an
9    appraiser gets to pick one.  The other side gets
10   to pick one as well.  Is that your experience?
11 A  No.
12 Q  No?  Do you deal with appraisers or did you in
13   your role as -- in Civil in this --
14 A  Yes.
15 Q  You did.  When would you deal with appraisers?
16 A  Prior to the sale we would have to -- I guess
17   Louisiana law requires you -- if it is with an
18   appraisal you would have to get an appraisal.
19 Q  Who would get the appraisal?
20 A  There was a -- we just had a list of appraisers,
21   real estate -- or I'm sorry, moving and non-
22   moving --
23 Q  Okay.
24 A  -- and we would just select one from the list or
25   just whomever's up next.

**18**

1  Q  You would do the selecting?
2  A  I mean, I didn't -- it was -- sorry, I'm trying
3    to think of the best way to word it.
4  Q  Sure.
5  A  I don't have a word.
6  Q  Okay.
7  A  I'm sorry, I don't know how to describe it, but
8    it was just whatever was next on the list if
9    that's --
10 Q  Okay.  Did you see that it's your job to appoint
11   an appraiser?
12 A  No.
13 Q  Whose job was it?
14 A  I thought that was Louisiana law that stated
15   that you had to.
16 Q  Okay.  When you had a judgment against a party
17   and their property was being seized, would that
18   go to a sheriff sale usually?
19      MR. LANGLEY:
20         Object to the form of the question.
21 A  I don't remember.  I'm sorry, I don't.
22 Q  Okay.
23 A  It's been a while.
24 Q  Sure.  Do you have any recollection of a third
25   appraiser being necessary in some cases?

**19**

1  A  Yes.
2  Q  Okay.  When would a third appraiser be
3    necessary?
4  A  Whenever the two appraisers were outside of the,
5    I believe, ten percent (10%) variants.
6  Q  And we had just been talking about one
7    appraiser.  What would necessitate two
8    appraisers?
9  A  I believe every sale had to have two.
10 Q  Okay.
11 A  That may be the law that says --
12 Q  Okay.  And so at that -- when you say two
13   appraisers, did you understand it to mean that
14   one side would get one -- judgment creditor
15   would get one and the judgment debtor would get
16   one?
17 A  No.
18 Q  Just two anybodies?
19 A  Yes.
20 Q  Okay.  So, if their -- those appraisals were
21   more than ten percent (10%) apart in monetary
22   value, you'd get the third appraiser?
23 A  Yes.
24 Q  That was your understanding?
25 A  Yes.

**20**

1  Q  And you said you didn't think you selected the
2    first two appraisers.  Did you select a third
3    appraiser usually in these cases?
4  A  No.
5  Q  Okay.  Who selected the third appraiser usually?
6  A  In a movable -- like there was a list for
7    movable appraisers, a list for non-movable, so
8    there were just -- it was whomever was next up,
9    I suppose if that makes --
10 Q  But who would pick those people?  Were they your
11   list?
12 A  No.
13 Q  That's not your list?
14 A  No, sir.
15 Q  It's the sheriff's list?
16 A  No, sir.  I'm not sure where the list --
17 Q  Okay.
18 A  It's just part of my --
19 Q  But this was something internal to your office?
20 A  Yes.
21 Q  Okay.  So, somewhere in your office there would
22   be a list --
23 A  Uh-huh.
24 Q  -- and you'd go to the next one?  And that piece
25   of paper I handed you and marked as Exhibit #4,

EXHIBIT C

**21**

1  you never consulted that when you were doing the
2  appraisal selection?
3  A  No, sir.
4  Q  You just went down your list because that's what
5  Ms. Pat Taylor told you to do?
6  A  Yes, sir.
7  Q  Or perhaps Ms. Jean Horne?
8  A  Pat, yes.
9  Q  Okay.  I take it there was no written guidelines
10  in the office of what to do?
11  A  No, sir.
12  Q  It was just a list and someone told you if
13  they're more than ten percent (10%) apart, call
14  the next person on this list?
15  A  I believe it was because it was the law is why -
16  -
17  Q  But someone told you that?
18  A  Yes, sir.
19  Q  Okay.  And you don't know if that was Ms. Pat
20  Taylor?
21  A  I believe it was going to be Pat Taylor.
22  Q  Okay.
23  A  She's the one who did all my training.
24  Q  Okay.  So, no written guidelines, just -- I take
25  it you don't know why a third appraiser would be

**22**

1  required for more than ten percent (10%)?
2  A  I'm not familiar with it.
3  Q  Okay.
4  A  So --
5  Q  You saw that as kind of a legal issue?
6  A  Yes.
7  Q  That goes without saying you didn't have
8  specific training about this situation with an
9  appraiser?
10  MR. LANGLEY:
11  Object.  Object to the form of the
12  question.  What situation are you referring
13  to, Counselor?
14  MR. MARTIN:
15  The necessitation for a third
16  appraiser.
17  MR. LANGLEY:
18  Okay.  Thank you.  You can answer the
19  question if you have an answer.  Did you
20  have specific training about third appraiser
21  being necessary?
22  A  No.
23  Q  But you did understand the third appraiser to be
24  something selected by y'all's office -- your
25  office?

**23**

1  A  In this particular situation or in general?
2  Q  In general.
3  A  In -- I guess in movables and non-movables or
4  real estate and movables -- I guess I'm just not
5  sure.  Can you repeat that or rephrase that?
6  Q  With the third appraiser if one would need to be
7  selected in any sale, you thought it was the
8  sheriff's office selecting from its own list,
9  correct?
10  A  On real estate and movables, yes.
11  Q  Okay.  Had you ever heard the term "referee
12  appraiser"?
13  A  No, sir.
14  Q  Neutral appraiser?
15  A  No, sir.
16  Q  Can you try to tell me the difference for
17  procedures for movable and immovable property?
18  You discussed that a couple of times.
19  A  It's been a while since I have, so I don't
20  remember the specifics of it, so I wouldn't --
21  I --
22  Q  You recall that there was a difference?
23  A  Yes, sir, in advertising and things of that
24  nature.  There were a few things that were
25  different.

**24**

1  Q  I think you said the list of appraisers was
2  different as well.  Is that right?
3  A  Yes, sir.
4  Q  Okay.  And you said if the appraisals, the first
5  two, differed by more than ten percent (10%),
6  you'd get that third appraiser?
7  A  Correct.
8  Q  Who did that calculation of whether there was a
9  ten percent (10%) discrepancy?
10  A  I don't recall how we came to determine what it
11  was.
12  Q  You don't recall for instance taking out a
13  calculator and adding up the values and seeing
14  if they differed by --
15  A  I don't recall how --
16  Q  Okay.
17  A  -- how we did that, no.
18  Q  Do you recall if you would have Jean Horne do
19  that?
20  A  Prior to any sale or advertising I would let
21  Jean Horne review it then -- the file.
22  Q  Okay.  Back to the long Exhibit #2 -- and you
23  don't have to scour it for everything -- just
24  generally what do you know?  Do you know what
25  this lawsuit's about?

**EXHIBIT C**

**25**

1   A    Not much about it at all.
2   Q    Okay.  Have you read any of the allegations that
3        concern you in that long complaint?
4        MS. JONES:
5             Object to the form.
6   A    I have.  There's just some of the legal -- I
7        guess I'm not understanding, you know, the
8        entirety of it, but --
9   Q    Do you understand what the allegations about you
10       are?
11  A    I guess no.
12  Q    Do you understand what sale it concerns?
13  A    Yes, sir.
14  Q    Okay.  And would that be the sale promissory
15       note in 2018?
16  A    Yes, sir.
17  Q    Okay.  And do you remember that promissory note
18       and that sale?
19  A    I remember some, yes.
20  Q    Okay.  Do you know anything about the lawsuit
21       that preceded that sale?
22  A    No, sir.
23  Q    Okay.  Do you know any of the parties in this
24       suit, the plaintiffs or defendants?
25  A    No.

**26**

1   Q    For instance, my client is -- this is Barbara
2        Lollar and her husband, Mr. Ronald Lollar.
3   A    No, sir.
4   Q    You're not familiar with them?
5   A    No, sir.
6   Q    Do you know Mr. William A. Lucky, III -- Buddy
7        Lucky?
8   A    No, sir.
9   Q    Vickie Lucky?
10  A    (Witness shakes head.)
11  Q    Okay.  You don't personally know any of these
12       people?
13  A    No, sir.
14  Q    Okay.  You do know Sheriff Whittington?
15  A    Yes, sir.
16  Q    Okay.  He is a defendant, but that's the only
17       one you personally know?
18  A    Yes, sir.
19  Q    You're represented by Mr. Langley in this suit;
20       is that right?
21  A    Yes, sir.
22  Q    Have you spoken with any of the other lawyers in
23       this case about the suit?
24  A    No, sir.
25  Q    When did you learn about this lawsuit and that

**27**

1        you were a defendant in it?
2   A    I suppose whenever I was served with the
3        paperwork.
4   Q    Okay.
5   A    I'm not sure of the date.
6   Q    Would that be this year?
7   A    Yes, sir.
8   Q    Were you aware of the lawsuit prior to that?
9   A    There was an affidavit I had signed and I'm not
10       sure it was --
11  Q    Okay.  You don't know if it was connected to
12       this suit or not?
13  A    (Witness shakes head.)
14  Q    But of the lawyers involved in this suit, the
15       only one you've spoken to is Mr. Langley?
16  A    Correct.  Yes, sir.
17  Q    Have you spoken to Ms. Julianna Parks about this
18       lawsuit?
19  A    About this?  She's --
20  Q    Yeah.  I'm not asking you the content of your
21       conversation, just if you've spoken to her about
22       it.
23  A    She took my affidavit --
24  Q    Okay.
25  A    -- but that was the extent.  What specific word,

**28**

1        but I don't know.
2   Q    That's fine.  Okay.  I'm going to hand you a
3        document.  I'm marking it as Exhibit #5.  It's a
4        Writ of Fieri Facias.
5   A    Fieri Facias?
6   Q    I trust your pronunciation more than mine.  I
7        call it a Writ of FIFA.  Do you recognize this
8        Writ?
9   A    Yes, sir.
10  Q    It looks like it is dated June 7, 2018.  Does
11       that seem right?
12  A    That's what it appears; yes.
13  Q    Do you remember getting this in July of 2018?
14  A    I do not.
15  Q    Okay.  Do you think you did get it?
16  A    I remember when it came in, but I don't remember
17       the details of --
18  Q    Were you managing this file when this came in?
19  A    Prior to this I don't think there was a file to
20       my knowledge.
21  Q    Okay.  How would a file be assigned between you
22       and Ms. Pat Taylor?
23  A    It was just a random assignment.  She would do
24       evens and I would do odd -- suits that ended in
25       evens and I would do ones that ended in odds.

**29**

1   Q   Okay.  And this is Docket #C-127573.  That's an
2       odd number, so this became yours?
3   A   Yes, sir.
4   Q   Okay.  So, you don't recall specifically this in
5       June of 2018, but you do know that at some point
6       after that you were assigned to this case?
7   A   Correct.
8   Q   This file?
9   A   Yes.
10  Q   Was there anything attached to this; do you
11      remember?  Would a judgment be attached to it?
12  A   I do not -- I do not know.
13  Q   Okay.  We're going to go to #6.  I'm marking
14      Exhibit #6.  It is -- appears to be a note maybe
15      drafted in Microsoft Word or something and it's
16      dated 6-12-2018.  Is this your note?
17  A   I do not know.
18  Q   It says, "Called Curtis Shelton, 227-3306, at
19      11:05 according to the Writ of FIFA.  He said to
20      hold off on the Writ because he's issued a
21      subpoena for Barbara Carter to produce the
22      promissory note on July 5, 2018.  He said, "He
23      may want us to seize the note on that court date
24      and would be in contact with us before July
25      5th."  So, you do not know if this is your note?

**30**

1   A   No, sir.  I do not.
2   Q   If it's not yours, whose could it be?
3           MR. LANGLEY:
4               I'll caution you, Liz, not to
5           speculate.  If you know give him an answer;
6           don't guess.
7           MS. JONES:
8               I'll object to form.
9   A   I'm sorry, I don't -- I don't know.
10  Q   Would anyone else have taken a note about one of
11      your assigned cases?
12          MS. JONES:
13              Same objection.
14          MR. LANGLEY:
15              Same instruction.  If you know --
16  A   Yeah, I do not.  There's no way to --
17  Q   Did you often take notes at this time in mid
18      2018 about your files?
19  A   Yes.
20  Q   Where would these notes go?
21  A   This would be in the file or on the file I'm
22      guessing.
23  Q   When you say on the file, do you mean
24      electronically?  Are these stored somewhere?
25  A   If anything was written on the file itself.

**31**

1   Q   You got a physical folder?
2   A   Yes.
3   Q   Okay.  You had a folder that was your -- you had
4       a series of folders that were yours?
5   A   Documents were kept in folders, yes, sir.
6   Q   Were those at your desk?
7   A   Yes, sir.
8   Q   Okay.  Did Ms. Taylor have her own set of
9       folders?
10  A   Yes, sir.
11  Q   To your knowledge, did anyone else have a set of
12      folders about cases?
13  A   I do not know.
14  Q   Okay.  Who else could hold off on the Writ other
15      than you or Ms. Taylor.
16  A   I'm not sure what hold off on the Writ actually
17      means so I don't know how to answer that.  I'm
18      sorry.
19  Q   So, you don't know if this is your note for this
20      file?
21          MS. JONES:
22              Object to the form, asked and answered.
23          MR. MARTIN:
24              I haven't even asked the question yet.
25          MR. LANGLEY:

**32**

1               Well, and that --
2           MS. JONES:
3               If that's a --
4           MR. MARTIN:
5               I'm re-stating the previous answer and
6           I'm using that to ask the question.
7           MS. JONES:
8               I thought that was your question.
9           MR. LANGLEY:
10              I object to --
11          MS. JONES:
12              Go ahead.
13          MR. LANGLEY:
14              I object to the form of the question.
15          Go ahead with --
16          MR. MARTIN:
17              I haven't yet asked the question.
18          MS. JONES:
19              Okay.
20          MR. LANGLEY:
21              Well, then proceed and ask the
22          question.
23          MR. MARTIN:
24              I'm trying.
25  MR. MARTIN, CONTINUING:

**EXHIBIT C**

**33**

1  Q  You told me just a minute ago you didn't know if
2     this was your note.
3  A  Correct.
4  Q  You said you had a folder which may contain
5     notes.  Do you have that folder still?
6  A  Oh, no, sir.  No.
7  Q  Do you know if there were other notes in it?
8  A  No, I do not.
9  Q  Do you know if you ever took notes about this
10    matter?
11 A  Like phone messages?  What do you mean by like
12    notes or --
13 Q  Anything that would have gone in the folder.
14 A  If it was a note or anything it should be in the
15    folder.
16 Q  Okay.  Have you handed over any notes that you
17    have to your attorney?
18 A  I don't have any notes, sir.
19 Q  If you had any notes, would you have left them
20    at the sheriff's civil department when you moved
21    to your new position?
22 A  It would be in the file.
23 Q  Okay.  Do you know who would have control over
24    those now?
25 A  I'm not sure when I left Civil.  I don't know.

**34**

1  Q  Okay.  What did you do with old folders once for
2     instance a case was resolved?
3  A  I'm not sure what we did with them.  I'm sorry.
4     I apologize.
5  Q  It's okay.  I believe you said that if you had
6     notes you would put them in the folder --
7  A  Correct.
8  Q  -- for that file?
9  A  Yes.
10 Q  Did you do that often?  Did you often take notes
11    for files?
12 A  Occasionally, yes.
13 Q  Did you often call attorneys who represented
14    seizing creditors in connections to your case
15    files?
16       MS. JONES:
17          Object to the form --
18       MR. LANGLEY:
19          Object to the form --
20       MS. JONES:
21          -- of the question.
22       MR. LANGLEY:
23          -- of the question.
24 A  Do you want me to answer?
25 Q  You --

**35**

1        MS. JONES:
2           Can still answer.
3  Q  -- can still answer.
4  A  Okay.
5  Q  Unless they instruct you not to answer.
6        MR. LANGLEY:
7           I object to it lacks a foundation and
8        since it lacks a foundation --
9        MR. MARTIN:
10          And you can just object to the form, I
11       think.
12       MS. JONES:
13          Well, you can state your --
14       MR. LANGLEY:
15          No.  I --
16       MS. JONES:
17          You can state your form objection on
18       the record.
19       MR. LANGLEY:
20          And the objection to the extent it can
21       be cured at the time the objection is made.
22       Has to be cured at that time and the
23       foundation objection needs to be cured down.
24 MR. MARTIN:
25 Q  When you are dealing with seizures of property,

**36**

1     did you often communicate with Counsel for the
2     seizing party?
3        MS. JONES:
4           I'm going to object to the form.
5        MR. LANGLEY:
6           Answer it if you have an answer.
7  A  We -- we spoke with the attorneys involved.  I
8     don't know what you're referring to, I'm sorry.
9  Q  All the attorneys involved?
10       MR. LANGLEY:
11          I'll object to that question, but you
12       can go ahead and answer it if you have an
13       answer.
14 A  It's just hard to say.  I don't know how to --
15    we had to be in communication with the
16    attorneys.  That's --
17 Q  But you didn't distinguish between attorneys for
18    one side and attorneys for another?
19       MR. LANGLEY:
20          Object to the form of the question.
21       You talking about in all communications,
22       Counsel or particular communications?
23 Q  In general, did you distinguish between
24    attorneys for creditors and debtors?
25       MR. LANGLEY:

**EXHIBIT C**

**37**

```
1          I object to the form of the question.
2   That's too vague to be susceptible of a
3   coached answer.  Try it out.
4   MR. MARTIN:
5          If she can't understand what I'm asking
6   she can say that and ask me to repeat it.
7   MS. JONES:
8          He's entitled to state his form
9   objection on the record.  He's not
10  instructing her not to answer.
11  MR. MARTIN:
12         He's saying if it's too vague to
13  answer.  If she thinks --
14  MS. JONES:
15         That's his form objection.
16  MR. MARTIN:
17         If she thinks it's too vague, she can
18  tell me it's too vague.
19  MS. JONES:
20         He can still make an objection.
21  MR. LANGLEY:
22         All right.  Can we go off the record
23  for a second.
24  MR. MARTIN:
25         Sure.
```

**38**

```
1          MR. LANGLEY:
2          Let's go off the record for a second --
3   just for a second.
4          (OFF RECORD.)
5   COURT REPORTER:
6          Ms. Jones, do you want a copy?
7   MS. JONES:
8          No thank you.
9   COURT REPORTER:
10         Mr. Shelton, do you want a copy?
11  MR. SHELTON:
12         Yes.
13  MR. MARTIN:
14         I can restate it again if you'd like.
15  MR. LANGLEY:
16         Please do.
17  A   Can you re --
18  EXAMINATION BY MR. MARTIN, CONTINUING:
19  Q   Yes.  When dealing with seizures, did you
20      distinguish -- in general, did you distinguish
21      between counsel for the judgment creditor and
22      counsel for the judgment debtor?
23         MR. LANGLEY:
24         I object to the form of the question as
25      being too vague to be susceptible for cogent
```

**39**

```
1          answer.  If you have an answer, you may give
2          it to Counsel.
3   A   I don't -- I guess I'm not understanding the
4       distinguish.
5   Q   You just understood there to be lawyers?
6   A   Yes.
7   Q   Did you understand the distinction between
8       judgement creditors and judgment debtors?
9   A   Somewhat, yes.
10  Q   Could you explain how you distinguish those two?
11  A   I couldn't now.  I'm sorry.  Then it was fresh
12      on my mind, but now it's --
13  Q   Did you understand it to mean that one party had
14      property that was seized, another party was
15      seizing it?
16  A   Yes, sir.
17  Q   Okay.  And both parties would generally have
18      attorneys?
19  A   Yes, that's correct.
20  Q   And so when you say reach out to the attorneys,
21      you mean both sides?
22  A   Correct.
23  Q   So, you would generally reach out to both sides?
24         MR. LANGLEY:
25         Objection.
```

**40**

```
1   A   We would communicate.  I wouldn't say reach out.
2   Q   You'd communicate.  How would you distinguish
3       between communicating and reaching out?
4   A   If there were questions, I would ask my
5       supervisor, Jean, who would speak with Mr.
6       Sutherland and he would advise us on what we
7       would need to do as far as if we needed to ask a
8       question.
9   Q   Okay.  So, you would reach out or communicate --
10  A   Yes.
11  Q   -- with attorneys upon instructions from Mr.
12      Sutherland?
13  A   Yes, sir.
14  Q   Would you do it before speaking with Mr.
15      Sutherland in any case?
16  A   I guess I'm kind of a little confused.  If -- if
17      someone were to send in something and we needed
18      additional information or something of that
19      nature, we would inquire about it that way if
20      that's --
21  Q   Okay.  Inquire with the attorney or with Mr.
22      Sutherland?
23  A   With the attorney.
24  Q   Okay.  So, sometimes you would reach out to the
25      attorney without speaking to Mr. Sutherland?
```

EXHIBIT C

**41**

```
 1          MR. LANGLEY:
 2          Or Ms. Horne, don't forget that part.
 3      MR. MARTIN:
 4          Can we let her answer?
 5      MR. LANGLEY:
 6          Well, you're misstating her answer.
 7  She said --
 8      MR. MARTIN:
 9          She did not mention Ms. Horne.
10      MR. LANGLEY:
11          Yes, she did.
12      MS. JONES:
13          Yes, she did.
14      MR. MARTIN:
15          She mentioned Ms. Horne twenty minutes
16  ago.  I'm asking her --
17      MR. LANGLEY:
18          Okay.  Fine, Counsel.
19  MR. MARTIN, CONTINUING:
20  A   I'm trying to think -- for non -- for clerical
21      issues --
22  Q   Okay.
23  A   -- like a misspelling or if a phone number was
24      left off or things of that nature, not subject
25      matter.
```

**42**

```
 1  Q   When you say things of that nature, are you
 2      saying you would not go to Mr. Sutherland for
 3      that?
 4  A   If they left off a zip code, no, sir.  I
 5      wouldn't ask him about that.  I would --
 6  Q   I think I understand.
 7  A   -- because --
 8  Q   In those cases, you would just proceed directly
 9      to an attorney?
10  A   Just to ask for clarification on --
11  Q   Okay.  That makes sense.  Now, I know this is a
12      few years back.  June 12, 2018, do you know if
13      you knew who Mr. Curtis Shelton was at this
14      point?
15  A   No, sir.
16  Q   You know who Mr. Curtis Shelton is now?
17  A   No.  No, sir.  I've not heard --
18  Q   Okay.  Does the name ring a bell?
19  A   From this lawsuit, yes, sir.
20      MR. LANGLEY:
21          All right.  Let's take a short five-
22      minute.
23      MR. MARTIN:
24          Sure.
25          (OFF RECORD.)
```

**43**

```
 1  EXAMINATION BY MR. MARTIN, CONTINUING:
 2  Q   Okay.  We were looking at what I had marked as
 3      Exhibit #6, this note.  And I'm not going to
 4      belabor this point.  You said you don't remember
 5      if this is your note.  You don't remember if you
 6      knew who Curtis Shelton was at that time.  But
 7      let me ask you about this -- lied about --
 8      MS. JONES:
 9          I'm going to object to the form.  She
10      stated she did not know Curtis Shelton and
11      she does not know him now, not that she
12      didn't remember.
13      MR. MARTIN:
14          Okay.
15      MS. JONES:
16          Okay.
17      MR. MARTIN:
18          Okay.
19  Q   It says, "He said he may want us to seize the
20      note on that court date."  Did you have any
21      experience in -- experience seizing notes?
22  A   No.  No, sir.
23  Q   Do you remember if you knew on June 12, 2018
24      that note was involved in this file number?
25  A   No, sir.
```

**44**

```
 1  Q   Okay.  We'll move on to what I'm marking as
 2      Exhibit #7.  This is with the letterhead of
 3      Bossier Parish Sheriff's Office and it's signed
 4      by a Kimberly E. Flournoy.
 5  A   Yes.
 6  Q   This letter's dated July 5, 2018.  You did write
 7      this letter; correct?
 8  A   Correct.
 9  Q   It says, "Please be advised we have received the
10      Writ in the above referenced suit and have also
11      received the original promissory note.  In order
12      to proceed we require a Fifteen Hundred Dollar
13      ($1500.00) deposit.  Please forward this as soon
14      as possible to proceed" and it's written to Mr.
15      Curtis Shelton.  Did you know at this point what
16      the original promissory note was?
17  A   I guess I'm just getting confused.  If I knew
18      what it was or if --
19  Q   Uh-huh.
20  A   -- I knew --
21  Q   At this point did you know -- I'll back up and
22      re-state it.  On July 5, 2018 when you sent this
23      fax to Mr. Shelton, had you reviewed the
24      promissory note related to this case file?
25  A   I don't know.
```

**EXHIBIT C**

**45**

1 Q  Why would you have sent this letter to Mr.
2    Shelton?
3 A  In any -- in any suit as Pat Taylor trained me
4    we would have to have funds available to start
5    filing and if the funds were not there, we would
6    have to send out the standard letter.
7 Q  Who would that letter go to?
8 A  Whomever the attorney was for the -- I guess for
9    the Writ that was --
10 Q  So, it would go to an attorney.  How did you
11    decide which attorney it would go to?
12 A  It should -- the attorney on the Writ.
13 Q  And we'll go back to what I've marked as
14    Exhibit #5, the Writ.  On the bottom left it
15    says, "Attorney Curtis Hart Shelton."  Is that
16    identification why you would have gone?
17 A  Yes, sir.
18 Q  But you said earlier you don't remember if you
19    knew who Mr. Shelton was prior to June 12th.
20    MS. JONES:
21       Object to the form.
22    MR. LANGLEY:
23       Is there a question pending?
24 Q  You did not know prior to June 12, 2018 who Mr.
25    Shelton was?

**46**

1    MR. LANGLEY:
2       Objection, Counsel.  That's been asked
3    and answered at least twice.
4    MR. MARTIN:
5       Feel free to answer.
6 A  No.  I did not know.  Still do not know.  I'm
7    sorry.
8 Q  Okay.  But you would have sent this fax to Mr.
9    Shelton?
10 A  Yes, because his name is on the Writ.
11 Q  Okay.  You don't remember if you had
12    communications with him prior to this?
13 A  No, sir.
14 Q  Is this the first time you ever dealt with the
15    seizure of a promissory note?
16    MR. LANGLEY:
17       Objection, asked and answered.  You can
18    answer it one more time.
19 A  Yes, sir.
20 Q  When you said that we have received the original
21    promissory note, who is the "we" there?
22 A  It's a standard letter.
23 Q  Okay.
24 A  Civil Department or Sheriff's Office?
25 Q  Would you have access to the physical note at

**47**

1    this point?
2 A  Of July -- what point at --
3    Of July 5, 2018.
4 A  Would I have access to it?
5 Q  Was it at your desk, for instance?
6 A  No, sir.  No, sir.
7 Q  Who would have had it?
8 A  It was locked up.
9 Q  Where does it get locked up at?
10 A  I'm not sure.  That's something you'd have to
11    ask --
12    MR. LANGLEY:
13       If you're not sure, that's your answer.
14 Q  Was seized property often locked up in this
15    place?
16 A  No, sir.
17 Q  Where was seized property usually kept?
18 A  We didn't lock up seized property . This
19    promissory note was locked up.
20 Q  So, nothing else would have been locked up at
21    the same location?
22    MR. LANGLEY:
23       Objection to the form of the question.
24    You can answer if you have an answer.
25 A  No, sir.

**48**

1 Q  Nothing else would have been locked up?
2 A  I do not -- not that I would know of.
3 Q  How would you know it was locked up I suppose is
4    what I'm asking?
5 A  Upon receipt, consulting with Jean Horne and
6    James Sutherland, it was advised that we had to
7    have that locked up.
8 Q  But you didn't know where?
9 A  No, sir.  I was not in charge of that.
10 Q  And when you say locked up, it suggests to me
11    through some sort of safe?
12 A  I would think so, yes, sir.
13 Q  But this is a form letter and you kind of filled
14    it in?
15 A  Correct.
16 Q  To your knowledge from what you remember, is
17    this your first communication to Mr. Shelton?
18 A  I don't know.  I don't know who Mr. Shelton is
19    so I don't know if I've ever talked to him in my
20    life before.
21 Q  Other than this?
22 A  I --
23    MR. LANGLEY:
24       What is "this"?
25    MR. MARTIN:

**EXHIBIT C**

**49**

```
1              I'm sorry, good point.
2   Q   I was holding up Exhibit #7.  Other than this
3       communication to Mr. Shelton, you don't know if
4       you've communicated with Mr. Shelton?
5   A   Correct.  I don't know.
6           MR. LANGLEY:
7               I'm going to object to the form of the
8           question.
9   Q   Okay.  I'm going to hand you a document -- I
10      think we're at #8 -- Exhibit #8.  This is a
11      letter.  Do you recognize this document?
12  A   I don't remember seeing, but -- I don't
13      remember, but yes, this does have my name on it.
14  Q   Okay.  And this says, "Dear Kim, enclosed please
15      find our check in the amount of Fifteen Hundred
16      (1500.00) payable to the Order of the Bossier
17      Sheriff's Office."  This would seem to be a
18      response to your July 5th letter; is that
19      correct, asking for a deposit?
20          MR. LANGLEY:
21              Object to the form of the question.
22              You can answer if you know it.
23  A   I don't know.
24  Q   Who does it say it's from?
25  A   It says it's from Curtis R. Shelton.
```

**50**

```
1   Q   Okay.  But you do not recall receiving this
2       letter?
3   A   Correct.
4   Q   There's handwriting on this letter.  Do you know
5       if that's your handwriting?
6   A   No, sir, that's not mine.
7   Q   There's something scratched out.  The original
8       note is described as follows and there's a wavy
9       line through it.  Do you remember if you
10      scratched that out?
11  A   No, sir.
12  Q   On the second page it says, "The promissory note
13      is movable property, therefore it is only
14      necessary for it to be advertised once for
15      sale."  We talked earlier about the
16      movable/immovable distinction.  Did attorneys
17      often tell you whether a piece of property was
18      movable or immovable?
19  A   No.
20  Q   How would you usually then make that
21      determination?
22  A   It should state it on the -- wherever the
23      Writ -- the description on the Writ.
24  Q   Do you recall if the Writ in this case had an
25      identification?
```

**51**

```
1   A   No, sir.
2   Q   Okay.  So, an attorney telling you that it is
3       movable property would be abnormal to you?
4           MS. JONES:
5               Object to the form.
6           MR. LANGLEY:
7               Object to the form of the question.
8   A   I would say no.
9   Q   It's not abnormal, but you said a minute ago
10      that they did not usually do that.
11  A   Occasionally we get things from people that have
12      a lot of information that I don't need or do
13      need.  I don't ask them for that.
14  Q   The following sentence says, "Therefore it is
15      only necessary for it to be advertised once for
16      sale."  Would attorneys often tell you how many
17      times something needed to be advertised?
18          MS. JONES:
19              Object to the form.
20  A   I would say no.
21  Q   That would be unusual?
22          MS. JONES:
23              Object to the form.
24  A   I'm sorry, I guess I'm -- could you repeat that?
25  Q   Sure.  Did attorneys usually tell you how many
```

**52**

```
1       times something needed to be advertised?
2   A   No.
3   Q   So, it was unusual to receive an instruction?
4           MR. LANGLEY:
5               Object to the form of the question.
6               You can answer it if you have an answer.
7   A   I wouldn't say anything was unusual.
8   Q   So, it did not usually happen, but you would not
9       characterize it as unusual?
10          MR. LANGLEY:
11              Object to the form of the question.
12  Q   I'm not trying to play gotcha here.  I just want
13      to understand your distinction between that
14      doesn't usually happen and it's not unusual.
15  A   I wouldn't rule out anything as unusual because
16      occasionally you get letters that may have
17      incorrect information or may have extra
18      information that you didn't ask for, so it's not
19      a --
20  Q   Do you recall if you asked for this information?
21  A   No, sir.
22  Q   In most cases were you're dealing with a sale,
23      did you receive instructions from an attorney?
24          MR. LANGLEY:
25              Object to the form of the question.
```

**EXHIBIT C**

**53**

1          You can answer it if you have an answer.
2   A   We receive a lot of things.  I don't know if you
3       could call them instructions.  I'd say no.
4   Q   Okay.  Do you recall whether you went to Jean
5       Horne about the issue of whether this was
6       immovable property or not?
7   A   No.
8   Q   No, you do not recall?
9   A   No, I do not.  Correct.
10  Q   Do you recall if you went to Mr. Sutherland
11      about the issue of whether this was movable
12      property?
13  A   About specifically movable?  No, sir.  I do not
14      recall.
15  Q   Do you recall asking anyone else about whether
16      it was necessary for it to be advertised once
17      for sale?
18  A   No, sir.
19  Q   Do you recall if after this when you did
20      advertise it for sale if you relied solely on
21      this statement?
22  A   No, sir.  I did not rely on this, no, sir.
23  Q   In determining how many times you'd advertise
24      the property, what would you have relied on
25      other than this?

**54**

1   A   I would have checked with Jean Horne who --
2   Q   Okay.
3   A   -- would have had to check with Mr. Sutherland.
4   Q   But you do not recall in this case whether that
5       happened?
6   A   I do not recall that specifically, no.
7   Q   Okay.  This letter was in September of 2018.
8       That's a few months after previous document I
9       showed you from July.  Do you know if anything
10      was going on -- let me go back.  Between July 5,
11      2018 and September 5, 2018, do you recall if you
12      took any action regarding this case?
13  A   No, sir.  I do not recall.
14  Q   If you had taken any action, do you think you'd
15      have documents showing what you did?
16  A   Yes, sir.
17  Q   What kind of documents would you have?
18          MR. LANGLEY:
19              Object to the form of the question.
20          You can answer it if you have an answer.
21  A   Anything we have -- letters or e-mails -- would
22      be in the file.
23  Q   So, it would consist of letters or e-mails if
24      you took any actions?
25  A   Correct.

**55**

1   Q   Okay.  I'm going to go to -- I'm going to mark
2       this as #9 -- Exhibit #9.
3          MS. JONES:
4              Is that the September 6th letter?
5          MR. MARTIN:
6              Yes.
7          MS. JONES:
8              Okay.
9   Q   Is this a letter from you to the Civil
10      Department of the sheriff's office?
11  A   Yes.
12          MR. LANGLEY:
13              I object to the form of the question.
14  Q   You've said yes, this is a letter from you?
15  A   This is a copy of the letter.
16  Q   Okay.
17  A   Yes.
18  Q   And it says, "Dear Clerk".  Do you remember who
19      the clerk was at that time?
20  A   No, sir.
21  Q   Okay.
22  A   We didn't deal with anyone specific.
23          MR. LANGLEY:
24              I'm sorry, what did you say?
25          WITNESS:

**56**

1              I'm sorry.  I said we didn't deal with
2          anyone specific.
3   Q   So, when you said dear clerk it's just sort of
4       the whole department?
5   A   (Witness nods head.)
6   Q   Okay.  I'm sorry, this is to the Caddo Parish
7       Sheriff's Office.
8          MR. LANGLEY:
9              Thank you, Counsel.
10  Q   You do not remember who the Caddo clerk was at
11      that time?  This was just to the office.  And it
12      says, "In order to expedite the date of sale per
13      the attorney, please mail the returns in a self-
14      addressed stamped envelope as soon as possible."
15      What is this letter about?
16  A   I don't --
17          MS. JONES:
18              I'm going to object to the form.  The
19          document speaks for itself, but she can
20          answer.
21  A   I do not know.  It --
22  Q   Why would you send a letter to Caddo Sheriff's
23      Office?
24  A   Anytime you sent anything for service you would
25      need to send a cover letter.

**EXHIBIT C**

**57**

1  Q  So, do you think this is a cover letter?
2  A  I don't know that.
3  Q  It says, "Ray, service for Barbara Marie Carey
4     Carr Lollar".  Do you remember if this is about
5     serving Ms. Lollar with a document?
6  A  I don't remember.  I'm sorry.
7  Q  Okay.  It says, "In order to expedite the date
8     of sale per the attorney, please mail the
9     returns".  Do you recall why you said in order
10    to expedite the date of sale per the attorney?
11 A  No, sir.
12 Q  Did you often at this time ask for expedited
13    sales?
14       MS. JONES:
15          Object to the form of the question.
16       MR. LANGLEY:
17          Join the objection.
18 A  No, sir.
19 Q  You did not often do that?
20       MS. JONES:
21          Same objection.
22       MR. LANGLEY:
23          Same objection.
24 Q  Just --
25 A  It's just time sensitive material that you deal

**58**

1     with.
2  Q  And what made a certain material time sensitive?
3  A  Things would have to be served before you could
4     advertise.  It was kind of a schedule you would
5     follow I guess according to the Louisiana law.
6     I'm not --
7  Q  Okay.
8  A  -- sure how things had to be advertised and so
9     forth.
10 Q  Was your understanding that some things were
11    more time sensitive than others under the law?
12       MR. LANGLEY:
13          I object to the form of the question.
14          You can answer it if you have an answer.
15 A  I don't know how to -- I don't --
16 Q  Because it says per the attorney.  You don't
17    think that's a request to expedite it from an
18    attorney?
19       MS. JONES:
20          Object to the form.
21 A  I can't say.  I don't -- I don't know why it's
22    in there.
23 Q  Do you recall any other instances where you did
24    expedite a sale upon an attorney's request?
25 A  No.  We never expedited sales.

**59**

1  Q  This would be unusual, though?
2       MS. JONES:
3          I'm going to object to the form.
4  A  I don't know why that wording is in there.  I
5     just know that things were time sensitive and we
6     had to do it according to the law.  I can't
7     attest to why those words are there.
8  Q  Do you distinguish between the law and an
9     attorney's request?
10       MR. LANGLEY:
11          I object to the form of the question.
12          Answer it if you can.
13 A  I don't understand it.  I'm sorry.
14 Q  I'll give you an example.  You're driving down
15    the road.  It says speed limit fifty-five.  You
16    might say that's the law telling you don't drive
17    over fifty-five.  If my mother-in-law's in the
18    car she's going to tell you not to drive over
19    forty-five.  That's a request from someone.
20    Okay?
21 A  Uh-huh.
22 Q  In one case if I'm obeying the speed limit, I'm
23    not going over that speed because the law tells
24    me not to.  In another case I'm not doing it
25    because someone told me not to.

**60**

1  A  Correct.
2  Q  Do you make that distinction when you're -- or
3     did you make that sort of distinction when you
4     were doing the scheduling of sales?
5       MR. LANGLEY:
6          Same objection.
7  A  No.
8       MR. LANGLEY:
9          Answer it if you can.
10 A  No, sir.  We went by the law.  Sorry.
11 Q  You went by the law and you don't know why the
12    wording per the attorney is in there?
13 A  No, sir.  I don't know why.
14 Q  You did not do favors for attorneys?
15 A  No, sir.
16 Q  You don't recall them if there was a request
17    from an attorney to expedite?
18 A  No, sir.  I do not.
19 Q  Do you know what you would have done if an
20    attorney had asked you to expedite the sale
21    form?
22       MR. LANGLEY:
23          I object to the form of the question.
24          I'll caution the witness not to speculate.
25          If you -- she can tell you what she --

EXHIBIT C

**61**

1  MR. MARTIN:
2      I --
3  MR. LANGLEY:
4      She can tell you what she did and
5  you've already asked her if she did favors
6  and she's answered that question.
7  MR. MARTIN:
8      I don't think you can caution the
9  witness on how to answer unless you're
10  telling her not to answer privileged.
11  MR. LANGLEY:
12      Don't answer.
13  MR. MARTIN:
14      Are you invoking privilege?
15  MR. LANGLEY:
16      I think it's an improper question. I
17  think you can -- this is a fact deposition.
18  You can ask her what she knows.
19  MR. LANGLEY:
20      Sure, and you can object in two ways,
21  on privilege or a form objection.
22  MR. LANGLEY:
23      Thank you, Counsel. I appreciate the
24  instruction.
25  MS. JONES:

**62**

1      He doesn't instruct on the basis of
2  harassment or protection under Rule 26b.
3  MR. LANGLEY:
4      So --
5  MR. MARTIN:
6      If that's what you're doing, please
7  state it on the record. I'd like to know.
8  MR. LANGLEY:
9      I'm instructing her not to answer the
10  question. I think this equine is deceased.
11  MR. MARTIN:
12      I don't think it is.
13  MR. LANGLEY:
14      Okay. Then proceed at your peril.
15  MR. MARTIN:
16      Okay.
17  MR. MARTIN, CONTINUING:
18  Q    You went by what the said?
19  A    Correct.
20  Q    Not by what attorneys said. And so if an
21  attorney had asked you to do something, what
22  would you have done?
23  A    Nothing.
24  Q    Okay. I'm going to hand you what I'm labeling
25  Exhibit #10, okay? Is this an e-mail from you

**63**

1  to curtisshelton@arklatexlaw.com?
2  A    Correct.
3  Q    Do you remember sending this e-mail?
4  A    No, sir.
5  Q    Okay. It says it's September 6, 2018. Would
6  that be the same as this letter to the clerk's
7  offices marked as Exhibit #9?
8  A    Yes, sir. They say the same date.
9  Q    Okay. Says, "Mr. Shelton, please review the
10  attached language and verbiage for the
11  description of the above-referenced suit and
12  make any necessary changes." Who would you send
13  such a request to generally?
14  A    I'm not sure.
15  Q    You can turn to the next page if you want.
16  A    (Witness complies.) Oh. This looks like the
17  martyr, the verbiage and the Writ that was sent
18  to whomever the attorney was that filed the
19  Writ.
20  Q    Okay. Based on that, do you think that was Mr.
21  Shelton?
22  A    Yes. If he's the attorney on the Writ, yes,
23  sir.
24  Q    Near the end of the body of the e-mail itself on
25  the first page, "Once I receive the returns from

**64**

1  Caddo Parish I will contact you immediately to
2  send you an ad approval. Once approved we will
3  set for sale as I understand this a time-
4  sensitive matter." Now, when we discussed
5  Exhibit #9 you said that expedited sales were
6  when there was time-sensitive materials. Does
7  looking at this e-mail jog your memory about why
8  this may have been a time-sensitive matter?
9  A    No, sir. Everything was treated as time
10  sensitive.
11  Q    Okay. So, if you only expedited sales when
12  things were time sensitive and everything was
13  time sensitive, were all sales expedited?
14  A    I'd say in a timely manner.
15  Q    Okay. To you is there a difference between
16  expedited and timely?
17  A    I would say no, not at -- not for me, no.
18  Q    Okay. So, if there's no difference then every
19  sale that's timely is an expedited sale?
20  A    Everything's time sensitive, so we --
21  Q    Okay.
22  A    -- everything had to go through process.
23  Q    Yeah, and I'm not trying to trap you. I'm just
24  trying to get you to be able to make a clear
25  record. It says earlier in the e-mail, "Once I

**65**

1   receive your approval, I will be sending a
2   notice of seizure and notice to appoint
3   appraiser to Barbara Marie Carey Carter Lollar."
4   Am I to understand that your approval means your
5   approval for the verbiage?
6   A   I don't recall.  I can't answer.
7   Q   Okay.
8   A   I'm sorry.
9   Q   Now, if I've asked you this already you can tell
10      me, but I believe you said earlier you were not
11      aware of the underlying litigation that led to
12      the judgment culminating in the Writ, Lucky V.
13      Carr, Case #127573?
14          MR. LANGLEY:
15             Objection to the form of the question.
16      That wasn't exactly what you asked her, but
17      --
18          MR. MARTIN:
19             Sure.
20  A   Are you asking if I know how this suit
21      originated, I guess?
22  Q   Sure.  Did you know anything about that suit?
23  A   No, sir.
24  Q   No?
25  A   No.

**66**

1   Q   Do you know anything about the suit now?
2   A   No.
3   Q   Okay.  You knew there was a case number?
4   A   Correct.
5   Q   1-2-7-5-7-3.
6   A   Yes.
7   Q   And that was directed to you because it ended in
8       an odd number?
9   A   Correct.
10  Q   But you never looked into what the suit was
11      about?
12  A   I guess -- within the scope of our job.
13          MR. LANGLEY:
14             It's a yes-or-no question.
15  A   No.
16  Q   You're allowed to say as much as you want.
17      Within the scope of your job you were starting
18      to say -- within the scope of your job, did you
19      have to know something about the suit?
20  A   I guess I'm just confused what --
21  Q   Sure.
22  A   If -- I don't know like what led up to it or
23      what -- I'm not --
24  Q   Do you know who Lucky is in Lucky V. Carr?
25  A   No.

**67**

1   Q   Do you know who Carr is in Lucky V. Carr?
2   A   No.  I know none of them, I'm sorry.
3   Q   Then it goes without saying you never looked at
4       any of the pleadings in that suit -- the
5       petition, for instance?
6   A   I would say no.
7   Q   Okay.  If there was a judgment in that suit,
8       what would it say to you?
9           MR. LANGLEY:
10             Object --
11  A   I don't know.
12          MR. LANGLEY:
13             -- to the form of the question.
14  A   I don't know how to answer that.  I'm sorry.  I
15      don't --
16  Q   Okay.
17  A   -- understand, I guess.
18  Q   When there was a judgment in a suit, did you
19      take it to mean the suit was over?
20  A   I just don't know how to answer that because
21      it's -- there were sales and not sales and I
22      don't know the judgments -- I'm sorry, I don't -
23      -
24  Q   Okay.  Goes without saying then that you did not
25      know this Lucky V. Carr suit was on appeal in

**68**

1       September of 2018?
2   A   (Witness shakes head.)
3   Q   Okay.  Do you know what a civil appeal is?
4   A   I'd say no.
5   Q   Have you ever been involved in civil litigation?
6   A   No, uh-uh.
7   Q   Okay.  I'm going to hand you what I'm marking as
8       Exhibit #11.  Do you remember getting this e-
9       mail?
10  A   No, sir.
11  Q   Looks like it's an e-mail from
12      curtisshelton@arklatexlaw.com to you regarding
13      suite 127573 and it says, "Dear Kimberly, I have
14      reviewed this and it looks great to me.
15      Thanks."  This looks to be a response to your e-
16      mail from September 6th that we just discussed
17      at Exhibit #10; does it not?
18  A   Yes.
19  Q   Okay.  I'm going to hand you what I'm calling
20      Exhibit #11.
21          MR. LANGLEY:
22             That last was #11, I think.
23          MR. MARTIN:
24             Oh.
25          COURT REPORTER:

**EXHIBIT C**

**69**

1        It's #12.
2    Q   Exhibit #12.
3        MR. LANGLEY:
4            You want to re-mark that, Counsel, to
5        your exhibit?
6        MR. MARTIN:
7            My apologies.
8    Q   Do you recognize this one?
9    A   I recognize it's a Notice of Seizure.
10   Q   Okay.  Is that your signature at the bottom?
11   A   Yes.
12   Q   Did you often sign these notices of seizure?
13   A   Yes, sir.
14   Q   Okay.  And what was the role of a Notice of
15       Seizure in your understanding?
16   A   This was notice I guess as it states.  It was a
17       Notice of Seizure being sent to the parties
18       involved.
19   Q   Which party does it look like this one is to?
20   A   This one is to Barbara Lollar, to her attorney,
21       Jay Davis Powell.
22   Q   Okay.  And you say it's a Notice of Seizure.  It
23       tells someone that a piece of property has been
24       seized?
25   A   Correct.

**70**

1    Q   At the bottom it says, "This matter is
2        tentatively scheduled for sheriff's sale on the
3        first Wednesday, 14 days from the date of the
4        Notice of Seizure.  However, you should contact
5        the sheriff's office at 318-965-3404 for the
6        actual sale date and any rescheduling."  Was
7        this form language?
8    A   Yes, correct.
9    Q   Who handled the scheduling of the sheriff's sale
10       in the office?
11   A   I believe that was set by log which days that
12       they -- every Wednesday.
13   Q   Okay.
14   A   Excluding holidays.
15   Q   I've never been very good at math.  This date is
16       September 6, 2018, fourteen days from the date
17       of the Notice of the Seizure would be September
18       20, 2018?  So, that would generally be the date
19       or the first Wednesday after that date?
20   A   That actually though does not include
21       advertising and such.  That's just formal
22       wording because I believe by law you would have
23       to have the seizure served, then you would have
24       to have the advertising --
25   Q   Okay.

**71**

1    A   -- so all that's dependent upon --
2    Q   So, the actual date would generally not be
3        what's listed in that form language because of
4        the aforementioned advertisements?
5    A   Correct.
6    Q   Yeah.  So, who would provide the notice of the
7        actual sales date?
8    A   Once everything was completed there was --
9        according to whichever Wednesday, if it was a
10       movable or non-movable, once everything was
11       completed there was just date -- look on the
12       calendar for which available Wednesday --
13   Q   Who would look on the calendar?
14   A   Whomever's suit or file it was.
15   Q   Would that be you in this case?
16   A   Yes.
17   Q   Okay.  So, would you then tell everyone the
18       actual date after that point?
19   A   I believe that's how you would select the
20       advertising dates and then the advertisement
21       itself, it would have the actual date of the
22       sale, so depending on whenever it was
23       advertised --
24   Q   Okay.
25   A   -- is when the date would correspond with that.

**72**

1    Q   And would you be the person who calculates that
2        date for the purposes of the advertisement?
3        Would you have to put that in when you request
4        the advertisement?
5    A   The date of sale?  Yes, correct.
6    Q   Who would you go to for the advertisement?  Does
7        it have to be a newspaper?
8    A   Bossier Press-Tribune, perhaps?  I can't --
9    Q   Okay.
10   A   -- remember the exact --
11   Q   But that was a newspaper?
12   A   I believe that was --
13   Q   Okay.  You did that because Ms. Pat Taylor
14       trained you to contact the Bossier Newspaper?
15   A   Yes, sir.
16   Q   Okay.  Exhibit #13 I'm handing you.  Exhibit #13
17       -- is this an e-mail from you to Mr.
18       curtisshelton@arklatexlaw.com?
19   A   Correct.
20   Q   The second page of it says, "Mr. Shelton, please
21       see attached advertisement notice for your
22       review.  After reviewing if all information is
23       correct please sign below and return to my
24       attention."  Was this a form you'd often send
25       out?

**EXHIBIT C**

**73**

| 1 | A | I just -- I can't remember if this was -- |
| 2 | | honestly I cannot remember. |
| 3 | Q | Okay.  Would you send advertisements out for |
| 4 | | approval? |
| 5 | A | Yes, correct. |
| 6 | Q | To whom? |
| 7 | A | I don't know what -- I don't know how to -- I |
| 8 | | can't -- okay.  It's whoever was on the Writ, |
| 9 | | I'm sorry -- |
| 10 | Q | Okay. |
| 11 | A | -- is what -- |
| 12 | Q | Yeah, that's fine. |
| 13 | A | -- that's for. |
| 14 | Q | And you've previously at this point had e-mail |
| 15 | | exchanges with Mr. Shelton as we've discussed; |
| 16 | | correct? |
| 17 | A | Correct. |
| 18 | Q | And this is September 14, 2018; correct? |
| 19 | A | (Witness nods head.) |
| 20 | Q | Okay.  I'm going to hand you Exhibit #14.  Is |
| 21 | | this another e-mail exchange between you and Mr. |
| 22 | | Shelton related to the advertisement form? |
| 23 | A | Yes. |
| 24 | Q | The second page appears to have a signature from |
| 25 | | an attorney for plaintiff on it? |

**74**

| 1 | A | Yes. |
| 2 | Q | Did you understand it at that time to be Mr. |
| 3 | | Curtis Shelton's signature? |
| 4 | A | Yes. |
| 5 | Q | Okay.  I'm going to hand you #15.  This looks |
| 6 | | like the ad in question? |
| 7 | A | Correct. |
| 8 | Q | And an invoice from the Bossier Press-Tribune. |
| 9 | | Do you recall looking at this advertisement? |
| 10 | A | I don't recall doing it, but my signature is on |
| 11 | | it, so -- |
| 12 | Q | That's your handwriting right there? |
| 13 | A | Yes. |
| 14 | Q | Okay.  And would the Bossier Press-Tribune |
| 15 | | typically send you invoices?  Do you remember? |
| 16 | A | They were sent to the sheriff's office. |
| 17 | Q | Okay.  You don't know if you received this |
| 18 | | particular one? |
| 19 | A | No, sir.  I didn't check the mail. |
| 20 | Q | Okay.  So, that was September 14th. |
| 21 | | | MR. LANGLEY: |
| 22 | | | What was September 14th? |
| 23 | | | MR. MARTIN: |
| 24 | | | Exhibit #15, and the invoice -- I'm |
| 25 | | wrong. |

**75**

| 1 | | MR. LANGLEY: |
| 2 | | | Okay. |
| 3 | | | MR. MARTIN: |
| 4 | | | It's my fault.  Go back. |
| 5 | Q | The e-mail exchange between you and Mr. Shelton |
| 6 | | I have marked Exhibit #15 is September 14, 2018? |
| 7 | A | That's correct. |
| 8 | Q | Okay.  Based on what you've seen today, is it |
| 9 | | correct to say you've -- you were on this file |
| 10 | | from July 5, 2018 to September 14, 2018?  That |
| 11 | | was just your file at that point? |
| 12 | A | I wouldn't restrict it to just my file. |
| 13 | Q | Okay.  But it was partially your file? |
| 14 | A | Correct. |
| 15 | Q | Okay.  Do you recall if prior to September 14th |
| 16 | | you had gone to anybody else for advice about |
| 17 | | this file? |
| 18 | A | Other than my supervisor or James Sutherland or |
| 19 | | -- |
| 20 | Q | Anybody at all.  I don't know if you've said |
| 21 | | before whether you have specific recollection of |
| 22 | | going to Jean Horne or Pat Taylor or Mr. |
| 23 | | Sutherland prior to September 14th.  Do you have |
| 24 | | any specific recollection? |
| 25 | A | I don't have a specific date recollection, but |

**76**

| 1 | | those are the people I would have consulted with |
| 2 | | during the entire -- |
| 3 | Q | Okay. |
| 4 | A | -- suit itself. |
| 5 | Q | And you said earlier when were discussing |
| 6 | | generally appraisers that you thought if two |
| 7 | | appraisals were more than ten percent (10%) |
| 8 | | apart you needed a third appraiser.  Do you |
| 9 | | recall by mid September of this year, 2018, that |
| 10 | | there was anything that made a third appraisal |
| 11 | | likely in this case? |
| 12 | A | By what date, I'm sorry? |
| 13 | Q | September 14, 2018. |
| 14 | A | I do not because I couldn't tell you when the |
| 15 | | appraisals came in. |
| 16 | Q | Yeah, okay.  Would that generally be an award |
| 17 | | for you then was when the appraisals came in? |
| 18 | | | MR. LANGLEY: |
| 19 | | | Object to the form of the question, but |
| 20 | | you can answer it. |
| 21 | A | I'm sorry, could you rephrase that?  I didn't -- |
| 22 | A | Sure. |
| 23 | A | Okay. |
| 24 | Q | What would key you off generally that third |
| 25 | | appraiser was necessary? |

**EXHIBIT C**

**77**

```
1              MR. LANGLEY:
2                  Objection.  That's been asked and
3          answered.
4     A    If there was more than a ten percent (10%)
5          difference?
6     Q    Okay.
7     A    Is that --
8     Q    So, before -- yeah.
9     A    Okay.
10    Q    If that's your answer.
11    A    Yeah.
12    Q    There would be nothing before getting the
13         appraisal --
14    A    No, sir.  No, sir.  I'm sorry, I didn't --
15    Q    Yeah.  Nothing before getting the actual
16         appraisals that would make you think --
17    A    Correct.  Correct.  Correct.  I'm sorry.
18    Q    Yeah, because you don't actually do the
19         appraisal?
20    A    Correct.
21    Q    You don't know how much a piece of property's
22         going to be appraised for?
23    A    Correct.
24    Q    Okay.  I'm going to hand you Exhibit #16.  Does
25         this look like another e-mail exchange between
```

**78**

```
1          you and Mr. Shelton?
2     A    Yes.
3     Q    Okay.  And this is dated Monday, September 17,
4          2018; is that correct?
5     A    Correct.
6     Q    Says, "Mr. Shelton, it is my understanding the
7          above-referenced suit is with appraisal in the
8          event we have two appraisals that vary greatly
9          and we have to get a third appraisal, do you
10         have any recommendations as to whom appraises
11         these types of notes?  If possible, could you
12         give the names of at least two so we're not down
13         to the wire trying to find one last minute.
14         Thanks, Kim."  Do you remember sending this e-
15         mail?
16    A    I don't remember sending it.
17    Q    Okay.  Do you remember why you would have asked
18         for a recommendation?
19    A    This would be after consulting with James
20         Sutherland.  He would have advised.
21    Q    Why would you have consulted with Mr. Sutherland
22         in the first place?
23    A    This was a sale of promissory note and this was
24         the first promissory so we would pretty much
25         check with everything with him on that.
```

**79**

```
1     Q    So, when you went to Mr. Sutherland it was for
2          every aspect of this procedure?
3              MR. LANGLEY:
4                  Objection.
5     A    Not every aspect, just any question we might
6          have.
7     Q    So, a question you might have is whether a third
8          appraiser might be necessary?
9     A    I'm not sure I would have asked him that.  I'm
10         not --
11    Q    Then you went to Mr. Sutherland before September
12         17, 2018?
13    A    Correct.
14    Q    But you don't know the exact date you went to
15         Mr. Sutherland?
16    A    No, sir.
17    Q    I'm going to hand you what I'm labeling Exhibit
18         #17.  Do you recall this document?  It should be
19         near the back of the lawyer's packages that fell
20         on the floor.
21    A    Yes, I do.
22    Q    Do you recall this one?
23    A    Yes.
24    Q    Is that your signature on page four?
25    A    Yes, sir.
```

**80**

```
1     Q    On page two, paragraph seven you say, "I was
2          instructed that if there was a great discrepancy
3          between the two appraisals the sheriff would be
4          required to appoint a third appraiser and obtain
5          a third appraisal in time for the sheriff's
6          sale, which would only be five days later."  Did
7          you swear to the truthfulness of that statement,
8          that you were instructed?
9     A    Is that --
10    Q    Yeah.
11    A    -- that's the --
12    Q    Yeah.
13    A    Yes, sir.  Yeah.
14    Q    You swore --
15    A    I'm sorry.
16    Q    -- in front of the notary that that's the truth?
17    A    Yes, sir.
18    Q    When you say I was instructed that if there was
19         a great discrepancy, who did the instructing?
20    A    Mr. Sutherland.
21    Q    Because in paragraph eight it says, "I then
22         consulted with my supervisor, Jean Horne, and we
23         both consulted with legal counsel for the
24         sheriff regarding sheriff's sales, James
25         Sutherland."
```

**EXHIBIT C**

**81**

1  A    Uh-huh.
2  Q    So, it looks like you're saying you went to
3       Sutherland after you were instructed that if
4       there was a great discrepancy.
5  A    No.  Consulting with my supervisor, Jean Horne,
6       about any questions, then we would decide -- or
7       not decide, but discuss whenever Mr. Sutherland
8       came in we would ask him about that.
9  Q    So when you say I was instructed, was that by
10      Ms. Horne?
11 A    By Mr. Sutherland.
12 Q    By Mr. Sutherland.
13 A    He was the -- I guess the Civil because I don't
14      know anything about civil law.
15 Q    Yeah.  So you were instructed if there's a great
16      discrepancy, so then you consulted with Jean
17      Horne and then y'all went to -- back to
18      Sutherland if I'm reading seven and eight right?
19 A    Okay.  (Witness examines documents.)  Okay.
20      Could you repeat that?
21 Q    Yeah.
22 A    Okay.
23 Q    You said -- just now you said -- when I asked
24      who instructed you in paragraph seven you said
25      it was Mr. Sutherland.

**82**

1  A    Yes, sir.
2  Q    So, the order would be Mr. Sutherland has
3       instructed you that the sheriff would be
4       required to appoint a third appraiser if there's
5       discrepancy --
6  A    Correct.
7  Q    -- for this sheriff's sale, which would only be
8       five days after the -- so, Mr. Sutherland
9       instructs you and then you go to Jean Horne and
10      then you both consulted with Mr. Sutherland?
11 A    Regarding sheriff sales, yes.
12 Q    So, the order is you talked to Sutherland, then
13      you talked to Horne and then y'all both talked
14      to Sutherland?
15 A    I guess that's -- I'm not -- I'm not necessarily
16      understanding because throughout the suit myself
17      and Jean Horne would consult with Mr.
18      Sutherland, so that specific -- are you asking
19      if --
20 Q    Yeah.  "I was instructed if there was a great
21      discrepancy" --
22 A    By Mr. Sutherland.
23 Q    Yes.
24 A    Yes, sir.
25 Q    And so then chronologically next and -- it says,

**83**

1       "I then consulted with Jean Horne."
2            MR. LANGLEY:
3                 Object to the form of the question,
4            Counsel.  You left out a critical word in
5            your question.  "I was instructed that if
6            there was a great discrepancy."
7  Q    So, when you said, "I was instructed that if
8       there was a great discrepancy", that instruction
9       that you're referencing was by Mr. Sutherland?
10 A    Yes.
11 Q    Okay.  So, that's paragraph seven.  And got to
12      paragraph eight.  When you say, "I then
13      consulted", so after that instruction you then
14      consulted with Jean Horne?
15 A    Yes.
16 Q    Okay.  And then you both consulted with Mr.
17      Sutherland?
18 A    Yes.
19 Q    Okay.  Just want to make sure I got the timeline
20      right.  So, you went to Mr. Sutherland by
21      yourself before you went with Ms. Horne?
22 A    No.
23           MR. LANGLEY:
24                Objection, Counsel.  That's --
25 Q    No?

**84**

1            MR. LANGLEY:
2                 -- not her testimony.
3            MR. MARTIN:
4                 Okay.
5  Q    So, you both -- are you saying that you both
6       went to Mr. Sutherland --
7            MR. LANGLEY:
8                 Objection, Counsel.  You don't
9            understand.  It's not her testimony.  I
10           object to form --
11           MR. MARTIN:
12                That's why I'm asking --
13           MR. LANGLEY:
14                -- of the --
15           MR. MARTIN:
16                -- for clarification.
17           MR. LANGLEY:
18                It's clear, but I object to the form of
19           the question.
20 MR. MARTIN:
21 Q    So, paragraph eight begins, "I then consulted".
22      Does the then there note that it's after
23      something else?
24 A    I'm not -- that's not clear.  I'm not sure.
25 Q    Okay.  Paragraph nine, "James Sutherland advised

EXHIBIT C

**85**

1    that he would look into the matter and see if
2    you could recommend the appropriate appraiser to
3    appraise the subject promissory note should the
4    sheriff be required to appoint a third
5    appraiser."  Paragraph ten, "Shortly after James
6    Sutherland contacted me and advised that after
7    looking into the matter he was unable to locate
8    the appropriate appraiser to contact."
9    Paragraph eleven, "James Sutherland mentioned
10   that I could contact Curtis Shelton, who he said
11   he knew to be an experienced business attorney
12   and asked him to provide recommendations."
13   Okay.  This was your testimony in this
14   affidavit; correct?
15 A That's correct.
16 Q Okay.  All that occurred prior to September 17;
17   correct?
18 A I don't know how to verify the timing.
19 Q Okay.  Because you told me earlier that you did
20   not reach out to Mr. Shelton asking for this
21   recommendation until you spoke to Mr.
22   Sutherland.
23 A I guess could you rephrase -- are you asking if
24   I spoke to Mr. Shelton about --
25 Q I'm saying your conversations with Mr.

**86**

1    Sutherland, which resulted him saying I could
2    contact Curtis Shelton who he said he knew to be
3    an experienced business attorney.
4  A Uh-huh.
5  Q When James Sutherland mentions that --
6  A Yes.
7  Q -- that had to be before September 17; right?
8    Because your request for the recommendation in
9    this e-mail that you verified is yours is
10   September 17th.
11       MR. LANGLEY:
12           Object to the form of the question.
13       You can answer him if you know.
14 A I don't know how to answer that.  I --
15 Q This may be a simpler way to do it.  Would you
16   have asked for a recommendation for a third
17   appraiser from Mr. Shelton prior to Mr.
18   Sutherland telling you to?
19 A No.
20 Q So, that had to be before September 17th?
21       MR. LANGLEY:
22           Object to the form of the question.
23       You can answer him if you know.
24 A I don't know how to answer -- I mean, date,
25   time.  I can't verify date.  I don't --

**87**

1  Q Can you verify that this e-mail says September
2    17, 2018?
3  A Yes.  I can verify --
4  Q Okay.
5  A -- that's what that e-mail reads, yes.
6  Q So, if that e-mail date is correct, then Mr.
7    Sutherland saying to contact Mr. Shelton had to
8    be before that day?
9        MR. LANGLEY:
10           Object to the form of the question.
11       It's been asked and answered three times.
12       The witness doesn't know.
13 A I just have no way to verify dates.  I'm sorry.
14 Q Okay.
15 A I don't --
16 Q Okay.  But you did say you wouldn't have got it
17   -- you wouldn't have asked Mr. Shelton for
18   recommendation?
19 A Prior to --
20 Q Prior to Mr. Sutherland telling you to?
21 A Correct.
22 Q Okay.  Do you remember going to Mr. Shelton?  I
23   mean, I'm sorry, do you remember going to Mr.
24   Sutherland about this situation?
25 A I do remember consulting with him.

**88**

1  Q Okay.  Did you tell him that Mr. Shelton was
2    already involved in the case?
3  A I don't know -- I would say no.  I don't --
4  Q Okay.
5  A He would have the Writ, so I don't know --
6  Q He would have the Writ --
7  A I mean, if --
8  Q -- at that point?  Would you have brought Mr.
9    Sutherland the Writ?
10 A He would have seen the Writ.  I don't know if I
11   would have brought it to him, but he would have
12   seen the Writ.
13 Q How would he have seen it?
14 A Talking about the Writ or the promissory note?
15 Q I just mentioned the Writ because you
16   mentioned --
17 A Okay.
18 Q -- the Writ.
19       MR. LANGLEY:
20           Your question is does she know how
21       Sutherland got the Writ?
22       MR. MARTIN:
23           She -- yeah.  She said he would have
24       had the Writ.
25       MR. LANGLEY:

**EXHIBIT C**

**89**

```
1              All right.
2  A    He would --
3         MR. MARTIN:
4              I said, how would he have had the Writ.
5  A    I'm sorry, he would have seen it?
6  Q    How would he have seen the Writ, yes.
7  A    He would have seen the -- the Writ itself.  This
8       is not -- the promissory note is what was locked
9       up.  The Writ itself -- a copy of the Writ would
10      always stay with the -- I would think would stay
11      with the file.  I don't --
12 Q    Okay.  So, you brought him the whole file then?
13        MR. LANGLEY:
14             Objection, Counsel.
15 A    Not all --
16 Q    Did you bring him the Writ?
17 A    I can't say I brought him the Writ.  I just --
18 Q    But you said he's seen the Writ?
19 A    He would be able to answer that.
20 Q    I believe he's deceased.
21        MR. LANGLEY:
22             Okay, this -- I object to the form of
23        the question.  I object to the line of
24        questions.  Counsel, you asked questions in
25        the conditional.  I will caution the witness
```

**90**

```
1       and instruct her not to answer any question
2       that you don't know the answer to.  I don't
3       want you to speculate.  You can answer if
4       you know.
5  Q    And unfortunately I'm going to tell you, you're
6       going to have to answer my questions over the
7       objections unless he invokes privilege.
8         MR. LANGLEY:
9              I am instructing you not to answer the
10        question unless you know the answer to the
11        question.  I don't want you to speculate.
12        MR. MARTIN:
13             Do you want to take a break?
14        WITNESS:
15             Yes.
16        MR. MARTIN:
17             I'm happy to give you a break.
18        WITNESS:
19             Is it okay to have one?
20        MR. LANGLEY:
21             Anytime you want one it's okay to have
22        one.
23        MR. MARTIN:
24             I think there is --
25        WITNESS:
```

**91**

```
1              I didn't know if there was a
2       question --
3         MR. MARTIN:
4              -- a pending question, but we can come
5       back to it.
6         MR. LANGLEY:
7              I'm sorry.  What is the pending
8       question just so I'm clear?
9  Q    The pending question is, you said Mr. Sutherland
10      would have seen the Writ and I asked how would
11      Mr. Sutherland have seen the Writ?
12 A    I don't know how he would have seen it.  I
13      don't --
14 Q    Okay, so what -- before we go on break, then why
15      do you say he would have?
16 A    I don't -- I just -- I guess to be able to
17      answer questions you'd have to have something to
18      look at, so --
19 Q    Okay.  So you just inferred, is that correct,
20      that he had seen it?
21 A    I can't remember what he said.  I don't know
22      what he has seen or --
23 Q    Okay.
24 A    I'm sorry.
25        MR. MARTIN:
```

**92**

```
1              Take your break.  Come back when you're
2       ready.
3              (OFF RECORD.)
4  EXAMINATION BY MR. MARTIN, CONTINUING:
5  Q    Okay.  Back to Exhibit #16.
6  A    #16?
7  Q    Yeah.
8  A    Okay.
9  Q    The e-mail from September 17th.
10 A    Okay.
11 Q    Not trying to do something you've already
12      answered.  Tell me if I'm correct when I say you
13      said you don't remember sending this particular
14      e-mail?
15 A    No, sir.
16 Q    Okay.  And you don't know why you asked for the
17      names of at least two so we're not down to the
18      wire?
19 A    No, sir.
20 Q    Okay.  I'm going to hand you what I'm calling
21      #18.  Is this another e-mail exchange between
22      you and Mr. Shelton?
23 A    That's correct.
24 Q    Do you recall this e-mail exchange?
25 A    I do not.
```

**EXHIBIT C**

**93**

1  Q  Mr. Shelton said on September 21, 2018, which is
2     four days after the Exhibit #16 e-mail, "Dear
3     Kim, attached is the appointment of appraiser
4     for the plaintiff, Mr. W.A. Lucky.  He is
5     appointing Chad M. Garland.  I would want to see
6     if I can find some other person to appraise the
7     note."  Do you understand now that to be a
8     response to your September 17th e-mail
9     requesting a recommendation?
10 A  Yes.
11 Q  Okay.  I'm going to hand you #19.  Do you recall
12    receiving this e-mail?
13 A  No, sir.
14 Q  Dated Friday, October 12, 2018.  But it does
15    appear to be an e-mail from Mr. Shelton to you?
16 A  Yes.
17 Q  "Dear Kim, attached please find the executed
18    oath and appraisement sheet for the plaintiff's
19    appraisal.  Originals of the attached will be
20    delivered to you today."  Were you used to
21    getting these oaths of appraiser?  You can look
22    at all the attachments if you want.
23 A  (Witness examines documents.)  No.
24 Q  You don't?
25 A  I don't, no.

**94**

1  Q  You did not usually receive this sort of oath of
2     appraiser?
3  A  No.  I don't think I've ever seen an oath of an
4     appraiser.
5  Q  Okay.  The last page that's talking about
6     appraisement sheet, do you recall looking at
7     this on October 12, 2018?
8  A  No.  I don't remember this.
9  Q  Okay.  If you don't remember it, it's -- that's
10    fine.  But do you remember this appraisement
11    sheet form in general from your work from this
12    old department?
13 A  I'm not certain.
14 Q  Okay.
15 A  I know there was an appraisement sheet, but I'm
16    not certain --
17 Q  Okay.
18 A  -- what it looked like.
19 Q  And it says on the body of the e-mail, "Attached
20    please find the executed oath and appraisement
21    sheet from plaintiff's appraisal."  Did you
22    understand then why there would be a plaintiff's
23    appraisal rather than anyone else's appraisal?
24 A  I don't know why they --
25 Q  Okay.

**95**

1  A  -- worded it that way.
2  Q  Do you know what the term "plaintiff" means?
3  A  Plaintiff and -- I mean, yes, sir.
4  Q  In a lawsuit?
5  A  Uh-huh.  Yes, sir.
6  Q  Did you understand from this then that Mr.
7     Shelton represented the plaintiff?
8  A  Yes.
9  Q  Okay.  If you go back to #18, I just want you to
10    look at the dates on #18 and #19.  Your e-mail
11    exchange that's Exhibit #18 ends with an e-mail
12    from you to Mr. Shelton, Friday, September 21,
13    2018 at 9:26 a.m.; is that right?
14 A  Yes.
15 Q  And then Exhibit #19, the e-mail from Mr.
16    Shelton is Friday, October 12, 2018.
17 A  Correct.
18 Q  Do you recall any other e-mail exchanges between
19    yourself and Mr. Shelton during that period
20    between September 21st and October 12th?
21 A  No, sir.
22 Q  Okay.  Do you remember doing anything on this
23    case file between September 21st and October 12,
24    2018?
25 A  No, sir.

**96**

1  Q  Let's go to #20 now.  I'm going to hand you what
2     I'm labeling #20.  This appears to be an e-mail
3     from Mr. Shelton to you, one that's dated
4     October 12, 2018.
5  A  Okay.
6  Q  Do you remember receiving this e-mail?
7  A  No, sir.
8  Q  It says, "Dear Kim, in the event a third
9     appraisal is needed, I have located a person,
10    Mr. Patrick Lacour, who can appraise for the
11    sheriff.  He's an accountant who also a CVA
12    designation, which is Certified Valuation
13    Analyst designation from NACVA, National
14    Association of Certified Valuators and
15    Analysts."  Skip down.  "I'm also attaching a
16    copy of Mr. Lacour's CV.  I have provided Mr.
17    Lacour information about the note and he has
18    told me that he is willing to be an appraiser
19    for the sheriff if he is appointed.  Mr. Lacour
20    understands that he would be appraising for the
21    sheriff and not for either party."  Now, you've
22    said you don't remember receiving this?
23 A  No.
24 Q  Okay.  I don't want to assume, but I think that
25    means you don't recall reading I have provided

**EXHIBIT C**

**97**

1    Mr. Lacour information about the note?
2  A  I don't -- yeah, I don't remember --
3  Q  Okay.
4  A  -- this e-mail.
5  Q  Sitting here today thinking back to your time in
6     civil department, can you think of other
7     instances where attorneys would have provided
8     information about property to a potential third
9     appraiser?
10 A  I do not know.
11 Q  Did you provide information to third appraisers
12    when third appraisals were required?
13 A  If a third appraisal was required, whatever was
14    provided was on the appraisal sheet, which I
15    don't remember the information on there.
16 Q  Okay.
17 A  But I believe it just had the description of
18    what they were --
19 Q  And who would do that providing?
20 A  It's a form that was printed or that you could
21    print.
22 Q  From your office?
23 A  Correct.
24 Q  Would you send that to the third appraiser?
25 A  Yes.

**98**

1  Q  Okay.
2  A  Just with the description of the property.
3  Q  You don't recall another instance of an attorney
4     providing information about property, correct?
5  A  I don't know if they -- I wouldn't know what
6     they would do, but no.
7  Q  Do you recall that if by October 12, 2018 you
8     sent the information you just referenced?
9  A  If I sent it to?
10 Q  A third appraiser?
11 A  I do not.
12 Q  To your knowledge sitting here today was a third
13    appraisal required on October 12, 2018?
14 A  I'm not sure where October 12th was in the --
15 Q  Okay.
16 A  -- the process.
17 Q  Okay.  I'm going to direct you back to
18    Exhibit #15.  And if you go down to -- a third
19    of the way down that first block paragraph, "In
20    the Town of Benton, Louisiana on Wednesday
21    October 24, 2018, between the hours of 10:00
22    a.m. and 4:00 p.m., the following described
23    property".  Is that setting forth the sale
24    date -- the promissory note?
25 A  Looks like it's the projected date.  I don't

**99**

1     know if that was the date of the sale.
2  Q  Okay.  Now when it says I have provided Mr.
3     Lacour information about the note, do you recall
4     what information --
5        MR. SHELTON:
6           What are you referring to, Counsel?
7        MR. MARTIN:
8           On back of Exhibit #20.
9        MR. LANGLEY:
10          Okay, thank you.
11 Q  When it says about halfway down the page, I have
12    provided Mr. Lacour information about the note
13    and we discussed that sentence earlier, do you
14    recall if you asked Mr. Shelton afterwards what
15    information he provided?
16 A  No.
17 Q  Do you recall if Mr. Shelton ever told you he'd
18    be communicating directly with a potential third
19    appraiser?
20 A  No, I do not.
21 Q  Do you recall if you had any telephone
22    conversations with Mr. Shelton at this point?
23 A  It --
24       MR. LANGLEY:
25          Counsel, would you repeat that?

**100**

1        MR. MARTIN:
2           Yeah.
3  Q  Do you recall if you had any telephone
4     conversations with Mr. Shelton at this point?
5  A  I don't know if they were -- I do not.
6     Correspondence, yes.
7  Q  And we've looked at some of that correspondence;
8     correct -- the e-mails?
9  A  Correct.
10 Q  Okay, that's fine.  We don't -- you don't
11    remember if there was a telephone call?
12 A  No, sir.
13 Q  Okay.  Sitting here today looking back, do you
14    know what information Mr. Shelton provided
15    Mr. --
16 A  No.
17 Q  Not to this day?
18 A  No.
19 Q  Are you curious?
20       MR. LANGLEY:
21          Objection.  You don't have to answer
22       that.
23 Q  When you sent the e-mail that marked Exhibit #16
24    and you said do you have any recommendations as
25    to who appraises these types of notes, did you

**EXHIBIT C**

**101**

1     expect a recommendation to you or do you expect
2     a direct communication with a potential third
3     appraiser or do you just not remember?
4         MR. LANGLEY:
5             Object to the form of the question.
6         You can answer it if you know.
7 A   I don't know how he would have --
8 Q   Okay.
9 A   -- honestly if I --
10 Q   You don't remember your expectations?
11 A   No, uh-uh.
12 Q   Be fair to say you don't remember expecting him
13     to go directly to a third appraiser?  You don't
14     recall having that expectation?
15 A   I just -- I didn't have any.
16 Q   Okay.
17 A   I mean, to be honest, no expectations.
18 Q   Okay.  Since October 12, 2018, that e-mail --
19     and you say you don't remember reading it -- do
20     you remember doing anything after that point to
21     find a third appraiser or a potential third
22     appraiser?
23 A   October 12th e-mail from?
24 Q   Mr. Shelton.
25 A   Okay.  The one with the oath and the

**102**

1     appraisement or the --
2 Q   Oh, I'm sorry, no.  Number twenty, the next one.
3 A   Okay.  I'm sorry.  If you repeat that
4     question -- I didn't --
5 Q   Do you recall doing anything after that point to
6     find a third appraiser on your own?
7 A   I would have checked with Mr. Sutherland.
8 Q   You would have?
9 A   I would have checked with him to --
10 Q   Keep looking for one?
11 A   To ask advice on what would -- to do next.
12 Q   Okay.  Do you remember going to --
13 A   No.
14 Q   -- Mr. Sutherland?  Do you remember taking any
15     action to find a third appraiser after that
16     point?
17 A   I don't remember if or what action.
18 Q   Okay.  Do you remember discussing the third
19     appraiser for -- with anyone else after this
20     point?
21 A   No.
22 Q   Okay.  Looks like Mr. Lacour's contact
23     information was given to you here based on what
24     you just said.  I thought you said you did not
25     call Mr. Patrick Lacour on October 12th?

**103**

1 A   I don't recall if I did or did not.
2 Q   Exhibit #21 I'm handing you now.  Do you recall
3     getting this e-mail?
4 A   I do not.
5 Q   Looks like it's another e-mail from Mr. Shelton
6     to you.
7 A   That's correct, yes.
8 Q   It says, "Dear Kim, I'm attaching three things
9     to this message.  The first two are a letter
10     that I am mailing today with a motion for order
11     authorizing reduced sheriff's commission.  If
12     the sheriff will negotiate the commission, that
13     will be appreciated.  I prepared this in the
14     same way that I usually prepare this for
15     sheriff's sale.  If something different needs to
16     be done just let me know."  Had you seen motions
17     for orders authorizing reduced sheriff's
18     commission before this point?
19 A   I'm not sure if I have or have not.
20 Q   What's a sheriff's commission in this context?
21 A   Based out of the sale -- I'm not sure exactly --
22         MR. LANGLEY:
23             Are you asking how much, Counsel, or
24     what --
25         MR. MARTIN:

**104**

1             If she had ever seen --
2         MR. LANGLEY:
3             -- or what it is?
4         MR. MARTIN:
5             If she had -- yeah, what's a sheriff's
6     commission.  What is --
7         MR. LANGLEY:
8             All right.
9         MR. MARTIN:
10             -- a sheriff's commission?
11         MR. LANGLEY:
12             I think she's misunderstanding you.
13 Q   I'm genuinely not familiar with --
14 A   I'm just -- I've been out of it so long it's
15     hard --
16 Q   Is it a cut that the sheriff --
17 A   Some of these terms I'm -- I'm -- I don't want
18     to assume.  It looks like some type of fare.  I
19     don't --
20 Q   Okay.  If you don't know, you don't know.
21     Thirteen -- I'm going back to e-mail.  "Thirteen
22     is an Ex Parte motion to fix appraiser's fees.
23     As we have discussed it will likely not be
24     possible to find someone to do the appraisal,
25     the promissory note for the amount the sheriff

**EXHIBIT C**

**105**

1    usually pays or even the Fifty Dollars ($50.00)
2    the statute authorizes without Board approval."
3    And he says, "As we have discussed, it will
4    likely not be possible to find someone to do the
5    appraisal, the promissory note for the amount
6    the sheriff usually pays."  Do you recall those
7    discussions?
8  A  No.
9  Q  Do you recall ever having a discussion with
10   anyone in the sheriff's sale context about
11   fixing appraiser's fees?
12 A  No.
13 Q  This would be the -- if this was indeed a motion
14   to fix appraiser's fees this would be the first
15   for you that you recall?
16       MR. LANGLEY:
17           Object to Counsel -- object to the form
18       of the question.  Not what she said.  You
19       can answer it.
20       MR. MARTIN:
21           I'll rephrase it.
22       MR. LANGLEY:
23           Okay, thank you.
24 Q  I'm not trying to put words in your mouth.  I
25   think you said you don't recall a motion to fix

**106**

1    attorney's fees -- appraiser's fees?
2  A  Correct.
3  Q  Okay.
4  A  That's not a form I'm familiar with seeing.
5  Q  Okay.  I think earlier we discussed whether you
6    had phone conversations with Mr. Shelton prior
7    to whatever point we were at then, September
8    21st.  Do you recall if you had telephone
9    conversations with Mr. Shelton by this point,
10   October 12th?
11 A  I do not.
12 Q  Okay.
13 A  I just wouldn't know what he sounded like on the
14   phone today.
15 Q  Sure.  Okay.  I'm going to hand you Exhibit #22.
16   Is this an e-mail from you to --
17 A  That's --
18 Q  -- Mr. Shelton?
19 A  Yes, that's correct.
20 Q  Do you recall sending this e-mail?
21 A  No, sir.
22 Q  It says, "Mr. Shelton, the sheriff has signed
23   your paperwork for the above referenced suit.
24   Please advise when you would like to come by and
25   pick up.  Thanks, Kim."  If Mr. Shelton had come

**107**

1    to pick up that paperwork, would you have
2    recognized him?
3  A  No, sir.  He would have had to identify himself
4    or I don't -- wouldn't know if he's a runner, so
5    no.
6  Q  Do you know what paperwork you're referencing in
7    this e-mail?
8  A  No.
9  Q  We talked a lot about communications with
10   attorneys with Ms. Taylor, with Ms. Horne and
11   Mr. Sutherland.  Do you recall ever speaking to
12   the sheriff himself, Sheriff Whittington, about
13   any of this?
14 A  No, sir.
15 Q  Did anyone ever tell you Sheriff Whittington
16   said something to them --
17 A  No.
18 Q  -- about this matter?
19 A  No, sir.
20 Q  Is that difficult for the sheriff not to be
21   involved with the sheriff sale?
22       MR. LANGLEY:
23           Object to the form of the question.
24       You can answer it if you have an answer.
25 A  I don't know how to -- I'm sorry, I don't know

**108**

1    how to answer it because it was --
2  Q  And maybe it's not --
3  A  -- it was a civil -- you know, anything
4    sheriff's sale, he, you know, wasn't --
5  Q  Did he entrust it to you guys in the civil
6    department?
7  A  As our job or -- I mean, that was -- the job was
8    civil -- was the sheriff's sale, so --
9  Q  Maybe the better way to ask it is do you recall
10   a time in civil ever having the sheriff
11   personally involved?
12 A  No.  It's -- no.
13 Q  You don't recall the sheriff personally
14   approving any of your actions?
15 A  That's correct.
16 Q  Had you ever spoken with the sheriff?
17 A  Like how?  Like --
18 Q  In any context?  Did you know Sheriff
19   Whittington?
20 A  Yes.
21 Q  Okay.
22 A  He's my employer, so I mean other than that, not
23   on a personal level, no, sir.
24 Q  Okay.  In the context of work during this time
25   you were in civil?

**EXHIBIT C**

```
                                            109
1   A    Uh-huh.
2   Q    You never went to him with issues with the sale,
3        I think you said?
4   A    Correct.
5   Q    Okay.  Can you recall -- I'm going to hand you -
6        -
7            COURT REPORTER:
8                Twenty-three.
9            MR. MARTIN:
10               What's that?
11           COURT REPORTER:
12               Twenty-three.
13  Q    Twenty-three.  Now, we're going to have to read
14       this one backwards.  I'm sorry.
15  A    Okay.
16  Q    Yeah, just help me with that.  On this second
17       page it's marked BS085 on the bottom.  It
18       appears to be an e-mail from you.
19  A    Okay.
20  Q    It says, "On October 18, 2018 at 3:04 p.m., Kim
21       Flournoy wrote, Mr. Shelter, I have the
22       sheriff's signature on the Ex Parte motion to
23       fix appraiser's fees.  Would you like a runner
24       to pick up the file at the clerk's office?
25       Also, is Mr. Lacour going to be able to come by
```

```
                                            110
1        tomorrow and sign the appraiser form?  We need
2        to have it ASAP.  Thank you so much for your
3        help."  Did you send that e-mail?
4   A    Yes.
5   Q    Do you remember sending that e-mail?
6   A    No.
7   Q    Did you know who Mr. Lacour was at this point?
8   A    No.
9   Q    Why did you ask is Mr. Lacour going to be able
10       to come by tomorrow and sign the appraiser form?
11  A    I guess I'm sorry, are you asking like --
12  Q    On October 18th, did you know who he was?
13  A    He --
14           MR. LANGLEY:
15               Yes or no.
16  A    Yes.
17  Q    Okay.  Who was it?
18  A    He was a third party appraiser.  I think that
19       was his title maybe.
20  Q    And that's on October 18, 2018?
21  A    That's correct.
22  Q    Now, earlier on the advertisement -- and you
23       don't have to turn to it, but it said October
24       24, 2018.  Was a third appraisal required at
25       this point?
```

```
                                            111
1   A    I don't know without -- the date on the
2        advertisement?
3        Uh-huh.
4   A    I don't know without -- it's just hard to
5        remember this with the steps.
6   Q    And we had -- that was #23; is that right?
7   A    Right.
8   Q    I'm going to hand you #24.  Do you recognize
9        this document?
10  A    Not this particular one, but this form, yes, I
11       do.
12  Q    What is this form for?
13  A    It's a form with information on -- I'm not sure.
14       It's something for the deed.  I'm not sure.
15  Q    And is that the same case number we were talking
16       about earlier, 1-2-7-5-7-3?
17  A    Yes.
18  Q    So, this is your file?
19  A    Yes.
20  Q    Okay.  Does this -- when you say the deed, does
21       that indicate property's been sold?
22  A    It's like when the property is sold.
23  Q    Okay.  This is something that would be sent
24       after the sale?
25  A    I don't -- again, it's been so long since I've
```

```
                                            112
1        been in civil I don't --
2   Q    Okay.  Back to #23, that October 18th e-mail
3        from you at 3:04 p.m. and I'm just asking about
4        the sentence "Is Mr. Lacour going to be able to
5        come by tomorrow and sign the appraiser form"
6        and I asked you who was Mr. Lacour, did you know
7        Mr. Lacour.
8   A    Uh-huh.
9   Q    And correct me if I'm wrong, you said he was the
10       third appraiser?
11  A    That's what it said he was.  I --
12  Q    Okay.
13  A    I don't -- I'm just going by what was on these.
14  Q    You said earlier that a third appraiser --
15           MR. LANGLEY:
16               Excuse me, she's looking for something.
17           MR. MARTIN:
18               My apologies.
19           WITNESS:
20               (Witness examines documents.)
21           MR. LANGLEY:
22               Okay.  You ready to move on?
23           WITNESS:
24               Yeah.  I've been --
25  Q    You had characterized Mr. Lacour as the third
```

**EXHIBIT C**

**113**

1   appraiser.
2  A  According to this e-mail that's what it seems.
3  Q  You said earlier at the beginning that a third
4     appraiser is required if the first two
5     appraisals differ by more than ten percent
6     (10%)?
7  A  Yes.
8  Q  If there aren't two appraisals in, you can't
9     have a differing of ten percent (10%), can you?
10 A  I wouldn't think so.
11 Q  So, you can't have a third appraiser before two
12    appraisals are in?
13       MR. LANGLEY:
14          Object to the form of the question.
15          You can answer if you have an answer for
16          that.
17 A  You can't have a third without a second if
18    that's what you're asking.
19 Q  Yeah.
20 A  Okay.
21 Q  If Mr. Lacour was the third appraiser at this
22    point, October 18, 2018, that means you've
23    already got the two; right?
24 A  Theoretically.
25 Q  Yeah.

**114**

1  A  To have three, yes, you would.
2  Q  So, who made Mr. Lacour the third appraiser?
3  A  I do not know that.
4  Q  Was it you?
5  A  No.  I do not --
6  Q  Somebody else?
7  A  I couldn't answer that.
8  Q  Okay.
9       MR. LANGLEY:
10          It's all right.  Just quit scrambling
11          around.
12 Q  Yeah.  You don't need to --
13       MR. LANGLEY:
14          Just tell him what you know.
15 Q  Okay.  So, at this point you're still asking Mr.
16    Shelton if Mr. Lacour's going to come by?
17       MR. LANGLEY:
18          Which report are you talking about?
19       MR. MARTIN:
20          I'm still -- October 18th at 3:04 p.m.
21       MR. LANGLEY:
22          Oh, okay.
23 Q  It's on the second page of Exhibit #23.
24       WITNESS:
25          I was on #25.

**115**

1       MR. LANGLEY:
2          Yeah, no problem.
3  A  Okay.  Yes, that's correct.
4  Q  Okay.  To your knowledge, had you spoken to Mr.
5     Lacour directly by 3:04 p.m. on October 18th?
6  A  I do not know.
7  Q  Would you have been asking Mr. Shelton what Mr.
8     Lacour was going to do if you had already
9     communicated with him?
10       MR. LANGLEY:
11          Object to the form of the question.
12          You can answer what you know.
13 A  Yeah.  I don't know what was going on that day.
14    I do not know.
15 Q  Generally, do you ask other people to be
16    intermediaries for you if you've already had
17    direct communications with them?
18       MR. LANGLEY:
19          I object to the form of the question.
20          If you can understand it, you can give him
21          an answer.
22 A  I mean, there's just so many factors I don't
23    know.
24 Q  Okay.  That's fine.  Next e-mail from Curtis
25    Shelton to Kim Flournoy and Patrick Lacour.

**116**

1     Looks like that's the next day, Friday, October
2     19, 2018.  Do you recall receiving this e-mail?
3  A  No.  I'm sorry.
4  Q  And I'm going to have to ask you --
5  A  I know.
6  Q  -- that every time.
7  A  It's obviously, you know, my e-mail, but no, I
8     don't recall.
9  Q  Mr. Lacour has reported he can have an appraisal
10    by noon Tuesday.  "I'm copying him with this
11    message.  Can you perhaps sign the appraiser --
12    before a notary in Alexandria and e-mail you a
13    copy and then give you the original with the
14    appraisal.  Is there something else you need him
15    to come sign or do today?  If you reply all to
16    this message, Mr. Lacour will also receive it."
17    Do you recall if you replied all to that e-mail?
18 A  I do not.
19 Q  Okay.  From that first sentence, do you infer
20    that Mr. Shelton spoke to Mr. Lacour after you
21    sent your e-mail on the 18th?
22       MR. LANGLEY:
23          Object to the form of the question.
24          Answer what you know.
25 A  No, I don't.  I have no way of knowing if they

**117**

1  spoke or not.
2  Q  The first page of Exhibit #23 looks like an e-
3     mail from you again.
4  A  Yes.
5  Q  "Mr. Shelton, I spoke with Mr. Lacour and he
6     will be by our office on Monday to sign the
7     form.  Thank you both for your help and have a
8     great weekend."  Do you recall sending that?
9  A  No, sir.
10 Q  When you say I spoke with Mr. Lacour, would that
11    be by the phone, do you think?
12 A  I don't know.
13 Q  Okay.  I just asked --
14 A  Yeah.  You can infer --
15 Q  Inferring from your own language --
16 A  -- but I can't -- I can't --
17 Q  -- because --
18 A  -- confirm a hundred percent (100%).
19 Q  Sure.  Based on what we've looked at today up
20    through Exhibit #23, is this the first instance
21    where you state that you spoke with Mr. Lacour?
22       MR. LANGLEY:
23          You mean is this the first time that
24          that reference appears in any of these
25          documents?  I'm confused.

**118**

1  A  Or is it the first time I spoke to him or --
2  Q  Is that the first written indication of anything
3     we've looked at today showing that you spoke to
4     Mr. Lacour?
5        MR. LANGLEY:
6           I object to the form of the question.
7           Documents speak for themselves.  You can
8           answer it if you know.
9  A  This is the only documentation that I see from
10    him, so --
11 Q  Okay.
12 A  And this paperwork.
13 Q  And you do not recall speaking to Mr. Lacour
14    prior to October 19, 2018 at 1:54 a.m.?
15 A  Correct.
16 Q  And that's the day after October 18, 2018 when
17    you asked Mr. Shelton if Mr. Lacour was going to
18    come back.  And that's not a question, sorry.
19    And that top e-mail is Patrick Lacour, CIA -- I
20    think that says CIA -- CVA to Kim Flournoy -- K.
21    Flournoy at Bossier Sheriff.  "Kim, please see
22    attached.  I'll be driving up shortly."  Do you
23    recall receiving that?
24 A  No.
25 Q  Why would Mr. Patrick Lacour be driving up?

**119**

1        MR. LANGLEY:
2           Object to the form of the question.
3           Answer if you know.
4  A  I don't know why.  I can't speculate as to why.
5  Q  Okay.
6  A  I can only infer and that's --
7  Q  Okay.  What's your inference sitting here today?
8        MR. LANGLEY:
9           Object to the form of the question.  If
10          you know, you can answer.  I don't want you
11          to speculate.
12 A  Yeah, I can't say with certainty what he --
13 Q  Okay, that's fine.  I think maybe I meant to
14    include this as part of Exhibit #23, but I'm
15    just going to hand it to you as #24.
16    COURT REPORTER:
17          I have marked that you have an
18          Exhibit #24.
19    MR. MARTIN:
20          No, you're right.  Let's scratch that
21          out.  Call this #25, then.
22    COURT REPORTER:
23          Okay.
24    MR. MARTIN:
25          Much appreciated.

**120**

1  Q  Do you recognize this document?
2  A  No, sir.
3  Q  Okay.  You don't recognize it.  Did Mr. Lacour
4     bring you an appraisal?
5  A  I don't know.  I can't remember.
6  Q  Would you have looked at an appraisal if Mr.
7     Lacour had brought one in?
8        MR. LANGLEY:
9           Object to the form of the question.
10    MR. MARTIN:
11          I'll rephrase it.
12    MR. LANGLEY:
13          Thank you.
14 Q  When third appraisers would bring in appraisals,
15    would you look at them?
16 A  Yes.
17 Q  Always?
18 A  I wouldn't say always because I may not have
19    been there.
20 Q  Okay.  When you were there you'd look at them?
21 A  (No audible response.)
22 Q  Did you --
23 A  I know it's what it -- yes.
24 Q  Okay.  Do you remember if you had spoke to Mr.
25    Lacour when he came in?

**EXHIBIT C**

**121**

1  A  I don't remember if he came in or --
2  Q  Okay.
3  A  -- not.
4  Q  You wouldn't --
5  A  I don't know if I was at lunch.  I don't know
6     who he gave it to if he did.
7  Q  Do you know what Mr. Lacour looks like?
8  A  No, sir.
9  Q  If he called you today, would you recognize his
10    voice?
11 A  No, sir.
12 Q  Goes without saying that based on what you told
13    me that you didn't ask Mr. Lacour for the basis
14    for his appraisal, why did he value anything
15    like he did?
16 A  No.
17 Q  Okay, that's fine.  Who would be responsible for
18    fixing the sale price after the third appraisal
19    came out?
20 A  I believe that's set by law also, isn't it?
21    Like the --
22 Q  Okay.
23 A  The guidelines, it's set by law.
24 Q  Do you write it down though?  Somebody write it
25    down for this file?

**122**

1  A  What do you mean write it down, like the -- we
2     have an appraisement sheet.  I don't -- it -- I
3     don't see one in here, but it has the Appraiser
4     1, Appraiser 2, Appraiser 3 and --
5  Q  What do you do with that Appraiser 3?
6  A  All the numbers are on there and from there is
7     how you get your calculation of the sale price
8     itself.
9  Q  Okay.  And who does that calculation?
10 A  I guess either -- I don't know.  It's hard to
11    say who typically does it versus who does it,
12    who did it so it's --
13 Q  Okay.
14 A  -- different.
15 Q  Who typically does it?
16 A  Whomever the sale would be assigned to -- the
17    clerk.
18 Q  Not you?  When you say the sale would be
19    assigned to, you're not referring to this file?
20    You're referring --
21 A  The file.  I apologize, yeah.
22 Q  So, generally if it was your file it would be
23    you doing the calculation?
24 A  (No audible response.)
25 Q  If you don't know, you don't --

**123**

1  A  I don't.  I'm sorry.  I'd have to --
2  Q  Typically someone has to send that calculation
3     to whoever's running the sale; is that right?
4         MR. SHELTON:
5             I want to object to these questions
6         because they're entirely misleading.  When
7         there's a third appraisement, that
8         appraisement is final.  There's no
9         calculation to be done under the law.
10 Q  That's --
11 A  I can't -- yeah.  I'm not a civil --
12        MR. SHELTON:
13            Just a minute.
14 A  -- attorney.  Thank you.
15        MR. SHELTON:
16            Standby.
17        MR. MARTIN:
18            I appreciate --
19        MR. SHELTON:
20            So, that's my objection.  I mean,
21        you're --
22 Q  Mr. Shelton is --
23        MR. SHELTON:
24            -- you're way down rabbit trail behind
25        the looking glass.

**124**

1  Q  I understand Mr. Shelton is trying to help you.
2         MR. SHELTON:
3             No, I'm trying to help you.
4  Q  I'm asking you who transmits that to whoever's
5     administering the sale on the sale though?
6         MR. SHELTON:
7             Transmits what?  I don't know what that
8         is.  I don't know what preposition is --
9         MR. MARTIN:
10            I'm not asking --
11        MR. SHELTON:
12            -- that doesn't have an --
13        MR. MARTIN:
14            I'm not asking you.  I'm asking her.
15        MR. SHELTON:
16            Okay, but like I -- so --
17 Q  So, if you don't know if --
18        MR. SHELTON:
19            -- object to the form of the question
20        because --
21        MR. MARTIN:
22            Okay.  If we --
23        MR. SHELTON:
24            -- I can't know and I can't know that
25        the witness knows to what you're referring

**125**

1    by using the word "that."
2    MR. MARTIN:
3        If the witness doesn't know, the
4    witness can say.
5    MR. SHELTON:
6        Well, I can make my objection to form.
7    MR. MARTIN:
8        Sure.
9    MR. SHELTON:
10       Look, I've sat over here and been
11   largely quiet, but that's just leaving
12   something out there that's wholly vague and
13   I'm sorry.
14 Q  If you don't understand, you can tell me you
15   don't understand.
16 A  I don't.
17 Q  Okay.
18 A  I'm sorry.  It's -- I don't know.
19 Q  Who administers the sale on the day of the sale?
20   MR. SHELTON:
21       I object to the form of the question.
22 A  What are -- I don't -- administers.  Could you
23   clarify?
24 Q  Okay.  I've been to a couple of sheriff's sale,
25   okay, and I go out there, stand in the hallway.

**126**

1 A  Yes.
2 Q  People shout out a property and case numbers and
3   somebody says --
4 A  Yes.  Yes.
5 Q  -- bid at this, bid at this like in movies
6   bidding wars.  It's awfully exciting.
7 A  Uh-huh.
8 Q  Who's doing the shouting of what the case is and
9   what the price is?
10 A  Mr. Sutherland.
11 Q  Mr. Sutherland?
12 A  James Sutherland.
13 Q  Okay.  So, someone has to get the final sale
14   number to Mr. Sutherland, the appraisal number?
15 A  Correct.
16 Q  Okay.  And who does that?
17 A  It would be the clerk who's working on the case
18   of the file.  I'm not sure what it would --
19 Q  Okay.  So, typically if it's your file it's you
20   who would communicate that to Mr. Sutherland?
21 A  Yes.
22 Q  Okay.  That's all I'm asking.  Do you know what
23   happened at the sale?
24 A  Honestly I don't remember if there -- I don't.
25 Q  Okay.  Typically would you know what happened at

**127**

1    the sale of a file you were in charge of?
2    MR. LANGLEY:
3        Object to the form of the question,
4    Counsel.  Could you be a little more
5    specific?
6 A  I guess, yeah.
7    MR. LANGLEY:
8        If not you can answer the best you can
9    subject to my objection.
10 A  Yeah.  I don't know how to -- how to answer.
11   I'm sorry.  I guess --
12 Q  If you -- if a piece of property sold for a
13   Hundred Thousand Dollars ($100,000.00) and it
14   was one of your files, would you know what the
15   sales price of the -- the actual sales price
16   was?
17 A  Yes.
18 Q  Why would you know that?
19 A  It's written on the front of the file by Mr.
20   Sutherland.
21 Q  When would Mr. Sutherland write that?
22 A  Let me clarify.
23 Q  Sure, yeah.
24 A  When it's done the final winner, that amount is
25   written on the --

**128**

1 Q  Yeah.
2 A  Yes, that's the amount that's written on there.
3 Q  And you still have tasks to do after these
4   properties sold?
5 A  Correct.
6 Q  Okay.  What else do you have to do?
7 A  I don't remember everything that's done.
8 Q  Okay.
9 A  It's hard to speculate which things.
10 Q  Would you send out invoices to people it would
11   cost?
12 A  I don't --
13 Q  Do people owe the sheriff money for fees
14   incurred in --
15 A  Yes.
16 Q  -- the running sale?
17 A  I just don't know the -- I don't remember the
18   process of when things are done and how.
19 Q  Would you be sending out cost statements to
20   people to pay the sheriff?
21   MR. LANGLEY:
22       Object to form of the question.  If you
23   remember you can tell him.
24 A  I don't.
25 Q  Okay.

EXHIBIT C

**129**

1  A   I don't know.
2  Q   With this particular file, do you remember what
3      happened after the sale date?
4  A   No.
5  Q   Okay.
6          MR. MARTIN:
7              Let's not get confused again.  I think
8          this is #26.
9          COURT REPORTER:
10             You're correct.
11         MR. MARTIN:
12             Thank you.
13 Q   Do you recognize this e-mail exchange?
14 A   No, sir.
15 Q   Okay.  One of it is -- well, I think it starts
16     on -- sorry, it starts on the next page.  On the
17     back -- First one appears to be from you on
18     October 22nd.  "Mr. Shelton, would you please
19     ask Mr. Lacour to get me an invoice ASAP so I
20     can build it into my suit cost.  Thank you and
21     have a great day."  Did you normally ask
22     appraisers directly for an invoice?
23 A   This just wasn't a normal -- I don't know.
24 Q   Yeah.
25 A   I'm sorry.

**130**

1  Q   That's okay.  Do you remember other instances
2      where you'd go through an attorney to ask an
3      appraiser for an invoice?
4  A   I don't know.
5  Q   Okay.
6  A   I wouldn't --
7  Q   Next one going back to that first page, "Kenny
8      said he would send an invoice tomorrow."  Do you
9      know if you ever got that invoice?
10 A   I don't recall, sorry.
11 Q   And then the last one I'm looking at is the top
12     of that page, from Kimberly Flournoy to Curtis
13     Shelton.  "Thank you so much for your help in
14     everything.  I apologize for being so needy.
15     This suit has been a learning experience for me.
16     Have a great day."  You don't recall sending
17     that one?
18 A   No, sir.
19 Q   You said this -- when I asked you about going
20     through Mr. Shelton for an invoice, you said
21     this was not normal -- this was not a normal
22     sale, I believe you said?
23 A   This was a promissory note and we didn't -- this
24     was the first promissory note that I've --
25 Q   But it seems like you were going through Mr.

**131**

1      Shelton for most of your communications with Mr.
2      Lacour; is that correct?
3          MR. LANGLEY:
4              Object to the form of the question.
5              Give him an answer if you have it.
6  A   I can't really -- I can't assume.  I don't --
7  Q   You'd agree with me that what we've looked at
8      regarding Mr. Lacour, it seems to be you asking
9      Mr. Shelton to communicate with him?
10 A   Uh-huh.  Yes, there are e-mails.
11 Q   Okay.
12 A   Yes.
13 Q   And when you say, "Thank you for your help in
14     everything" to Mr. Shelton, at that time,
15     October 23rd, did you think Mr. Shelton was
16     helping you?
17 A   No.
18 Q   Who was he helping?
19 A   He wasn't.  I just guess I was trying to be
20     courteous to --
21 Q   So, when you said --
22 A   -- for answering an e-mail or for replying, I
23     guess.
24 Q   "You said this suit has been a learning
25     experience for me.  I apologize for being so

**132**

1      needy."
2          MR. LANGLEY:
3              And what's the question, Counsel?
4  Q   Why were you apologizing to Mr. Shelton?
5  A   I guess I feel like -- I don't know -- I don't
6      know how to answer that.  I don't --
7  Q   And when you say, "Thank you so much for your
8      help in everything", you're just being
9      courteous?
10 A   Just --
11 Q   Okay.
12 A   And hoping I'm not bugging people, I guess.
13 Q   Bugging people about what?  What would you be
14     bugging Mr. Shelton about in this?
15 A   Just I guess to me just if I have to ask a
16     question, I guess, I feel like that's kind of --
17 Q   What questions did you have to ask Mr. Shelton?
18 A   Just in general, ask -- you know, anyone, not
19     him, but just --
20 Q   Sure, but in this case, what were you -- what do
21     you recall asking Mr. Shelton?
22 A   I don't recall anything asking him, but -- I
23     don't asking him -- remember asking him anything
24     specific at all.
25 Q   So, on this previous one when you said, "Would

EXHIBIT C

**133**

1    you please ask Mr. Lacour to get me invoice
2    ASAP", you don't think that's you asking --
3  A  Yes.
4  Q  -- Mr. Shelton?
5  A  That's -- yeah.
6  Q  Did -- in these previous e-mails we've examined
7    where you asked Mr. Shelton to for instance give
8    a recommendation as a third appraiser --
9  A  Uh-huh.
10  Q  -- would you construe that as asking Mr. Shelton
11    a question?
12  A  Asking him a question?
13  Q  Yeah.
14        MR. LANGLEY:
15           I object to the form of the question.
16        MR. MARTIN:
17           Sure.
18  A  I don't know how to answer that, I guess.
19  Q  Okay.
20  A  If it was phrased as a question --
21  Q  Would you say it was a request?
22  A  A question.
23  Q  It was a question.
24  A  Are you asking a question for --
25  Q  Oh, yeah.  Would you say you were asking Mr.

**134**

1    Shelton a request?  You were making a request to
2    Mr. Shelton when you asked for a recommendation?
3  A  I don't think I would -- I guess that's kind of
4    interpretation what the difference --
5  Q  Then what's your interpretation?
6  A  I don't know what --
7        MR. LANGLEY:
8           Objection, Counsel.  This is didactic
9    and improper question and you're not to
10    answer anymore of this crap.  So, next
11    question.
12        MR. MARTIN:
13           I don't think I got an answer.
14        MR. LANGLEY:
15           You got the answer you're going to get.
16    The questions that she asked, the
17    communications that she had she's already
18    told you about.  They're in that paper.
19        MR. MARTIN:
20           I'm asking how she construes that.
21        MR. LANGLEY:
22           And she told you what communication she
23    had both with Mr. Shelton and Mr. Lacour.
24        MR. MARTIN:
25           And I'm asking her state of mind.

**135**

1        MR. LANGLEY:
2           Don't --
3        MR. MARTIN:
4           And I'm able to do that.
5  A  I don't know if I --
6        MR. LANGLEY:
7           No, not today you're not.
8         MR. MARTIN:
9           Okay.  I would really like not to come
10    back and have to do this again.
11        MR. LANGLEY:
12           Then --
13        MR. MARTIN:
14           So, I'm going to ask the questions I'm
15    allowed to ask under law and I'm not trying
16    to be harsh.
17  MR. MARTIN, CONTINUING:
18  Q  I'm asking you how you would characterize
19    certain things and I'm looking at this e-mail
20    where you say, "Thank you so much for your help
21    in everything.  I apologize for being so needy"
22    and all I want to know is what you're
23    referencing there.
24        MR. LANGLEY:
25           She's given you the answer to that.

**136**

1        Next question.
2  Q  What was a learning experience about this suit
3    for you?
4        MR. LANGLEY:
5           She's answered that question, too.
6        MR. MARTIN:
7           I don't think she has.
8        MR. LANGLEY:
9           She has.  She's --
10        MR. MARTIN:
11           Okay.
12        MR. LANGLEY:
13           She's asked -- answered that question.
14    It's in black and white.  It's on the
15    record.  Next question, Counsel.
16  Q  Did you learn anything from this suit?
17        MR. LANGLEY:
18           Objection.
19        MR. MARTIN:
20           That's not the question I asked.
21        MR. LANGLEY:
22           It's the very question you asked stated
23    differently.  Not going to answer it.  Move
24    on, Counsel.
25  Q  Do you understand for this time period that Mr.

**EXHIBIT C**

**137**

| | |
|---|---|
| 1 | Shelton represented Mr. Lucky? |
| 2 | A  Yes, sir.  He's on the Writ, yes, sir. |
| 3 | Q  Okay.  Did you understand him in communicating |
| 4 | with you to be working on behalf of Mr. Lucky? |
| 5 | A  I was -- I'm sorry.  I don't know how to -- |
| 6 | could you rephrase that, I guess, and -- |
| 7 | Q  You understand that a lawyer works on behalf of |
| 8 | a client? |
| 9 | A  Correct. |
| 10 | Q  Okay.  Did you understand him in his |
| 11 | communications to you to be working on behalf of |
| 12 | his client? |
| 13 | A  I understand he represented him, so -- |
| 14 | Q  Okay.  So, when he recommended an appraiser to |
| 15 | you, did you understand to be recommending |
| 16 | something that would be good for his client? |
| 17 |        MR. LANGLEY: |
| 18 |            Object to the form of the question. |
| 19 |            You can answer it if you have an answer. |
| 20 | A  I have -- I wouldn't know -- I wouldn't know |
| 21 | what he was -- |
| 22 | Q  Did you understand him to be doing you a favor? |
| 23 | A  Doing -- |
| 24 | Q  Right.  Providing a recommendation? |
| 25 | A  I don't really know how to answer.  I guess -- |

**138**

| | |
|---|---|
| 1 |        MR. LANGLEY: |
| 2 |            Don't guess. |
| 3 | A  I don't know -- |
| 4 |        MR. LANGLEY: |
| 5 |            If you know. |
| 6 | A  I mean, I don't know how to answer. |
| 7 | Q  Okay.  Was his recommendation helpful to you? |
| 8 | A  I don't know how to -- I didn't have a personal |
| 9 | interest, so I don't know how to -- |
| 10 | Q  Didn't help you learn anything? |
| 11 | A  I like criminal law better. |
| 12 | Q  Okay. |
| 13 | A  I just -- |
| 14 |        MR. LANGLEY: |
| 15 |            You answered his question. |
| 16 | Q  Earlier we looked at an e-mail where Mr. Shelton |
| 17 | told you that he had contacted Mr. Lacour and |
| 18 | provided him information.  Do you recall us |
| 19 | looking at that e-mail? |
| 20 | A  Yes. |
| 21 | Q  Okay.  Correct me if I'm wrong, but I believe |
| 22 | you said you don't know what information was |
| 23 | provided. |
| 24 | A  Okay.  I think this is one. |
| 25 | Q  That's it. |

**139**

| | |
|---|---|
| 1 | A  Okay.  Could you repeat that, I'm sorry? |
| 2 | Q  Yeah.  You do not know what information Mr. |
| 3 | Shelton provided there, do you? |
| 4 | A  No, sir. |
| 5 | Q  Okay.  Still don't? |
| 6 | A  No, sir. |
| 7 | Q  And you don't recall providing Mr. Lacour with |
| 8 | anything? |
| 9 | A  Correct. |
| 10 | Q  You didn't say to Mr. Shelton on the phone, for |
| 11 | instance, hey wait a second, why are you talking |
| 12 | to a potential third appraiser? |
| 13 | A  No, sir. |
| 14 | Q  Okay.  You just kind of let him handle that side |
| 15 | of things? |
| 16 |        MR. LANGLEY: |
| 17 |            Objection.  Mischaracterizes the |
| 18 |        witness' testimony. |
| 19 |        MR. MARTIN: |
| 20 |            I'm asking a question. |
| 21 | A  I don't -- |
| 22 |        MR. LANGLEY: |
| 23 |            I'm telling you that you're |
| 24 |        mischaracterizing her testimony and I'm not |
| 25 |        going to let you do that. |

**140**

| | |
|---|---|
| 1 |        MR. MARTIN: |
| 2 |            I'm asking a separate question. |
| 3 |        MR. LANGLEY: |
| 4 |            It's a question that's been asked and |
| 5 |        answered all day.  If you have an answer to |
| 6 |        that question, you may answer it one more |
| 7 |        time. |
| 8 | A  I don't. |
| 9 | Q  You don't what?  You did not let Mr. Shelton |
| 10 | handle everything? |
| 11 | A  I don't have an answer, I guess.  I'm not sure. |
| 12 | Q  Okay. |
| 13 |        MR. LANGLEY: |
| 14 |            Okay. |
| 15 | Q  What did you handle with relation to the third |
| 16 | appraiser? |
| 17 | A  The third appraiser just has to sign our |
| 18 | sheriff's office form so that would be something |
| 19 | that he would have to sign. |
| 20 | Q  That form though you said you didn't send to him |
| 21 | because you didn't send him anything? |
| 22 | A  They would have to come in and sign it in |
| 23 | person. |
| 24 | Q  But just to recount, Mr. Shelton identified Mr. |
| 25 | Lacour and he communicated directly with him. |

**EXHIBIT C**

**141**

1     He provided him information and you did none of
2     those things until your first recollecting being
3     October 18, 2018?
4  A  I don't know what all -- I can't answer for
5     other --
6  Q  You can't answer for anybody else and -- that's
7     right.  Did it occur to you at this time that
8     Mr. Shelton may have been trying to help his
9     client in this?
10  A  I didn't --
11  Q  Did you trust Mr. Shelton at this time?
12  A  I didn't --
13        MR. SHELTON:
14           Object to the form --
15  A  -- know him.
16        MR. SHELTON:
17           -- of the question.
18  Q  You didn't know him?
19  A  Like I didn't -- I don't -- we didn't have a
20     personal relationship.  I don't know to trust or
21     not trust.  It's just -- it's business.
22     Sure.  And he sent information -- you don't know
23     what information -- to Mr. Lacour?
24  A  It didn't specify us in that.
25  Q  It didn't specify, so you did not look into it?

**142**

1     Just kind of let it happen?
2        MR. LANGLEY:
3           This has been asked and answered,
4     Counsel.  If you have another set of
5     questions, you can ask them.  Otherwise --
6        MR. MARTIN:
7           I'm recapping the relations.
8        MR. LANGLEY:
9           No, you can't recap it because we've
10     already done -- gone through this at least
11     twice.  That's it.  Next question.
12  Q  Now, you've already said that you knew that Mr.
13     Shelton represented Mr. Lucky.
14        MR. LANGLEY:
15           That's been asked and answered as you
16     objected.
17        MR. MARTIN:
18           I'm setting up a question, that's why I
19     started with you've already said comma.
20  Q  Were you aware that Mr. Lucky had an interest in
21     the outcome of this sale?
22  A  I don't know who Mr. Lucky was, so I --
23  Q  Back to Exhibit #17.  That's your affidavit and
24     fourth page.  "I contacted Curtis Shelton for a
25     recommendation and he provided me with the name

**143**

1     of Patrick Lacour."  Then to fifteen, "I spoke
2     with Patrick Lacour regarding performing the
3     appraisal and to coordinate his appointment with
4     the sheriff's office to sign the appraisement
5     sheet and provide an appraisal in accordance
6     with his appointment by the sheriff."  And
7     you're telling me today -- I'm asking for
8     confirmation so it don't mischaracterize you.
9     You're telling me you don't remember the first
10     time you spoke with Mr. Patrick Lacour?
11  A  No.
12  Q  But you did eventually speak with Mr. Patrick
13     Lacour when he was the third appraiser?
14  A  Yes.
15  Q  Okay.
16  A  That's what that says.
17  Q  Okay.  Do you remember signing this affidavit?
18  A  I don't remember when I signed it, no.
19  Q  Okay.  I'm going to point you to that last page,
20     page four, and it says, "Done and signed on this
21     3rd day of February, 2020."
22  A  I signed it.  I just -- I don't remember --
23  Q  Yeah.  Do you remember who you spoke to with
24     regards to signing this affidavit?
25  A  No.  Someone from the attorney's office, but I

**144**

1     don't remember.
2  Q  It's been a long time since the events we're
3     talking about, mostly in 2018 and I am impressed
4     with your ability to recall things from back
5     then and that's not easy.  We've had Covid in
6     the interim, disrupted everybody's sense of
7     time.  This affidavit seems to me to show a
8     pretty good recollection of what happened.  Do
9     you think your memory would have been sharper
10     four years ago, three years ago on these
11     matters?
12  A  I don't know.  I mean, I don't --
13  Q  Do you think your memory was sharper on these
14     events in February of 2020 when you signed this
15     affidavit?
16  A  I mean, I can't say for certain.
17        MR. LANGLEY:
18           Object to the form of the question.
19  Q  Generally speaking you remember things better
20     closer to the time they happened than later?
21        MR. LANGLEY:
22           Object to the form of the question.  If
23     you have an answer, you can give it to him.
24  A  I don't have a --
25  Q  No?  You don't --

**EXHIBIT C**

**145**

```
1    A   I mean, scientifically, I think that's how it's
2        supposed to work, but I don't know.
3    Q   So, if we had tried to depose you in November of
4        2019, we might have better recollections of what
5        happened?
6            MR. LANGLEY:
7                You don't have to answer that.  Next
8            question, Counsel.
9    Q   I'm going to hand you a document.  It's actually
10       part of Exhibit #2.  It is going to be marked
11       #2K
12           MR. LANGLEY:
13               This is the document that he's
14           referring to.  Do you mind if I show her the
15           document?
16           MR. MARTIN:
17               That's totally fine, yes.  And if -- we
18           could separately label this if you want,
19           but --
20           MR. LANGLEY:
21               Not on my account.
22           MR. MARTIN:
23               What?
24           MR. LANGLEY:
25               You don't have to do it on my account.
```

**146**

```
1            MR. SHELTON:
2                No, I don't care.  You're talking about
3            Exhibit K?
4            MR. MARTIN:
5                Exhibit K.
6            MR. LANGLEY:
7                Exhibit K to Exhibit #2.
8            MR. SHELTON:
9                Yeah, that's fine.
10   Q   Have you ever seen this document?
11   A   No, sir.
12   Q   Do you know based on looking at it who it's
13       from?
14   A   It's signed Curtis R. Shelton.
15   Q   Okay.  And what's the date on this?
16   A   October 10, 2018.
17   Q   Okay.  And if we look at Exhibit #20.
18           MR. MARTIN:
19               I could just show you my copy if you
20           have a problem accessing it.
21           MR. LANGLEY:
22               I got it.
23           MR. MARTIN:
24               Okay.
25   Q   Can you tell me the date on that e-mail from Mr.
```

**147**

```
1        Shelton?
2    A   That says October 12, 2018.
3    Q   Yeah.  And that's the e-mail where Mr. Shelton
4        tells you that he's contacted Mr. Lacour and
5        provided information to them?
6    A   Yes, that's correct.
7    Q   If you look at page one of that document --
8            MR. SHELTON:
9                Which document, Counsel?  K?
10           MR. MARTIN:
11               K, yeah.  2K.
12           MR. SHELTON:
13               All right.  Standby.
14           COURT REPORTER:
15               You're labeling that 2K?
16           MR. MARTIN:
17               I am.  I don't know if we need a
18           separate one, but --
19           MR. SHELTON:
20               It's okay.
21           MR. SHELTON:
22               It's Exhibit 2, Exhibit K.
23           MR. LANGLEY:
24               It's Exhibit K to Exhibit #2 so it's
25           already attached.
```

**148**

```
1            COURT REPORTER:
2                Okay.
3            MR. LANGLEY:
4                Yeah.  So, you don't need another one.
5            All right.  Page one.
6    Q   It says, "Dear Patrick" and if you go down to
7        the second paragraph, "The sheriff elects to
8        appoint you as a third appraiser.  You will not
9        be acting for either the plaintiff or the
10       defendant to appraise the promissory note."
11       Okay.  Now, you told me earlier that you did not
12       appoint Mr. Lacour.
13           MR. LANGLEY:
14               No, I don't think that's what --
15           MR. MARTIN:
16               That's --
17           MR. LANGLEY:
18               -- she said.  I --
19           MR. MARTIN:
20               -- verbatim quote.
21   Q   So --
22           MR. LANGLEY:
23               I'll object to the form of the
24           question.
25   A   I don't remember --
```

**EXHIBIT C**

**149**

```
1   Q   Okay.
2   A   -- who appointed the third one.  I'm sorry.
3   Q   Okay.
4   A   I don't.
5   Q   If you go to page three, the I guess first full
6       paragraph on page three, which is about halfway
7       down the page.  It says, "The parts of the
8       statute which will apply to you are paragraphs A
9       and D.  I will need you to do two things."  And
10      then you go to the end or -- the end of that
11      section.  I think that's the third paragraph
12      down.  "That is all the detail the sheriff will
13      require."  Now, when you see these words, "I
14      will need you to do two things" --
15          MR. SHELTON:
16              Whoa, standby.
17          MR. MARTIN:
18              Yeah.
19          MR. SHELTON:
20              Where are you?  That is all the detail
21          -- okay, I'm with you.  Thank you.
22  Q   Did you authorize this communication?
23  A   No.
24  Q   All right.  Because you didn't know it existed?
25  A   No, I didn't.
```

**150**

```
1   Q   And you haven't even looked at this document
2       before we're looking at it right now?  It was
3       part of the amended complaint, but you haven't
4       seen this part, have you?  No.
5   A   No, sir.
6   Q   Okay.  Page four, halfway down, "Lucky Carr 2
7       was filed because of the attempt by Ms. Lollar
8       to place the immovable property described in the
9       credit sale deed with vendor's lien and special
10      mortgage out of her name."  Go to the next
11      paragraph.  "We caught onto Ms. Lollar's scam
12      and we filed Lucky 2.  We believe that the
13      Notice of Lis Pendens makes the claims in second
14      lawsuit effective."  To your knowledge when Mr.
15      Shelton says "we" there is he speaking for you -
16      -
17  A   No.
18  Q   -- or the sheriff's office?
19  A   No, sir.
20  Q   When he called something a scam, does that
21      mirror your characterization of any of this?
22  A   I have no idea what any of this means.  I
23      apologize.
24  Q   Okay.  I'm going to represent to you that this
25      is the information sent or part of the
```

**151**

```
1       information sent by Mr. Shelton to Mr. Lacour.
2           MR. LANGLEY:
3               So, what's your question?
4           MR. MARTIN:
5               I'm getting to it.
6   Q   This is some of the information sent by Mr.
7       Shelton to Mr. Lacour that he references in that
8       October 12th e-mail to you and you were telling
9       me today this is not something sent on behalf of
10      the sheriff's department?
11  A   Correct.
12  Q   Okay.  Page six of that same letter.  "We are
13      going to press forward with Lucky Carr 2 to a
14      trial and judgment.  Mr. Lucky is resolute and
15      unwavering and he will pursue Lucky Carr 2 to a
16      conclusion."  Do you know what Lucky Carr 2 is?
17  A   No.
18  Q   Do you know if --
19  A   I'm sorry, no.
20  Q   Do you know if the "we" referenced there,
21      "Continue to press forward with this Lucky Carr
22      2", whatever it is?
23  A   No, sir.  I do not.
24  Q   Have you read any of the pleadings in this case?
25          MR. LANGLEY:
```

**152**

```
1               Objection.  Asked and answered.
2           MR. MARTIN:
3               Okay.
4   Q   Has anyone told you that a federal judge in this
5       case has characterized this letter as one-sided
6       and present it to decisively slantive
7       perspective in favor of Mr. Lucky?
8           MR. LANGLEY:
9               Object to the form of the question.
10  Q   Not aware about this?
11          MR. LANGLEY:
12              Has anybody -- wait, what?  What is
13          that last thing?  Not worried about it?
14          You're not worried about that?  Is that what
15          you said?
16          MR. MARTIN:
17              I didn't say that.
18          MR. LANGLEY:
19              I'm sorry.  I misheard you then.  Has
20          anybody told you that the --
21          MR. MARTIN:
22              No one's told you that.
23          MR. LANGLEY:
24              No one's told you that?
25  A   No, sir.
```

**153**

```
1   Q   Just --
2   A   Sorry.
3   Q   Okay.  You're not aware of the existence of this
4       letter until today?
5   A   Correct.
6   Q   Okay.  Did you assume that most appraisers
7       looked at what they were appraising before
8       issuing an appraisal?
9   A   Honestly I don't know what the appraisers --
10  Q   Sitting here today, would you be surprised if
11      you learned that Mr. Lacour never looked at this
12      promissory note?
13  A   I don't -- I don't know how to -- I mean, I'm
14      sorry.  I just didn't know -- I don't know how
15      to answer, I guess.
16  Q   Based on your time in the civil department,
17      you'd be surprised today if I told you that the
18      only thing Mr. Lacour looked at was not the note
19      itself, but this letter?
20          MR. SHELTON:
21              I'm going to object to that.  It's
22      misleading.
23          MR. LANGLEY:
24              Object to the form of the question.
25  Q   Are you surprised to learn that?
```

**154**

```
1           MR. LANGLEY:
2               Do --
3   A   I --
4           MR. LANGLEY:
5               Do you know?  I'm going to rephrase
6       your question because it's misleading.  What
7       he looked at?
8   A   No.
9   Q   Was there any policy in place to prevent someone
10      like you or Ms. Taylor from handing over the
11      appraisal process to someone else?
12          MR. LANGLEY:
13              I object to the form of the question.
14      You don't have to answer that.
15  A   I don't know how --
16  Q   Yeah, please answer.  Is there a policy --
17          You don't --
18  Q   -- or guideline in place --
19          You don't --
20  Q   -- or guideline in place --
21              -- have to answer that.
22  Q   -- to prevent you from letting someone handle
23      the appraisal process for you?
24          MR. LANGLEY:
25              You don't have to answer that.  I'm
```

**155**

```
1       instructing you not to answer.
2           MR. MARTIN:
3               Are you asserting privilege?  I would
4       like to know.
5           MR. LANGLEY:
6               I'm instructing her not to answer --
7           MR. MARTIN:
8               Sure.
9           MR. LANGLEY:
10              -- that question.
11          MR. MARTIN:
12              And I would like to know your basis so
13      we can go to court and talk about it.  What
14      is your basis for telling her not to answer?
15          MR. LANGLEY:
16              Because it's argumentative, suggestive.
17      It's -- it's a ridiculous question, Counsel
18      --
19          MR. MARTIN:
20              I don't --
21          MR. LANGLEY:
22              -- and you know it.
23          MR. MARTIN:
24              It's irrelevant if it's ridiculous,
25      okay?  It's my question.  This is --
```

**156**

```
1           MR. LANGLEY:
2               It is.
3           MR. MARTIN:
4               -- our deposition --
5           MR. LANGLEY:
6               It is.
7           MR. MARTIN:
8               -- and if you keep going --
9           MR. LANGLEY:
10              And it's about to be over because you
11      keep going and doing things like this.
12      She's not answering that question.  You can
13      put it interrogatory and we can argue about
14      that.
15  Q   Is there any policy in place to prevent you from
16      handing the process over to a third party not
17      affiliated with the sheriff's office?
18          MR. LANGLEY:
19              Objection, two points.  One, it's been
20      asked and answered.  Secondly, it's --
21      you've asked her about policies before and
22      she's already answered it and secondly, it's
23      an improper question and I'm instructing her
24      not to answer it.
25          MR. MARTIN:
```

EXHIBIT C

**157**

1  It's improper for what reason?
2  MR. LANGLEY:
3  It's improper because it's suggestive
4  and argumentative.  It lacks foundation and
5  --
6  MR. MARTIN:
7  Okay.
8  MR. LANGLEY:
9  -- I think it's just -- it's violates
10  let's see, 401, 803.  I'm telling you, it's
11  --
12  MR. MARTIN:
13  And you think that those --
14  MR. LANGLEY:
15  -- an improper question.
16  MR. MARTIN:
17  Evidentiary rules are controlling over
18  what questions I can ask if they're in any
19  deposition?
20  MR. LANGLEY:
21  They are -- they are controlling over
22  what questions I'm going to allow my witness
23  to answer.
24  MR. MARTIN:
25  These are directly related to claims in

**158**

1  our lawsuit, okay?
2  Q  So, was there a policy in place to prevent you
3  from handing the process over?
4  MR. LANGLEY:
5  It's been asked and answered, Counsel.
6  Move on.
7  MR. MARTIN:
8  I asked about reading policies.
9  Q  Are there unwritten policies --
10  MR. LANGLEY:
11  All right.  Are there unwritten
12  policies.
13  Q  -- to prevent you from handing over the
14  appraisal process to somebody else?
15  MR. LANGLEY:
16  I object to the lack of a foundation to
17  the suggestion that's what happened in this
18  case --
19  MR. MARTIN:
20  That's fine.  You can dispute the
21  characterization.
22  MR. LANGLEY:
23  I'm sorry, Counsel, I was talking.  And
24  so I object to that question on those bases.
25  MR. MARTIN:

**159**

1  Great.
2  Q  Subject to that objection?
3  A  I don't know if there are or not.
4  Q  Let's say you're ultimately --
5  WITNESS:
6  Can I go to the bathroom?
7  MR. MARTIN:
8  Yeah.
9  WITNESS:
10  I'm sorry.
11  MR. MARTIN:
12  Yeah.  And I'm not going to be much
13  longer, I promise.
14  (OFF RECORD.)
15  MR. LANGLEY:
16  Counsel, if you'll just re-state your
17  last question.
18  MR. MARTIN:
19  Sure.
20  EXAMINATION BY MR. MARTIN, CONTINUING:
21  Q  Was there any policy in place to prevent you
22  from handing the selection of the third
23  appraiser process off to someone else?
24  MR. LANGLEY:
25  Subject to my objection.  I object to

**160**

1  the form of the question.  You may answer
2  it.
3  A  Not that I know about.  Not that I'm aware of,
4  yeah.
5  Q  We discussed generally that you're aware that
6  you've been sued, that you haven't read the
7  complaint in full.  I want to re-visit before we
8  finish up here.  Do you know why you in
9  particular -- what the plaintiff's allege you
10  have done in this case?
11  A  No.
12  Q  Okay.  You know you've been sued.  Are you aware
13  that we're seeking -- the plaintiffs are seeking
14  monetary damages from you?
15  A  Yes.
16  Q  Okay.  Do you understand we're -- plaintiffs are
17  also seeking damages from the sheriff --
18  A  Yes, sir.
19  Q  -- sheriff's office and Mr. Lucky?
20  A  No, I didn't --
21  Q  Okay.
22  A  -- know all the parties involved.
23  Q  You understand or do you understand that you're
24  being sued on a separate basis than the
25  sheriff's office or the sheriff himself?

**EXHIBIT C**

**161**

1        MR. LANGLEY:
2            Object to the form of the question.
3        You can answer it.
4    Q   Are you aware that you have been sued as a
5        distinct party with distinct interests from the
6        sheriff?
7        MR. LANGLEY:
8            Same objection.
9    A   It's just -- I guess it's basic knowledge.
10   Q   Sure.
11   A   You know, I don't have a lot.
12   Q   Okay.  I'm not asking you for a legal conclusion
13       or your legal reading.  Can you tell me in short
14       what you understand us -- the plaintiffs have
15       sued you for?
16       MR. LANGLEY:
17           I object to the form of the question.
18   A   I don't -- I couldn't tell --
19   Q   Okay.  I think it's the last thing, okay.  Were
20       you aware that Mrs. Lollar filed a motion to
21       enjoin or stop the sheriff's sale?
22   A   No, sir.
23   Q   Okay.  Could you have stopped the sheriff's sale
24       on let's say October 22, 2018?
25   A   The sheriff's sale was set for the 24th?

**162**

1    Q   Yes.
2    A   To my knowledge sheriff's sales can be stopped
3        the day of.
4    Q   Did you recommend --
5    A   I don't know about --
6    Q   Do you know who would have the power to stop a
7        sheriff's sale?
8    A   No, I don't.
9    Q   That's it.
10       MR. SHELTON:
11           I have just a couple of questions real
12       quick.
13   EXAMINATION BY MR. SHELTON:
14   Q   Exhibit #27.  Does that appear to you to be the
15       invoice that was received for Mr. Lacour's
16       services as an appraiser with respect to the
17       sheriff's sale?
18   A   I can't remember.  It -- I can't say for
19       certain.
20   Q   Okay.  The last line of it, do you see what his
21       last entry is the day being -- I believe it's
22       October 22nd?
23   A   Yes, sir.
24   Q   And what does that say?
25   A   Drive from Alex to Benton to deliver report and

**163**

1        sign appraisement.
2    Q   Okay.  Now I want you to look at Exhibit L-2,
3        Exhibit #2.
4    A   (Witness complies.)  Okay.
5    Q   And do you recognize your signature on that
6        page?
7    A   Yes, sir.
8    Q   Okay.  As deputy sheriff; right?
9    A   Yes, sir.
10   Q   Okay.  And do you see a signature for Mr.
11       Patrick Lacour on that page?
12   A   Yes, sir.
13   Q   And do you see that underneath his signature it
14       says, "Sworn to and subscribed before me this 22
15       day of October, 2018".
16   A   Yes.
17   Q   Okay.  So, you signed that document confirming
18       that Mr. Lacour appeared before you and signed
19       this appraisement sheet; correct?
20   A   Yes.
21   Q   Okay.  So, whether you were in or out of the
22       office that day you had, you know, interaction
23       with Mr. Lacour because he actually appeared
24       before you to sign this appraisement?
25       MR. MARTIN:

**164**

1            Object to form.
2        MR. SHELTON:
3            Okay.
4    Q   All right.  Did -- from this document, does this
5        refresh your memory of whether or not you would
6        have had interaction with Mr. Lacour on October
7        22, 2018 in connection with his rendition of his
8        appraisal?
9    A   Yes.  I did have interaction.
10   Q   Okay.  And how does that date, October 22, 2018,
11       square up with the invoice that you have there,
12       Exhibit #27?
13   A   Those dates are the same.
14   Q   Okay.  And what does the invoice reflect about
15       whether Mr. Lacour actually went to Benton on
16       that date?
17   A   It just says that he drove from Alex to
18       Benton --
19   Q   Okay.
20   A   -- deliver report and sign appraisement.
21   Q   Where did you work in the sheriff's office civil
22       department; what town?
23   A   Benton.
24   Q   Okay.  During the time that you worked from the
25       sheriff's civil office, describe to me any

EXHIBIT C

**165**

```
1        instance in which you believe you may have ever
2        handed over your duties that you performed for
3        the sheriff somebody outside the sheriff to do
4        your job for you if there were any?
5    A   I have not.
6    Q   Okay.  Would you have ever done that?
7    A   No, sir.
8    Q   Okay.  What was your position about whether you
9        would faithfully perform your duties to the
10       sheriff in the performance of his official
11       duties?
12   A   Okay.   Can you kind of rephrase that?
13   Q   Yeah.  Did you take an oath as a deputy sheriff?
14   A   Yes, sir.
15   Q   Okay.  And was that oath to faithfully discharge
16       the laws of the State of Louisiana?
17   A   Yes, sir.
18   Q   Okay.  And did you ever to your recollection
19       fail to do that?
20   A   No, sir.
21   Q   Okay.  That's all the questions I have.
22           MR. LANGLEY:
23               We will read and sign.
24           COURT REPORTER:
25               Okay.  You want a copy?
```

**166**

```
1            MR. LANGLEY:
2                Yes.
3
4
5
6
7    THE WITNESS WAS EXCUSED.
8    DEPOSITION CONCLUDED AT 5:15 P.M.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**167**

```
1                REPORTER'S PAGE
2
3        I, Jeanne Bain, Certified Court Reporter in and
4    for the State of Louisiana, the officer, as defined
5    in Rule 28 of the Federal Rules of Civil Procedure
6    and/or the Article 1434(B) of the Louisiana Code of
7    Civil Procedure, before whom this proceeding was
8    taken, do hereby state on the Record: That due to
9    the spontaneous nature of the interaction and
10   discourse of the proceeding, double-dashes (--) have
11   been used to indicate pauses, changes of thought
12   and/or talkovers; that such is the universally
13   accepted method for a court reporter's transcription
14   of a proceeding; that double-dashes (--) do not
15   indicate that words or phrases have been left out of
16   the transcript; And that the spelling of any words
17   and/or names which could not be verified through
18   reference resources have been denoted with the
19   parenthetical phrase "(spelled phonetically)."
20
21
22
23
24
25
```

**168**

```
1                CERTIFICATE
2
3        This certification is valid only for a
4    transcript accompanied by my original signature and
5    original required seal on this certificate.
6        I, Jeanne Bain, Certified Court Reporter in and
7    for the State of Louisiana, as the officer before
8    whom this testimony was taken, do hereby certify
9    that KIMBERLY FLOURNOY, after having been duly sworn
10   by me upon authority of R.S. 37:2554, did testify on
11   the 26th day of October, 2022, at Shreveport,
12   Louisiana, as hereinbefore set forth in the
13   foregoing pages; that this testimony was reported by
14   me in the stenograph reporting method, was prepared
15   and transcribed by me or under my personal direction
16   and supervision, and is true and correct to the best
17   of my ability and understanding; that the transcript
18   has been prepared in compliance with the transcript
19   format guidelines required by statute and rules of
20   the board; that I am informed about the complete
21   arrangement, financial or otherwise, with the person
22   or entity making arrangements for deposition
23   services; that I have acted in compliance with the
24   prohibition on contractual relationships, as defined
25   by Louisiana Code of Civil Procedure Article 1434
```

**EXHIBIT C**

**169**

```
 1   and rules of the board; that I have no actual
 2   knowledge of any prohibited employment or
 3   contractual relationship, direct or indirect,
 4   between a court reporting firm and any party
 5   litigant in this matter, nor is there any such
 6   relationship between myself and a party litigant in
 7   this matter; that I am not related to counsel or to
 8   any of the parties hereto, I am in no manner
 9   associated with counsel for any of the interested
10   parties to this litigation, and I am in no way
11   concerned with the outcome thereof.
12        This 30th day of November, 2022, Shreveport,
13   Louisiana.
14
15
16
17
18
19
20
21
22
23
24        _____
25             Certified Court Reporter
```



**EXHIBIT C**

**#**

**#1** 8:4
**#10** 62:25 68:17
**#11** 68:8,20,22
**#12** 69:1,2
**#127573** 65:13
**#13** 72:16
**#14** 73:20
**#15** 74:5,24 75:6 98:18
**#16** 77:24 92:5,6 93:2 100:23
**#17** 79:18 142:23
**#18** 92:21 95:9,10,11
**#19** 93:11 95:10,15
**#2** 8:19 9:13,19 24:22 145:10 146:7 147:24 163:3
**#20** 96:1,2 99:8 146:17
**#21** 103:2
**#22** 106:15
**#23** 111:6 112:2 114:23 117:2,20 119:14
**#24** 111:8 119:15,18
**#25** 114:25 119:21
**#26** 129:8
**#27** 162:14 164:12
**#2K** 145:11
**#3** 9:11
**#4** 16:16 20:25
**#5** 28:3 45:14
**#6** 29:13,14 43:3
**#7** 44:2 49:2
**#8** 49:10
**#9** 55:2 63:7 64:5
**#C-127573** 29:1

**$**

**$100,000.00** 127:13
**$1500.00** 44:13
**$50.00** 105:1

**1**

**1** 122:4
**1-2-7-5-7-3** 66:5 111:16
**10** 146:16
**10%** 19:5,21 21:13 22:1 24:5,9 76:7 77:4 113:6,9
**100%** 117:18
**10:00** 98:21
**11:05** 29:19
**12** 42:12 43:23 45:24 93:14 94:7 95:16,23

96:4 98:7,13 101:18 147:2
**127573** 68:13
**12th** 45:19 95:20 98:14 101:23 102:25 106:10 151:8
**13:4365".have** 16:18
**14** 70:3 73:18 75:6,10 76:13
**14th** 74:20,22 75:15,23
**1500.00** 49:16
**17** 78:3 79:12 85:16 86:7 87:2
**17th** 86:10,20 92:9 93:8
**18** 109:20 110:20 113:22 118:16 141:3
**18th** 110:12 112:2 114:20 115:5 116:21
**19** 116:2 118:14
**1:54** 118:14

**2**

**2** 122:4 147:22 150:6,12 151:13,15,16,22
**20** 70:18
**2016** 12:8
**2016-ish** 12:7
**2017** 12:9
**2018** 10:18 11:3,9 12:7 25:15 28:10,13 29:5,22 30:18 42:12 43:23 44:6, 22 45:24 47:3 54:7,11 63:5 68:1 70:16,18 73:18 75:6,10 76:9,13 78:4 79:12 87:2 93:1,14 94:7 95:13,16,24 96:4 98:7,13,21 101:18 109:20 110:20,24 113:22 116:2 118:14,16 141:3 144:3 146:16 147:2 161:24 163:15 164:7,10
**2019** 145:4
**2020** 143:21 144:14
**21** 93:1 95:12
**21st** 95:20,23 106:8
**22** 161:24 163:14 164:7, 10
**227-3306** 29:18
**22nd** 129:18 162:22
**23rd** 131:15
**24** 98:21 110:24
**24th** 161:25
**26b** 62:2
**2K** 147:11,15

**3**

**3** 122:4,5
**318-965-3404** 70:5
**3:04** 109:20 112:3 114:20 115:5
**3rd** 143:21

**4**

**401** 157:10
**4:00** 98:22

**5**

**5** 29:22 44:6,22 47:3 54:10,11 75:10
**5:15** 166:8
**5th** 29:25 49:18

**6**

**6** 63:5 70:16
**6-12-2018** 29:16
**6th** 55:4 68:16

**7**

**7** 28:10

**8**

**803** 157:10

**9**

**9:26** 95:13

**A**

**a.m.** 95:13 98:22 118:14
**ability** 144:4
**abnormal** 51:3,9
**above-referenced** 63:11 78:7
**access** 46:25 47:4
**accessing** 146:20
**accordance** 143:5
**account** 145:21,25
**accountant** 96:11
**accurate** 12:22 16:11
**acquainted** 16:5
**acting** 148:9
**action** 54:12,14 102:15, 17
**actions** 54:24 108:14

**actual** 70:6 71:2,7,18,21 77:15 127:15
**ad** 64:2 74:6
**adding** 24:13
**additional** 40:18
**addressed** 56:14
**administering** 124:5
**administers** 125:19,22
**administration** 12:1
**administrative** 12:9
**advertise** 53:20,23 58:4
**advertised** 50:14 51:15, 17 52:1 53:16 58:8 71:23
**advertisement** 71:20 72:2,4,6,21 73:22 74:9 110:22 111:2
**advertisements** 71:4 73:3
**advertising** 23:23 24:20 70:21,24 71:20
**advice** 75:16 102:11
**advise** 40:6 106:24
**advised** 44:9 48:6 78:20 84:25 85:6
**affidavit** 27:9,23 85:14 142:23 143:17,24 144:7,15
**affiliated** 156:17
**aforementioned** 71:4
**afternoon** 6:5
**agree** 131:7
**ahead** 32:12,15 36:12
**Alex** 162:25 164:17
**Alexandria** 116:12
**allegations** 25:2,9
**allege** 160:9
**allowed** 66:16 135:15
**amended** 8:21 150:3
**amount** 49:15 104:25 105:5 127:24 128:2
**Analyst** 96:13
**Analysts** 96:15
**answering** 131:22 156:12
**anybodies** 19:18
**anymore** 6:17 134:10
**Anytime** 56:24 90:21
**apologies** 69:7 112:18
**apologize** 14:10 34:4 122:21 130:14 131:25 135:21 150:23
**apologizing** 132:4
**appeal** 67:25 68:3
**appeared** 163:18,23
**appears** 28:12 29:14 73:24 96:2 109:18

117:24 129:17
**apply** 149:8
**appoint** 18:10 65:2 80:4 82:4 85:4 148:8,12
**appointed** 96:19 149:2
**appointing** 93:5
**appointment** 93:3 143:3,6
**appraisal** 17:18,19 21:2 76:10 77:13,19 78:7,9 80:5 93:19 94:21,23 96:9 97:13,14 98:13 104:24 105:5 110:24 116:9,14 120:4,6 121:14,18 126:14 143:3,5 153:8 154:11, 23 158:14 164:8
**appraisals** 19:20 24:4 76:7,15,17 77:16 78:8 80:3 97:12 113:5,8,12 120:14
**appraise** 85:3 93:6 96:10 148:10
**appraised** 77:22
**appraisement** 93:18 94:6,10,15,20 102:1 122:2 123:7,8 143:4 163:1,19,24 164:20
**appraiser** 17:9 18:11,25 19:2,7,22 20:3,5 21:25 22:9,16,20,23 23:6,12, 14 24:6 65:3 76:8,25 79:8 80:4 82:4 85:2,5,8 86:17 93:3,21 94:2,4 96:18 97:9,24 98:10 99:19 101:3,13,21,22 102:6,15,19 110:1,10, 18 112:5,10,14 113:1,4, 11,21 114:2 116:11 122:3,4,5 130:3 133:8 137:14 139:12 140:16, 17 143:13 148:8 159:23 162:16
**appraiser's** 104:22 105:11,14 106:1 109:23
**appraisers** 16:24 17:12, 15,20 19:4,8,13 20:2,7 24:1 76:6 97:11 120:14 129:22 153:6,9
**appraises** 78:10 100:25
**appraising** 96:20 153:7
**appreciated** 103:13 119:25
**approval** 64:2 65:1,4,5 73:4 105:2
**approved** 64:2
**approving** 108:14
**argue** 156:13

**argumentative** 155:16
157:4
**ASAP** 110:2 129:19
133:2
**aspect** 79:2,5
**asserting** 155:3
**assigned** 28:21 29:6
30:11 122:16,19
**assignment** 28:23
**Association** 96:14
**assume** 96:24 104:18
131:6 153:6
**attached** 29:10,11 63:10
72:21 93:3,17,19 94:19
118:22 147:25
**attaching** 96:15 103:8
**attachments** 8:20 93:22
**attempt** 150:7
**attention** 72:24
**attest** 59:7
**attorney** 15:12 33:17
40:21,23,25 42:9 45:8,
10,11,12,15 51:2 52:23
56:13 57:8,10 58:16,18
60:12,17,20 62:21
63:18,22 69:20 73:25
85:11 86:3 98:3 123:14
130:2
**attorney's** 58:24 59:9
106:1 143:25
**attorneys** 34:13 36:7,9,
16,17,18,24 39:18,20
40:11 50:16 51:16,25
60:14 62:20 97:7
107:10
**audible** 120:21 122:24
**authorize** 149:22
**authorizes** 105:2
**authorizing** 103:11,17
**award** 76:16
**aware** 8:10 27:8 65:11
142:20 152:10 153:3
160:3,5,12 161:4,20

**B**

**back** 9:5 10:18 16:22
24:22 42:12 44:21
45:13 54:10 75:4 79:19
81:17 91:5 92:1,5 95:9
97:5 98:17 99:8 100:13
104:21 112:2 118:18
129:17 130:7 135:10
142:23 144:4
**backwards** 109:14
**Barbara** 26:1 29:21 57:3
65:3 69:20

**based** 63:20 75:8 102:23
103:21 117:19 121:12
146:12 153:16
**bases** 158:24
**basic** 161:9
**basically** 12:21
**basis** 13:16,24 62:1
121:13 155:12,14
160:24
**bathroom** 6:23 159:6
**beginning** 113:3
**begins** 84:21
**behalf** 137:4,7,11 151:9
**belabor** 43:4
**bell** 42:18
**Benton** 98:20 162:25
164:15,18,23
**bid** 126:5
**bidding** 126:6
**big** 8:19 9:19
**bit** 9:6
**black** 136:14
**block** 98:19
**Board** 105:2
**body** 14:13 63:24 94:19
**book** 16:19
**books** 13:3
**Bossier** 10:3 44:3 49:16
72:8,14 74:8,14 118:21
**bottom** 45:14 69:10 70:1
109:17
**break** 6:19,20,22 7:3
13:2 90:13,17 91:14
92:1
**breath** 6:24
**briefly** 8:13
**bring** 89:16 120:4,14
**brought** 88:8,11 89:12,
17 120:7
**BSO85** 109:17
**Buddy** 26:6
**bugging** 132:12,13,14
**build** 129:20
**bunch** 13:3 16:6
**business** 85:11 86:3
141:21

**C**

**Caddo** 56:6,10,22 64:1
**calculates** 72:1
**calculation** 24:8 122:7,
9,23 123:2,9
**calculator** 24:13
**calendar** 71:12,13
**call** 21:13 28:7 34:13
53:3 100:11 102:25

119:21
**called** 8:4,21 16:17
29:18 121:9 150:20
**calling** 68:19 92:19
**capable** 6:10
**capacity** 11:22
**car** 59:18
**care** 146:2
**Carey** 57:3 65:3
**Carr** 57:4 65:13 66:24
67:1,25 150:6 151:13,
15,16,21
**Carter** 29:21 65:3
**case** 7:25 13:24 26:23
29:6 34:2,14 40:15
44:24 50:24 54:4,12
59:22,24 65:13 66:3
71:15 76:11 88:2 95:23
111:15 126:2,8,17
132:20 151:24 152:5
158:18 160:10
**cases** 18:25 20:3 30:11
31:12 42:8 52:22
**catch** 6:23
**caught** 150:11
**caution** 30:4 60:24 61:8
89:25
**certainty** 119:12
**Certified** 96:12,14
**Chad** 93:5
**characterization** 150:21
158:21
**characterize** 12:23 52:9
135:18
**characterized** 112:25
152:5
**charge** 48:9 127:1
**check** 49:15 54:3 74:19
78:25
**checked** 54:1 102:7,9
**chronologically** 82:25
**CIA** 118:19,20
**civil** 10:19,20 11:14,25
12:2,9 13:7,14 15:5,19
17:13 33:20,25 46:24
55:9 68:3,5 81:13,14
97:6 108:3,5,8,10,25
112:1 123:11 153:16
164:21,25
**claims** 150:13 157:25
**clarification** 42:10 84:16
**clarify** 125:23 127:22
**classes** 11:19 12:24
**clean** 14:20
**clear** 64:24 84:18,24
91:8
**clerical** 41:20

**clerk** 55:18,19 56:3,10
122:17 126:17
**clerk's** 63:6 109:24
**client** 9:24 26:1 137:8,
12,16 141:9
**closer** 144:20
**coached** 37:3
**code** 42:4
**cogent** 38:25
**comma** 142:19
**commission** 103:11,12,
18,20 104:6,10
**communicate** 14:13
36:1 40:1,2,9 126:20
131:9
**communicated** 49:4
115:9 140:25
**communicating** 40:3
99:18 137:3
**communication** 36:15
48:17 49:3 101:2
134:22 149:22
**communications** 36:21,
22 46:12 107:9 115:17
131:1 134:17 137:11
**complaint** 8:21 9:9 25:3
150:3 160:7
**completed** 71:8,11
**complies** 16:3 163:4
**concern** 25:3
**concerns** 25:12
**CONCLUDED** 166:8
**conclusion** 151:16
161:12
**conditional** 89:25
**confirm** 117:18
**confirmation** 143:8
**confirming** 163:17
**confused** 40:16 44:17
66:20 117:25 129:7
**connected** 27:11
**connection** 164:7
**connections** 34:14
**consist** 54:23
**construe** 133:10
**construes** 134:20
**consult** 15:11 82:17
**consulted** 21:1 76:1
78:21 80:22,23 81:16
82:10 83:1,13,14,16
84:21
**consulting** 48:5 78:19
81:5 87:25
**contact** 29:24 64:1 70:4
72:14 85:8,10 86:2 87:7
102:22

**contacted** 85:6 138:17
142:24 147:4
**content** 27:20
**context** 103:20 105:10
108:18,24
**Continue** 151:21
**CONTINUING** 32:25
38:18 41:19 43:1 62:17
92:4 135:17 159:20
**control** 33:23
**controlling** 157:17,21
**conversation** 14:12
27:21
**conversations** 14:18
85:25 99:22 100:4
106:6,9
**coordinate** 143:3
**copy** 7:17 38:6,10 55:15
89:9 96:16 116:13
146:19 165:25
**copying** 116:10
**correct** 11:20 13:1,8,10,
13 14:6 15:7,22 16:1,4
23:9 24:7 27:16 29:7
33:3 34:7 39:19,22
44:7,8 48:15 49:5,19
50:3 53:9 54:25 60:1
62:19 63:2 66:4,9 69:25
70:8 71:5 72:5,19,23
73:5,16,17,18 74:7
75:7,9,14 77:17,20,23
78:4,5 79:13 82:6
85:14,15,17 87:6,21
91:19 92:12,23 95:17
97:23 98:4 100:8,9
103:7 106:2,19 108:15
109:4 110:21 112:9
115:3 118:15 126:15
128:5 129:10 131:2
137:9 138:21 139:9
147:6 151:11 153:5
163:19
**correspond** 71:25
**correspondence** 100:6,
7
**cost** 128:11,19 129:20
**counsel** 36:1,22 38:21,
22 39:2 41:18 46:2 56:9
61:23 69:4 80:23 83:4,
24 84:8 89:14,24 99:6,
25 103:23 105:17 127:4
132:3 134:8 136:15,24
142:4 145:8 147:9
155:17 158:5,23 159:16
**Counselor** 22:13
**couple** 23:18 125:24
162:11
**court** 7:19 9:12,16 14:2,
7,14 29:23 38:5,9 43:20

EXHIBIT C

68:25 109:7,11 119:16,
22 129:9 147:14 148:1
155:13 165:24
**courteous** 131:20 132:9
**cover** 56:25 57:1
**Covid** 144:5
**crap** 134:10
**credit** 150:9
**creditor** 19:14 38:21
**creditors** 34:14 36:24
39:8
**criminal** 138:11
**critical** 83:4
**culminating** 65:12
**cured** 35:21,22,23
**curious** 100:19
**current** 10:11
**Curtis** 29:18 42:13,16
43:6,10 44:15 45:15
49:25 74:3 85:10 86:2
115:24 130:12 142:24
146:14
**curtisshelton@
arklatexlaw.com** 63:1
68:12 72:18
**cut** 104:16
**CV** 96:16
**CVA** 96:11 118:20

---

**D**

**daily** 13:24
**damages** 160:14,17
**date** 27:5 29:23 43:20
56:12 57:7,10 63:8
70:3,6,15,16,18,19
71:2,7,11,18,21,25
72:2,5 75:25 76:12
79:14 86:24,25 87:6
98:24,25 99:1 111:1
129:3 146:15,25
164:10,16
**dated** 28:10 29:16 44:6
78:3 93:14 96:3
**dates** 71:20 87:13 95:10
164:13
**David** 15:11
**Davis** 69:21
**Dawn** 6:8
**day** 87:8 100:17 115:13
116:1 118:16 125:19
129:21 130:16 140:5
143:21 162:3,21
163:15,22
**day-to-day** 13:16
**days** 70:3,11,16 80:6
82:8 93:2

**deal** 17:12,15 55:22 56:1
57:25
**dealing** 35:25 38:19
52:22
**dealt** 46:14
**dear** 49:14 55:18 56:3
68:13 93:2,17 96:8
103:8 148:6
**debtor** 19:15 38:22
**debtors** 36:24 39:8
**deceased** 62:10 89:20
**decide** 45:11 81:6,7
**decisively** 152:6
**deed** 111:14,20 150:9
**defendant** 9:10 26:16
27:1 148:10
**defendants** 25:24
**deliver** 162:25 164:20
**delivered** 93:20
**department** 10:19,20
13:14 15:5 33:20 46:24
55:10 56:4 94:12 97:6
108:6 151:10 153:16
164:22
**depended** 16:8
**dependent** 71:1
**depending** 71:22
**depose** 145:3
**deposit** 44:13 49:19
**deposition** 6:11,13 8:5,
11 61:17 156:4 157:19
166:8
**deputy** 163:8 165:13
**describe** 18:7 164:25
**description** 13:20 50:23
63:11 97:17 98:2
**designation** 96:12,13
**desk** 31:6 47:5
**detail** 149:12,20
**details** 28:17
**determination** 50:21
**determine** 24:10
**determining** 53:23
**didactic** 134:8
**differ** 113:5
**differed** 24:5,14
**difference** 23:16,22
64:15,18 77:5 134:4
**differently** 136:23
**differing** 113:9
**difficult** 107:20
**direct** 98:17 101:2
115:17
**directed** 66:7
**directly** 42:8 99:18
101:13 115:5 129:22
140:25 157:25

**discharge** 165:15
**discrepancy** 24:9 80:2,
19 81:4,16 82:5,21
83:6,8
**discuss** 81:7
**discussed** 23:18 64:4
68:16 73:15 99:13
104:23 105:3 106:5
160:5
**discussing** 76:5 102:18
**discussion** 105:9
**discussions** 105:7
**dispute** 158:20
**disrupted** 144:6
**distinct** 161:5
**distinction** 39:7 50:16
52:13 60:2,3
**distinguish** 36:17,23
38:20 39:4,10 40:2 59:8
**Docket** 29:1
**document** 7:21 8:3,5,18,
23 9:2,4,10,20 16:15
28:3 49:9,11 54:8 56:19
57:5 79:18 111:9 120:1
145:9,13,15 146:10
147:7,9 150:1 163:17
164:4
**documentation** 118:9
**documents** 7:14,15 31:5
54:15,17 81:19 93:23
112:20 117:25 118:7
**Dollar** 44:12
**Dollars** 105:1 127:13
**drafted** 96:5
**Drew** 6:5
**drive** 59:16,18 162:25
**driving** 59:14 118:22,25
**drove** 164:17
**duly** 6:2
**duties** 165:2,9,11

---

**E**

**e-** 68:8,15 78:14 117:2
**e-mail** 62:25 63:3,24
64:7,25 68:11 72:17
73:14,21 75:5 77:25
86:9 87:1,5,6 92:9,14,
21,24 93:2,8,12,15
94:19 95:10,11,15,18
96:2,6 97:4 100:23
101:18,23 103:3,5
104:21 106:16,20 107:7
109:18 110:3,5 112:2
113:2 115:24 116:2,7,
12,17,21 118:19 129:13
131:22 135:19 138:16,
19 146:25 147:3 151:8

**e-mails** 54:21,23 100:8
131:10 133:6
**earlier** 14:11 45:18
50:15 64:25 65:10 76:5
85:19 99:13 106:5
110:22 111:16 112:14
113:3 138:16 148:11
**easy** 144:5
**effective** 150:14
**electronically** 30:24
**elects** 148:7
**eleven** 85:9
**else's** 94:23
**employed** 10:2
**employer** 108:22
**enclosed** 49:14
**end** 63:24 149:10
**ended** 28:24,25 66:7
**ends** 95:11
**engage** 13:2
**enjoin** 161:21
**entail** 13:15
**entire** 76:2
**entirety** 9:1 25:8
**entitled** 37:8
**entrust** 108:5
**entry** 162:21
**envelope** 56:14
**equine** 62:10
**estate** 17:21 23:4,10
**evens** 28:24,25
**event** 78:8 96:8
**events** 144:2,14
**eventually** 143:12
**everybody's** 144:6
**Everything's** 64:20
**Evidentiary** 157:17
**exact** 11:5 72:10 79:14
**EXAMINATION** 6:4
38:18 43:1 92:4 159:20
162:13
**examined** 6:2 133:6
**examines** 9:4 81:19
93:23 112:20
**exchange** 73:21 75:5
77:25 92:21,24 95:11
129:13
**exchanges** 73:15 95:18
**exciting** 9:2 126:6
**Excluding** 70:14
**Excuse** 112:16
**EXCUSED** 166:7
**executed** 93:17 94:20
**exhibit** 8:4,19 9:11
20:25 24:22 28:3 29:14
43:3 44:2 45:14 49:2,10

55:2 62:25 63:7 64:5
68:8,17,20 69:2,5 72:16
73:20 74:24 75:6 77:24
79:17 92:5 93:2 95:11,
15 98:18 99:8 100:23
103:2 106:15 114:23
117:2,20 119:14,18
142:23 145:10 146:3,5,
7,17 147:22,24 162:14
163:2,3 164:12
**exhibits** 7:15,20
**existed** 149:24
**existence** 153:3
**expect** 101:1
**expectation** 101:14
**expectations** 101:10,17
**expecting** 101:12
**expedite** 52:16 57:7,10
58:17,24 60:17,20
**expedited** 57:12 58:25
64:5,11,13,16,19
**experience** 17:10 43:21
130:15 131:25 136:2
**experienced** 15:24
85:11 86:3
**explain** 39:10
**extent** 27:25 35:20
**extra** 52:17

---

**F**

**Facias** 28:4,5
**fact** 61:17
**factors** 115:22
**fail** 165:19
**fair** 101:12
**faithfully** 165:9,15
**familiar** 22:2 26:4
104:13 106:4
**fare** 104:18
**faster** 6:18
**fault** 75:4
**favor** 137:22 152:7
**favors** 60:14 61:5
**fax** 44:23 46:8
**February** 143:21 144:14
**federal** 152:4
**feel** 6:10 46:5 132:5,16
**feeling** 6:10
**fees** 104:22 105:11,14
106:1 109:23 128:13
**fell** 79:19
**Fieri** 28:4,5
**FIFA** 28:7 29:19
**fifteen** 10:10 44:12
49:15 143:1

---

**EXHIBIT C**

**Fifty** 105:1

**fifty-five** 59:15,17

**file** 15:20 24:21 28:18, 19,21 29:8 30:21,23,25 31:20 33:22 34:8 43:24 44:24 54:22 71:14 75:9, 11,12,13,17 89:11,12 95:23 109:24 111:18 121:25 122:19,21,22 126:18,19 127:1,19 129:2

**filed** 9:9 63:18 150:7,12 161:20

**files** 13:25 16:7 30:18 34:11,15 127:14

**filing** 45:5

**filled** 48:13

**final** 123:8 126:13 127:24

**find** 49:15 78:13 93:6,17 94:20 101:21 102:6,15 104:24 105:4

**fine** 12:6 28:2 41:18 73:12 94:10 100:10 115:24 119:13 121:17 145:17 146:9 158:20

**finish** 14:18 160:8

**five-** 42:21

**fix** 104:22 105:14,25 109:23

**fixing** 105:11 121:18

**floor** 12:24 79:20

**Flournoy** 6:1,8,9 44:4 109:21 115:25 118:20, 21 130:12

**flow** 6:18

**folder** 31:1,3 33:4,5,13, 15 34:6

**folders** 31:4,5,9,12 34:1

**follow** 58:5

**foreclosures** 13:17 14:23

**foreign** 16:16

**forget** 41:2

**form** 17:1 18:20 22:11 25:5 30:8 31:22 32:14 34:17,19 35:10,17 36:4, 20 37:1,8,15 38:24 43:9 45:21 47:23 48:13 49:7, 21 51:5,7,19,23 52:5, 11,25 54:19 55:13 56:18 57:15 58:13,20 59:3,11 60:21,23 61:21 65:15 67:13 70:7 71:3 72:24 73:22 76:19 83:3 84:10,18 86:12,22 87:10 89:22 94:11 97:20 101:5 105:17

106:4 107:23 110:1,10 111:10,12,13 112:5 113:14 115:11,19 116:23 117:7 118:6 119:2,9 120:9 124:19 125:6,21 127:3 128:22 131:4 133:15 137:18 140:18,20 141:14 144:18,22 148:23 152:9 153:24 154:13 160:1 161:2,17 164:1

**formal** 11:11 70:21

**forty-five** 59:19

**forward** 44:13 151:13,21

**foundation** 35:7,8,23 157:4 158:16

**fourteen** 70:16

**fourth** 142:24

**free** 46:5

**fresh** 39:11

**Friday** 93:14 95:12,16 116:1

**front** 80:16 127:19

**full** 6:7 149:5 160:7

**funds** 45:4,5

___

**G**

**Garland** 93:5

**gave** 121:6

**general** 23:1,2 36:23 38:20 94:11 132:18

**generally** 9:23 24:24 39:17,23 63:13 70:18 71:2 76:6,16,24 115:15 122:22 144:19 160:5

**genuinely** 104:13

**give** 30:5 39:1 59:14 78:12 90:17 115:20 116:13 131:5 133:7 144:23

**giving** 6:10 8:10

**glass** 123:25

**good** 6:5,6 49:1 70:15 137:16 144:8

**gotcha** 52:12

**grade** 12:15

**great** 68:14 80:2,19 81:4,15 82:20 83:6,8 117:8 129:21 130:16 159:1

**greatly** 78:8

**ground** 6:18

**guess** 12:6 16:8 17:3,16 23:3,4 25:7,11 30:6 39:3 40:16 44:17 45:8 51:24 58:5 65:21 66:12, 20 67:17 69:16 81:13

82:15 85:23 91:16 110:11 122:10 127:6,11 131:19,23 132:5,12,15, 16 133:18 134:3 137:6, 25 138:2 140:11 149:5 153:15 161:9

**guessing** 12:13 30:22

**guideline** 154:19

**guidelines** 21:9,24 121:23

**guys** 108:5

___

**H**

**halfway** 99:11 149:6 150:6

**hallway** 125:25

**hand** 7:17 8:3,18 9:10 16:15 28:2 49:9 62:24 68:7,19 73:20 74:5 77:24 79:17 92:20 93:11 96:1 106:15 109:5 111:8 119:15 145:9

**handed** 9:20 20:25 33:16 165:2

**handing** 72:16 103:2 154:10 156:16 158:3,13 159:22

**handle** 139:14 140:10, 15 154:22

**handled** 70:9

**hands-on** 11:17 12:20

**handwriting** 50:4,5 74:12

**happen** 52:8,14 142:1

**happened** 54:5 126:23, 25 129:3 144:8,20 145:5 158:17

**happy** 90:17

**harassment** 62:2

**hard** 36:14 104:15 111:4 122:10 128:9

**harsh** 135:16

**Hart** 45:15

**head** 14:1 26:10 27:13 56:5 68:2 73:19

**heard** 23:11 42:17

**helped** 13:12

**helpful** 138:7

**helping** 131:16,18

**hey** 139:11

**hold** 29:20 31:14,16

**holding** 49:2

**holidays** 70:14

**homework** 12:15

**honest** 101:17

**honestly** 73:2 101:9 126:24 153:9

**hoping** 132:12

**Horne** 15:4,11,14 16:2 21:7 24:18,21 41:2,9,15 48:5 53:5 54:1 75:22 80:22 81:5,10,17 82:9, 13,17 83:1,14,21 107:10

**Horne's** 15:5,8

**hours** 98:21

**hundred** 44:12 49:15 117:18 127:13

**husband** 26:2

___

**I**

**idea** 150:22

**identification** 45:16 50:25

**identified** 140:24

**identify** 7:16 107:3

**III** 26:6

**immediately** 64:1

**immovable** 23:17 50:18 53:6 150:8

**impressed** 144:3

**improper** 61:16 134:9 156:23 157:1,3,15

**include** 70:20 119:14

**incorrect** 52:17

**incurred** 128:14

**indication** 118:2

**infer** 116:19 117:14 119:6

**inference** 119:7

**inferred** 91:19

**Inferring** 117:15

**information** 40:18 51:12 52:17,18,20 72:22 96:17 97:1,8,11,15 98:4,8 99:3,4,12,15 100:14 102:23 111:13 138:18,22 139:2 141:1, 22,23 147:5 150:25 151:1,6

**inquire** 40:19,21

**instance** 24:12 26:1 34:2 47:5 67:5 98:3 117:20 133:7 139:11 165:1

**instances** 58:23 97:7 130:1

**instruct** 35:5 62:1 90:1

**instructed** 80:2,8,18 81:3,9,15,24 82:3,20 83:5,7

**instructing** 37:10 62:9 80:19 90:9 155:1,6 156:23

**instruction** 30:15 52:3 61:24 83:8,13

**instructions** 40:11 52:23 53:3

**instructs** 7:8,9 82:9

**interaction** 163:22 164:6,9

**interest** 138:9 142:20

**interests** 161:5

**interim** 144:6

**intermediaries** 115:16

**internal** 20:19

**interpretation** 134:4,5

**interrogatory** 156:13

**invoice** 74:8,24 129:19, 22 130:3,8,9,20 133:1 162:15 164:11,14

**invoices** 74:15 128:10

**invokes** 90:7

**invoking** 61:14

**involved** 27:14 36:7,9 43:24 68:5 69:18 88:2 107:21 108:11 160:22

**irrelevant** 155:24

**Island** 10:1

**issue** 22:5 53:5,11

**issued** 29:20

**issues** 41:21 109:2

**issuing** 153:8

___

**J**

**James** 15:12 48:6 75:18 78:19 80:24 84:25 85:5, 9 86:5 126:12

**Jay** 69:21

**Jean** 15:4,5,8,10,11,13 21:7 24:18,21 40:5 48:5 53:4 54:1 75:22 80:22 81:5,16 82:9,17 83:1,14

**job** 10:5,12,18 13:5,14 18:10,13 66:12,17,18 108:7 165:4

**jog** 64:7

**Join** 57:17

**Jones** 25:4 30:7,12 31:21 32:2,7,11,18 34:16,20 35:1,12,16 36:3 37:7,14,19 38:6,7 41:12 43:8,15 45:20 51:4,18,22 55:3,7 56:17 57:14,20 58:19 59:2 61:25

**judge** 152:4

___

**EXHIBIT C**

**judgement** 39:8
**judgment** 18:16 19:14, 15 29:11 38:21,22 39:8 65:12 67:7,18 151:14
**judgments** 67:22
**Julianna** 27:17
**July** 28:13 29:22,24 44:6,22 47:2,3 49:18 54:9,10 75:10
**June** 28:10 29:5 42:12 43:23 45:19,24

**K**

**Kenny** 130:7
**key** 76:24
**Kim** 49:14 78:14 93:3,17 96:8 103:8 106:25 109:20 115:25 118:20, 21
**Kimberly** 6:1,8 44:4 68:13 130:12
**kind** 11:17 22:5 40:16 48:13 54:17 58:4 132:16 134:3 139:14 142:1 165:12
**knew** 42:13 43:6,23 44:17,20 45:19 66:3 85:11 86:2 142:12
**knowing** 116:25
**knowledge** 20:20 31:11 48:16 98:12 115:4 150:14 161:9 162:2

**L**

**L-2** 163:2
**label** 145:18
**labeling** 9:11 62:24 79:17 96:2 147:15
**lack** 158:16
**lacks** 35:7,8 157:4
**Lacour** 96:10,17,19 97:1 99:3,12 102:25 109:25 110:7,9 112:4,6,7,25 113:21 114:2 115:5,8, 25 116:9,16,20 117:5, 10,21 118:4,13,17,19, 25 120:3,7,25 121:7,13 129:19 131:2,8 133:1 134:23 138:17 139:7 140:25 141:23 143:1,2, 10,13 147:4 148:12 151:1,7 153:11,18 163:11,18,23 164:6,15
**Lacour's** 96:16 102:22 114:16 162:15
**lady** 11:14

**Langley** 7:23 16:25 18:19 22:10,17 26:19 27:15 30:3,14 31:25 32:9,13,20 34:18,22 35:6,14,19 36:5,10,19, 25 37:21 38:1,15,23 39:24 41:1,5,10,17 42:20 45:22 46:1,16 47:12,22 48:23 49:6,20 51:6 52:4,10,24 54:18 55:12,23 56:8 57:16,22 58:12 59:10 60:5,8,22 61:3,11,15,22 62:3,8,13 65:14 66:13 67:9,12 68:21 69:3 74:21 75:1 76:18 77:1 79:3 83:2,23 84:1,7,13,17 86:11,21 87:9 88:19,25 89:13,21 90:8,20 91:6 99:9,24 100:20 101:4 103:22 104:2,7,11 105:16,22 107:22 110:14 112:15, 21 113:13 114:9,13,17, 21 115:1,10,18 116:22 117:22 118:5 119:1,8 120:8,12 127:2,7 128:21 131:3 132:2 133:14 134:7,14,21 135:1,6,11,24 136:4,8, 12,17,21 137:17 138:1, 4,14 139:16,22 140:3, 13 142:2,8,14 144:17, 21 145:6,12,20,24 146:6,21 147:23 148:3, 13,17,22 151:2,25 152:8,11,18,23 153:23 154:1,4,12,17,20,24 155:5,9,15,21 156:1,5, 9,18 157:2,8,14,20 158:4,10,15,22 159:15, 24 161:1,7,16 165:22 166:1
**language** 14:13 63:10 70:7 71:3 117:15
**largely** 125:11
**law** 17:17 18:14 19:11 21:15 58:5,11 59:6,8, 16,23 60:10,11 70:22 81:14 121:20,23 123:9 135:15 138:11
**laws** 165:16
**lawsuit** 9:7 25:20 26:25 27:8,18 42:19 95:4 150:14 158:1
**lawsuit's** 24:25
**lawyer** 7:9 137:7
**lawyer's** 79:19
**lawyers** 7:14 26:22 27:14 39:5

**learn** 12:20 26:25 136:16 138:10 153:25
**learned** 153:11
**learning** 14:23 15:1 130:15 131:24 136:2
**leaving** 125:11
**led** 65:11 66:22
**left** 33:19,25 41:24 42:4 45:14 83:4
**legal** 22:5 25:6 80:23 161:12,13
**letter** 44:7 45:1,6,7 46:22 48:13 49:11,18 50:2,4 54:7 55:4,9,14, 15 56:15,22,25 57:1 63:6 103:9 151:12 152:5 153:4,19
**letter's** 44:6
**letterhead** 44:2
**letters** 52:16 54:21,23
**letting** 154:22
**level** 15:8 108:23
**lied** 43:7
**lien** 150:9
**life** 48:20
**limit** 59:15,22
**Lis** 150:13
**list** 17:20,24 18:8 20:6,7, 11,13,15,16,22 21:4,12, 14 23:8 24:1
**listed** 71:3
**litigation** 65:11 68:5
**Liz** 30:4
**locate** 85:7
**located** 96:9
**location** 47:21
**lock** 47:18
**locked** 47:8,9,14,19,20 48:1,3,7,10 89:8
**log** 70:11
**Lollar** 10:1 26:2 57:4,5 65:3 69:20 150:7 161:20
**Lollar's** 150:11
**long** 9:2 10:7,11,22 11:1,7 24:22 25:3 104:14 111:25 144:2
**longer** 159:13
**looked** 16:18 66:10 67:3 94:18 100:7 117:19 118:3 120:6 131:7 138:16 150:1 153:7,11, 18 154:7
**lot** 8:20 14:12 51:12 53:2 107:9 161:11
**Louisiana** 16:17 17:17 18:14 58:5 98:20

165:16
**Lucky** 26:6,7,9 65:12 66:24 67:1,25 93:4 137:1,4 142:13,20,22 150:6,12 151:13,14,15, 16,21 152:7 160:19
**lunch** 121:5

**M**

**made** 35:21 58:2 76:10 114:2
**Magnolia** 10:1
**mail** 56:13 57:8 68:9,16 74:19 78:15 117:3
**mailing** 103:10
**make** 6:15,18 14:11,20 37:20 50:20 60:2,3 63:12 64:24 77:16 83:19 125:6
**makes** 7:6 20:9 42:11 150:13
**making** 134:1
**managing** 28:18
**manner** 64:14
**Marie** 57:3 65:3
**mark** 8:19 55:1
**marked** 16:16 20:25 43:2 45:13 63:7 75:6 100:23 109:17 119:17 145:10
**marking** 8:4 28:3 29:13 44:1 68:7
**Martin** 6:4,5 7:24 9:14, 18 22:14 31:23 32:4,16, 23,25 35:9,24 37:4,11, 16,24 38:13,18 41:3,8, 14,19 42:23 43:1,13,17 46:4 48:25 55:5 61:1,7, 13,19 62:5,11,15,17 65:18 68:23 69:6 74:23 75:3 84:3,11,15,20 88:22 89:3 90:12,16,23 91:3,25 92:4 99:7 100:1 103:25 104:4,9 105:20 109:9 112:17 114:19 119:19,24 120:10 123:17 124:9,13,21 125:2,7 129:6,11 133:16 134:12,19,24 135:3,8,13,17 136:6,10, 19 139:19 140:1 142:6, 17 145:16,22 146:4,18, 23 147:10,16 148:15,19 149:17 151:4 152:2,16, 21 155:2,7,11,19,23 156:3,7,25 157:6,12,16, 24 158:7,19,25 159:7, 11,18,20 163:25

**martyr** 63:17
**material** 57:25 58:2
**materials** 64:6
**math** 70:15
**matter** 33:10 41:25 64:4, 8 70:1 85:1,7 107:18
**matters** 144:11
**means** 31:17 65:4 95:2 96:25 113:22 150:22
**meant** 119:13
**memory** 64:7 144:9,13 164:5
**mention** 41:9
**mentioned** 41:15 85:9 88:15,16
**mentions** 86:5
**message** 103:9 116:11, 16
**messages** 33:11
**Microsoft** 29:15
**mid** 30:17 76:9
**Miller** 15:12
**mind** 39:12 134:25 145:14
**mine** 28:6 50:6
**minute** 33:1 42:22 51:9 78:13 123:13
**minutes** 41:15
**mirror** 150:21
**mischaracterize** 143:8
**Mischaracterizes** 139:17
**mischaracterizing** 139:24
**misheard** 152:19
**misleading** 123:6 153:22 154:6
**misspelling** 41:23
**misstating** 41:6
**misunderstanding** 104:12
**Monday** 78:3 117:6
**monetary** 19:21 160:14
**money** 128:13
**months** 54:8
**mortgage** 150:10
**mother-in-law's** 59:17
**motion** 103:10 104:22 105:13,25 109:22 161:20
**motions** 103:16
**mouth** 105:24
**movable** 20:6,7 23:17 50:13,18 51:3 53:11,13 71:10
**movable/immovable** 50:16

**movables** 23:3,4,10
**move** 44:1 112:22
  136:23 158:6
**moved** 12:9 33:20
**movies** 126:5
**moving** 17:21,22

---

**N**

**NACVA** 96:13
**named** 9:9
**names** 78:12 92:17
**National** 96:13
**nature** 23:24 40:19
  41:24 42:1
**necessarily** 82:15
**necessitate** 19:7
**necessitation** 22:15
**needed** 40:7,17 51:17
  52:1 76:8 96:9
**needy** 130:14 132:1
  135:21
**negotiate** 103:12
**neophyte** 11:3
**Neutral** 23:14
**newspaper** 72:7,11,14
**nods** 14:1 56:5 73:19
**non-** 17:21
**non-movable** 20:7 71:10
**non-movables** 23:3
**noon** 116:10
**normal** 129:23 130:21
**notary** 80:16 116:12
**note** 25:15,17 29:14,16,
  22,23,25 30:10 31:19
  33:2,14 43:3,5,20,24
  44:11,16,24 46:15,21,
  25 47:19 50:8,12 78:23
  84:22 85:3 88:14 89:8
  93:7 96:17 97:1 98:24
  99:3,12 104:25 105:5
  130:23,24 148:10
  153:12,18
**notes** 30:17,20 33:5,7,9,
  12,16,18,19 34:6,10
  43:21 78:11 100:25
**notice** 8:4 9:11 65:2
  69:9,14,16,17,22 70:4,
  17 71:6 72:21 150:13
**notices** 69:12
**November** 145:3
**number** 16:11 29:2
  41:23 43:24 66:3,8
  102:2 111:15 126:14
**numbers** 122:6 126:2

---

**O**

**oath** 93:18 94:1,3,20
  101:25 165:13,15
**oaths** 93:21
**obeying** 59:22
**object** 17:1 18:20 22:11
  25:5 30:8 31:22 32:10,
  14 34:17,19 35:7,10
  36:4,11,20 37:1 38:24
  43:9 45:21 49:7,21
  51:5,7,19,23 52:5,11,25
  54:19 55:13 56:18
  57:15 58:13,20 59:3,11
  60:23 61:20 67:10
  76:19 83:3 84:10,18
  86:12,22 87:10 89:22,
  23 101:5 105:17 107:23
  113:14 115:11,19
  116:23 118:6 119:2,9
  120:9 123:5 124:19
  125:21 127:3 128:22
  131:4 133:15 137:18
  141:14 144:18,22
  148:23 152:9 153:21,24
  154:13 158:16,24
  159:25 161:2,17 164:1
**objected** 142:16
**objection** 7:7 30:13
  35:17,20,21,23 37:9,15,
  20 39:25 46:2,17 47:23
  57:17,21,23 60:6 61:21
  65:15 77:2 79:4 83:24
  84:8 89:14 100:21
  123:20 125:6 127:9
  134:8 136:18 139:17
  152:1 156:19 159:2,25
  161:8
**objections** 90:7
**obtain** 80:4
**occasionally** 34:12
  51:11 52:16
**occur** 141:7
**occurred** 85:16
**October** 93:14 94:7
  95:16,20,23 96:4 98:7,
  13,14,21 101:18,23
  102:25 106:10 109:20
  110:12,20,23 112:2
  113:22 114:20 115:5
  116:1 118:14,16 129:18
  131:15 141:3 146:16
  147:2 151:8 161:24
  162:22 163:15 164:6,10
**odd** 28:24 29:2 66:8
**odds** 28:25
**office** 10:3,8 11:22
  20:19,21 21:10 22:24,

---

25 23:8 44:3 46:24
  49:17 55:10 56:7,11,23
  70:5,10 74:16 97:22
  109:24 117:6 140:18
  143:4,25 150:18 156:17
  160:19,25 163:22
  164:21,25
**offices** 63:7
**official** 165:10
**one's** 152:22,24
**one-sided** 152:5
**online** 16:21
**order** 44:11 49:16 56:12
  57:7,9 82:2,12 103:10
**orders** 8:7 103:17
**original** 44:11,16 46:20
  50:7 116:13
**Originals** 93:19
**originated** 65:21
**other's** 14:18
**outcome** 142:21
**owe** 128:13

---

**P**

**p.m.** 98:22 109:20 112:3
  114:20 115:5 166:8
**packages** 79:19
**paper** 20:25 134:18
**papers** 13:18
**paperwork** 27:3 106:23
  107:1,6 118:12
**paragraph** 80:1,21
  81:24 83:11,12 84:21,
  25 85:5,9 98:19 148:7
  149:6,11 150:11
**paragraphs** 149:8
**Parish** 10:3 44:3 56:6
  64:1
**Parks** 27:17
**part** 9:17 20:18 41:2
  119:14 145:10 150:3,4,
  25
**Parte** 104:22 109:22
**partially** 75:13
**parties** 25:23 39:17
  69:17 160:22
**parts** 9:3 149:7
**party** 18:16 36:2 39:13,
  14 69:19 96:21 110:18
  156:16 161:5
**Pat** 11:12,13 12:19
  14:24 15:15,16,18,21
  21:5,8,19,21 28:22 45:3
  72:13 75:22
**Patrick** 96:10 102:25
  113:18 119:25
  143:1,2,10,12 148:6

---

163:11
**pay** 128:20
**payable** 49:16
**pays** 105:1,6
**Pendens** 150:13
**pending** 6:25 45:23
  91:4,7,9
**people** 14:18 20:10
  26:12 51:11 76:1
  115:15 126:2 128:10,
  13,20 132:12,13
**percent** 19:5,21 21:13
  22:1 24:5,9 76:7 77:4
  113:5,9 117:18
**perform** 165:9
**performance** 165:10
**performed** 165:2
**performing** 143:2
**peril** 62:14
**period** 95:19 136:25
**person** 21:14 72:1 93:6
  96:9 140:23
**personal** 11:17 108:23
  138:8 141:20
**personally** 26:11,17
  108:11,13
**personnel** 12:10
**perspective** 152:7
**petition** 9:7 67:5
**phone** 33:11 41:23
  106:6,14 117:11 139:10
**phrased** 133:20
**physical** 31:1 46:25
**pick** 14:14 17:9,10 20:10
  106:25 107:1 109:24
**piece** 17:8 20:24 50:17
  69:23 77:21 127:12
**place** 47:15 78:22 150:8
  154:9,19 156:15 158:2
  159:21
**plaintiff** 73:25 93:4 95:2,
  3,7 148:9
**plaintiff's** 93:18 94:21,
  22 160:9
**plaintiffs** 7:24 25:24
  160:13,16 161:14
**Plantation** 10:2
**play** 52:12
**pleadings** 67:4 151:24
**point** 6:19 7:13 10:24
  11:24 12:6 14:22 29:5
  42:14 43:4 44:15,21
  47:1,2 49:1 71:18 73:14
  75:11 88:8 99:22 100:4
  101:20 102:5,16,20
  103:18 106:7,9 110:7,
  25 113:22 114:15

---

143:19
**points** 156:19
**policies** 156:21 158:8,9,
  12
**policy** 154:9,16 156:15
  158:2 159:21
**position** 11:3,9,10 33:21
  165:8
**possibly** 16:12
**potential** 97:8 99:18
  101:2,21 139:12
**Powell** 69:21
**power** 162:6
**preceded** 25:21
**prepare** 103:14
**prepared** 103:13
**preposition** 124:8
**present** 152:6
**press** 151:13,21
**Press-tribune** 72:8 74:8,
  14
**pretty** 78:24 144:8
**prevent** 154:9,22 156:15
  158:2,13 159:21
**previous** 32:5 54:8
  132:25 133:6
**previously** 11:21 73:14
**price** 121:18 122:7
  126:9 127:15
**print** 97:21
**printed** 97:20
**prior** 17:16 24:20 27:8
  28:19 45:19,24 46:12
  75:15,23 85:16 86:17
  87:19,20 106:6 118:14
**privilege** 61:14,21 90:7
  155:3
**privileged** 61:10
**problem** 115:2 146:20
**procedure** 79:2
**procedures** 23:17
**proceed** 32:21 42:8
  44:12,14 62:14
**process** 15:1 16:8 64:22
  98:16 128:18 154:11,23
  156:16 158:3,14 159:23
**processing** 13:25
**produce** 29:21
**projected** 98:25
**promise** 159:13
**promissory** 25:14,17
  29:22 44:11,16,24
  46:15,21 47:19 50:12
  78:23,24 85:3 88:14
  89:8 98:24 104:25
  105:5 130:23,24 148:10
  153:12

---

**EXHIBIT C**

pronunciation 28:6
properties 128:4
property 17:8 18:17 23:17 35:25 39:14 47:14,17,18 50:13,17 51:3 53:6,12,24 69:23 97:8 98:2,4,23 111:22 126:2 127:12 150:8
property's 77:21 111:21
protection 62:2
provide 71:6 85:12 97:11 143:5
provided 96:16,25 97:7, 14 99:2,12,15 100:14 138:18,23 139:3 141:1 142:25 147:5
providing 97:19 98:4 137:24 139:7
purposes 72:2
pursue 151:15
put 6:17 34:6 72:3 105:24 156:13

Q

question 6:24,25 7:1,3, 4,6,11 17:1 18:20 22:12,19 31:24 32:6,8, 14,17,22 34:21,23 36:11,20 37:1 38:24 40:8 45:23 47:23 49:8, 21 51:7 52:5,11,25 54:19 55:13 57:15 58:13 59:11 60:23 61:6, 16 62:10 65:15 66:14 67:13 74:6 76:19 79:5,7 83:3,5 84:19 86:12,22 87:10 88:20 89:23 90:1, 10,11 91:2,4,8,9 101:5 102:4 105:18 107:23 113:14 115:11,19 116:23 118:6,18 119:2, 9 120:9 124:19 125:21 127:3 128:22 131:4 132:3,16 133:11,12,15, 20,22,23,24 134:9,11 136:1,5,13,15,20,22 137:18 138:15 139:20 140:2,4,6 141:17 142:11,18 144:18,22 145:8 148:24 151:3 152:9 153:24 154:6,13 155:10,17,25 156:12,23 157:15 158:24 159:17 160:1 161:2,17
questions 15:2,10,14 40:4 81:6 89:24 90:6 91:17 123:5 132:17 134:16 135:14 142:5

157:18,22 162:11 165:21
quick 162:12
quickly 16:5
quiet 125:11
quit 114:10
quiz 12:14
quote 148:20

R

rabbit 123:24
random 28:23
Ray 57:3
re-mark 69:4
re-state 44:22 159:16
re-stating 32:5
re-visit 160:7
reach 39:20,23 40:1,9, 24 85:20
reaching 40:3
read 8:25 9:3 13:3 25:2 109:13 151:24 160:6 165:23
reading 9:3 81:18 96:25 101:19 158:8 161:13
reads 87:5
ready 92:2 112:22
real 17:21 23:4,10 162:11
reason 157:1
recall 12:3 23:22 24:10, 12,15,18 29:4 50:1,24 52:20 53:4,8,10,14,15, 19 54:4,6,11 57:9 58:23 60:16 65:6 74:9,10 75:15 76:9 79:18,22 92:24 93:11 94:6 95:18 96:25 98:3,7 99:3,14, 17,21 100:3 101:14 102:5 103:1,2 105:6,9, 15,25 106:8,20 107:11 108:9,13 109:5 116:2,8, 17 117:8 118:13,23 130:10,16 132:21,22 138:18 139:7 144:4
recap 142:9
recapping 142:7
receipt 48:5
receive 52:3,23 53:2 63:25 65:1 94:1 116:16
received 44:9,11 46:20 74:17 162:15
receiving 50:1 93:12 96:6,22 116:2 118:23
recognize 7:21 28:7 49:11 69:8,9 111:8 120:1,3 121:9 129:13

163:5
recognized 107:2
recollecting 141:2
recollection 18:24 75:21,24,25 144:8 165:18
recollections 145:4
recommend 85:2 162:4
recommendation 78:18 85:21 86:8,16 87:18 93:9 101:1 133:8 134:2 137:24 138:7 142:25
recommendations 78:10 85:12 100:24
recommended 137:14
recommending 137:15
record 6:7 14:20 35:18 37:9,22 38:2,4 42:25 62:7 64:25 92:3 136:15 159:14
records 10:6,12 12:10, 18
recount 140:24
reduced 103:11,17
referee 23:11
reference 117:24
referenced 44:10 98:8 106:23 151:20
references 151:7
referencing 83:9 107:6 135:23
referring 22:12 36:8 99:6 122:19,20 124:25 145:14
reflect 164:14
refresh 164:5
related 44:24 73:22 157:25
relation 140:15
relations 142:7
relationship 141:20
relied 53:20,24
Relief 8:22
rely 53:22
remember 18:21 23:20 25:17,19 28:13,16 29:11 43:4,5,12,23 45:18 46:11 48:16 49:12,13 50:9 55:18 56:10 57:4,6 63:3 68:8 72:10 73:1,2 74:15 78:14,16,17 87:22,23, 25 91:21 92:13 94:8,9, 10 95:22 96:6,22 97:2, 15 100:11 101:3,10,12, 19,20 102:12,14,17,18 110:5 111:5 120:5,24 121:1 126:24 128:7,17,

23 129:2 130:1 132:23 143:9,17,18,22,23 144:1,19 148:25 162:18
rendition 164:7
repeat 7:3,5,12 17:3 23:5 37:6 51:24 81:20 99:25 102:3 139:1
rephrase 23:5 76:21 85:23 105:21 120:11 137:6 154:5 165:12
replied 116:17
reply 116:15
replying 131:22
report 114:18 162:25 164:20
reported 116:9
reporter 9:12,16 14:2,7, 14 38:5,9 68:25 109:7, 11 119:16,22 129:9 147:14 148:1 165:24
reporter's 7:19
represent 150:24
represented 26:19 34:13 95:7 137:1,13 142:13
represents 7:24
request 58:17,24 59:9, 19 60:16 63:13 72:3 86:8 133:21 134:1
requesting 93:9
require 44:12 149:13
required 8:15 22:1 80:4 82:4 85:4 97:12,13 98:13 110:24 113:4
requires 17:17
rescheduling 70:6
resolute 151:14
resolved 34:2
respect 162:16
response 49:18 68:15 93:8 120:21 122:24
responsibilities 13:11
responsible 121:17
restate 17:6 38:14
Restated 8:21
restrict 75:12
resulted 86:1
return 72:23
returns 56:13 57:9 63:25
review 24:21 63:9 72:22
reviewed 44:23 68:14
reviewing 72:22
Revised 16:17
ridiculous 155:17,24
ring 42:18
road 59:15

role 10:22 16:24 17:13 69:14
Ronald 26:2
rule 52:15 62:2
rules 6:18 157:17
runner 107:4 109:23
running 123:3 128:16

S

safe 48:11
sale 8:22 14:22 16:10 17:16 18:18 19:9 23:7 24:20 25:12,14,18,21 50:15 51:16 52:22 53:17,20 56:12 57:8,10 58:24 60:20 64:3,19 70:2,6,9 71:22 72:5 78:23 80:6 82:7 98:23 99:1 103:15,21 105:10 107:21 108:4,8 109:2 111:24 121:18 122:7, 16,18 123:3 124:5 125:19,24 126:13,23 127:1 128:16 129:3 130:22 142:21 150:9 161:21,23,25 162:7,17
sales 13:17,23 16:3,22, 23 17:7 57:13 58:25 60:4 64:5,11,13 67:21 71:7 80:24 82:11 127:15 162:2
sat 125:10
scam 150:11,20
schedule 58:4
scheduled 70:2
scheduling 60:4 70:9
scientifically 145:1
scope 66:12,17,18
scour 24:23
scrambling 114:10
scratch 119:20
scratched 50:7,10
section 149:11
seeking 160:13,17
seize 29:23 43:19
seized 17:8 18:17 39:14 47:14,17,18 69:24
seizing 34:14 36:2 39:15 43:21
seizure 46:15 65:2 69:9, 12,15,17,22 70:4,17,23
seizures 35:25 38:19
select 17:24 20:2 71:19
selected 20:1,5 22:24 23:7
selecting 18:1 23:8

EXHIBIT C

**selection** 21:2 159:22
**self-** 56:13
**send** 40:17 45:6 56:22, 25 63:12 64:2 72:24 73:3 74:15 97:24 110:3 123:2 128:10 130:8 140:20,21
**sending** 63:3 65:1 78:14,16 92:13 106:20 110:5 117:8 128:19 130:16
**sense** 42:11 144:6
**sensitive** 57:25 58:2,11 59:5 64:4,10,12,13,20
**sentence** 51:14 99:13 112:4 116:19
**sentences** 14:19
**separate** 140:2 147:18 160:24
**separately** 145:18
**September** 54:7,11 55:4 63:5 68:1,16 70:16,17 73:18 74:20,22 75:6,10, 15,23 76:9,13 78:3 79:11 85:16 86:7,10,20 87:1 92:9 93:1,8 95:12, 20,23 106:7
**series** 31:4
**serve** 7:15,19
**served** 27:2 58:3 70:23
**service** 13:18 56:24 57:3
**services** 162:16
**serving** 57:5
**set** 31:8,11 64:3 70:11 121:20,23 142:4 161:25
**setting** 98:23 142:18
**shakes** 26:10 27:13 68:2
**sharper** 144:9,13
**sheet** 93:18 94:6,11,15, 21 97:14 122:2 143:5 163:19
**Shelter** 109:21
**Shelton** 29:18 38:10,11 42:13,16 43:6,10 44:15, 23 45:2,15,19,25 46:9 48:17,18 49:3,4,25 63:9,21 72:20 73:15,22 75:5 78:1,6 85:10,20,24 86:2,17 87:7,17,22 88:1 92:22 93:1,15 95:7,12, 16,19 96:3 99:5,14,17, 22 100:4,14 101:24 103:5 106:6,9,18,22,25 114:16 115:7,25 116:20 117:5 118:17 123:4,12, 15,19,22,23 124:1,2,6, 11,15,18,23 125:5,9,20 129:18 130:13,20

131:1,9,14,15 132:4,14, 17,21 133:4,7,10 134:1, 2,23 137:1 138:16 139:3,10 140:9,24 141:8,11,13,16 142:13, 24 146:1,8,14 147:1,3, 8,12,19,21 149:15,19 150:15 151:1,7 153:20 162:10,13 164:2
**Shelton's** 74:3
**sheriff** 8:22 16:3,22,23 17:7 18:18 26:14 80:3, 24 82:3,11 85:4 96:11, 19,21 103:12 104:16,25 105:6 106:22 107:12, 15,20,21 108:10,13,16, 18 118:21 128:13,20 143:6 148:7 149:12 160:17,25 161:6 163:8 165:3,10,13
**sheriff's** 10:3,8 11:22 13:17,23 14:22 20:15 23:8 33:20 44:3 46:24 49:17 55:10 56:7,22 70:2,5,9 74:16 80:5,24 82:7 103:11,15,17,20 104:5,10 105:10 108:4, 8 109:22 125:24 140:18 143:4 150:18 151:10 156:17 160:19,25 161:21,23,25 162:2,7, 17 164:21,25
**shifted** 13:7
**short** 42:21 161:13
**shortly** 85:5 118:22
**shout** 126:2
**shouting** 126:8
**show** 144:7 145:14 146:19
**showed** 54:9
**showing** 54:15 118:3
**side** 17:7,9 19:14 36:18 139:14
**sides** 39:21,23
**sign** 69:12 72:23 110:1, 10 112:5 116:11,15 117:6 140:17,19,22 143:4 163:1,24 164:20 165:23
**signature** 69:10 73:24 74:3,10 79:24 109:22 163:5,10,13
**signed** 27:9 44:3 106:22 143:18,20,22 144:14 146:14 163:17,18
**signing** 143:17,24
**simpler** 86:15
**sir** 6:12,14 8:6,9,12,17, 24 9:1,22,25 10:4,25

11:23 13:4,6 15:17 16:20 20:14,16 21:3,6, 11,18 23:13,15,23 24:3 25:13,16,22 26:3,5,8, 13,15,18,21,24 27:7,16 28:9 29:3 30:1 31:5,7, 10 33:6,18 39:16 40:13 42:4,15,17,19 43:22,25 45:17 46:13,19 47:6,16, 25 48:9,12 50:6,11 51:1 52:21 53:13,18,22 54:13,16 55:20 57:11, 18 60:10,13,15,18 63:4, 8,23 64:9 65:23 68:10 69:13 72:15 74:19 77:14 79:16,25 80:13, 17 82:1,24 92:15,19 93:13 95:3,5,21,25 96:7 100:12 106:21 107:3, 14,19 108:23 117:9 120:2 121:8,11 129:14 130:18 137:2 139:4,6, 13 146:11 150:5,19 151:23 152:25 160:18 161:22 162:23 163:7,9, 12 165:7,14,17,20
**sitting** 97:5 98:12 100:13 119:7 153:10
**situation** 22:8,12 23:1 87:24
**Skip** 96:15
**slantive** 152:6
**smoother** 14:12
**smoothly** 6:16
**sold** 111:21,22 127:12 128:4
**solely** 53:20
**sort** 13:2 48:11 56:3 60:3 94:1
**sounded** 106:13
**Sounds** 12:12
**speak** 40:5 118:7 143:12
**speaking** 40:14,25 107:11 118:13 144:19 150:15
**speaks** 56:19
**special** 150:9
**specific** 22:8,20 27:25 55:22 56:2 75:21,24,25 82:18 127:5 132:24
**specifically** 29:4 53:13 54:6
**specifics** 9:5 23:20
**speculate** 30:5 60:24 90:3,11 119:4,11 128:9
**speed** 59:15,22,23
**spoke** 36:7 85:21,24 116:20 117:1,5,10,21

118:1,3 120:24 143:1, 10,23
**spoken** 26:22 27:15,17, 21 108:16 115:4
**square** 164:11
**stamped** 56:14
**stand** 125:25
**standard** 45:6 46:22
**standby** 123:16 147:13 149:16
**start** 45:4
**started** 13:9 142:19
**starting** 66:17
**starts** 129:15,16
**state** 6:7 35:13,17 37:8 50:22 62:7 117:21 134:25 165:16
**stated** 18:14 43:10 136:22
**statement** 53:21 80:7
**statements** 128:19
**states** 69:16
**statute** 16:17,18 105:2 149:8
**stay** 89:10
**steps** 111:5
**stop** 161:21 162:6
**stopped** 161:23 162:2
**stored** 30:24
**story** 14:21
**subject** 41:24 85:3 127:9 159:2,25
**subpoena** 29:21
**subscribed** 163:14
**sued** 8:16 9:24 160:6,12, 24 161:4,15
**suggestion** 158:17
**suggestive** 155:16 157:3
**suggests** 48:10
**suing** 7:25
**suit** 25:24 26:19,23 27:12,14 44:10 45:3 63:11 65:20,22 66:1,10, 19 67:4,7,18,19,25 71:14 76:4 78:7 82:16 106:23 129:20 130:15 131:24 136:2,16
**suite** 68:13
**suits** 28:24
**Summons** 9:11
**supervisor** 15:2,3,6 40:5 75:18 80:22 81:5
**suppose** 20:9 27:2 48:3
**supposed** 145:2
**surprised** 153:10,17,25

**susceptible** 37:2 38:25
**Sutherland** 15:12 40:6, 12,15,22,25 42:4 48:6 53:10 54:3 75:18,23 78:20,21 79:1,11,15 80:20,25 81:3,7,11,12, 18,25 82:2,8,10,12,14, 18,22 83:9,17,20 84:6, 25 85:6,9,22 86:1,5,18 87:7,20,24 88:9,21 91:9,11 102:7,14 107:11 126:10,11,12, 14,20 127:20,21
**swear** 80:7
**swore** 80:14
**sworn** 6:2 163:14

T

**taking** 24:12 102:14
**talk** 7:10 155:13
**talked** 48:19 50:15 82:12,13 107:9
**talking** 19:6 36:21 88:14 94:5 111:15 114:18 139:11 144:3 146:2 158:23
**tasks** 128:3
**Taylor** 11:12,13 12:19 13:12 14:25 21:5,20,21 28:22 31:8,15 45:3 72:13 75:22 107:10 154:10
**telephone** 99:21 100:3, 11 106:8
**telling** 51:2 59:16 61:10 86:18 87:20 139:23 143:7,9 151:8 155:14 157:10
**tells** 59:23 69:23 147:4
**ten** 16:12 19:5,21 21:13 22:1 24:5,9 76:7 77:4 85:5 113:5,9
**tentatively** 70:2
**term** 23:11 95:2
**terms** 104:17
**testify** 6:3
**testimony** 84:2,9 85:13 139:18,24
**Theoretically** 113:24
**thing** 6:24 152:13 153:18 161:19
**things** 23:23,24 41:24 42:1 51:11 53:2 58:3,8, 10 59:5 64:12 103:8 128:9,18 135:19 139:15 141:2 144:4,19 149:9, 14 156:11

EXHIBIT C

thinking 97:5
thinks 37:13,17
Thirteen 104:21
thought 11:1 18:14 23:7
  32:8 76:6 102:24
Thousand 127:13
til 7:1
time 10:11 11:2 15:19
  16:7 30:17 35:21,22
  43:6 46:14,18 55:19
  56:11 57:12,25 58:2,11
  59:5 64:9,12,13,20 74:2
  80:5 86:25 97:5 108:10,
  24 116:6 117:23 118:1
  131:14 136:25 140:7
  141:7,11 143:10 144:2,
  7,20 153:16 164:24
time- 64:3
time-sensitive 64:6,8
timeline 83:19
timely 64:14,16,19
times 14:12 23:18 51:17
  52:1 53:23 87:11
timing 85:18
title 10:5,12,18 110:19
today 6:10 75:8 93:20
  97:5 98:12 100:13
  103:10 106:14 116:15
  117:19 118:3 119:7
  121:9 135:7 143:7
  151:9 153:4,10,17
told 14:9 21:5,12,17
  33:1 59:25 85:19 96:18
  99:17 121:12 134:18,22
  138:17 148:11 152:4,
  20,22,24 153:17
tomorrow 110:1,10
  112:5 130:8
top 118:19 130:11
totally 16:16 145:17
town 98:20 164:22
trail 123:24
trained 11:12 45:3 72:14
training 11:10,11,18
  12:20 21:23 22:8,20
transcript 7:20
transmits 124:4,7
trap 64:23
treated 64:9
trial 151:14
trust 28:6 141:11,20,21
truth 80:16
truthfulness 80:7
Tuesday 116:10
turn 63:15 110:23
twenty 41:15 102:2
Twenty-three 109:8,12,

13

type 13:17 104:18
types 78:11 100:25
typically 16:23 74:15
  122:11,15 123:2
  126:19,25

U

uh-huh 10:21 11:17
  14:13 16:9 20:23 44:19
  59:21 81:1 86:4 95:5
  109:1 111:3 112:8
  126:7 131:10 133:9
uh-uh 14:14 68:6 101:11
ultimately 159:4
unable 85:7
underlying 65:11
underneath 163:13
understand 8:7 9:23
  19:13 22:23 25:9,12
  37:5 39:7,13 42:6 52:13
  59:13 64:3 65:4 67:17
  74:2 84:9 93:7 94:22
  95:6 115:20 124:1
  125:14,15 136:25
  137:3,7,10,13,15,22
  160:16,23 161:14
understanding 8:13
  17:6 19:24 25:7 39:3
  58:10 69:15 78:6 82:16
understands 96:20
understood 39:5
unusual 51:21 52:3,7,9,
  14,15 59:1
unwavering 151:15
unwritten 158:9,11

V

vague 37:2,12,17,18
  38:25 125:12
vaguely 12:12
Valuation 96:12
Valuators 96:14
values 24:13
variants 19:5
vary 78:8
vendor's 150:9
verbatim 148:20
verbiage 63:10,17 65:5
verified 86:9
verify 85:18 86:25 87:1,
  3,13
versus 122:11
Vickie 26:9
violates 157:9

voice 121:10

W

W.A. 93:4
wait 7:1 139:11 152:12
wars 126:6
wavy 50:8
ways 61:20
Wednesday 70:3,12,19
  71:9,12 98:20
weekend 117:8
whichever 71:9
white 136:14
Whittington 26:14
  107:12,15 108:19
Whoa 149:16
whoever's 123:3 124:4
wholly 125:12
whomever 20:8 45:8
  63:18 122:16
whomever's 17:25
  71:14
William 26:6
winner 127:24
wire 78:13 92:18
witness' 139:18
word 18:3,5 27:25 29:15
  83:4 125:1
worded 95:1
wording 59:4 60:12
  70:22
words 59:7 105:24
  149:13
work 15:23 94:11 108:24
  145:2 164:21
worked 11:14 12:1
  164:24
working 11:21 13:9
  126:17 137:4,11
works 137:7
worried 152:13,14
Writ 28:4,7,8 29:19,20
  31:14,16 44:10 45:9,12,
  14 46:10 50:23,24
  63:17,19,22 65:12 73:8
  88:5,6,9,10,12,14,15,
  18,21,24 89:4,6,7,9,16,
  17,18 91:10,11 137:2
write 44:6 121:24 122:1
  127:21
written 21:9,24 30:25
  44:14 118:2 127:19,25
  128:2
wrong 74:25 112:9
  138:21
wrote 109:21

Y

y'all 15:20 81:17 82:13
y'all's 22:24
year 12:8 27:6 76:9
years 10:10,13,14,23
  11:1,4 42:12 144:10
yes-or-no 66:14

Z

zip 42:4