UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| MAGNOLIA ISLAND PLANTATION L.L.C. and BARBARA MARIE CAREY LOLLAR<br>　　　　Plaintiffs<br><br>VS<br><br>LUCKY FAMILY, L.L.C., W.A. LUCKY, III, and BOSSIER PARISH SHERIFF JULIAN C. WHITTINGTON<br>　　　　Defendants | §§§§§§§§§§§§ | CIVIL ACTION NO: 5:18-cv-01526<br><br><br>CHIEF JUDGE S. MAURICE HICKS, JR.<br><br><br><br>MAGISTRATE JUDGE KAREN HAYES<br>Jury Trial Demanded |

**REPLY MEMORANDUM IN SUPPORT OF BARBARA LOLLAR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now into Court, through undersigned counsel, comes plaintiff Barbara Marie Carey Lollar ("Mrs. Lollar"), who replies to the two oppositions filed to her *Amended and Corrected Motion for Partial Summary Judgment* (**Rec. Doc. 198**): a joint opposition filed by W.A. Lucky, III, Julian Whittington, and Kimberly Flournoy (the "BSO/Lucky Opposition"; **Rec. Doc. 221**, et seq) and an opposition filed by Lucky Family, LLC (**Rec. Doc. 220**).

**A. There are no questions of material fact**

Four years into this litigation, the appointment issue has finally been whittled down to its essence: it is a legal question about the effects of certain undisputed actions and events. In the BSO/Lucky Opposition statements of material fact, Ms. Lollar's core fact contentions are left unchallenged; the defendants do not dispute what happened, but merely characterize those actions differently. For instance, Ms. Lollar alleged that the "Sheriff's office had no direct contact with Mr. Lacour until after he had completed his appraisal of the Note." The defendants' ostensible

1

disagreement on this point is premised on the fact that Mr. Lacour did not *sign* an appraisement sheet until October 22nd, 2018, after exchanging one email and one phone call with Ms. Flournoy.[1] But Mr. Lacour himself confirmed that his appraisal *qua* substantive valuation was completed before he first spoke to Ms. Flournoy on October 19, 2018.[2] No on disagrees on that point of fact – the defendants simply ask the Court to assign it no legal significance vis-à-vis the Sheriff's role, or lack thereof, in Mr. Lacour's "appointment."

So it is with Ms. Lollar's claim that the "sheriff's office took no active steps to appoint Mr. Lacour as a third appraiser." The defendants' "rebuttal" of this allegation consists of claims which match up precisely with Ms. Lollar's statement of fact and the undisputed timeline of events in this case.[3]

- Before September 17, 2018: "The Sheriff's deputies…sought the advice of the Sheriff's attorney concerning the appointment of a third appraiser."
    - These conversations preceded the necessity of a third appraisal, and thus preceded the BSO's ability to appoint anyone at all. Further, these speculative conversations had nothing to do with Mr. Lacour.[4]
- September 17, 2018: "…Kimberly Flournoy asked Mr. Lucky's attorney if he had any recommendations as to whom appraises these kinds of notes."
    - As above, these covert communications with Mr. Shelton preceded the necessity of a third appraisal. And, again, they did not involve any steps towards appointing Mr. Lacour.[5]

---

[1] **Rec. Doc. 221-**1, p.14.
[2] **Rec. Doc. 198-13**, excerpts from Patrick Lacour deposition, at p. 8-9, and Exhibit 2 thereto.
[3] **Rec. Doc. 221-1**, p.6-8.
[4] **Rec. Doc. 198-5**, p. 87, l. 16-21.
[5] **Rec. Doc. 198-4**, at BSO 025 (discussion at **Rec. Doc. 198-2**, p.17)

- October 12th and 16th, 2018: "The Sheriff had also signed an Ex Parte Motion to Fix Appraisers' Fees…The Sheriff thereby actively undertook steps toward the appointment of a third appraiser by assuring that he would be able to sufficiently compensate a third appraiser."
    - This motion is discussed in greater detail later in this brief. However, like everything above, its signing preceded the necessity of a third appraiser – the need for that appraiser was not triggered until October 18, 2018, when Ms. Lollar's designated appraiser submitted his appraisal. Even more importantly, there is nothing "active" about the Sheriff's role in the motion, given that it was drafted by Mr. Shelton and for the benefit of Mr. Shelton's client.
- October 19, 2018: "…Flournoy communicated with Mr. Lacour about his coming to the Sheriff's office to sign the appraisal form."
    - The initial communication between Flournoy and Mr. Lacour occurred after (1) Mr. Lacour completed his valuation, and (2) Ms. Flournoy believed that Mr. Lacour had already been appointed.[6]
- October 22, 2018: "When Mr. Lacour came to the Sheriff's office…Flournoy had Mr. Lacour sign the appraisal form…The Appraisement Sheet signed by Mr. Lacour identifies him as "Third (sheriff) appraiser."
    - This sheet was signed after all substantive work on the valuation was performed and after all parties involved believed Mr. Lacour had already been designated as the appraiser by someone other than the Sheriff.

---

[6] **Rec. Doc. 198-5**, p. 110, l. 9-21, p. 113, l. 21 – p. 114, l.7.

3

None of this shows the Sheriff or anyone in his office taking an active role in Mr. Lacour's "appointment."

In an attempt to conjure up more support for their unsupportable position, the BSO/Lucky defendants also resurrect a discredited argument in their joint memorandum: "The Sheriff's personnel knew that they were free to reject any appraiser recommendation made by Mr. Shelton."[7] This contention is drawn from the deposition of David Lee Miller, an employee who admittedly had nothing to do with the appointment of Mr. Lacour or the seizure and sale of the Note.[8] Ms. Flournoy is the Sheriff's employee who was actually in charge of the Note's sale, and the only one who interacted with Mr. Lacour. At deposition, Ms. Flournoy did not claim that she was "free" to reject any recommendation prior to appointing an appraiser – **because she did not believe she accepted a recommendation at all**. She thought someone else had already appointed Mr. Lacour by the time she first spoke to him; the appointment had already occurred, and her role was minimal and merely administrative:

> **Q**: What did you handle with relation to the third appraiser?
> **A**: The third appraiser just has to sign our sheriff's office form so that would be something that he would have to sign.
> **Q**: That form though you said you didn't send to him because you didn't send him anything?
> **A**: They would have to come in and sign it in person.[9]

The Miller deposition testimony about being "free to reject" a recommendation is irrelevant to the facts of this case.

Both sides agree on what happened. There is not any dispute of *fact* on which a reasonable jury could disagree.[10] The only disagreement concerns the legal effect of the occurrences. Thus,

---

[7] **Rec. Doc. 221-28**, p.9-10.
[8] **Rec. Doc. 198-8**, p.38, 41.
[9] **Rec. Doc. 198-5,** p.140, l.15-23.
[10] Contrary to the fact/law confusion in the Lucky Family LLC opposition, **Rec. Doc. 220**, p. 8.

4

this Court's task at this stage is to determine if the undisputed events legally amount to an appointment by the Sheriff pursuant to La. R.S. 13:4365(B).

This is a question of some importance. If what transpired was legally sufficient, then attorneys who represent debtors or creditors need to know, so that they can adjust their post-seizure strategies accordingly: the job henceforth must be to follow Mr. Lucky's example, to draft one's own Shelton Letter in every action, to blur the lines between private interest and government function, to get involved in the Sheriff's putatively private deliberations, to work behind the scenes whenever possible, to minimize transparency, to game outcomes, to make direct contact with Sheriff's employees and provide them self-serving legal "advice" for the benefit of your client, to instruct the Sheriff's proposed or actual third appraiser on how to appraise, and to otherwise interpose on the Sheriff's "independent" statutory role. Such a ruling will also clarify things for sheriffs' departments. If this was an example of a sheriff "appoint[ing] a third appraiser" in accord with La. R.S. 13:4365, then those departments should reallocate resources and training time away from the appointment process altogether, because the only requirement is that an employee be in the office when an appraiser *someone else has selected* arrives to sign an appraisement sheet. Sheriffs will be free of any obligation to identify, vet, inform, or communicate with a third appraiser.

**B. The sheriff's interference with full and timely discovery**

The Sheriff's justification for his low discovery tactics is ludicrous. In her motion, Ms. Lollar noted that:[11]

1) In November of 2019, the Sheriff's counsel emailed Ms. Lollar's attorneys that Ms. Flournoy did not "know anything or remember anything" at that time, and told them to depose Jean Horne instead.

---

[11] See generally**, Rec. Doc 198-2**, p.21-22.


2) In her November 2019 deposition, Ms. Horne revealed that Ms. Flournoy did have direct relevant information about the case.[12]

3) In February of 2020, and in support of a motion for summary judgment, the Sheriff's counsel had Ms. Flournoy execute a lengthy affidavit which attested to personal knowledge and extensive recollections as to numerous events central to this case.

4) In October of 2022, after re-opening discovery deadlines, Plaintiffs were able to depose Ms. Flournoy.

In response, the Sheriff and Mr. Lucky say: so what? "This statement by BSO counsel did not prevent Plaintiff's [sic] from issuing a notice of deposition to Ms. Flournoy and taking her deposition."[13] **The deposition was taken three years later**. It was only possible because the Court re-opened the discovery deadlines in this matter, which had been closed under the previous scheduling order. According to the BSO/Lucky Opposition, the Sheriff's November 2019 email to Ms. Lollar's counsel was fine, because the BSO Defendants simply "passed along what Ms. Flournoy remembered and which [sic] was nothing, as stated in her deposition"[14] This would be laughable if it were not so egregious: Ms. Flournoy clearly had *forgotten* things in the years between executing her affidavit and her 2022 deposition.

For instance, she did not even remember who Mr. Shelton was by the time she gave her deposition, despite exchanging numerous emails with him in 2018 and remembering in her 2020 affidavit that she had communications with Mr. Shelton regarding the appointment process.[15] More information about the substance of those messages would have been useful to the Court in looking at many of the issues in this case. Ms. Flournoy asked the Caddo Parish Sheriff's office clerk to mail service returns back to her "as soon as possible," and to do so "[i]n order to expedite the date

---

[12] **Rec. Doc. 198-15**, deposition of Jean Horne, p. 49, l.3-8.
[13] **Rec. Doc. 221-28**, p. 14.
[14] *Id*., p.14-15
[15] **Rec. Doc. 198-**5, p. 16-20.

of sale (per the attorney)."[16] By the time she gave her deposition, she could no longer recall why she would want a sale expedited "per the attorney."[17] Similarly, she could not remember discussions about the possibility of a third appraiser that she had with Mr. Shelton. Those conversations were referenced in an email from Mr. Shelton to Ms. Flournoy which stated: "As we have discussed, it will likely not be possible to find someone to do the appraisal of the promissory note for the amount the Sheriff usually pays." While Ms. Flournoy's admission that she did not appoint Mr. Lacour is sufficient for the purposes of this motion, uncovering how and why these discussions were initiated would shed light on other aspects of this litigation. This Court should read the Kim Flournoy affidavit and compare it to the Sheriff's contention that Ms. Flournoy did "not know anything or remember anything" two months earlier. This is dirty pool.

### C. "I am working for the Sheriff" – the curious role of Mr. Shelton

Curtis Shelton told Mr. Lacour on October 18th, 2018, that "I am working for them [the Sheriff's office] to understand that your appraisal for the Sheriff would be timely on Monday or Tuesday."[18] In their joint opposition, the BSO/Lucky defendants state that this email "communicates that Shelton was engaged in an effort to make sure that the Sheriff and his deputies understood that under the law the third appraisal would be timely if it was received on the Monday or Tuesday before the sale."[19] Given that the opposition is signed by Mr. Shelton himself, it is not clear whether this is meant as a first-hand explanation of intent or as a detached interpretation of a text. If the former, the appropriate manner of providing this personal testimony would be in a sworn affidavit. If the latter, it is by no means the only cogent reading of the email. But, in any

---

[16] **Rec. Doc. 198-4**, at BSO 004.
[17] **Rec. Doc. 198-5**, at p. 57, l. 7-11.
[18] **Rec. Doc. 198-12**, at W.A. Lucky III 485.
[19] **Rec. Doc. 221-28**, p.18-19.

7

event, the attempt at elucidating the communication only highlights the problem of Mr. Shelton's split role in the appointment process. If Mr. Shelton was indeed telling Mr. Lacour he wanted to "make sure that the [Sheriff's deputies]" understood the applicable statutory deadlines for a third appraisal, then he was claiming to give legal advice to the Sheriff's employees regarding *their* deadlines for *their* appointed appraiser, and he was making these representations to the person whom the sheriff would later claim to have appointed. **On whose behalf** did he provide this legal counsel? This problem pervades the entire seizure and sale process. For whose benefit was the Shelton Letter, containing the only information about the Note ever received by Mr. Lacour, sent? Mr. Shelton repeatedly acted as an apparent intermediary between the Sheriff's office and Mr. Lacour, both spontaneously and at the request of Ms. Flournoy – should we regard any of Mr. Shelton's communications as part of the Sheriff's appointment efforts for the purposes of La. R.S. 13:4365, or are they all the independent and self-interested actions of one of the parties in the case? It is impossible to ignore the causal role Mr. Shelton had on the pseudo-appointment of Mr. Lacour.

**D. The ex parte motion to fix appraiser's fees**

The BSO/Lucky Opposition makes much of the joint *Ex Parte Motion to Fix Appraisers' Fees* ultimately granted by the Bossier Parish district court, arguing that this motion demonstrates an active role for the Sheriff in the appointment of a third appraiser. But the motion shows just the opposite. Mr. Shelton submitted the proposed joint motion six days before a third appraiser was required.[20] It was drafted entirely by Mr. Shelton, and the BSO/Lucky Opposition admits that Mr. Shelton drafted and submitted it because he was "acting for his client Mr. Lucky," despite the motion making claims about the Sheriff's intent.[21] The Sheriff signed the motion only at Mr.

---

[20] **Rec. Doc. 198-4**, at BSO 62-64 (October 12, 2018)
[21] **Rec. Doc. 221-1**, p.15; compare Rec. Doc. 198-14, at Paragraph 8 ("The Sheriff intends…").

Shelton's request and did so before a third appraiser was required.[22] This motion was not drafted on behalf of the Sheriff's interests.[23]

In a telling omission, the BSO/Lucky Opposition states that the motion reads "The Sheriff will appoint a third appraiser," but exclude the remainder of Paragraph 6 of the motion, which begins with "if" and lists out the contingent circumstance under which an appointment would be legally required.[24] This appears to be an effort to convince the Court that the Sheriff's signing of the motion occurred after an appointment was necessary. It was not. The Sheriff signed the motion on October 16, 2018, two days before Ms. Lollar's designated appraiser submitted his appraisal.[25] At the time the Sheriff signed the motion, no third appraiser was required, the relief sought in the motion was hypothetical, and Ms. Flournoy had not spoken to the Sheriff about the matter.[26]

**E. Annulment is a proper remedy**

In arguing that annulment is improper in this case, defendants conflate the standards applicable to sales made under executory process and those made after seizure under a writ of fifa for an ordinary process action. This is obvious even from the quotes on which the defendants rely, such as "…a sale with proper notice and with benefit of appraisals that is valid on **the face of the executory process** and sheriff's record is legally presumed to have been conducted as the law directs…"*First Bank & Tr. v. Tedesco*, 2012-0774 (La. App. 4 Cir. 12/5/12), 106 So. 3d 653, 662, *writ denied,* 2013-0021 (La. 2/22/13), 108 So. 3d 774.[27] The defendants' references to questions of the sale's "validity" are misplaced, as that inquiry is germane to cases under executory process.

---

[22] **Rec. Doc. 198-4**, p. 82 ("the Sheriff has signed your paperwork" on October 16, 2018)
[23] **Rec. Doc. 221-1**, p.14-15.
[24] **Rec. Doc. 198-14**, p.2.
[25] **Rec. Doc. 198-4**, p. 82
[26] **Rec. Doc. 198-5**, p.107, l. 9-19.
[27] **Rec. Doc. 220**, p.9; see, generally, **Rec. Doc. 225** and arguments contained therein on this issue.

*Id*. The sheriff's sale in this matter was made pursuant to a writ of fifa, based on a judicial mortgage from the short-lived judgment in Lucky I. For these sorts of sales, if there is an improper, fraudulent, or complete lack of appraisal, annulment is the appropriate remedy. *Tucker v. New Orleans Laundries, Inc.*, 145 So. 2d 365, 372 (La. App. 4 Cir. 1962); *Thibodaux v. Barrow*, 129 La. 395, 399, 56 So. 339, 340 (La. 1911); *Phoenix Bldg. & Homestead Ass'n v. Meraux*, 189 La. 819, 824, 180 So. 648, 649 (La. 1938); *Zacharie v. Winter*, 17 La. 76, 82 (1841); *Oak Cliff Bank & Trust v. Kittle*, 309 So. 2d 742, 743, La. App. 4th Cir. 1975.

**F. The "duck test"**

Lucky Family, LLC says that the appointment question in this case can be resolved by application of the "duck test."[28] True. That test confirms that the sales process in this case was fowl in a very different way than urged by the defendants. Undersigned has scoured the jurisprudence and cannot find any other cases wherein an interested party's attorney located a "third appraiser" for the sheriff, served as the sole source of information for the property to be appraised, instructed that appraiser on how to perform the appraisal, slandered the debtor's character, offered the appraiser conspiracy theories about the debtor's property, gave self-serving legal "advice" to the sheriff's employees on how to conduct the sale, or otherwise interjected himself into the sheriff's functions as Mr. Lucky's counsel did in this case. The employees on the ground all agreed that this sale was not normal.[29] Ms. Lollar implores the Court to apply the duck test, and determine for itself whether Mr. Lacour's mock-appointment resembles in any way an "appointment" by the Sheriff

---

[28] **Rec. Doc. 220,** p.9.
[29] **Rec. Doc. 198-5**, p.129, l. 15-25 ("This just wasn't a normal…I don't know). **Rec. Doc. 198-15**, deposition of Jean Horne, p. 26, l. 5-10 (**Q**: Is it normal procedure for the judgment creditor's counsel to provide that information to the third appraiser? **A**: That is not normal---in our procedure")

Respectfully submitted by,

_____/s/ Andrew D. Martin_____
Randall S. Davidson, LSBA No. 4715, TA
J. Davis Powell, LSBA 33631
Andrew D. Martin, LSBA 34947
DAVIDSON SUMMERS, APLC
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342 | (318) 226-0168
E:       rsdav@davidsonsummers.com
         dpowell@davidsonsummers.com
         dmartin@davidsonsummers.com
***Counsel for Barbara Marie Carey Lollar.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF filing system, and notice of the same will be sent to all counsel of record by operation of the court's electronic noticing system.

Shreveport, Louisiana, on this 19th day of December, 2022.

                    *s/ Andrew D. Martin*
                         OF COUNSEL